UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| SCOTT KINGSTON,<br><br>               Plaintiff,<br><br>    v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION, a New York Corporation,<br><br>               Defendant. | NO.<br><br>**COMPLAINT** |

Plaintiff Scott Kingston, hereby assert as his complaint against Defendant International Business Machines Corporation ("IBM") as follows:

**I. NATURE OF THE CASE**

1. This case seeks to hold Defendant IBM accountable for retaliating against one of its managers, Plaintiff Scott Kingston. Plaintiff's only transgressions were that: (1) he followed the law (and IBM policy) by not capping the sales commissions payments to his sales representatives, something IBM policies did not authorize him to do; and (2) he tried to prevent IBM from discriminating against an African-American sales representative by failing to pay the employee a large commission when IBM had previously approved payment to a white sales representative under the same circumstances.

2. Plaintiff Kingston is not alone in experiencing retaliation under these circumstances. IBM retaliated against two other managers, Andre Temidis and Michael Lee,

COMPLAINT - 1

when they tried to prevent IBM from discriminating against an Arab-American sales representative by failing to pay the employee a large commission when IBM had previously approved payment to a white sales representative under the same circumstances.

3. When Plaintiff Kingston, Mr. Temidis, and Mr. Lee opposed the efforts of IBM's senior management to pay minorities less in commissions than were paid to white colleagues, IBM quickly launched an "investigation" into unrelated matters *for all three managers*. IBM then turned around and fired each of them. The reason IBM gave was that, seven months earlier, Plaintiff Kingston and the other two managers had committed fireable offenses when they followed IBM policy (and the law) and didn't cap or limit commission payments to other white sales representatives—payments that were reviewed and approved by IBM itself.[1] Adding insult to injury, IBM demanded that at least one of the managers pay back his own earned commissions and then refused to pay both Plaintiff Kingston and Mr. Temidis the full amount of their Q1 2018 earned compensation (i.e., their commissions).

## II. JURISDICTION & VENUE

4. This Court has jurisdiction over this matter and all claims under 28 U.S.C. § 1332(a)(1) because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

5. The Court has jurisdiction over Defendant IBM because IBM is a corporation that has minimum contacts with Washington sufficient to render this Court's exercise of jurisdiction over the company permissible under traditional notions of fair play and substantial justice.

6. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because IBM is subject to the Court's jurisdiction in relation to Plaintiff Kingston's claims and therefore resides in Washington. Venue is also proper in this District under 28 U.S.C. § 1391(b)(2)

---

[1] Notably, IBM has never attempted to claw-back those large payments to the white sales representatives.

COMPLAINT - 2

because a substantial part of the events or omissions giving rise to Plaintiff Kingston's claims occurred in this District.

### III.  PARTIES

7. Plaintiff Scott Kingston is a resident of the State of Washington. IBM employed Plaintiff Kingston in Washington as a Business Unit Executive. Plaintiff Kingston worked for IBM for more than 17 years.

8. Defendant IBM is a corporation formed under the laws of the State of New York and maintains its headquarters there.

### IV.  GENERAL ALLEGATIONS

9. In the first half of 2017, IBM sales representatives, led by a sales representative named Nick, closed a large software sales licensing deal, with revenue to IBM valued in the tens of millions of dollars (the "SAS Sale"). Nick was paid the commissions he was owed, in excess of $1,000,000.

10. Just a few months later, IBM sales representatives, led by a sales representative referred to in this complaint as J, closed another large software licensing deal, with revenue to IBM again valued in the tens of millions of dollars (the "HCL Sale"). Like Nick, J earned more than $1,000,000 in commissions from this sale. Unlike Nick however, J was paid approximately $200,000 by IBM. The only difference between Nick and J? Nick is white, whereas J is African American. Plaintiff Kingston managed both.

11. The same thing happened on a deal with two other sales representatives that Mr. Lee managed (referred to in this complaint as William and K). William is white and K is Arab American. Both William and K had deals develop in their respective territories, though neither was primarily responsible for those deals. Even though K had more involvement in his deal than William did in the other deal, K wasn't paid anything while William was paid in full. When Mr. Lee complained to IBM manager Greg Mount and said specifically that this looked like discrimination, Mr. Lee was fired.

COMPLAINT - 3

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

### A.     IBM Sales Representative Compensation

12.     IBM's sales representatives are generally compensated in a similar way: a base salary makes up a portion of their compensation, and commissions make up the rest.

13.     IBM promises its sales representatives that their commissions are uncapped, meaning the bigger the deal a representative closes, the more the representative can make.

14.     IBM even encourages its sales representatives to close large deals in excess of their quota through the use of "accelerators." In other words, IBM provides a multiplier on quota attainment over 100%, such that sales in excess of quota enable sales representatives to earn more in commissions per dollar of sales than they would have been able to earn for each dollar of sales below 100% quota attainment.

15.     IBM communicates the uncapped nature of commissions to its sales representatives in writing through PowerPoint presentations, emails, and orally through its management at sales conferences and in one-on-one meetings.

16.     Sales representatives are advised that their commissions will be paid in accordance with these promises and will only be adjusted to correct errors in a sales representative's quota or territory.

17.     IBM reaffirms this to its managers through the following guidance:

> Conditions that may lead to an adjustment include the need to correct errors or the need to balance with employee's contribution to the success of a large sales transaction (which criteria must be clearly provided to Commissions team).
>
> **Adjustments must not be done only as a ceiling or cap on the total earnings allowable to employees.**

18.     In other words, IBM's official policies provide that the commissions sales representatives earn may be adjusted to correct errors, but those commissions may not be arbitrarily capped for the purpose of limiting an employee's earnings.

COMPLAINT - 4

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

**B.    IBM's Process for Reviewing Commissions on Large Deals**

19.    When large deals are closed, or when a sales representative significantly exceeds his quota, IBM reviews the deal for inaccuracies.

20.    This process entails several levels of review by various IBM managers and executives. It also includes approval by the IBM Center of Excellence, which is the final approval layer at IBM for commission payments.

21.    The process begins with the sales representative's first-line manager reviewing the deal's specifics for accuracy, particularly the sales representative's quota, territory, and recognized revenue. Typically, the sales representative's second-line manager double checks this same information.

22.    As part of the review process, the managers are sent authorization emails that contain the following language:

> *Your role as a manager is to validate the accuracy of the territory and quota for each seller on an IQP.* ***Seller commissions for these plans are uncapped****, and are paid based on achievement results as determined by the respective territory and quotas, so it is critical to ensure this is correct.*

23.    In other words, the only role of first- and second-line managers in the authorization process is to ensure the sales representative's territory and quota are appropriate.

24.    If no errors are found by the managers during the review process, the IBM Center of Excellence reviews the proposed commissions payment. If the Center of Excellence approves, the payment automatically flows to the sales representative.

25.    If the sales representative achieves in excess of 250% of his quota, approval by an IBM executive above the second-line manager is required before the commissions payment goes to the IBM Center of Excellence for final signoff.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

C. **Two Large Deals Were Closed by Sales Representatives in 2017, Leading to Two Sales Representatives Each Being Owed More than $1,000,000 in Commissions**

26. IBM breaks up its sales periods into half-year segments. In the first half of 2017, a significant deal was closed for the sale of IBM products and services that was worth tens of millions of dollars in revenue to IBM (the "SAS Sale").

27. Based on the terms of his commission plan, the primary sales representative responsible for closing the SAS Sale (identified in this complaint as Nick) was entitled to a sales commission in excess of $1,000,000.

28. As a result of this deal, Nick achieved nearly 2,000% of his quota.

29. A sales representative named William also exceeded his quota as a result of the SAS Sale, achieving nearly 600%, and was owed approximately $172,000 in commissions payments.

30. During the commission review process for the SAS Sale, Plaintiff Kingston, Mr. Temidis, and Mr. Lee were each required to review the quotas, territory, and recognized revenue for certain members of the sales force team behind the SAS Sale based on IBM's commission payment policy. Each of the managers ultimately found no errors in the quotas, territories, or recognized revenue for Nick and William. Accordingly, the managers expected both sales representatives to be paid in full based on three key factors: (1) the lack of errors in quotas, territories, or recognized revenue; (2) IBM's "no capping" policy, and (3) the law.

31. The "no capping" policy is a written IBM policy that states IBM will not "cap" or otherwise limit the amount a sales force member earns in commission compensation. "No capping" means that IBM will not limit the commission amount if, for example, the commission amount exceeds a certain dollar amount. The law, of course, also requires that amounts earned under a given compensation policy must be paid in full.

32. Notably, the review Plaintiff Kingston, Mr. Temidis, and Mr. Lee performed for the SAS Sale was only one part of the process required for commissions payments to issue. Indeed, the managers did not have ultimate authority to approve the payments because Nick

COMPLAINT - 6

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

and William had each achieved more than 250% of their respective quotas. As a result, Nick's commissions were reviewed and ultimately approved by other executives higher up in the IBM sales organization. And ultimately, the IBM Center of Excellence had the final approval over the specific sales commission amounts. Nick and William were each paid the full amounts of their respective commissions.

33. The review that Plaintiff Kingston, Mr. Temidis, and Mr. Lee performed for the SAS Sale commissions was only one part of the process required for payment to issue. Due to the high achievement by William, Mr. Lee received an email from an employee with the IBM Center of Excellence who informed him that: "Bob's [Mr. Lee's boss] approval is <u>required</u> for [certain] achievements above 150% and other achievements above 250%."

34. Following this email, Bob told Mr. Lee that only a percentage of the commissions should be paid to William and requested that Mr. Lee discuss this with Plaintiff Kingston.

35. Plaintiff Kingston and Mr. Lee were not aware of any IBM policies that permitted an arbitrary adjustment to William's commissions, so Mr. Lee emailed the IBM Center of Excellence regarding the matter.

36. Mr. Lee received a response to his request, which informed him that IBM's policies did not permit an arbitrary adjustment of a sales representative's commissions. Mr. Lee was told that if a sales representative's territory and quota are correct, the representative's commissions cannot be adjusted.

37. Accordingly, Mr. Lee, after consultation with Mr. Temidis, confirmed that William's quota and territory were correct, and the payment ultimately flowed in full to William.

38. Later in 2017, the HCL Sale closed. Like the SAS Sale, the HCL Sale was another large software licensing deal worth tens of millions of dollars in revenue to IBM. Again, Plaintiff Kingston was involved in the process of determining the relevant sales commissions.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Following the same protocol and adhering to IBM's no-capping policy and the law, Plaintiff Kingston again expected the relevant sales representatives to be paid their full commission amounts. One of those commissions exceeded $1,000,000 and was owed to J, who (as noted above) is an African-American man on the IBM sales force.

39. Like the SAS Sale, J's first-line manager and his second line manager, Plaintiff Kingston, found no errors in J's quota or territory and thus expected full payment of commissions would flow to J.

40. This time around, however, Plaintiff Kingston's reviews drew the attention and ire of IBM executives higher up in the commission approval hierarchy. In particular, Brian Mulada, the Chief Financial Officer of a particular IBM unit, decided that J's commission was simply too high. Specifically, Mr. Mulada communicated that J's commission would account for more than 10% of the sale revenue, an internal benchmark that IBM executives have used as a commissions budget, unbeknownst to sales representatives and their managers. As a result, Mr. Mulada said IBM would not be paying J his full commission. This determination was communicated to Plaintiff Kingston through another executive, Rose Nunez. No basis in IBM policy or law was provided to Plaintiff Kingston to justify this decision.

41. In his conversation with Ms. Nunez, Plaintiff Kingston raised the point that IBM's decision to arbitrarily limit J's commissions payments was inconsistent with the million-dollar commission paid to Nick just a few months earlier. They specifically discussed whether an error had occurred with respect to Nick's commission payment. After consultation with other executives, Ms. Nunez confirmed Nick was paid appropriately.

D. **Plaintiff Kingston and Other Managers Raise the Issue of Discrimination and Policy Violation**

42. Plaintiff Kingston and Mr. Temidis were disturbed by IBM's new-found position and discussed the discriminatory treatment of J in comparison to Nick on several occasions.

43. Plaintiff Kingston repeatedly explained to more than one IBM executive that it would be wrong to reduce any portion of J's commission because, among other things, it

COMPLAINT - 8

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

would be discriminatory and would violate the no-capping policy. Plaintiff Kingston asked IBM to put its position regarding J's commission in writing. IBM refused.

44.     In the fourth quarter of 2017, Plaintiff Kingston told IBM managers Dave Mitchell and Rose Nunez that IBM's treatment of J was discriminatory. In January of 2018, Plaintiff Kingston told IBM manager Dorothy Copeland that IBM's treatment of J was discriminatory and reiterated that point to Dave Mitchell and Rose Nunez again, urging IBM to reconsider its decision. IBM did not. Throughout his discussions with IBM executives, Plaintiff Kingston referenced the disparity in the treatment of Nick and J.

45.     Because Mr. Temidis was the direct manager for Nick and Plaintiff Kingston was not actively involved in the details of the payment of Nick's commissions, it was clear in Plaintiff Kingston's conversations with IBM executives that he had discussed the discrimination against J with Mr. Temidis and that Mr. Temidis agreed IBM's treatment of J was discriminatory.

46.     While IBM was deciding not to pay J in full for his efforts in closing the HCL Sale, the company also chose not to pay K, the Arab-American sales representative, at all for closing another large sale.

47.     K was one of two sales representatives under Mr. Lee, the other being William. Around the same time that William earned a large sales commission, K also earned a similarly sized commission. Although the amount of effort contributed to the closing of a deal is not a factor in the amount of commissions earned, it is worth noting that K expended even more time and effort in the pursuit of his sale than William did. But IBM executives told Mr. Lee that K would not be paid for his efforts.[2]

---

[2] IBM provides its sales representatives and their managers with educational materials each sales period that explain the sales plans. The education materials for the individual quota plan (which was the type of commission plan applicable to William, K, J, and Nick) for this particular sales period explicitly state: "Seller earnings for these plans are uncapped and the plan is paid based upon achievement results rather than on an assessment of employee contribution." Thus, the amount of effort expended by K in relation to William is only mentioned here to highlight the fact that the only reason K appears not to have been paid was because of his race because under IBM's policy, the effort he expended actually is not a factor in the calculation of commissions he earned.

COMPLAINT - 9

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

48. Mr. Lee raised the disparity in IBM's treatment of William and K with the executives over him, including some of the same executives that Plaintiff Kingston had voiced concerns regarding IBM's mistreatment of J. Just like with Nick and J, the only difference between William and K was the color of their skin. Mr. Lee communicated to Greg Mount at IBM that this was potentially discriminatory treatment.

49. Plaintiff Kingston is informed and believes the IBM executives were aware from their discussions with him that Plaintiff Kingston, Mr. Temidis, and Mr. Lee were discussing IBM's mistreatment of minority sales representatives between themselves and that they all held the same views Plaintiff Kingston and Mr. Lee expressed to IBM.

E. **IBM Retaliates and Puts Plaintiff Kingston, Mr. Temidis, and Mr. Lee Under "Investigation"**

50. Shortly after Plaintiff Kingston raised concerns about IBM's mistreatment of minority sales representatives, IBM transferred him to a new manager. Plaintiff Kingston immediately explained the situation to the new manager and shared his view that IBM's decisions were discriminatory and violated the law and company policy. Still, nothing changed.

51. In January of 2018, IBM advised Plaintiff Kingston that it had, in fact, capped the commission payable to J, withholding more than 80% of the commissions he earned.

52. In his seventeen and a half years as an IBM manager, Plaintiff Kingston had never before seen one of his sales representative's commissions arbitrarily capped by IBM in violation of IBM's written no-capping policy. Indeed, Plaintiff Kingston had never been advised of a way that he could adjust the commissions of a sales representative when there were no errors in the sales representative's quota or territory.

53. In January of 2018, Plaintiff Kingston, Mr. Temidis, and Mr. Lee all became aware that IBM had launched its purported "investigation." IBM's investigator interviewed each manager. At first, Plaintiff Kingston thought IBM was finally taking the complaint about discrimination seriously and investigating the reduction of J's commission. IBM, however, had

COMPLAINT - 10

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

a very different agenda. The investigation was, in fact, focused on IBM's new-found contention that *Plaintiff Kingston, Mr. Temidis, and Mr. Lee* engaged in misconduct by not limiting the payment of commissions to white sales employees in connection with the SAS Sale that had occurred seven months earlier as described above—commissions that multiple levels of IBM executives and its Center of Excellence had approved. In short, IBM decided that the right way to cure underpayment to an African-American employee was not to pay him the correct amount but to blame Plaintiff Kingston and the other managers for not ensuring that IBM also paid white employees incorrectly as well.

54. Plaintiff Kingston cooperated with the interview. He advised the investigator of IBM's no-capping policy and provided the names of other executives who were involved in the SAS Sale commission approvals. Plaintiff Kingston did not hear anything further from IBM or the investigator.

55. On April 16, 2018, IBM executives advised Plaintiff Kingston, Mr. Temidis, and Mr. Lee that they were each being fired. The reason? Failure to reduce commissions paid to white employees on the SAS Sale. The managers protested and asked how the IBM executives could terminate the managers for following IBM's written policy; how the executives could terminate the managers when they did not approve the payments or even have the authority to approve the payments, but only reviewed the specifics of the deals for accuracy; and how the executives could terminate the managers when multiple layers of senior executives and the Center of Excellence approved the payments. All of these questions were met with the same response from the IBM executives: "no comment."

F. **IBM Refuses to Pay Plaintiff Kingston and Mr. Temidis Their Earned Commission Compensation**

56. In its final blow, IBM sought to claw back commission compensation paid to Plaintiff Kingston earlier in the year. IBM sent Plaintiff Kingston a letter after he was terminated, asserting that he was overpaid $1,801.07 and requesting that he pay this amount

COMPLAINT - 11

back to IBM. This was surprising to Plaintiff Kingston because IBM in fact owes him $125,425 in commissions from the first quarter of 2018.

57. Mr. Temidis is likewise owed approximately $251,699 in commissions.

58. Sales managers, such as Plaintiff Kingston and Mr. Temidis, earn commissions based on the sales closed by representatives who work under them. It is common that at the end of each quarter, many deals have minor accounting adjustments to accurately reflect the revenue attributed to sales representatives.

59. After Plaintiff Kingston and Mr. Temidis were wrongfully terminated on April 16, 2018, many adjustments were made to the deals closed by their sales representatives in the first quarter of 2018, when Plaintiff Kingston and Mr. Temidis were still employed by IBM.

60. The result of these adjustments led to increased revenue that should have been attributed to both Plaintiff Kingston and Mr. Temidis. Based on their respective quotas and commissions formulas, these adjustments had the effect of increasing the commissions earned by both Plaintiff Kingston and Mr. Temidis.

61. IBM has failed to pay these earned commissions to Plaintiff Kingston and Mr. Temidis.

## V.  FIRST CAUSE OF ACTION

### RETALIATION IN VIOLATION OF RCW 49.60.210

62. Plaintiff Kingston incorporates by reference in this section each of the allegations set forth in the preceding paragraphs.

63. RCW 49.60.210(1) provides that "[i]t is an unfair practice for any employer . . . or other person to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by [chapter 49.60 RCW] . . . ."

64. RCW 49.60.030(2) provides that "[a]ny person deeming himself or herself injured by an act in violation of [chapter 49.60 RCW] shall have a civil action in a court of competent jurisdiction to enjoin further violations, or to recover the actual damages sustained

COMPLAINT - 12

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

by the person, or both, together with the cost of suit including reasonable attorneys' fees or other appropriate remedy . . . ."

65. Plaintiff Kingston engaged in protected activity. He opposed discriminatory treatment by IBM—namely, its decision to apply the no-capping commission policy to white sales employees while refusing to apply the same policy to an African-American sales employee—and reported that discriminatory treatment to IBM.

66. Defendant IBM was aware of this protected activity.

67. In response to this protected activity, Defendant IBM took adverse actions against Plaintiff Kingston by terminating his employment, demanding he repay earned commissions, and refusing to pay his full commission for the first quarter of 2018.

68. These punitive measures violated Washington law.

69. A causal connection exists between Plaintiff Kingston's protected activity and the adverse actions taken by Defendant IBM. Among other things, the purported investigation and subsequent termination of Plaintiff Kingston was prompted by and followed shortly after Plaintiff Kingston's protected activity.

70. Plaintiff Kingston has suffered emotional distress and humiliation as a result of Defendant IBM's conduct. Plaintiff Kingston has also suffered lost wages and benefits as a result of Defendant IBM's conduct.

71. As a result of Defendant IBM's unlawful conduct, Plaintiff Kingston is entitled to recover damages, including lost back wages and benefits, prejudgment interest on those wages and benefits, lost future earnings and benefits, compensatory damages for emotional distress, and attorneys' fees and costs.

## VI.  SECOND CAUSE OF ACTION

### FAILURE TO PAY WAGES PURSUANT TO RCW 49.52.050

72. Plaintiff Kingston incorporates by reference in this section each of the allegations set forth in the preceding paragraphs.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

73. RCW 49.52.050 provides that "[a]ny employer or officer, vice principal or agent of any employer . . . who  . . . [w]ilfully and with intent to deprive the employee of any part of his or her wages, shall pay any employee a lower wage than the wage such employer is obligated to pay such employee by any statute, ordinance, or contract" shall be guilty of a misdemeanor.

74. RCW 49.52.070 provides that any employer who violates the provisions of RCW 49.52.050 shall be liable in a civil action for twice the amount of wages withheld, attorneys' fees, and costs.

75. Defendant IBM was Plaintiff Kingston's employer within the meaning of Washington law.

76. Defendant IBM willfully and with intent to deprive Plaintiff Kingston of his wages, paid Plaintiff a lower wage than Defendant was obligated to pay him by virtue of his commission agreement with Defendant. Specifically, Defendant IBM failed to pay Plaintiff Kingston all $125,425 of his earned commissions for Quarter 1 of 2018.

77. As a result of Defendant IBM's willful and unlawful conduct, Plaintiff Kingston has suffered and is entitled to recover as damages all wages willfully withheld along with prejudgment interest, exemplary damages, attorneys' fees, and costs under RCW 42.52.070.

## VII.  THIRD CAUSE OF ACTION

### WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

78. Plaintiff Kingston incorporates by reference in this section each of the allegations set forth in the preceding paragraphs.

79. Washington has a well-grounded public policy that protects employees from adverse actions, including termination, in retaliation for protected activity, such as reporting employer misconduct.

80. Plaintiff Kingston engaged in protected activity by opposing and reporting IBM's discriminatory treatment and wage violations.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

81. A clear public policy exists in Washington against racial discrimination. For example, the RCW 49.60.030 provides that "[t]he right to be free from discrimination because of race . . [or] color . . . is recognized as and declared to be a civil right."

82. By opposing and reporting IBM's discriminatory treatment of sales representatives, Plaintiff Kingston furthered the public policy set forth in RCW 49.60.030.

83. A clear public policy also exists in Washington in favor of ensuring the payment to employees of the full amount of wages earned. *See, e.g.*, RCW 49.52.050; *Morgan v. Kingen*, 166 Wn.2d 526, 538 (2009) ("RCW 49.52.050 and .070 express the legislature's 'strong policy in favor of ensuring the payment of the full amount of wages earned.'").

84. By opposing and reporting IBM's unlawful withholding of wages owed to sales representatives, Plaintiff Kingston furthered the public policy in RCW 49.52.050 favoring the full payment to employees of wages earned.

85. Plaintiff Kingston engaged in activity related to and in furtherance of the clear public policies established by the statutes above.

86. Defendant IBM was aware of Plaintiff Kingston's protected activity and, in response to such activity, took adverse actions against Plaintiff by terminating his employment, demanding he repay earned commissions, and refusing to pay the full commission he earned for the first quarter of 2018.

87. Defendant IBM's adverse actions against Plaintiff Kingston, including his termination, jeopardize the clear mandates of Washington public policy set forth in RCW 49.60.030 and RCW 49.52.050.

88. Defendant IBM's adverse actions are likely to deter protected activity.

89. Defendant IBM's adverse actions violated Washington's prohibition against termination in violation of public policy.

90. A causal connection exists between Plaintiff Kingston's protected activity and the adverse actions taken by Defendant IBM. Among other things, the purported investigation

COMPLAINT - 15

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   and subsequent termination of Plaintiff Kingston's employment was prompted by and
2   followed shortly after Plaintiff Kingston engaged in protected activity.

3   91.   Defendant IBM was not justified in taking adverse actions against Plaintiff
4   Kingston.

5   92.   Plaintiff Kingston has suffered emotional distress and humiliation as a result of
6   Defendant IBM's adverse actions against him. Plaintiff Kingston has also suffered lost wages
7   and benefits as a result of Defendant IBM's adverse actions against him.

8   93.   As a result of Defendant's conduct, Plaintiff Kingston is entitled to recover
9   damages, including lost back wages and benefits, prejudgment interest on those wages and
10  benefits, lost future earnings and benefits, compensatory damages for emotional distress, and
11  attorneys' fees and costs.

## VIII.  FOURTH CAUSE OF ACTION

## AGE DISCRIMINATION IN VIOLATION OF RCW 49.60.180

94.   Plaintiff Kingston incorporates by reference in this section each of the allegations set forth in the preceding paragraphs.

95.   RCW 49.46.180(2) provides that "[i]t is an unfair practice for any employer . . . [t]o discharge or bar any person from employment because of age . . . ."

96.   RCW 49.46.180(3) provides that "[i]t is an unfair practice for any employer . . . [t]o discriminate against any person in compensation or in other terms or conditions of employment because of age . . . ."

97.   RCW 49.60.205 provides that "[n]o person shall be considered to have committed an unfair practice on the basis of age discrimination unless the practice violates RCW 49.44.090."

98.   RCW 49.44.090(1) provides that "[i]t shall be an unfair practice . . . [f]or an employer . . . because an individual is forty years of age or older . . . to terminate from

COMPLAINT - 16

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

employment such individual, or to discriminate against such individual in promotion, compensation or in terms, conditions or privileges of employment."

99. Plaintiff Kingston was 58 years of age at the time Defendant IBM terminated him. Thus, he was within the statutorily protected class.

100. Defendant IBM terminated Plaintiff Kingston.

101. At the time of his termination, Plaintiff Kingston was doing satisfactory work.

102. After Defendant IBM terminated Plaintiff Kingston, Plaintiff's position remained open and Defendant IBM continued to seek applicants with qualifications similar to those of Plaintiff Kingston.

103. Age discrimination was a substantial factor motivating Defendant IBM to terminate Plaintiff Kingston.

104. As a result of IBM's age discrimination against Plaintiff Kingston, he is entitled to recover damages, including lost back wages and benefits, prejudgment interest on those wages and benefits, lost future earnings and benefits, compensatory damages for emotional distress, and attorneys' fees and costs

### IX.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kingston hereby prays for judgment against Defendant IBM on all causes of action and for the following damages and other relief:

A. Lost back wages and benefits in an amount to be proven at trial;

B. Lost future earnings and benefits in an amount to be proven at trial;

C. Emotional distress damages in an amount to be proven at trial;

D. Exemplary damages pursuant to statute;

E. Prejudgment interest;

F. Attorneys' fees and costs; and

G. For such other relief as the Court may deem just and proper.

COMPLAINT - 17

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

| | |
|---|---|
| 1 | RESPECTFULLY SUBMITTED AND DATED this 16th day of September, 2019. |
| 2 | TERRELL MARSHALL LAW GROUP PLLC |
| 3 | |
| 4 | By: /s/ Toby J. Marshall, WSBA #32726 |
| | Toby J. Marshall, WSBA #32726 |
| 5 | Email: tmarshall@terrellmarshall.com |
| | Brittany J. Glass, WSBA #52095 |
| 6 | Email: bglass@terrellmarshall.com |
| | 936 North 34th Street, Suite 300 |
| 7 | Seattle, Washington 98103 |
| | Telephone: (206) 816-6603 |
| 8 | Facsimile: (206) 319-5450 |
| 9 | |
| 10 | Matthew E. Lee, *pro hac vice forthcoming* |
| | Email: matt@wbmllp.com |
| 11 | Jeremy R. Williams, *pro hac vice forthcoming* |
| | Email: jeremy@wbmllp.com |
| 12 | WHITFIELD BRYSON & MASON, LLP |
| | 900 W. Morgan Street |
| 13 | Raleigh, North Carolina 27603 |
| 14 | Telephone: (919) 600-5000 |
| | Facsimile: (919) 600-5035 |
| 15 | |
| 16 | *Attorneys for Plaintiff* |

COMPLAINT - 18

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com