THE HONORABLE MARSHA J. PECHMAN

1

2

3

4

5

6                           UNITED STATES DISTRICT COURT

7                          WESTERN DISTRICT OF WASHINGTON

8   SCOTT KINGSTON,

9                     Plaintiff,            NO. 2:19-cv-01488-MJP

10        v.                                **AMENDED COMPLAINT**

11  INTERNATIONAL BUSINESS MACHINES
    CORPORATION, a New York Corporation,
12
                      Defendant.
13

14

15        Plaintiff Scott Kingston hereby asserts his complaint against Defendant International

16  Business Machines Corporation ("IBM") as follows:

17                          **I.  NATURE OF THE CASE**

18        1.      This case seeks to hold Defendant IBM accountable for retaliating against one

19  of its managers, Plaintiff Scott Kingston. Plaintiff's only transgressions were that: (1) he

20  followed the law (and IBM policy) by not capping the sales commissions payments to his sales

21  representatives, something IBM policies did not authorize him to do; and (2) he tried to

22  prevent IBM from discriminating against an African-American sales representative by failing to

23  pay the employee a large commission when IBM had previously approved payment to a white

24  sales representative under the same circumstances.

25        2.      Plaintiff Kingston is not alone in experiencing retaliation under these

26  circumstances. IBM retaliated against two other managers, Andre Temidis and Michael Lee,

27

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1 when they tried to prevent IBM from discriminating against an Arab-American sales

2 representative by failing to pay the employee a large commission when IBM had previously

3 approved payment to a white sales representative under the same circumstances.

4      3.     When Plaintiff Kingston, Mr. Temidis, and Mr. Lee opposed the efforts of IBM's

5 senior management to pay minorities less in commissions than were paid to white colleagues,

6 IBM quickly launched an "investigation" into unrelated matters *for all three managers*. IBM

7 then turned around and fired each of them. The reason IBM gave was that, seven months

8 earlier, Plaintiff Kingston and the other two managers had committed fireable offenses when

9 they followed IBM policy (and the law) and didn't cap or limit commission payments to other

10 white sales representatives—payments that were reviewed and approved by IBM itself.[1]

11 Adding insult to injury, IBM demanded that at least one of the managers pay back his own

12 earned commissions and then refused to pay both Plaintiff Kingston and Mr. Temidis the full

13 amount of their Q1 2018 earned compensation (i.e., their commissions).

14 **II.  JURISDICTION & VENUE**

15      4.     This Court has jurisdiction over this matter and all claims under 28 U.S.C.

16 § 1332(a)(1) because there is complete diversity among the parties and the amount in

17 controversy exceeds the sum of $75,000, exclusive of interest and costs.

18      5.     The Court has jurisdiction over Defendant IBM because IBM is a corporation

19 that has minimum contacts with Washington sufficient to render this Court's exercise of

20 jurisdiction over the company permissible under traditional notions of fair play and

21 substantial justice.

22      6.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because IBM is

23 subject to the Court's jurisdiction in relation to Plaintiff Kingston's claims and therefore

24 resides in Washington. Venue is also proper in this District under 28 U.S.C. § 1391(b)(2)

25

26

27 [1] Notably, IBM has never attempted to claw-back those large payments to the white sales representatives.

AMENDED COMPLAINT - 2
CASE No.: 2:19-CV-01488-MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  because a substantial part of the events or omissions giving rise to Plaintiff Kingston's claims

2  occurred in this District.

3                        **III.  PARTIES**

4        7.      Plaintiff Scott Kingston is a resident of the State of Washington. IBM employed

5  Plaintiff Kingston in Washington as a Business Unit Executive. Plaintiff Kingston worked for

6  IBM for more than 17 years.

7        8.      Defendant IBM is a corporation formed under the laws of the State of New

8  York and maintains its headquarters there.

9                  **IV.  GENERAL ALLEGATIONS**

10        9.      In the first half of 2017, IBM sales representatives, led by a sales representative

11  named Nick, closed a large software sales licensing deal, with revenue to IBM valued in the

12  tens of millions of dollars (the "SAS Sale"). Nick was paid the commissions he was owed, in

13  excess of $1,000,000.

14        10.     Just a few months later, IBM sales representatives, led by a sales

15  representative referred to in this complaint as J, closed another large software licensing deal,

16  with revenue to IBM again valued in the tens of millions of dollars (the "HCL Sale"). Like Nick, J

17  earned more than $1,000,000 in commissions from this sale. Unlike Nick however, J was paid

18  approximately $200,000 by IBM. The only difference between Nick and J? Nick is white,

19  whereas J is African American. Plaintiff Kingston managed both.

20        11.     The same thing happened on a deal with two other sales representatives that

21  Mr. Lee managed (referred to in this complaint as William and K). William is white and K is

22  Arab American. Both William and K had deals develop in their respective territories, though

23  neither was primarily responsible for those deals. Even though K had more involvement in his

24  deal than William did in the other deal, K wasn't paid anything while William was paid in full.

25  When Mr. Lee complained to IBM manager Greg Mount and said specifically that this looked

26  like discrimination, Mr. Lee was fired.

27

**A.      IBM Sales Representative Compensation**

12.      IBM's sales representatives are generally compensated in a similar way: a base salary makes up a portion of their compensation, and commissions make up the rest.

13.      IBM promises its sales representatives that their commissions are uncapped, meaning the bigger the deal a representative closes, the more the representative can make.

14.      IBM even encourages its sales representatives to close large deals in excess of their quota through the use of "accelerators." In other words, IBM provides a multiplier on quota attainment over 100%, such that sales in excess of quota enable sales representatives to earn more in commissions per dollar of sales than they would have been able to earn for each dollar of sales below 100% quota attainment.

15.      IBM communicates the uncapped nature of commissions to its sales representatives in writing through PowerPoint presentations, emails, and orally through its management at sales conferences and in one-on-one meetings.

16.      Sales representatives are advised that their commissions will be paid in accordance with these promises and will only be adjusted to correct errors in a sales representative's quota or territory.

17.      IBM reaffirms this to its managers through the following guidance:

> Conditions that may lead to an adjustment include the need to correct errors or the need to balance with employee's contribution to the success of a large sales transaction (which criteria must be clearly provided to Commissions team).

> **Adjustments must not be done only as a ceiling or cap on the total earnings allowable to employees.**

18.      In other words, IBM's official policies provide that the commissions sales representatives earn may be adjusted to correct errors, but those commissions may not be arbitrarily capped for the purpose of limiting an employee's earnings.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

**B.    IBM's Process for Reviewing Commissions on Large Deals**

19.    When large deals are closed, or when a sales representative significantly exceeds his quota, IBM reviews the deal for inaccuracies.

20.    This process entails several levels of review by various IBM managers and executives. It also includes approval by the IBM Center of Excellence, which is the final approval layer at IBM for commission payments.

21.    The process begins with the sales representative's first-line manager reviewing the deal's specifics for accuracy, particularly the sales representative's quota, territory, and recognized revenue. Typically, the sales representative's second-line manager double checks this same information.

22.    As part of the review process, the managers are sent authorization emails that contain the following language:

> Your role as a manager is to validate the accuracy of the territory and quota for each seller on an IQP. **Seller commissions for these plans are uncapped,** and are paid based on achievement results as determined by the respective territory and quotas, so it is critical to ensure this is correct.

23.    In other words, the only role of first- and second-line managers in the authorization process is to ensure the sales representative's territory and quota are appropriate.

24.    If no errors are found by the managers during the review process, the IBM Center of Excellence reviews the proposed commissions payment. If the Center of Excellence approves, the payment automatically flows to the sales representative.

25.    If the sales representative achieves in excess of 250% of his quota, approval by an IBM executive above the second-line manager is required before the commissions payment goes to the IBM Center of Excellence for final signoff.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

**C.   Two Large Deals Were Closed by Sales Representatives in 2017, Leading to Two Sales Representatives Each Being Owed More than $1,000,000 in Commissions**

26.     IBM breaks up its sales periods into half-year segments. In the first half of 2017, a significant deal was closed for the sale of IBM products and services that was worth tens of millions of dollars in revenue to IBM (the "SAS Sale").

27.     Based on the terms of his commission plan, the primary sales representative responsible for closing the SAS Sale (identified in this complaint as Nick) was entitled to a sales commission in excess of $1,000,000.

28.     As a result of this deal, Nick achieved nearly 2,000% of his quota.

29.     A sales representative named William also exceeded his quota as a result of the SAS Sale, achieving nearly 600%, and was owed approximately $172,000 in commissions payments.

30.     During the commission review process for the SAS Sale, Plaintiff Kingston, Mr. Temidis, and Mr. Lee were each required to review the quotas, territory, and recognized revenue for certain members of the sales force team behind the SAS Sale based on IBM's commission payment policy. Each of the managers ultimately found no errors in the quotas, territories, or recognized revenue for Nick and William. Accordingly, the managers expected both sales representatives to be paid in full based on three key factors: (1) the lack of errors in quotas, territories, or recognized revenue; (2) IBM's "no capping" policy, and (3) the law.

31.     The "no capping" policy is a written IBM policy that states IBM will not "cap" or otherwise limit the amount a sales force member earns in commission compensation. "No capping" means that IBM will not limit the commission amount if, for example, the commission amount exceeds a certain dollar amount. The law, of course, also requires that amounts earned under a given compensation policy must be paid in full.

32.     Notably, the review Plaintiff Kingston, Mr. Temidis, and Mr. Lee performed for the SAS Sale was only one part of the process required for commissions payments to issue. Indeed, the managers did not have ultimate authority to approve the payments because Nick

1  and William had each achieved more than 250% of their respective quotas. As a result, Nick's

2  commissions were reviewed and ultimately approved by other executives higher up in the

3  IBM sales organization. And ultimately, the IBM Center of Excellence had the final approval

4  over the specific sales commission amounts. Nick and William were each paid the full amounts

5  of their respective commissions.

6      33.     The review that Plaintiff Kingston, Mr. Temidis, and Mr. Lee performed for the

7  SAS Sale commissions was only one part of the process required for payment to issue. Due to

8  the high achievement by William, Mr. Lee received an email from an employee with the IBM

9  Center of Excellence who informed him that: "Bob's [Mr. Lee's boss] approval is <u>required</u> for

10  [certain] achievements above 150% and other achievements above 250%."

11      34.     Following this email, Bob told Mr. Lee that only a percentage of the

12  commissions should be paid to William and requested that Mr. Lee discuss this with Plaintiff

13  Kingston.

14      35.     Plaintiff Kingston and Mr. Lee were not aware of any IBM policies that

15  permitted an arbitrary adjustment to William's commissions, so Mr. Lee emailed the IBM

16  Center of Excellence regarding the matter.

17      36.     Mr. Lee received a response to his request, which informed him that IBM's

18  policies did not permit an arbitrary adjustment of a sales representative's commissions. Mr.

19  Lee was told that if a sales representative's territory and quota are correct, the

20  representative's commissions cannot be adjusted.

21      37.     Accordingly, Mr. Lee, after consultation with Mr. Temidis, confirmed that

22  William's quota and territory were correct, and the payment ultimately flowed in full to

23  William.

24      38.     Later in 2017, the HCL Sale closed. Like the SAS Sale, the HCL Sale was another

25  large software licensing deal worth tens of millions of dollars in revenue to IBM. Again,

26  Plaintiff Kingston was involved in the process of determining the relevant sales commissions.

27

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  Following the same protocol and adhering to IBM's no-capping policy and the law, Plaintiff

2  Kingston again expected the relevant sales representatives to be paid their full commission

3  amounts. One of those commissions exceeded $1,000,000 and was owed to J, who (as noted

4  above) is an African-American man on the IBM sales force.

5       39.    Like the SAS Sale, J's first-line manager and his second line manager, Plaintiff

6  Kingston, found no errors in J's quota or territory and thus expected full payment of

7  commissions would flow to J.

8       40.    This time around, however, Plaintiff Kingston's reviews drew the attention and

9  ire of IBM executives higher up in the commission approval hierarchy. In particular, Brian

10  Mulada, the Chief Financial Officer of a particular IBM unit, decided that J's commission was

11  simply too high. Specifically, Mr. Mulada communicated that J's commission would account

12  for more than 10% of the sale revenue, an internal benchmark that IBM executives have used

13  as a commissions budget, unbeknownst to sales representatives and their managers. As a

14  result, Mr. Mulada said IBM would not be paying J his full commission. This determination was

15  communicated to Plaintiff Kingston through another executive, Rose Nunez. No basis in IBM

16  policy or law was provided to Plaintiff Kingston to justify this decision.

17       41.    In his conversation with Ms. Nunez, Plaintiff Kingston raised the point that

18  IBM's decision to arbitrarily limit J's commissions payments was inconsistent with the million-

19  dollar commission paid to Nick just a few months earlier. They specifically discussed whether

20  an error had occurred with respect to Nick's commission payment. After consultation with

21  other executives, Ms. Nunez confirmed Nick was paid appropriately.

22  **D.**    **Plaintiff Kingston and Other Managers Raise the Issue of Discrimination and Policy**
       **Violation**

23

24       42.    Plaintiff Kingston and Mr. Temidis were disturbed by IBM's new-found position

and discussed the discriminatory treatment of J in comparison to Nick on several occasions.

25

26       43.    Plaintiff Kingston repeatedly explained to more than one IBM executive that it

would be wrong to reduce any portion of J's commission because, among other things, it

27

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1 would be discriminatory and would violate the no-capping policy. Plaintiff Kingston asked IBM

2 to put its position regarding J's commission in writing. IBM refused.

3    44.    In the fourth quarter of 2017, Plaintiff Kingston told IBM managers Dave

4 Mitchell and Rose Nunez that IBM's treatment of J was discriminatory. In January of 2018,

5 Plaintiff Kingston told IBM manager Dorothy Copeland that IBM's treatment of J was

6 discriminatory and reiterated that point to Dave Mitchell and Rose Nunez again, urging IBM to

7 reconsider its decision. IBM did not. Throughout his discussions with IBM executives, Plaintiff

8 Kingston referenced the disparity in the treatment of Nick and J.

9    45.    Because Mr. Temidis was the direct manager for Nick and Plaintiff Kingston was

10 not actively involved in the details of the payment of Nick's commissions, it was clear in

11 Plaintiff Kingston's conversations with IBM executives that he had discussed the

12 discrimination against J with Mr. Temidis and that Mr. Temidis agreed IBM's treatment of J

13 was discriminatory.

14    46.    While IBM was deciding not to pay J in full for his efforts in closing the HCL Sale,

15 the company also chose not to pay K, the Arab-American sales representative, at all for closing

16 another large sale.

17    47.    K was one of two sales representatives under Mr. Lee, the other being William.

18 Around the same time that William earned a large sales commission, K also earned a similarly

19 sized commission. Although the amount of effort contributed to the closing of a deal is not a

20 factor in the amount of commissions earned, it is worth noting that K expended even more

21 time and effort in the pursuit of his sale than William did. But IBM executives told Mr. Lee that

22 K would not be paid for his efforts.[2]

23

---

24 [2] IBM provides its sales representatives and their managers with educational materials each sales period that explain the sales plans. The education materials for the individual quota plan (which was the type of commission

25 plan applicable to William, K, J, and Nick) for this particular sales period explicitly state: "Seller earnings for these plans are uncapped and the plan is paid based upon achievement results rather than on an assessment of

26 employee contribution." Thus, the amount of effort expended by K in relation to William is only mentioned here to highlight the fact that the only reason K appears not to have been paid was because of his race because under

27 IBM's policy, the effort he expended actually is not a factor in the calculation of commissions he earned.

AMENDED COMPLAINT - 9
CASE NO.: 2:19-CV-01488-MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

48.     Mr. Lee raised the disparity in IBM's treatment of William and K with the executives over him, including some of the same executives that Plaintiff Kingston had voiced concerns regarding IBM's mistreatment of J. Just like with Nick and J, the only difference between William and K was the color of their skin. Mr. Lee communicated to Greg Mount at IBM that this was potentially discriminatory treatment.

49.     Plaintiff Kingston is informed and believes the IBM executives were aware from their discussions with him that Plaintiff Kingston, Mr. Temidis, and Mr. Lee were discussing IBM's mistreatment of minority sales representatives between themselves and that they all held the same views Plaintiff Kingston and Mr. Lee expressed to IBM.

**E.     IBM Retaliates and Puts Plaintiff Kingston, Mr. Temidis, and Mr. Lee Under "Investigation"**

50.     Shortly after Plaintiff Kingston raised concerns about IBM's mistreatment of minority sales representatives, IBM transferred him to a new manager. Plaintiff Kingston immediately explained the situation to the new manager and shared his view that IBM's decisions were discriminatory and violated the law and company policy. Still, nothing changed.

51.     In January of 2018, IBM advised Plaintiff Kingston that it had, in fact, capped the commission payable to J, withholding more than 80% of the commissions he earned.

52.     In his seventeen and a half years as an IBM manager, Plaintiff Kingston had never before seen one of his sales representative's commissions arbitrarily capped by IBM in violation of IBM's written no-capping policy. Indeed, Plaintiff Kingston had never been advised of a way that he could adjust the commissions of a sales representative when there were no errors in the sales representative's quota or territory.

53.     In January of 2018, Plaintiff Kingston, Mr. Temidis, and Mr. Lee all became aware that IBM had launched its purported "investigation." IBM's investigator interviewed each manager. At first, Plaintiff Kingston thought IBM was finally taking the complaint about discrimination seriously and investigating the reduction of J's commission. IBM, however, had

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    a very different agenda. The investigation was, in fact, focused on IBM's new-found

2    contention that *Plaintiff Kingston, Mr. Temidis, and Mr. Lee* engaged in misconduct by not

3    limiting the payment of commissions to white sales employees in connection with the SAS

4    Sale that had occurred seven months earlier as described above—commissions that multiple

5    levels of IBM executives and its Center of Excellence had approved. In short, IBM decided that

6    the right way to cure underpayment to an African-American employee was not to pay him the

7    correct amount but to blame Plaintiff Kingston and the other managers for not ensuring that

8    IBM also paid white employees incorrectly as well.

9       54.    Plaintiff Kingston cooperated with the interview. He advised the investigator of

10   IBM's no-capping policy and provided the names of other executives who were involved in the

11   SAS Sale commission approvals. Plaintiff Kingston did not hear anything further from IBM or

12   the investigator.

13      55.    On April 16, 2018, IBM executives advised Plaintiff Kingston, Mr. Temidis, and

14   Mr. Lee that they were each being fired. The reason? Failure to reduce commissions paid to

15   white employees on the SAS Sale. The managers protested and asked how the IBM executives

16   could terminate the managers for following IBM's written policy; how the executives could

17   terminate the managers when they did not approve the payments or even have the authority

18   to approve the payments, but only reviewed the specifics of the deals for accuracy; and how

19   the executives could terminate the managers when multiple layers of senior executives and

20   the Center of Excellence approved the payments. All of these questions were met with the

21   same response from the IBM executives: "no comment."

22   **F.    IBM Refuses to Pay Plaintiff Kingston and Mr. Temidis Their Earned Commission
         Compensation**
23

24      56.    In its final blow, IBM sought to claw back commission compensation paid to

25   Plaintiff Kingston earlier in the year. IBM sent Plaintiff Kingston a letter after he was

26   terminated, asserting that he was overpaid $1,801.07 and requesting that he pay this amount

27

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

1   back to IBM. This was surprising to Plaintiff Kingston because IBM in fact owes him $125,425

2   in commissions from the first quarter of 2018.

3       57.     Mr. Temidis is likewise owed approximately $251,699 in commissions.

4       58.     Sales managers, such as Plaintiff Kingston and Mr. Temidis, earn commissions

5   based on the sales closed by representatives who work under them. It is common that at the

6   end of each quarter, many deals have minor accounting adjustments to accurately reflect the

7   revenue attributed to sales representatives.

8       59.     After Plaintiff Kingston and Mr. Temidis were wrongfully terminated on April

9   16, 2018, many adjustments were made to the deals closed by their sales representatives in

10  the first quarter of 2018, when Plaintiff Kingston and Mr. Temidis were still employed by IBM.

11      60.     The result of these adjustments led to increased revenue that should have

12  been attributed to both Plaintiff Kingston and Mr. Temidis. Based on their respective quotas

13  and commissions formulas, these adjustments had the effect of increasing the commissions

14  earned by both Plaintiff Kingston and Mr. Temidis.

15      61.     IBM has failed to pay these earned commissions to Plaintiff Kingston and Mr.

16  Temidis.

17                          **V.  FIRST CAUSE OF ACTION**

18                  **RETALIATION IN VIOLATION OF RCW 49.60.210**

19      62.     Plaintiff Kingston incorporates by reference in this section each of the

20  allegations set forth in the preceding paragraphs.

21      63.     RCW 49.60.210(1) provides that "[i]t is an unfair practice for any employer . . .

22  or other person to discharge, expel, or otherwise discriminate against any person because he

23  or she has opposed any practices forbidden by [chapter 49.60 RCW] . . . ."

24      64.     RCW 49.60.030(2) provides that "[a]ny person deeming himself or herself

25  injured by an act in violation of [chapter 49.60 RCW] shall have a civil action in a court of

26  competent jurisdiction to enjoin further violations, or to recover the actual damages sustained

27

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

1  by the person, or both, together with the cost of suit including reasonable attorneys' fees or

2  other appropriate remedy . . . ."

3      65.     Plaintiff Kingston engaged in protected activity. He opposed discriminatory

4  treatment by IBM—namely, its decision to apply the no-capping commission policy to white

5  sales employees while refusing to apply the same policy to an African-American sales

6  employee—and reported that discriminatory treatment to IBM.

7      66.     Defendant IBM was aware of this protected activity.

8      67.     In response to this protected activity, Defendant IBM took adverse actions

9  against Plaintiff Kingston by terminating his employment, demanding he repay earned

10  commissions, and refusing to pay his full commission for the first quarter of 2018.

11      68.     These punitive measures violated Washington law.

12      69.     A causal connection exists between Plaintiff Kingston's protected activity and

13  the adverse actions taken by Defendant IBM. Among other things, the purported investigation

14  and subsequent termination of Plaintiff Kingston was prompted by and followed shortly after

15  Plaintiff Kingston's protected activity.

16      70.     Plaintiff Kingston has suffered emotional distress and humiliation as a result of

17  Defendant IBM's conduct.  Plaintiff Kingston has also suffered lost wages and benefits as a

18  result of Defendant IBM's conduct.

19      71.     As a result of Defendant IBM's unlawful conduct, Plaintiff Kingston is entitled to

20  recover damages, including lost back wages and benefits, prejudgment interest on those

21  wages and benefits, lost future earnings and benefits, compensatory damages for emotional

22  distress, and attorneys' fees and costs.

23                    **VI.  SECOND CAUSE OF ACTION**

24                **BREACH OF EXPRESS UNILATERAL CONTRACT**

25      72.     Plaintiff Kingston incorporates by reference in this section each of the

26  allegations set forth in the preceding paragraphs.

27

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    73.    Defendant IBM sent an Incentive Plan Letter to Plaintiff Kingston on January 31,

2    2018.

3    74.    The Incentive Plan Letter constituted a unilateral contract offer to Plaintiff

4    Kingston.

5    75.    Through its unilateral contract offer, Defendant IBM promised pay commissions

6    to Plaintiff Kingston in accordance with the terms of the Incentive Plan Letter.

7    76.    Plaintiff Kingston accepted the unilateral contract offer and provided

8    consideration by performing work for Defendant IBM.

9    77.    The Incentive Plan Letter is a legally enforceable contract.

10    78.    Defendant IBM breached the contract by refusing and failing to pay Plaintiff

11    Kingston $125,425 in commissions earned for sales made during Quarter 1 of 2018.

12    79.    As a result of Defendant IBM's unlawful conduct, Plaintiff Kingston has suffered

13    and is entitled to recover damages along with prejudgment interest. Because the commissions

14    owed are "wages," Plaintiff Kingston is also entitled to recover attorneys' fees and costs under

15    RCW 49.48.030.

16    **VII.  THIRD CAUSE OF ACTION**

17    **BREACH OF IMPLIED-IN-FACT CONTRACT**

18    80.    Plaintiff Kingston incorporates by reference in this section each of the

19    allegations set forth in the preceding paragraphs.

20    81.    Based on their conduct, Defendant IBM and Plaintiff Kingston reached

21    agreement whereby Defendant IBM would pay commissions to Plaintiff Kingston for deals

22    closed in Quarter 1 of 2018 by sales employees he managed.

23    82.    Defendant IBM requested that Plaintiff Kingston perform services for the

24    company by, among other things, managing sales employees.

25    83.    Plaintiff Kingston performed services for Defendant IBM with the reasonable

26    expectation that he would be paid commissions.

27

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

84.     Defendant IBM reasonably expected or should have expected to pay commissions to Plaintiff Kingston for the services he performed.

85.     Defendant IBM breached the implied-in-fact contract it had with Plaintiff Kingston by refusing and failing to pay Plaintiff Kingston $125,425 in commissions earned for sales made during Quarter 1 of 2018.

86.     As a result of Defendant IBM's unlawful conduct, Plaintiff Kingston has suffered and is entitled to recover damages along with prejudgment interest. Because the commissions Defendant IBM refused to pay are "wages," Plaintiff Kingston is also entitled to recover attorneys' fees and costs under RCW 49.48.030.

### VIII.  FOURTH CAUSE OF ACTION

### VIOLATION OF RCW 49.48.010—UNPAID WAGES ON TERMINATION

87.     Plaintiff Kingston incorporates by reference in this section each of the allegations set forth in the preceding paragraphs.

88.     Washington law provides that "[w]hen any employee shall cease to work for an employer, whether by discharge or by voluntary withdrawal, the wages due him or her on account of his or her employment shall be paid to him or her at the end of the established pay period." The statute further provides that "[i]t shall be unlawful for any employer to withhold or divert any portion of an employee's wages . . . ."

89.     By the actions alleged above, Defendant IBM has violated the provisions of RCW 49.48.010.

90.     As a result of Defendant IBM's unlawful conduct, Plaintiff Kingston has suffered and is entitled to recover damages along with prejudgment interest. Because the commissions Defendant IBM refused to pay are "wages," Plaintiff Kingston is also entitled to recover attorneys' fees and costs under RCW 49.48.030.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1

**IX.  FIFTH CAUSE OF ACTION**

2

**FAILURE TO PAY WAGES PURSUANT TO RCW 49.52.050**

3       91.     Plaintiff Kingston incorporates by reference in this section each of the

4   allegations set forth in the preceding paragraphs.

5       92.     RCW 49.52.050 provides that "[a]ny employer or officer, vice principal or agent

6   of any employer . . . who  . . . [w]ilfully and with intent to deprive the employee of any part of

7   his or her Kingwages, shall pay any employee a lower wage than the wage such employer is

8   obligated to pay such employee by any statute, ordinance, or contract" shall be guilty of a

9   misdemeanor.

10      93.     RCW 49.52.070 provides that any employer who violates the provisions of RCW

11  49.52.050 shall be liable in a civil action for twice the amount of wages withheld, attorneys'

12  fees, and costs.

13      94.     Defendant IBM was Plaintiff Kingston's employer within the meaning of

14  Washington law.

15      95.     Defendant IBM willfully and with intent to deprive Plaintiff Kingston of his

16  wages, paid Plaintiff a lower wage than Defendant was obligated to pay him by statute or

17  contract. Specifically, Defendant IBM failed to pay Plaintiff Kingston all $125,425 of his earned

18  commissions for Quarter 1 of 2018.

19      96.     As a result of Defendant IBM's willful and unlawful conduct, Plaintiff Kingston

20  has suffered and is entitled to recover as damages all wages willfully withheld along with

21  prejudgment interest, exemplary damages, attorneys' fees, and costs under RCW 49.52.070.

22

**X.  SIXTH CAUSE OF ACTION**

23

**UNJUST ENRICHMENT**

24      97.     Plaintiff Kingston incorporates by reference in this section each of the

25  allegations set forth in the preceding paragraphs.

26

27

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

98.     Based on Defendant IBM's own incentive plan, Plaintiff Kingston was entitled to be paid commissions for deals closed in Quarter 1 of 2018 by sales employees he managed.

99.     Defendant IBM failed to pay Plaintiff Kingston the commissions to which he was entitled and instead retained those monies.

100.    Defendant IBM benefited at the expense of Plaintiff Kingston by receiving his labor, experience, and skills as a manager of sales employees.

101.    Defendant IBM was unjustly enriched by its refusal to pay the commissions to which Plaintiff Kingston was entitled.

102.    Defendant IBM should be required to disgorge this unjust enrichment.

103.    As a result of Defendant IBM's unjust enrichment, Plaintiff Kingston has suffered and is entitled to recover damages along with prejudgment interest. Because the commissions Defendant IBM refused to pay are "wages," Plaintiff Kingston is also entitled to recover attorneys' fees and costs under RCW 49.48.030.

## XI.  SEVENTH CAUSE OF ACTION

### WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

104.    Plaintiff Kingston incorporates by reference in this section each of the allegations set forth in the preceding paragraphs.

105.    Washington has a well-grounded public policy that protects employees from adverse actions, including termination, in retaliation for protected activity, such as reporting employer misconduct.

106.    Plaintiff Kingston engaged in protected activity by opposing and reporting IBM's discriminatory treatment and wage violations.

107.    A clear public policy exists in Washington against racial discrimination. For example, the RCW 49.60.030 provides that "[t]he right to be free from discrimination because of race . . [or] color . . . is recognized as and declared to be a civil right."

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

108.    By opposing and reporting IBM's discriminatory treatment of sales representatives, Plaintiff Kingston furthered the public policy set forth in RCW 49.60.030.

109.    A clear public policy also exists in Washington in favor of ensuring the payment to employees of the full amount of wages earned. *See, e.g.*, RCW 49.52.050; *Morgan v. Kingen*, 166 Wn.2d 526, 538 (2009) ("RCW 49.52.050 and .070 express the legislature's 'strong policy in favor of ensuring the payment of the full amount of wages earned.'").

110.    By opposing and reporting IBM's unlawful withholding of wages owed to sales representatives, Plaintiff Kingston furthered the public policy in RCW 49.52.050 favoring the full payment to employees of wages earned.

111.    Plaintiff Kingston engaged in activity related to and in furtherance of the clear public policies established by the statutes above.

112.    Defendant IBM was aware of Plaintiff Kingston's protected activity and, in response to such activity, took adverse actions against Plaintiff by terminating his employment, demanding he repay earned commissions, and refusing to pay the full commission he earned for the first quarter of 2018.

113.    Defendant IBM's adverse actions against Plaintiff Kingston, including his termination, jeopardize the clear mandates of Washington public policy set forth in RCW 49.60.030 and RCW 49.52.050.

114.    Defendant IBM's adverse actions are likely to deter protected activity.

115.    Defendant IBM's adverse actions violated Washington's prohibition against termination in violation of public policy.

116.    A causal connection exists between Plaintiff Kingston's protected activity and the adverse actions taken by Defendant IBM. Among other things, the purported investigation and subsequent termination of Plaintiff Kingston's employment was prompted by and followed shortly after Plaintiff Kingston engaged in protected activity.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1      117.    Defendant IBM was not justified in taking adverse actions against Plaintiff

2   Kingston.

3      118.    Plaintiff Kingston has suffered emotional distress and humiliation as a result of

4   Defendant IBM's adverse actions against him. Plaintiff Kingston has also suffered lost wages

5   and benefits as a result of Defendant IBM's adverse actions against him.

6      119.    As a result of Defendant's conduct, Plaintiff Kingston is entitled to recover

7   damages, including lost back wages and benefits, prejudgment interest on those wages and

8   benefits, lost future earnings and benefits, compensatory damages for emotional distress, and

9   attorneys' fees and costs.

10                    **XII.  EIGHTH CAUSE OF ACTION**

11              **AGE DISCRIMINATION IN VIOLATION OF RCW 49.60.180**

12     120.    Plaintiff Kingston incorporates by reference in this section each of the

13   allegations set forth in the preceding paragraphs.

14     121.    RCW 49.46.180(2) provides that "[i]t is an unfair practice for any employer . . .

15   [t]o discharge or bar any person from employment because of age . . . ."

16     122.    RCW 49.46.180(3) provides that "[i]t is an unfair practice for any employer . . .

17   [t]o discriminate against any person in compensation or in other terms or conditions of

18   employment because of age . . . ."

19     123.    RCW 49.60.205 provides that "[n]o person shall be considered to have

20   committed an unfair practice on the basis of age discrimination unless the practice violates

21   RCW 49.44.090."

22     124.    RCW 49.44.090(1) provides that "[i]t shall be an unfair practice . . . [f]or an

23   employer . . . because an individual is forty years of age or older . . . to terminate from

24   employment such individual, or to discriminate against such individual in promotion,

25   compensation or in terms, conditions or privileges of employment."

26

27

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

125.    Plaintiff Kingston was 58 years of age at the time Defendant IBM terminated him. Thus, he was within the statutorily protected class.

126.    Defendant IBM terminated Plaintiff Kingston.

127.    At the time of his termination, Plaintiff Kingston was doing satisfactory work.

128.    After Defendant IBM terminated Plaintiff Kingston, Plaintiff's position remained open and Defendant IBM continued to seek applicants with qualifications similar to those of Plaintiff Kingston.

129.    Age discrimination was a substantial factor motivating Defendant IBM to terminate Plaintiff Kingston.

130.    As a result of IBM's age discrimination against Plaintiff Kingston, he is entitled to recover damages, including lost back wages and benefits, prejudgment interest on those wages and benefits, lost future earnings and benefits, compensatory damages for emotional distress, and attorneys' fees and costs

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kingston hereby prays for judgment against Defendant IBM on all causes of action and for the following damages and other relief:

A.    Lost back wages and benefits in an amount to be proven at trial;

B.    Lost future earnings and benefits in an amount to be proven at trial;

C.    Emotional distress damages in an amount to be proven at trial;

D.    Exemplary damages pursuant to statute;

E.    Prejudgment interest;

F.    Attorneys' fees and costs; and

G.    For such other relief as the Court may deem just and proper.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

1      RESPECTFULLY SUBMITTED AND DATED this 9th day of December, 2019.

2                                      TERRELL MARSHALL LAW GROUP PLLC

3
                                       By:  /s/ Toby J. Marshall, WSBA #32726
4                                           Toby J. Marshall, WSBA #32726
                                            Email:  tmarshall@terrellmarshall.com
5                                           Brittany J. Glass, WSBA #52095
                                            Email: bglass@terrellmarshall.com
6                                           936 North 34th Street, Suite 300
                                            Seattle, Washington 98103
7                                           Telephone: (206) 816-6603
                                            Facsimile: (206) 319-5450
8
9
                                            Matthew E. Lee, *Admitted Pro Hac Vice*
10                                          Email: matt@wbmllp.com
                                            Jeremy R. Williams, *Admitted Pro Hac Vice*
11                                          Email: jeremy@wbmllp.com
                                            WHITFIELD BRYSON & MASON, LLP
12                                          900 W. Morgan Street
                                            Raleigh, North Carolina 27603
13                                          Telephone: (919) 600-5000
                                            Facsimile: (919) 600-5035
14
15
                                            *Attorneys for Plaintiff*
16

17

18

19

20

21

22

23

24

25

26

27

**CERTIFICATE OF SERVICE**

I, Toby J. Marshall, hereby certify that on September 20, 2019, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system which will send notification of

such filing to the following:

Barry Alan Johnsrud, WSBA #21952
Email: barry.johnsrud@jacksonlewis.com
JACKSON LEWIS P.C.
520 Pike Street, Suite 2300
Seattle, Washington 98101
Telephone: (206) 405-0404
Facsimile: (206) 405-4450

Justin R. Barnes, *Admitted Pro Hac Vice*
Email: justin.barnes@jacksonlewis.com
Kelli N. Church, *Admitted Pro Hac Vice*
Email: kelli.church@jacksonlewis.com
JACKSON LEWIS P.C.
171 17th Street, NW, Suite 1200
Atlanta, Georgia 30363
Telephone: (404) 525-8200

*Attorneys for Defendant*

DATED this 9th day of December, 2019.

TERRELL MARSHALL LAW GROUP PLLC

By: /s/ Toby J. Marshall, WSBA #32726
Toby J. Marshall, WSBA #32726
Email: tmarshall@terrellmarshall.com
936 North 34th Street, Suite 300
Seattle, Washington 98103
Telephone: (206) 816-6603
Facsimile: (206) 319-5450
*Attorneys for Plaintiff*

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com