1
2
3
4
5
6
7

HONORABLE MARSHA J. PECHMAN

8

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

SCOTT KINGSTON,

No.  2:19-cv-01488-MJP

11

Plaintiff,

12

v.

**INTERNATIONAL BUSINESS
MACHINES CORPORATION'S MOTION
FOR SUMMARY JUDGMENT**

13

INTERNATIONAL BUSINESS MACHINES
CORPORATION, a New York Corporation,

14

**NOTE ON MOTION CALENDAR:
January 8, 2021**

15

Defendant.

16        Plaintiff Scott Kingston sued IBM bringing claims for (1) retaliation in violation of RCW

17    49.60.210; (2) breach of express unilateral contract; (3) breach of implied-in-fact contract; (4)

18    violation of RCW 49.48.010 – unpaid wages on termination; (5) failure to pay wages pursuant to

19    RCW 49.52.050; (6) unjust enrichment; (7) wrongful termination in violation of public policy;

20    and (8) age discrimination in violation of RCW 49.60.180. (Dkt. #20). After IBM moved to

21    partially dismiss Plaintiff's Amended Complaint, this Court dismissed Plaintiff's claims for

22    breach of express unilateral contract, breach of implied-in-fact contract, violation of RCW

23    49.48.010, and failure to pay wages pursuant to RCW 49.52.050. (Dkt. #27). IBM now moves

24    this Court, pursuant to Federal Rule of Civil Procedure 56, to grant summary judgment in its

25    favor and dismiss Plaintiff's remaining claims (retaliation, unjust enrichment, wrongful

26    termination, and age discrimination).

27

28

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 1
(CASE NO. 2:19-cv-01488-MJP)

## I.    INTRODUCTION AND SUMMARY OF ARGUMENTS

Plaintiff alleges that IBM terminated him in retaliation for his complaints about race discrimination, for his complaints about IBM withholding an employee's wages, and because of his age. In reality, Plaintiff's employment was terminated because he added an account to a sales representative's territory after a deal with IBM customer SAS closed without a corresponding increase in quota. Based on IBM's commission policies, this sales representative, Nick Donato, would not have otherwise been paid for the deal because it was not in his territory. Instead this late addition to Mr. Donato's territory with no corresponding quota addition generated a commission payment to Mr. Donato of $1.6 million for a deal he worked on for 10 days. Furthermore, during the standard review of the commissions paid to Mr. Donato, Plaintiff had the opportunity to correct this error by exercising the discretion afforded to IBM in Mr. Donato's commission plan to adjust commissions. Rather than appropriately exercising this discretion, Plaintiff approved the $1.6 million payment to Mr. Donato.

IBM conducted an internal investigation into the commission payments on the SAS deal, which led to the termination of three IBM managers: Plaintiff, Andre Temidis, and Mike Lee. Importantly, this investigation was requested and started before Plaintiff ever engaged in any alleged protected conduct, and the ultimate decision makers were not aware of Plaintiff's alleged protected conduct. This obviates Plaintiff's retaliation and wrongful termination claims entirely.

Plaintiff also alleges that IBM terminated him on the basis of his age, 58. However, Plaintiff has no evidence to support this claim, other than his conclusory speculation that his age played a part in his termination. Moreover, no one involved in the decision to terminate Plaintiff's employment was aware of Plaintiff's age. Thus, Plaintiff's age discrimination claim also fails.

Plaintiff also alleges that IBM was unjustly enriched because it did not pay Plaintiff commission he claims he was entitled to for deals that closed while he was employed, but that had revenue adjustments after his employment was terminated. Plaintiff admits that he was paid all money owed upon termination. Additionally, per the plain terms of Plaintiff's Incentive Plan

**Jackson Lewis P.C.**
520 Pike Street, Suite 2300
Seattle, Washington 98101
(206) 405-0404

Letter ("IPL") he would not be paid for revenue recognized after his termination. Thus, Plaintiff's unjust enrichment claim also fails.

Accordingly, IBM asks this Court to dismiss all of Plaintiff's claims.

## II.      STATEMENT OF MATERIAL FACTS

### A.  Plaintiff's Employment with IBM and Commission Plan.

Plaintiff was hired by IBM in or about October 2000, when he was 41 years old. (Pl. Dep. 19:13-15, 152:6-9).[1] While at IBM, Plaintiff managed a sales team, known as the ESA team. (Pl. Dep. 45:16-17). ESA stands for embedded solution agreement. (Pl. Dep. 46:5-6). ESA arrangements exist when a company develops a product and embeds IBM software within the product. (Pl. Dep. 46:7-11). One of the managers reporting to Plaintiff was Andre Temidis. (Copeland Dep. 22:21-23:13).[2] One of the sales representatives reporting to Mr. Temidis was Nick Donato. (Pl. Dep. 92:18-22).

Plaintiff and his team were paid a base salary plus commissions. (Pl. Dep. 22:2-4). At IBM, Incentive Plan Letters (or IPLs) spell out the terms of an individual's commission plan. (Pl. Dep. 22:18-21). Generally, IBM's commission plans run for half years, meaning from January 1 to June 30 and from July 1 to December 31; sales representatives were required to sign and acknowledge their IPL for each sales period. (Pl. Dep. 22:8-17). Plaintiff and his team were on a commission plan known as an Individual Quota Plan or IQP. (Pl. Dep. 26:13-19). As managers, Plaintiff and Mr. Temidis were responsible for assigning Mr. Donato a territory and sales quota at the beginning of each sales period. (Pl. Dep. 30:8-33:9). An IQP must have a sales quota. (Pl. Dep. 29:4-7). Additionally, Plaintiff was responsible for reviewing and validating achievement and payment results before, during and after the commission close periods to ensure it is consistent with the sales representative's established goals. (Pl. Dep. 51:21-52:11). Further, as a manager, Plaintiff was responsible for reviewing each employee's commission statement for reasonableness after a payment cycle and if there was an issue to submit an inquiry in the inquiry

---

[1] The cited portions of Scott Kingston's Deposition ("Pl. Dep.") are attached as Exhibit A to the Declaration of Justin Barnes filed herewith.
[2] The cited portions of Dorothy Copeland's Deposition ("Copeland Dep.") are attached as Exhibit B to the Declaration of Justin Barnes filed herewith.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 3
(CASE NO. 2:19-cv-01488-MJP)

**Jackson Lewis P.C.**
520 Pike Street, Suite 2300
Seattle, Washington 98101
(206) 405-0404

database, which Plaintiff never did. (Pl. Dep. 52:25-53:25). Plaintiff was informed that conditions that may lead to an adjustment of commissions include the need to correct errors or the need to balance with employee's contribution to the success of a large sales transaction. (Pl. Dep. 51:9-15, 54:15-22).

If a sales representative had an account in their territory, they would also be given a quota for that account. (Pl. Dep. 33:17-20). Commissions on IQPs are uncapped, subject to the terms in the IPL. (Johnson Dep. 40:11-15).[3] In the first half of 2017, a customer called SAS was not in Mr. Donato's or Mr. Temidis's territory. (Pl. Dep. 95:22-96:21). In the IPLs there is a provision that allows for an adjustment to commissions for deals that were not anticipated during account planning or is disproportionate compared to the seller's contribution to the deal. (Pl. Dep. Ex. 12). Specifically, the provision states:

> **Review of a Specific Transaction:** If a specific customer transaction has a disproportionate effect on an incentive payment when compared with the opportunity anticipated during account planning and used for the setting of sales objectives, or is disproportionate compared with your performance contribution towards the transaction, IBM reserves the right to review, and in its sole discretion, adjust the incentive achievement or related payments.

(Pl. Dep. Ex. 12, at p. 2).

Both Plaintiff and Mr. Temidis were aware of this provision. (Larkin Dep. Ex. 25[4], at p. 3).[5] Additionally, Plaintiff agrees that if contribution is an appropriate factor, it is permissible to adjust commissions based on contribution. (Pl. Dep. 61:16-25). Plaintiff likewise agrees that individuals should be paid commissions according to the rules in their IPL. (Pl. Dep. 107:13-19). Plaintiff's IPL also contained the following provision which explained how commission payments were paid when someone leaves IBM in the middle of a plan period:

> **Leaving the Plan Early:** If for any reason (including leaving IBM's employment) you leave your currently assigned Incentive

---

[3] The cited portions of Karla Johnson's Deposition ("Johnson Dep.") are attached as Exhibit C to the Declaration of Justin Barnes filed herewith.
[4] Exhibit 25 to be submitted separately together with a Motion to Seal.
[5] The cited portions of Jeff Larkin's Deposition ("Larkin Dep.") are attached as Exhibit D to the Declaration of Justin Barnes filed herewith.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 4
(CASE NO. 2:19-cv-01488-MJP)

**Jackson Lewis P.C.**
520 Pike Street, Suite 2300
Seattle, Washington 98101
(206) 405-0404

1

2

> Plan before the last day of its full-plan period, your final achievement for that Plan will be based on business results credited to you as of the last day of the last full-month you were on that Plan. The final incentive payments will be made according to the normal payment schedule for that Plan. If you remain with IBM in a non-incentives role, after receiving your final incentives payment your future IBM compensation will be determined by the terms of your new role.

3

4

5

6    (Pl. Dep. Ex. 12, at p. 3).

7    **B. The SAS Deal.**

8         On or about June 20, 2017, the vice president from a different sales team reached out to

9    Plaintiff to see if the ESA team could help on a deal with IBM customer SAS. (Pl. Dep. 87:1-4,

10   88:16-89:2). Plaintiff assigned the deal to Mr. Temidis and Mr. Donato. (Pl. Dep. 92:14-17). Mr.

11   Donato worked on the deal for 10 days and helped to close the deal on June 30, 2017. (Pl. Dep.

12   93:5-11). After the deal closed, Mark Baglini (CFO for North America Storage Sales) reached

13   out to the incentives and commissions department about the commissions on the SAS deal.

14   (Johnson Dep. 162:7-163:1). Karla Johnson, Director of Sales Commissions for North America

15   and Latin America, determined that Mr. Temidis and Mr. Donato did not have the SAS account

16   in their territory and thus should not receive commissions for the SAS deal. (Johnson Dep.

17   163:19-164:16). Ms. Johnson informed Mr. Baglini that because individuals are paid for

18   accounts in their territory, Mr. Donato and Mr. Temidis would not be paid on the deal, but they

19   could use an IBM program called "share of credit" to share some of the commission payments

20   with them. (Johnson Dep. 164:19-165:13, 166:15-167:8). A share of credit was not pursued.

21   (Larkin Dep. 288:22-289:8). Instead, Plaintiff and Mr. Temidis added SAS to Mr. Temidis's and

22   Mr. Donato's territory after the deal closed but did not add any quota for this account. (Pl. Dep.

23   95:22-96:21, 97:13-98:13; Johnson Dep. 92:21-93:11). This resulted in a commission payment to

24   Mr. Donato of approximately $1.6 million. (Pl. Dep. 109:14-22, 115:15-117:12).

25        At IBM there is a process to approve large commission payments. (Pl. Dep. 111:13-16).

26   As part of the review process, first- and second-line managers were required to review and

27   validate the revenue and quota and ensure that the payment was being calculated correctly. (Pl.

28

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 5
(CASE NO. 2:19-cv-01488-MJP)

Dep. 113:1-11). If the revenue or quota were incorrect, the managers were required to contact the commissions analyst and inform them of the error. (Pl. Dep. 113:12-15). Although SAS was added to Mr. Donato's territory after the deal closed without an increase in quota, and although both Mr. Temidis and Plaintiff were aware of the Specific Transaction provision in Mr. Donato's IPL, both Mr. Temidis and Plaintiff approved Mr. Donato's commissions on the SAS deal and did not raise any concerns with the commissions analyst, thus approving the $1.6 million commission payment to Mr. Donato. (Pl. Dep. 115:15-116:21).

**C. The Investigation into Commissions Paid on the SAS Deal.**

*1) Ms. Johnson Submits Allegations Related to the Payments on the SAS Deal.*

On October 7, 2017, finance reached out to Ms. Johnson about the commissions paid on the SAS deal. (Johnson Dep. 133:7-16, 137:9-138:8). This caused Ms. Johnson to examine the payments on the deal. (Johnson Dep. 133:7-134:10). She discovered that SAS was added to Mr. Temidis and Mr. Donato's territories after the deal closed without a corresponding addition to quota, which resulted in the large payment to Mr. Donato. (Johnson Dep. 133:7-134:10). Ms. Johnson also discovered that the account was added to another sales representative's (William Sherrin) territory after the deal closed without a corresponding increase in quota. (Johnson Dep. 133:7-134:10). Ms. Johnson viewed this as a business process violation, so she reached out to Internal Audit on October 16, 2017 about the territory additions without quota. (Johnson Dep. 29:7-30:1, 141:6-142:2). When an allegation is submitted, an Allegation Review Board reviews the allegations and determines what action to take, which could include initiating an investigation. (Larkin Dep. 94:14-95:23). After reviewing the allegations, Internal Audit initiated an investigation and Jeff Larkin was assigned as the investigator. (Larkin Dep. 46:12-47:11).

*2) Mr. Larkin Conducts the Investigation and Ms. Kenny Recommends Termination.*

Over the course of 60 days and approximately 100 hours, Mr. Larkin collected and reviewed facts, conducted interviews, and prepared an investigation report related to the commissions paid on the SAS deal. (Larkin Dep. 86:19-90:6). Mr. Larkin's role is to present the facts related to the situation, not to make disciplinary recommendations. (Larkin Dep. 161:23-

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 6
(CASE NO. 2:19-cv-01488-MJP)

Jackson Lewis P.C.
520 Pike Street, Suite 2300
Seattle, Washington 98101
(206) 405-0404

162:4, 184:13-19). Mr. Larkin investigated whether management authorized inappropriate commission payments for a transaction that was not reflected in the sellers' quota. (Larkin Dep., Ex. 25 at p. 2). The investigation report noted that the SAS deal closed on June 30, 2017 and was added to Mr. Donato, Mr. Temidis, and Mr. Sherrin's territory on July 19, 2017. (Larkin Dep., Ex. 25 at p. 2). As a result of the investigation, Mr. Larkin found that Plaintiff and Mr. Temidis were negligent in not initiating an adjustment of Mr. Donato's commissions on the SAS deal for which he had no quota. (Larkin Dep., Ex. 25 at p. 3). Additionally, Mr. Larkin found that although both Plaintiff and Mr. Temidis acknowledged that the payment was in excess of what Mr. Donato earned or deserved and that they were aware of the Specific Transaction provision, they did nothing to adjust Mr. Donato's commissions or raise the issue with their manager. (Larkin Dep. 134:1-135:7, 152:20-154:9, Ex. 25 at p. 3). Additionally, Mr. Larkin found that Mike Lee (Mr. Sherrin's manager) failed to ensure that Mr. Sherrin's commissions were adjusted for the SAS deal. (Larkin Dep., Ex. 25 at pp. 2, 3). After Mr. Larkin completes an investigation report, he sends it to Human Resources for assignment to a case manager to determine the appropriate disciplinary actions if the allegations are substantiated. (Larkin Dep. 184:13-19). Here, the allegations were substantiated. (Larkin Dep. Ex. 25 at p. 2).

Linda Kenny, who is a member of the Employee Concerns and Appeals team, was assigned as the case manager for the SAS investigation. (Kenny Dep. 23:5-24:6, 42:1-12).[6] Ms. Kenny's role was to review Mr. Larkin's report and determine the recommended disciplinary actions for Plaintiff, Mr. Temidis, and Mr. Lee and to facilitate obtaining the required approvals for the disciplinary actions. (Kenny Dep. 23:18-24:16, 246:10-22). Based on the facts in the investigation report, Ms. Kenny determined that the appropriate recommendation for Plaintiff, Mr. Temidis, and Mr. Lee was termination of employment. (Kenny Dep. 26:3-6). Ms. Kenny recommended termination for Plaintiff and Mr. Temidis because they did not add quota for the SAS deal to Mr. Donato's quota, they were aware of but did not use the Specific Transaction provision or speak with anyone about using that provision, and she felt they exercised poor

---

[6] The cited portions of Linda Kenny's Deposition ("Kenny Dep.") are attached as Exhibit E to the Declaration of Justin Barnes filed herewith.

**Jackson Lewis P.C.**
520 Pike Street, Suite 2300
Seattle, Washington 98101
(206) 405-0404

business judgment by not speaking with the upline manager before approving the commissions even though Plaintiff said he expected his manager to raise red flags that never materialized. (Kenny Dep. 48:18-49:7, 71:4-11, 72:8-13, 85:2-8, 91:17-23, 107:14-24, 226:2-228:3, 228:14-229:7, 235:18-24). Ms. Kenny recommended termination for Mr. Lee because he did not ensure that Mr. Sherrin's commissions were adjusted after being told by his manager to make an adjustment. (Kenny Dep. 177:5-21, 185:7-186:14).

   3) ***Based on Ms. Kenny's Recommendation, Plaintiff, Mr. Temidis, and Mr. Lee's Employment is Terminated.***

   Once Ms. Kenny develops a recommendation, she speaks with the North American Consistency Reviewer who reviews the recommendation to ensure it is an appropriate recommendation and consistent with recommendations in other situations. (Kenny Dep. 247:3-248:9, Mandel Dep. 44:19-45:1).[7] Russell Mandel was the consistency reviewer in this case. (Mandel Dep. 4p.14:19-45:1). Mr. Mandel spoke with Ms. Kenny and agreed with her recommendations. (Mandel Dep. 55:17-24). After Mr. Mandel approved the recommendations, the recommendations were sent to Dorothy Copeland, the manager responsible for implementing the recommendations and a Review Board which consisted of Lisa Mihalik (HR), Cindy Alexander (Finance), and Scott Ferrauiola (Legal). (Kenny Dep. 266:9-267:5, 267:21-268:16). The Review Board approved the recommended actions for Plaintiff, Mr. Temidis, and Mr. Lee. (Alexander Dep. 82:1-20).[8]

   Before agreeing with the recommendations, Ms. Copeland spoke with her managers Stephen Leonard and John Teltsch, Ms. Mihalik, and Ms. Copeland's HR partner Dominic Agostino. (Copeland Dep. 61:8-19). Ms. Mihalik and Mr. Leonard told Ms. Copeland that she had to follow the recommendation of termination. (Copeland Dep. 138:15-139:3). Ms. Copeland followed the recommendation from Ms. Kenny and all three employees were terminated. (Copeland Dep. 145:15-19). Plaintiff agrees that Ms. Copeland deferred the authority to make a

---

[7] The cited portions of Russell Mandel's Deposition ("Mandel Dep.") are attached as Exhibit F to the Declaration of Justin Barnes filed herewith.
[8] The cited portions of Cindy Alexander's Deposition ("Alexander Dep.") are attached as Exhibit G to the Declaration of Justin Barnes filed herewith.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 8
(CASE NO. 2:19-cv-01488-MJP)

Jackson Lewis P.C.
520 Pike Street, Suite 2300
Seattle, Washington 98101
(206) 405-0404

decision to Mr. Leonard, Ms. Mihalik, and Ms. Kenny and that Ms. Copeland's involvement in the decision was irrelevant. (Pl. Dep. 135:2-136:4). Plaintiff's employment was terminated on April 16, 2018. (Pl. Dep. 19:16-19). At the time of his termination, Plaintiff had been paid all commissions he was owed. (Pl. Dep. 153:22-154:4).

**D. Plaintiff Alleges He was Terminated for Complaints About Race Discrimination.**

Plaintiff alleges that he was terminated in retaliation for complaining about IBM's discriminatory treatment of an African American sales representative named Jerome Beard in comparison to Mr. Donato, who is Caucasian, because Mr. Beard's commissions were reduced on a different deal in 2017. (Am. Compl., Dkt. #20, ¶¶ 62-69). He believes he was terminated for his complaints because the offered explanation is "patently ridiculous." (Pl. Dep. 132:19-24). He believes this even though he is aware of other white sales representatives on the ESA team who had their commissions reduced. (Pl. Dep. 62:20-63:20). The first time Plaintiff alleges that he raised concerns about Mr. Beard's commissions and race discrimination was to Rose Nunez on November 15, 2017, after the allegations related to SAS had already been raised with Internal Audit and after Mr. Larkin initiated the investigation. (Pl. Dep. 63:21-64:13, 127:13-20; Johnson Dep. 29:7-30:1, 141:6-142:2; Larkin Dep. 86:3-15). After the first conversation with Ms. Nunez, Plaintiff alleges that he also raised concerns related to Mr. Beard's race to his manager Dave Mitchell. (Pl. Dep. 69:14-70:17). Plaintiff also alleges that he spoke with Ms. Copeland and Mr. Temidis regarding Mr. Beard's commission payments and concerns about race. (Pl. Dep. 71:11-73:5). The last time Plaintiff brought up Mr. Beard's race was to Ms. Copeland around January 25, 2018. (Pl. Dep. 78:23-80:6). Plaintiff does not know if Ms. Copeland, Mr. Mitchell, or Ms. Nunez told anyone about his concerns of race discrimination. (Pl. Dep. 80:7-13).

Ms. Copeland did not tell anyone about Plaintiff's concerns. (Copeland Dep. 54:8-10). Neither Mr. Mitchell nor Ms. Nunez told anyone about Plaintiff's concerns. (Mitchell Decl., ¶ 6; Nunez Decl., ¶ 6).[9] The individual who raised the allegations against Plaintiff (Karla Johnson),

---

[9] The declaration of Dave Mitchell ("Mitchell Decl.") is attached as Exhibit K to the Declaration of Justin Barnes filed herewith. The declaration of Rosalva Nunez ("Nunez Decl.") is attached as Exhibit L to the Declaration of Justin Barnes filed herewith.

Jackson Lewis P.C.
520 Pike Street, Suite 2300
Seattle, Washington 98101
(206) 405-0404

the investigator (Jeff Larkin), and the individual responsible for the recommendations of termination (Linda Kenny) did not know Mr. Beard's race at the time of the SAS investigation and were not aware of any complaints of race discrimination or any unlawful activity raised by Plaintiff. (Johnson Dep. 75:8-19, 194:12-16; Larkin Dep. 61:3-15, 297:11-25; Kenny Dep. 339:19-340:4). Likewise, at the time of the SAS investigation, Cindy Alexander, John Teltsch, Lisa Mihalik, Russell Mandel, and Stephen Leonard did not know Mr. Beard's race nor were they aware of any complaints of discrimination or unlawful conduct raised by Plaintiff. (Alexander Dep. 20:7-17, 299:6-15; Teltsch Dep. 147:20-148:1, 179:24-180:3; Mihalik Dep. 239:7-9, 265:14-17; Mandel Dep. 149:14-16, 167:12-18; Leonard Dep. 191:8-9, 247:7-16).[10]

**E. Plaintiff Alleges He was Terminated due to His Age.**

Plaintiff also alleges that he was terminated due to his age, 58. (Am. Compl., Dkt. #20, ¶¶ 125-129). While Plaintiff thinks his age may have contributed to his termination, he thinks the more likely final contributing factor were his complaints of race discrimination. (Pl. Dep. 151:13-152:5). Plaintiff believes he was terminated for his age because there were "programmatic efforts" to "remove older employees," one of which Plaintiff contends was called Project Sunrise. (Pl. Dep. 140:6-141:2). According to Plaintiff, Project Sunrise was executed via resource actions (IBM terminology for a reduction in force). (Pl. Dep. 141:3-14). Plaintiff was not terminated as part of a resource action. (Kenny Dep. 140:1-141:1).

Furthermore, at the time of his termination, Ms. Alexander, Ms. Copeland, Mr. Larkin, Mr. Teltsch, Ms. Johnson, Ms. Mihalik, Ms. Kenny, Mr. Mandel, and Mr. Leonard all did not know how old Plaintiff was. (Alexander Dep. 299:20-22; Copeland Dep. 222:13-18; Larkin Dep. 295:16-18; Teltsch Dep. 179-16-18; Johnson Dep. 191:3-6; Kenny Dep. 339:2-7; Mihalik Dep. 265:21-23; Mandel Dep. 175:2-3; Leonard Dep. 246:23-247:1).

## III.   ARGUMENT AND CITATION TO AUTHORITY

**A. Plaintiff's Retaliation Claim Fails.**

---

[10] The cited portions of John Teltsch's Deposition ("Teltsch Dep.") are attached as Exhibit H to the Declaration of Justin Barnes filed herewith; the cited portions of Lisa Mihalik's Deposition ("Mihalik Dep.") are attached as Exhibit I to the Declaration of Justin Barnes filed herewith; the cited portions of Stephen Leonard's Deposition ("Leonard Dep.") are attached as Exhibit J to the Declaration of Justin Barnes filed herewith.

Plaintiff alleges that he was fired in retaliation for his complaints of race discrimination in violation of RCW 49.60.210. To establish a *prima facie* case of retaliation, Plaintiff must show that (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the exercise of the legal right and the adverse employment action. *Dean v. Avis Budget Car Rental, LLC*, Case No. C10-277 MJP, 2011 U.S. Dist. LEXIS 50144, at *15 (W.D. Wash. May 10, 2011) (citing *Wilmot v. Kaiser Aluminum & Chem. Corp.*, 118 Wn. 2d 46, 68-69, 821 P.2d 18 (1991)). If Plaintiff establishes a *prima facie* case, IBM has the opportunity to show a legitimate non-retaliatory reason for the adverse action. *Id.* If IBM produces such evidence, Plaintiff must then show IBM's reason is pretextual, i.e. that retaliation was a substantial factor motivating the adverse action. *Id.* (citing *Allison v. Housing Authority of City of Seattle*, 118 Wash. 2d 79, 85, 821 P.2d 34 (1991)). Plaintiff's retaliation claim fails because he cannot show that there is a causal connection between his alleged protected activity and his termination. Furthermore, even if Plaintiff establishes a *prima facie* case of retaliation, he cannot show that IBM's reason for his termination was pretext for retaliation.

### 1) *Plaintiff Cannot Show His Termination of Employment was Causally Related to Any Alleged Complaints of Race Discrimination.*

Naturally, Plaintiff must show that the decision makers knew of his alleged protected activity to prove causation. *Carroll v. Univ. of Wash.*, No. C08-1498Z, 2010 U.S. Dist. LEXIS 152493, at *21 (W.D. Wash. Sept. 27, 2010) ("Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity.") (citation omitted). Plaintiff alleges he complained about race discrimination to Rose Nunez, Dave Mitchell, and Dorothy Copeland, but he does not know if any of them told anyone about his concerns. (Pl. Dep. 63:21-64:13, 69:14-70:17, 71:11-73:5, 80:7-13, 127:13-20). In fact, Ms. Copeland did not tell anyone about Plaintiff's concerns. (Copeland Dep. 54:8-10). Likewise, neither Mr. Mitchell nor Ms. Nunez told anyone about Plaintiff's concerns. (Mitchell Decl., ¶ 6; Nunez Decl., ¶ 6). Additionally, not only did none of the following individuals know Mr. Beard's race at the time of

**Jackson Lewis P.C.**
520 Pike Street, Suite 2300
Seattle, Washington 98101
(206) 405-0404

the investigation, they were not aware of any complaints of unlawful conduct by Plaintiff: the individual who raised the allegations against Plaintiff (Ms. Johnson); the individual who investigated the allegations (Mr. Larkin); the individuals who made the recommendation for termination (Ms. Kenny and Mr. Mandel); the Review Board (Ms. Mihalik and Ms. Alexander); and the individuals who told Ms. Copeland she needed to carry out the recommendation of termination (Mr. Leonard and Ms. Mihalik). (Johnson Dep. 75:8-19, 194:12-16; Larkin Dep. 61:3-15, 297:11-25; Kenny Dep. 339:19-340:4; Alexander Dep. 20:7-17, 299:6-15; Teltsch Dep. 147:20-148:1, 179:24-180:3; Mihalik Dep. 239:7-9, 265:14-17; Mandel Dep. 149:14-16, 167:12-18; Leonard Dep. 191:8-9, 247:7-16). The only person involved in the termination who was aware of any concerns raised by Plaintiff was Ms. Copeland, who testified that she was not the decision maker and merely implemented the recommendations. (Copeland Dep. 138:15-139:3, 145:15-19). Indeed, Plaintiff agrees that Ms. Copeland deferred the decision to others and that "her involvement was as close to irrelevant as [Plaintiff] could imagine." (Pl. Dep. 135:2-136:4). Additionally, the last alleged conversation Plaintiff and Ms. Copeland had regarding Plaintiff's concerns was almost three months prior to his termination. (Pl. Dep. 19:16-19, 78:23-80:6). *Serlin v. Alexander Dawson Sch., LLC*, 656 Fed. App'x 853, 856 (9th Cir. 2016) (three months between complaint and decision was insufficient evidence of causation where no other evidence of retaliation existed). Plaintiff cannot show that the decision makers were aware of his alleged protected activity and, thus, cannot show a causal connection.

Further, Plaintiff testified that the first time he complained about race discrimination was November 15, 2017. (Pl. Dep. 63:21-64:13, 127:13-20). It is undisputed that Ms. Johnson raised allegations regarding Plaintiff on October 16, 2017, a month prior to any alleged complaints by Plaintiff. (Johnson Dep. 29:7-30:1, 141:6-142:2). Further, the investigator, Mr. Larkin testified that he began his investigation in late October or early November. (Larkin Dep. 86:3-15). That the allegations and investigation were initiated prior to Plaintiff's alleged complaints further belies a finding of any causal connection between his termination and his alleged protected activity. *Ramsey v. City of Philomath*, 182 Fed. App'x 678, 680 (9th Cir. 2006) ("Where the

**Jackson Lewis P.C.**
520 Pike Street, Suite 2300
Seattle, Washington 98101
(206) 405-0404

decision to take an adverse employment action is made prior to any protected activity, no factfinder could find the requisite causal link between the employment action and the protected conduct."); *Harris v. City of Seattle*, 315 F. Supp. 2d 1112, 1126 (W.D. Wash. 2004) (where employer considered a reassignment of plaintiff with different responsibilities prior to the plaintiff's complaint, the plaintiff failed to establish the necessary causal link for a retaliation claim).

Accordingly, Plaintiff's retaliation claim fails.

**2) *Plaintiff Cannot Show that IBM's Legitimate Non-retaliatory Reason for His Termination of Employment was a Pretext for Retaliation.***

Even if Plaintiff can make out a *prima facie* case of retaliation (he cannot), he cannot show that IBM's reason for his discharge was a pretext for retaliation. IBM terminated Plaintiff (and Mr. Temidis) because they did not add quota for the SAS deal to Mr. Donato's quota as required, they were aware of but did not use the Specific Transaction provision or speak with anyone about using that provision, and they exercised poor business judgment by not speaking with the upline manager before approving the commissions even though Plaintiff said he expected his manager to raise red flags that never materialized. (Kenny Dep. 48:18-49:7, 71:4-11, 72:8-13, 85:2-8, 91:17-23, 107:14-24, 226:2-228:3, 228:14-229:7, 235:18-24). Thus, IBM has met its burden to show a legitimate, non-retaliatory action for its decisions. *Lillywhite v. AECOM*, Case No. C18-1840-JCC, 2020 U.S. Dist. LEXIS 205487, at *15 (W.D. Wash. Nov. 3, 2020) (termination for poor judgment and failure to follow policy was legitimate non-retaliatory reason); *Cockle v. Nelson*, No. 16815-8-III, 1999 Wash. App. LEXIS 166, at *19 (Ct. App. Wash. Feb. 2, 1999) (where employer argued conduct violated company policy it had met its burden of establishing a legitimate reason for the adverse action).

Plaintiff has no evidence that retaliation was a substantial factor motivating his termination of employment. In fact, the undisputed facts show the opposite. To believe Plaintiff's story, this Court must believe that individuals who did not know Mr. Beard's race or that Plaintiff had raised any concerns about race discrimination were somehow motivated by

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 13
(CASE NO. 2:19-cv-01488-MJP)

Jackson Lewis P.C.
520 Pike Street, Suite 2300
Seattle, Washington 98101
(206) 405-0404

retaliation for Plaintiff's complaints that they were not even aware of, including Karla Johnson who raised allegations prior to any complaints by Plaintiff, Jeff Larkin who initiated the investigation prior to any complaints by Plaintiff, and the decision makers. (Pl. Dep. 63:21-64:13, 127:13-20; Johnson Dep. 29:7-30:1, 141:6-142:2; Larkin Dep. 86:3-15). Accordingly, Plaintiff cannot show he was terminated in retaliation for his alleged complaints.

Although Plaintiff does not like the result of the investigation and thinks the reason for his termination is "patently ridiculous," this does not make a retaliation claim. *Atkins v. Runyon*, No. 97-56322, 1998 U.S. App. LEXIS 17532, at *3 (9th Cir. July 27, 1998) (citing *Collings v. Longview Fibre Co.*, 63 F.3d 828, 833-34 (9th Cir. 1995) (to avoid summary judgment, employee must produce specific, substantial, non-conclusory evidence of pretext)). Plaintiff has no evidence that retaliation was a substantial factor motivating his termination of employment, and his conclusory allegations are insufficient to save his claims. Therefore, the Court should grant IBM summary judgment on Plaintiff's retaliation claim. *See Dean v. Avis Budget Car Rental, LLC*, Case No. C10-277 MJP, 2011 U.S. Dist. LEXIS 50144, at *17-18 (W.D. Wash. May 10, 2011) (granting summary judgment to employer on retaliation claim where despite plaintiff's argument that defendant conducted an inadequate investigation into plaintiff's complaint, but rather investigated complaints against plaintiff, plaintiff could not show he was terminated in retaliation for his complaints).

**B. Plaintiff's Wrongful Termination Claim Fails.**

Plaintiff alleges that he was terminated in violation of public policy for reporting IBM's misconduct. Plaintiff bases his wrongful termination claim on the Washington Law Against Discrimination ("WLAD") and the policy against racial discrimination found in RCW 49.60.030. (Dkt. #20, at ¶¶ 107, 113). Additionally, Plaintiff bases his claim on the policy set forth in RCW 49.52.050 regarding payment of wages earned. (Dkt. #20, at ¶¶ 110, 113). To establish a claim for wrongful discharge in violation of public policy, Plaintiff must show either that the discharge alleged arises under one of four established public-policy related categories or meets the requirements of the alternative *Perritt* test adopted in *Gardner v. Loomis Armored, Inc.*, 128

Wn.2d 931, 936. *See, Martin v. Gonzaga University*, 191 Wn.2d 712, 723-24 (2018); *Becker v. Cmty. Health Sys., Inc.*, 184 Wash. 2d 252, 258-59, 359 P.3d 746, 749 (2015). Here, Plaintiff claims his discharge was in retaliation for reporting employer misconduct. Retaliation for reporting misconduct is the fourth category of public policy set forth in *Thompson* and *Wilmot* and reaffirmed in *Martin*.

Under *Martin*, Plaintiff must first show that his "discharge may have been motivated by reasons that contravene a clear mandate of public policy." *Martin*, 191 Wn.2d at 725. Plaintiff first must establish a *prima facie* case by producing evidence that the public-policy-linked conduct was a cause of the firing. *Id.* at 725-26. If Plaintiff succeeds in presenting a *prima facie* case, the burden then shifts to IBM to "articulate a legitimate nonpretextual nonretaliatory reason for the discharge." *Id.* (citation omitted). This is a burden of production, not persuasion. *Id.* ("The employer must produce relevant admissible evidence of another motivation, but need not do so by the preponderance of evidence necessary to sustain the burden of persuasion, because the employer does not have that burden.") (citation omitted). If IBM articulates such a reason, the burden shifts back to Plaintiff either to show "that the reason is pretextual, or by showing that although the employer's stated reason is legitimate, the [public-policy-linked conduct] was nevertheless a substantial factor motivating the employer to discharge the worker." *Id.* (citations omitted).

Here, Plaintiff cannot show his alleged public-policy-linked conduct caused his termination of employment (e.g. decision makers were not aware of any complaints by Plaintiff of unlawful conduct) or that IBM's reason for discharge is a pretext for retaliation. *See* Section II.A above. Additionally, as with his alleged complaints of race and age discrimination, the investigation of the SAS deal was initiated prior to Plaintiff raising any complaints about IBM's failure to pay Mr. Beard his earned commissions. (Pl. Dep. 63:21-64:13, 127:13-20; Johnson Dep. 29:7-30:1, 141:6-142:2; Larkin Dep. 86:3-15). A complaint that happened later in time cannot be the cause of a termination that began with the earlier investigation.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 15
(CASE NO. 2:19-cv-01488-MJP)

Jackson Lewis P.C.
520 Pike Street, Suite 2300
Seattle, Washington 98101
(206) 405-0404

Further, with respect to Plaintiff's alleged protected activity under the Wage Act, Plaintiff has failed to even identify any employee who he contends was protected by the Wage Act, much less any employee whose rights under the Wage Act were violated. And even if he could identify such a person, this Court previously dismissed Plaintiff's claims for violation of the Wage Act in light of the plain language in IBM's commission plans (i.e., the IPLs). (Dkt. #27, at pp. 9-10). Thus, IBM could not have violated RCW 49.52.050 in reducing any employee's commissions, and that statute could not have formed the predicate for any alleged protected activity. *Dicomes v. State*, 113 Wn. 2d 612, 620, 624 (1989) (affirming summary judgment to employer where there was no violation of public policy after considering whether "the employer's conduct constituted either a violation of the letter or policy of the law.").

Accordingly, the Court should grant IBM summary judgment on Plaintiff's wrongful termination claim.

### C. Plaintiff's Age Discrimination Claim Fails.

Plaintiff also alleges that his employment was terminated due to his age. To succeed on his age discrimination claim, Plaintiff must show that his age was a substantial or motivating factor behind his termination. *Trzebiatowski v. Walgreen Co.*, Case No. C09-0228-RSM, 2011 U.S. Dist. LEXIS 7851, at *9 (W.D. Wash. Jan. 27, 2011). Plaintiff has no direct evidence of age discrimination. (Pl. Dep. 143:25-145:9). Thus, Plaintiff's age discrimination claim is subject to a burden-shifting analysis. *Trzebiatowksi*, 2011 U.S. Dist. LEXIS at *9. Plaintiff bears the burden of proving (1) that he is over 40; (2) that he was discharged; (3) that he was doing satisfactory work; and (4) he was replaced by a younger person. *Id.* If Plaintiff proves a *prima facie* case, IBM then has the opportunity to articulate a legitimate, non-discriminatory reason for Plaintiff's discharge. *Id.* at *10. Then, to create a genuine issue of material fact, Plaintiff must satisfy his ultimate burden of persuasion and show that IBM's articulated reasons are a mere pretext for a discriminatory purpose. *Id.*

Plaintiff bases his age discrimination claim on nothing besides speculation. Specifically, Plaintiff believes he was terminated for his age because there were "programmatic efforts" to

Jackson Lewis P.C.
520 Pike Street, Suite 2300
Seattle, Washington 98101
(206) 405-0404

"remove older employees," one of which was allegedly called Project Sunrise. (Pl. Dep. 140:6-141:2). According to Plaintiff, Project Sunrise was executed via resource actions (IBM's terminology for reductions in force). (Pl. Dep. 141:3-14). However, Plaintiff was not terminated as part of a resource action. (Kenny Dep. 140:1-141:1). Plaintiff has no evidence that his age was a substantial or motivating factor in his termination other than speculating that his age was a "contributing cause to my termination is I believe entirely possible, probable." *Id.* This is not enough to establish a claim for age discrimination. *Grimwood v. Univ. of Puget Sound*, 110 Wn. 2d 355, 360-65 (Wa. 1988) (affirming summary judgment where plaintiff's claim of age discrimination was based on nothing more than conclusory statements by plaintiff).

Additionally, as discussed above when discussing Plaintiff's retaliation claim, IBM had a legitimate non-discriminatory reason for terminating Plaintiff's employment. *See* Section II.C. 3) above. Plaintiff cannot show that IBM's articulated reason is a pretext for age discrimination, because Plaintiff has offered no basis to tie his age to his termination and further, no one involved in the decision to terminate Plaintiff's employment was even aware of his age. (Alexander Dep. 299:20-22; Copeland Dep. 222:13-18; Larkin Dep. 295:16-18; Teltsch Dep. 179-16-18; Johnson Dep. 191:3-6; Kenny Dep. 339:2-7; Mihalik Dep. 265:21-23; Mandel Dep. 175:2-3; Leonard Dep. 246:23-247:1).

Accordingly, the Court should grant IBM summary judgment on Plaintiff's age discrimination claim.

**D. Plaintiff's Unjust Enrichment Claim Fails.**

Plaintiff asserts a claim for unjust enrichment, which requires "a benefit conferred upon the defendant by the plaintiff," as well as "the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Young v. Young,* 164 Wn.2d 477, 484 (2008) (citing *Bailie Communications, Ltd. v. Trend Bus. Sys., Inc.*, 61 Wn. App. 151, 160 (1991)). Plaintiff admits that he was paid all commissions he was owed at the time his employment was terminated. (Pl.

Jackson Lewis P.C.
520 Pike Street, Suite 2300
Seattle, Washington 98101
(206) 405-0404

Dep. 153:22-154:4). Notwithstanding this damning admission, Plaintiff claims he is owed additional commissions by IBM.

Specifically, Plaintiff contends that after his termination the revenue on the ledger was revised for deals that were closed while he was employed and already paid commissions for, which would have resulted in additional commissions to him if he had still been employed. (Pl. Dep. 154:5-15). A provision in Plaintiff's IPL addressed this exact situation when an individual may leave IBM in the middle of a plan period. Specifically, Plaintiff's IPL stated:

> **Leaving the Plan Early:** If for any reason (including leaving IBM's employment) you leave your currently assigned Incentive Plan before the last day of its full-plan period, ***your final achievement for that Plan will be based on business results credited to you as of the last day of the last full-month you were on that Plan***. The final incentive payments will be made according to the normal payment schedule for that Plan. If you remain with IBM in a non-incentives role, after receiving your final incentives payment your future IBM compensation will be determined by the terms of your new role.

(Pl. Dep. Ex. 12, at p. 3 (emphasis added)). Per this provision, Plaintiff was entitled to commissions based on the revenue results as of the last day he was employed, and Plaintiff admits he was paid all commissions he was due as of the last day of his employment. (Pl. Dep. 153:22-154:4). Thus, based on the unambiguous terms of his IPL, Plaintiff was not entitled to additional commissions after his termination. *See Babcock v. ING Life Ins. & Annuity Co.*, No. 12-CV-5093-TOR, 2013 U.S. Dist. LEXIS 1035, at *21-23 (E.D. Wash. Jan. 2, 2013) (granting defendant summary judgment on plaintiff's unjust enrichment claim where a release made clear that plaintiff was entitled to periodic payments but not any investment proceeds of the annuity purchased by defendant). As Plaintiff himself testified, he believes "people should be paid according to the rules of the IBM commission program, which are specified in each of their quota plans, quota letter…" (Pl. Dep. 107:13-19). Here, Plaintiff was paid pursuant to the terms specified in his commission plan.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 18
(CASE NO. 2:19-cv-01488-MJP)

**Jackson Lewis P.C.**
520 Pike Street, Suite 2300
Seattle, Washington 98101
(206) 405-0404

1    Accordingly, the Court should grant IBM summary judgment on Plaintiff's unjust
2    enrichment claim.

3                                  **IV.    CONCLUSION**

4    For the foregoing reasons, IBM respectfully requests that this Court grant its Motion for
5    Summary Judgment and dismiss this action in its entirety.

6

7    DATED this 14th day of December, 2020.

8                                              Respectfully submitted,

9                                              JACKSON LEWIS P.C.

10                                             By: *s/ Barry Alan Johnsrud*
                                                  Barry Alan Johnsrud, WSBA #21952
11                                                520 Pike Street, Suite 2300
                                                  Seattle, WA 98101
12                                                Telephone: 206-405-0404
                                                  Facsimile:  206-405-4450
13                                                Email: Barry.Johnsrud@jacksonlewis.com

14
                                                  *s/ Justin R. Barnes*
15                                                Justin R. Barnes (*pro hac vice*)
                                                  Kelli N. Church (*pro hac vice*)
16                                                JACKSON LEWIS P.C.
                                                  171 17th Street, N.W., Ste. 1200
17                                                Atlanta, GA 30363
                                                  Telephone: (404) 525-8200
18                                                Facsimile: (404 525-1173
                                                  Email: Justin.Barnes@jacksonlewis.com
19                                                Email: Kelli.Church@jacksonlewis.com

20                                                Attorneys for Defendant

21

22

23

24

25

26

27

28

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 19
(CASE NO. 2:19-cv-01488-MJP)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### DECLARATION OF SERVICE

The undersigned declares under penalty of perjury under the laws of the United States of America that on this day, I electronically filed a true and accurate copy of the document to which this declaration is affixed with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to the following:

Toby J. Marshall, WSBA #32726
Brittany J. Glass, WSBA #52095
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, WA 98103
tmarshall@terrellmarshall.com
bglass@terrellmarshall.com

Attorneys for Plaintiff

Matthew E. Lee, *pro hac vice*
Jeremy R. Williams, *pro hac vice*
WHITFIELD BRYSON & MASON, LLP
900 W. Morgan Street
Raleigh, NC  27603
matt@whitfieldbryson.com
jeremy@whitfieldbryson.com

Attorneys for Plaintiff

DATED this 14th day of December, 2020 at Lynnwood, Washington.



_____
Nani Vo

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 20
(CASE NO. 2:19-cv-01488-MJP)

**Jackson Lewis P.C.**
520 Pike Street, Suite 2300
Seattle, Washington 98101
(206) 405-0404