UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

SCOTT KINGSTON,

               Plaintiff,

   v.

INTERNATIONAL BUSINESS MACHINES
CORPORATION, a New York corporation,

               Defendant.

NO. 2:19-CV-01488-MJP

**PLAINTIFF'S RESPONSE TO
DEFENDANT INTERNATIONAL
BUSINESS MACHINES' MOTION
FOR SUMMARY JUDGMENT**

**ORAL ARGUMENT REQUESTED**

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5240
www.terrellmarshall.com

# TABLE OF CONTENTS

                                                            **Page**

I. INTRODUCTION ........................................................................................... 1

    A. Kingston was a highly valued IBM employee for nearly eighteen years ........... 1

    B. The ESA team and IBM's method of establishing quota .................................. 2

        1. The ESA team ........................................................................................ 2

        2. Payment structure and quota establishment ........................................... 2

    C. It is undisputed that IBM policies prohibit the capping of commissions
        and the tying of commissions to contribution ..................................................... 3

    D. Nick Donato closes a large sale to SAS Institute and earns an uncapped
        commission of ▮▮▮▮▮ ........................................................................... 4

        1. The SAS deal closes and triggers a large commission to
            Nick Donato ........................................................................................... 4

        2. Kingston and Temidis approved Donato's payment consistent
            with IBM's high achievement review process and
            no-capping policy ................................................................................... 6

        3. Karla Johnson reviewed the approval process and found
            no problems. ........................................................................................... 7

    E. Jerome Beard closes two large deals with HCL that earn him
        nearly $1.5 million each, but IBM caps him at less than 15% of what
        he was owed ........................................................................................................ 7

        1. The HCL deal triggers a large payment to Jerome Beard, which
            IBM caps ............................................................................................... 7

        2. Kingston repeatedly objects to capping Beard's payments ................... 9

        3. Beard sues IBM and the court finds that there is a genuine
            issue of material fact as to whether IBM's conduct
            was discriminatory ............................................................................... 10

    F. IBM attempts to cover its differential treatment of Jerome Beard,
        and get rid of Kingston, by portraying Kingston as the problem .................... 10

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

1.     Karla Johnson reverses course on the Donato payment to justify capping Beard and offers contradictory bases for Kingston's purported error.................................................................................10

2.     Larkin's report is incomplete and inconsistent with IBM policies and heavily influenced by Johnson.......................................11

    a.     Larkin did not consider IBM's no-capping policy ..................12

    b.     Larkin admits that IBM's policies contradict his findings and that managers were given no guidance on the significant transaction clause..................................................13

    c.     IBM took no action against other employees Larkin found to be at fault...................................................14

G.     Kingston is terminated.........................................................15

1.     Alexander emailed Larkin and Kenny about the Beard matter during the period when she and the rest of the review board were reviewing Kingston's case.........................................15

2.     Decisionmakers testified they relied on incorrect information and their basis for termination conflicts with testimony from IBM's designated representative .........................................16

H.     Kingston was not paid his full commissions for work in the first quarter of 2018 .................................................16

I.     Employees involved in the Kingston's termination knew he was over 40.......17

II.     AUTHORITY AND ARGUMENT .................................................17

A.     Genuine issues of material fact exist as to Kingston's retaliation claim..........17

1.     Kingston can establish a prima facie case of retaliation......................17

2.     A jury could find IBM's asserted justification for Kingston's termination is pretext ..........................................20

B.     Genuine issues of material fact exist as to Kingston's wrongful termination claim.........................................................21

C.     Genuine issues of material fact exist as to Kingston's age discrimination Claim .........................................................23

PLAINTIFF'S RESPONSE TO DEFENDANT
INTERNATIONAL BUSINESS MACHINES' MOTION
FOR SUMMARY JUDGMENT - ii
CASE NO. 2:19-CV-01488 MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

D.       Genuine issues of material fact exist as to Kingston's unjust
         enrichment claim ............................................................................... 24

III.    CONCLUSION .......................................................................................... 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

# <u>TABLE OF AUTHORITIES</u>

**Page**

## FEDERAL CASES

Page

*Beard v. Int'l Bus. Machines Corp.*,
No. C 18-06783 WHA, 2020 WL 1812171 (N.D. Cal. Apr. 9, 2020). .................... 1, 10

*Coghlan v. Am. Seafoods Co. LLC*,
413 F.3d 1090 (9th Cir. 2005) ................................................................. 24

*Dries v. Sprinklr, Inc.*,
No. C20-47-MLP, 2020 WL 6119423 (W.D. Wash. Oct. 16, 2020) ........................... 22

*Grimwood v. Univ. of Puget Sound*,
753 P.2d 517 (Wash. 1988) ................................................................. 23

*Harris v. City of Seattle*,
315 F. Supp. 2d 1112 (W.D. Wash. 2004) ................................................. 19

*Ramsey v. City of Philomath*,
182 F. App'x. 678 (9th Cir. 2006) ......................................................... 19

*Scrivener v. Clark College*,
334 P.3d 541 (Wash. 2014) ................................................................. 24

*Serlin v. Alexander Dawson Sch., LLC*,
656 F. App'x 853 (9th Cir. 2016) .......................................................... 19

*Singleton v. Intellisist, Inc.*,
No. C17-1712-RSL, 2018 WL 2113973 (W.D. Wash. May 8, 2018) ....................... 22

*Trzebiatowski v. Walgreen Co.*,
No. C09-0228-RSM, 2011 WL 307377 (W.D. Wash. Jan. 27, 2011) ...................... 23

## STATE CASES

*Anica v. Wal-Mart Stores, Inc.*,
120 Wn. App. 481, 84 P.3d 1231 (2004) ................................................... 19

*Bengtsson v. Sunnyworld Int'l, Inc.*,
14 Wn. App. 2d 91, 469 P.3d 339 (2020) ............................................... 20, 21

*Cornwell v. Microsoft Corp.*,
192 Wn.2d 403, 430 P.3d 229 (2018) ................................................ 17, 18, 19

PLAINTIFF'S RESPONSE TO DEFENDANT
INTERNATIONAL BUSINESS MACHINES' MOTION
FOR SUMMARY JUDGMENT - iv
CASE NO. 2:19-CV-01488 MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

*Dicomes v. State*,
  113 Wn.2d 612, 624, 782 P.2d 1002 (1989) ...................................................... 22

*Kahn v. Salerno*,
  90 Wn. App. 110, 951 P.2d 321 (1998) ........................................................... 17

*Mackey v. Home Depot USA Inc.*,
  12 Wn. App. 2d 557, 459 P.3d 371 (2020) ..................................................... 18

*Martin v. Gonzaga Univ.*,
  191 Wn.2d 712, 725, 425 P.3d 837 (2018) ..................................................... 21

*Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas Cnty.*,
  189 Wn.2d 516, 536, 404 P.3d 464 (2020) .................................................... 23

*Morgan v. Kingen*,
  166 Wn.2d 526, 210 P.3d 995 (2009) .............................................................. 22

*Renz v. Spokane Eye Clinic, P.S.*,
  114 Wn. App. 611, 60 P.3d 106 (2002)........................................................... 20

*Rice v. Offshore Sys., Inc.*,
  167 Wn. App. 77, 272 P.3d 865 (2012)........................................................... 20

*Thompson v. St. Regis Paper Co.*,
  102 Wn.2d 219, 685 P.2d 1081 (1984) ........................................................... 21

*Vasquez v. State, Dep't of Soc. & Health Servs.*,
  94 Wn. App. 976, 974 P.2d 348 (1999)........................................................... 19

## FEDERAL RULES

Rule 30(b)(6) ............................................................................................... *passim*

## STATE STATUTES

RCW 49.52.050 ........................................................................................... 22

RCW 49.52.070 ........................................................................................... 22

RCW 49.60.030 ........................................................................................... 21

RCW 49.60.210 ........................................................................................... 17

PLAINTIFF'S RESPONSE TO DEFENDANT
INTERNATIONAL BUSINESS MACHINES' MOTION
FOR SUMMARY JUDGMENT - v
CASE NO. 2:19-CV-01488 MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

# I. INTRODUCTION

IBM provides multiple, incompatible reasons for Kingston's termination, but the evidence indicates they are simply pretext to cover up the real reason for his termination: eliminating an older employee who objected to IBM capping a Black salesperson's commissions in violation of IBM policy and the law. When that salesperson, Jerome Beard, sued IBM for racial discrimination, IBM moved for summary judgment and the court largely denied the motion. *Beard v. Int'l Bus. Machines Corp.*, No. C 18-06783 WHA, 2020 WL 1812171, at *13 (N.D. Cal. Apr. 9, 2020). IBM's motion should be denied here as well. There is evidence before this Court directly from the white-salesperson-comparator, Nick Donato, that *IBM never asked him* to return any portion of the ████████ the company claims should not have been approved. Donato Decl. ¶¶ 3-6. That alone could (and should) raise serious doubts about IBM's excuse to any reasonable juror. As it always seems to do in these cases, IBM recites facts incompletely and improperly frames them in a light most favorable to IBM. The full record, viewed in the light most favorable to Mr. Kingston, shows genuine issues precluding summary judgment. This is not a close call.

## A.    Kingston was a highly valued IBM employee for nearly eighteen years.

Scott Kingston had been working for IBM for nearly eighteen years when he was terminated on April 16, 2018, at the age of 58. Ex.[1] 1 at 19:13-18; Ex. 2 at 3. He was a highly valued and successful employee. From 2015 to 2017, he reported to Dave Mitchell, who testified that Kingston was "very ethical," "very committed," and "very smart." Ex. 3 at 88:16-89:9, 92:17-21, 130:18-131:11. In Kingston's 2017 performance review, dated March 1, 2018, Mitchell reported that Kingston "exceeded" all objectives and measures in three of the five review categories. Ex. 4 at 33. Mitchell noted that Kingston "led the ESA team to great success in 2017, greatly exceeding plan and returning the business to double digit growth," and that "Scott is a strong leader despite the complexities of having to manage a team spread across

---

[1] Unless otherwise noted, exhibits are attached to the Declaration of Toby J. Marshall. A list of relevant individuals and three flow charts are attached as exhibits A-D to the Declaration.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

multiple brands." *Id.* Mitchell added that Kingston "is often sought out as a subject matter expert on the embedded model and I expect this will only increase as IBM continues to recognize the value of the embed model." *Id.* Dorothy Copeland, who became Kingston's direct supervisor in January 2018, agreed his 2017 performance review did not look like that of someone who would be terminated for cause six weeks later. Ex. 5 at 140:19-144:12.

Kingston's 2017 performance review is consistent with the positive reviews he received in each of the three preceding years. Ex. 6 at 28-31 (2016 review rating Kingston at highest marks for three of five review categories and noting he was "instrumental in developing the new business with [Worldwide] team"); Ex. 2 at 11-13 (2015 review rating Kingston "among the top contributors"); *id.* at 14-17 (2014 review rating Kingston "above average contributor").

**B.      The ESA team and IBM's method of establishing quota.**

1.      The ESA team.

Kingston was a second-line manager for the embedded solutions agreement (ESA) team, a sales team responsible for deals under which IBM licenses its software to other technology companies. Ex. 5 at 167:5-18; Ex. 3 at 32:24-34:14. Kingston directly supervised first-line managers, including Andre Temidis and Greg Mount, who in turn supervised sales representatives—Temidis supervised Nick Donato, and Mount supervised Jerome Beard. Ex. 5 at 22:21-25:6; Ex. 7 at 26:13-20. Ex. A. A technical sales team supported the ESA team and consisted of representatives Kami Nazem and William (Bil) Sherrin, first-line manager Mike Lee, and second-line manager Bob Finnecy (Kingston's peer). Ex. 1 at 109:23-110:4; Ex. 5 at 23:17-24:4; Ex. B. The technical sales team reported to Dorothy Copeland in 2018. *Id.*

2.      Payment structure and quota establishment.

IBM paid Kingston and other members of the ESA team under a commissions plan called the individual quota plan (IQP). Ex 8 at 84:10-13. They each received an electronically issued incentive plan letter (IPL) every six months, which contained quotas and commission formulas. Ex. 1 at 22:8-23; Ex. 9.

IBM's finance team provided a total quota amount to Kingston at the beginning of a

PLAINTIFF'S RESPONSE TO DEFENDANT
INTERNATIONAL BUSINESS MACHINES' MOTION
FOR SUMMARY JUDGMENT - 2
CASE NO. 2:19-CV-01488 MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

six-month sales period that was allocated among members of the team. Ex. 1 at 30:8-20. The total quota was built "bottom up," meaning finance set a specific amount for each account based on the account's "historical baseline"—that is, the "baseline from the previous sales period." *Id.* at ** 31:3–33:5; Ex. 10 at 2771; Ex. 8 at 92:14-20; 142:12-144:5. An "uplift" or percentage increase was added to each account "based on [IBM's] desired growth rate . . . ." Ex. 1 at 31:3–33:5. The sum of individual quotas for those accounts equaled the total quota. *Id.*

When he received the total quota for a given period, Kingston allocated it among team members "exactly as it was prescribed by the account[s]" the team members held. *Id.* at 33:17-20, 34:10–35:20. In other words, the quota for any given account was identical to the individual quota Kingston received from the finance team. *Id.* When the finance team assigned "zero quota" to an account, the allocated amount to the salesperson who held the account would also be zero. *Id.* at 34:10–38:8, 98:14-16, 99:22–100:1.

## C. It is undisputed that IBM policies prohibit the capping of commissions and the tying of commissions to contribution.

IBM Rule 30(b)(6) representative Karla Johnson testified that IBM prohibits capping commissions for sellers on an IQP and expects its employees, including managers, to enforce its no-capping policy. Ex. 8 at 24:11-25:10, 58:21-24, 59:5-9. If a manager capped a sales representative's commissions, that would violate IBM policy. *Id.* at 25:11-18. IBM also requires that IQP commissions be calculated based on sales, not an individual's contribution. *Id.* at 36:11-21, 56:12-22. IBM prohibits capping because uncapped commissions motivate representatives to sell more. Ex. 11 at 30:17-31:7; Ex. 7 at 50:3-15. IBM also uses accelerators to drive sales; representatives are paid more the more they sell. Ex. 11 at 31:8-32:10.

IBM provided clear guidance to the ESA team that capping was prohibited and that contribution should not be factored into commissions. The "primary education" IBM used for this in 2017 was a PowerPoint presentation. Ex. 12; Ex. 8 at 40:23-41:6. On slide 8, IBM describes various incentive plans, including the IQP. In its description of the IQP, IBM emphasizes in bold, red text: "**Managers are required to assign a territory and quota for**

PLAINTIFF'S RESPONSE TO DEFENDANT
INTERNATIONAL BUSINESS MACHINES' MOTION
FOR SUMMARY JUDGMENT - 3
CASE NO. 2:19-CV-01488 MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

each seller on an individual quota plan. Seller earnings for these plans are uncapped and the plan is paid based upon achievement results rather than on an assessment of employee contribution.** Ex. 12 at 289. On slide 10, IBM lists "payments uncapped" under "2017 Individual Quota Plan Highlights." *Id.* at 292. The phrase "[e]arnings opportunity is uncapped" is repeated thirteen additional times, reinforcing that commissions may not be capped. *Id.* at 295-96, 298, 300, 302, 304, 306, 308, 310, 312, 314-15, 317. IBM also published a manager's guide to incentive plans directed specifically at the ESA sales team that summarizes the IQP and lists "payments uncapped" as one of the plan highlights. Ex. 13 at 1255.

Johnson testified it was reasonable for managers and sales employees to rely on IBM's PowerPoint and the manager's guide. Ex. 8 at 41:7-10, 85:17-24. She also said the "education materials" IBM provided to Donato (and other ESA team members) "represented" that "his earnings opportunity" and "payments were uncapped." *Id.* at 40:5-15, 41:18-42:4. Other IBM employees responsible for the decision to terminate Kingston agreed that based on it was reasonable for a managers to rely on IBM's education materials, believe seller earnings for the IQP plans were uncapped, and believe the plan was based on achievement rather than contribution. Ex. 14 at 178:11-181:13, 204:17-205:18; Ex. 11 at 171:8-172:2.

**D.   Nick Donato closes a large sale to SAS Institute and earns an uncapped commission of** ▮▮▮▮▮▮

  1.   The SAS deal closes and triggers a large commission to Nick Donato.

On June 20, 2017, an IBM Vice President for another sales division reached out to Kingston for help closing a deal with SAS Institute. Ex. 15 at 1713; Ex. 1 at 88:10-89:2. The SAS deal was in Kingston's territory, which included all ESA sales in North America, but quota had not been assigned to any sales representatives on the ESA team based on the historical baseline set by finance, which took into account that there had been no sales to SAS in the prior year. Ex. 1 at 31:3–33:5, 95:22-97:11. Because quotas were based on historical purchases, it was not unusual for there to be no quota for the ESA team on an account within Kingston's territory. *Id.* at 35:22-37:1. Unlike other teams at IBM, the ESA team could work

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  with any account, which "ma[de] the scope of the universe very large" and made the team

2  "more prone than any other sales team to this kind of situation where they can work on a very

3  large deal and generate a result that would be . . . much larger than their quota." Ex. 3 at

4  Mitchell 22:2-20. The commissions would typically even out over time because sellers would

5  have additional quota the following year based on that large transaction. Ex. 1 at 35:12-37:1.

6      Kingston assigned the SAS deal to Donato, who was in Pennsylvania, and Temidis

7  because "[Donato] was in the correct territory for SAS" and "may have actually covered SAS

8  at some point and [Temidis] was his manager." Ex 1 at 92:9-22; Ex. 57. With the assistance of

9  Kingston, Temidis, and Donato, the SAS deal closed on June 30, 2017. *Id.* at 93:5-95:10.

10     On July 5, 2017, IBM finance executive Mark Baglini emailed the commission team

11  instructions from the executives who worked on the SAS deal as to who should receive

12  commissions, stating ████████████████████████████████████████

13  ████████████████████████████████████████████████████." Ex. 16 at

14  1791-92; Ex. 8 at 162:7-163:15. After reviewing the SAS deal, Johnson, a commissions

15  executive, told Baglini and North American Finance VP Cindy Alexander that ████████

16  ████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████

21  ████████████████████." *Id.* at 2832; Ex. 8 at 164:19-25, 166:8-14, 170:15-171:21.

22     The three executives determined that ████████████████████████████

23  ████████████████████████████████." Ex. 17 at 2831-32; Ex. 8 at 166:8-167:20;

24  Ex. 18 at 1557. Notably, none of the executives said that Kingston should apply the significant

25  transaction clause—the reason later given for Kingston's termination. Ex. 8 at 128:25-131:11,

26  131:19-22, 160:19-161:6; Ex. 17; Ex. 19; Ex. 21 at 401; Ex. 22 at 189:19-190:6.

27     According to IBM's 1H2017 Quota Setting Guidelines, a one-time share of credit is a

PLAINTIFF'S RESPONSE TO DEFENDANT
INTERNATIONAL BUSINESS MACHINES' MOTION
FOR SUMMARY JUDGMENT - 5
CASE NO. 2:19-CV-01488 MJP

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  ██████████████████████████████████████████████████████████████

2  ████████████████ Ex. 23 at 2702. The guidelines state that ████████████

3  ██████████████████████████████████████████████████

4  ████████████████████████████████████ *Id.* at 703. Thus, the determination

5  by executives that ██████████████████████████████ d was contrary

6  to IBM's policy. It also violated IBM's policy to calculate IQP commissions based on

7  contribution. Ex. 8 at 36:11-21, 56:12-22.

8          Ultimately, share of credit was not applied because no one communicated that decision

9  to Kingston's team or otherwise ensured it was applied. *Id.* at 167:21-169:5. Johnson testified

10  that this was a mistake, which is important because IBM claims to have terminated Kingston

11  and Temidis for not handling the SAS commissions correctly—despite admitting they were

12  never told how the deal should have been handled. Ex. 8 at 167:21-169:5; Ex. 21 at 401; Ex. 22

13  at 189:19-190:6; Ex. 24 at 2841.

14          The commission team added SAS to Donato's account coverage on ██████ at Temidis's

15  request. Ex. 1 at 96:11-20; 97:13-98:10; Ex. 21 at 400. It was not unusual that an account was

16  updated after a deal was completed. Ex. 58. Under Donato's commission formula, ████████

17  ██████████████████████████████████████████████████. Ex. 25 at

18  1926. IBM does not dispute that Donato should be paid for his work on the deal. Ex. 22 at

19  277:14-21; Ex. 8 at 166:8-167:20; Ex. 5 at 205:20-206:10; Ex. 14 at 72:21-24.

20          2.    Kingston and Temidis approved Donato's payment consistent with IBM's high
              achievement review process and no-capping policy.

21          IBM has a process for internally reviewing commissions before payment. Ex. 8 at 58:5-

22  14; Ex. 26 at 391. The so-called "out-of-range" or "high achievement" review is a written

23  process with standard procedures. *Id.* The commission team first checks for errors and then, for

24  large payments, emails first-line managers asking them to "████████████████████████

25  ████████████████████" Ex. 1 at 112:17-113:7; Ex. 26 at 391-92, 394.

26

27

PLAINTIFF'S RESPONSE TO DEFENDANT
INTERNATIONAL BUSINESS MACHINES' MOTION
FOR SUMMARY JUDGMENT - 6
CASE NO. 2:19-CV-01488 MJP

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  Communication to second-line managers, like Kingston, is "███████." Ex. 26 at 391 n 1.

2  ████████████████████████████████████████████ *Id.* at 391-92.

3         Because Donato's commission was greater than 400% of his quota, the commission

4  team emailed ████████████████████████████████████████████████████

5  ████████████████████████. Ex. 1 at 115:12-116:18; Ex. 27 at 1567-68. ████████

6  ████████████████████████████████████████. Ex. 28 at 3168.

7  ████████████████████████████████████████████████. Ex. 1 at 111:13-117:12;

8  Ex. 27 at 1567-68. ██████████████████████████████████████ Ex 21 at

9  401, 403. Kingston also "███████████████████████████████████████████████████"

10  *Id.* at 403. Johnson, as IBM's 30(b)(6) designee, agreed Kingston's belief that Mitchell would

11  review Donato's commission was reasonable. Ex. 8 at 136:16-23.

12         3.    Karla Johnson reviewed the approval process and found no problems.

13         Not long after the payment was made, Johnson was asked to review the approval

14  process and identified no problems. On October 7, 2017, she responded to an inquiry from

15  IBM's Director of Finance about ████████████████████████████████████████

16  ████████████████████████████████████." Ex. 20 at 1921. Johnson

17  noted ████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████

19  ████████████████████████ *Id.*; Ex. 8 at 128:25-131:11. ████████████████

20  ████████████████████████. *Id.* at 131:19-22. It was only after IBM decided to cap

21  the commissions of a Black representative on the ESA team that Johnson raised an issue with

22  Donato's ████████████████. Even then, IBM never tried to recover any of it. Donato Decl.

23  ¶¶ 3-6; Ex. 5 at 183:12-185:10; Ex. 14 at 120:16-121:12; Ex. 29; Ex. 30 at 257:9-17.

24  **E.    Jerome Beard closes two large deals with HCL that earn him nearly $1.5 million each, but IBM caps him at less than 15% of what he was owed.**

25         1.    The HCL deal triggers a large payment to Jerome Beard, which IBM caps.

26         Not long after it paid out commissions on the SAS deal, IBM closed a deal with HCL

27

PLAINTIFF'S RESPONSE TO DEFENDANT
INTERNATIONAL BUSINESS MACHINES' MOTION
FOR SUMMARY JUDGMENT - 7
CASE NO. 2:19-CV-01488 MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  Technologies that resulted in another large commission payment, this time to Jerome Beard.

2  Ex. 8 at 131:23-132:19, 142:22-143:9. Beard was subject to the "same rules" for "commission

3  payments" as Donato. *Id.* at 78:8-25. Beard is Black and Donato is white. Ex. 7 at 151:8-11.

4  Under IBM's automated procedures, and based on his quota and territory, Beard was set

5  to receive more than $1.4 million for the HCL deal. Ex. 31 at 2363. Beard's first-line manager

6  approved the payment on October 18, 2017. Ex. 7 at 62:23-65:9; Ex. 32 at 25. The next day,

7  Kingston and Mitchell, Beard's second- and third-line managers, approved it. Ex. 3 at 220:1-

8  19; Ex. 31 at 2362; Ex. 33 at 11. Mitchell was not disciplined for this. Ex. 3 at 139:9-140:8.

9  On October 7, unbeknownst to Beard and his managers, IBM Solutions COO/CFO

10  Brian Mulada had contacted the head of the commission team, Maria Lipner, ████████████

11  ████████████████████████████████████████████████████████████████████████████

12  ████████████████████." Ex. 8 at 131:23-132:4; Ex. 34 at 1711. Just as Johnson had

13  done *that same day* when asked about Donato's commission on the SAS sale, Lipner ████

14  ████████████████████████████████████████████████████████

15  ████████████████████████████████████████████

16  ████████████████████████████████████████████." Ex. 8 at 132:20-

17  24; Ex. 34 at 1711. Even so, Lipner agreed the incentives team would review the commission

18  payment before processing. Ex. 35 at 61:4-15. Johnson reviewed the deal for the commission

19  team and testified that the decision came down to an analysis of Beard's contribution. *Id.* at

20  63:25-64:21; 65:6-10. This contradicts Lipner's guidance, IBM's "primary education"

21  Powerpoint, and Johnson's own testimony as IBM's 30(b)(6) representative that IBM policy

22  dictates commissions on IQPs are not based on contribution. Ex. 8 at 36:11-21, 56:12-22; Ex.

23  12 at 289. IBM capped Beard's payment at $205,286, less than 15% of what he was owed

24  under his established commission calculation. Ex. 36 at 452. IBM also capped Beard's

25  commission on another HCL deal in the final quarter of 2017, again paying him $205,286 when

26  he was owed nearly $1.5 million. *Id.*

27

PLAINTIFF'S RESPONSE TO DEFENDANT
INTERNATIONAL BUSINESS MACHINES' MOTION
FOR SUMMARY JUDGMENT - 8
CASE NO. 2:19-CV-01488 MJP

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

2.   <u>Kingston repeatedly objects to capping Beard's payments.</u>

From the moment he learned IBM intended to cap Beard's commission, Kingston was a consistent and unrelenting voice of opposition to IBM's efforts to do so. Kingston repeatedly complained to his supervisors that capping Beard's commission was an unfair violation of IBM policy and smacked of racial discrimination. He first complained on or around November 13, 2017, the day he learned from sales team executive Rose Nunez that Beard would not receive his full commission. Ex. 1 at 63:21-64:19; Ex. 31 at 2358; Ex. 37 at 50:24-51:14. Kingston objected that capping Beard's commission "was a violation of the company's policies and potentially the laws" and complained about the "incongruity" of capping Beard when Donato's payment had recently gone through uncapped without objection. Ex. 1 at 63:21-66:14. Kingston "pointed out the possibility of racial discrimination and the fact that it was an appearance that would be hard to overlook, given that Nick Donato was white and Jerome Beard was black." *Id.* Nunez agreed and told Kingston she would try to get an explanation. *Id.* In an email to Mulada the next day, Nunez confirmed that Kingston told her IBM needed to make sure "'caps' are known up-front going forward" so "people don't think they are being singled out or treated unfairly." Ex. 31 at 2358; Ex. 37 at 76:13-78:21.

Shortly after his call with Nunez, Kingston contacted Mitchell to express his concerns that Beard had been unfairly capped in violation of IBM's no-capping policy and that IBM was discriminating against Beard because Donato's commission had not been capped just months earlier. Ex. 1 at 69:14-70:17. Kingston "begged [Mitchell] to carry up [the] escalation to get proper review and hopefully resolve the problem in a logical way." *Id. see also* Ex. 3 at 260:14-261:7 (between October 20 and November 15, Kingston talked to Mitchell about Beard's frustration of being treated differently because of race). Like Nunez, Mitchell agreed and said he would try to get an answer. Ex. 1 at 69:14-70:17.

Over the following weeks, Kingston brought up Beard every time he spoke with Mitchell or Dorothy Copeland, who replaced Mitchell as his manager in early 2018. *Id.* at 71:11-15. In January, Kingston raised his concerns on a call with Nunez, Copeland, and

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Mitchell. *Id*. at 74:23-75:18. And on January 5, Kingston emailed Nunez, Mitchell, and

Copeland asking them to revisit the amount of Beard's commission so the "outcome [is]

congruent with his reasonable expectations" and to "rebuild the trust" with Beard. Ex. 38 at

2403-04. Kingston cautioned, "I don't need to tell you how sensitive this issue is." *Id.*

Copeland confirmed that when she became Kingston's manager, he shared his concerns that

Beard would not be paid as much on the HCL deal as he should be and that he worried Beard

was being treated differently than Donato because Beard was Black. Ex. 5 at 53:3-54:3. Mount

also testified that when Beard's payment was put on hold, Kingston sent an email to Nunez and

Mitchell "voicing concern that . . . there is a minority being treated [differently] here, and that

we need to be careful." Ex. 7 at 150:12-21.

        3.    <u>Beard sues IBM and the court finds that there is a genuine issue of material fact as to whether IBM's conduct was discriminatory.</u>

Beard ultimately sued IBM, in California where he resides, alleging discrimination and

that his commissions had been unlawfully withheld. The court denied IBM's summary

judgment motion, holding that Beard "carried his burden in raising a prima facie case of racial

discrimination" and that a jury could find IBM's asserted justification for reducing Beard's

commission was pretext. *Beard v. Int'l Bus. Machines Corp.*, 2020 WL 1812171, at \*12-13

(N.D. Cal. Apr. 9, 2020). Beard settled with IBM in May 2020. Marshall Decl. ¶ 44.[2]

**F.    IBM attempts to cover its differential treatment of Jerome Beard, and get rid of Kingston, by portraying Kingston as the problem.**

        1.    <u>Karla Johnson reverses course on the Donato payment to justify capping Beard and offers contradictory bases for Kingston's purported error.</u>

As detailed above, when Johnson reviewed the process for Donato's payment on

October 7, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 8 at 128:25-131:11, 131:19-22; Ex. 20 at 1921. And

the same day, Lipner ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[2] Plaintiff's motion to compel production of the settlement agreement between Beard and IBM is pending before the Court. Plaintiff reserves the right to supplement his opposition to IBM's motion for summary judgement with relevant information if the Court grants his motion.

PLAINTIFF'S RESPONSE TO DEFENDANT
INTERNATIONAL BUSINESS MACHINES' MOTION
FOR SUMMARY JUDGMENT - 10
CASE NO. 2:19-CV-01488 MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

███████. Ex. 34 at 1711. Nevertheless, Mulada insisted Beard's commissions not be paid normally, and Lipner agreed the commission team would review the deal ███████ ██. *Id*.; Ex. 35 at 58:19-61:15. Johnson was involved in this. Ex. 35 at 62:11-64:14.

On October 16, 2017, ██████████████████████████████████ ██████ but after learning IBM intended to cap a similar payment to Beard, Johnson initiated an investigation with IBM's internal audit team against Kingston, alleging ███████ ████████████████████████████████" Ex 8 at 29:14-30:5; Exs. 20 and 24; Ex. 35 at 63:25-64:21; 65:6-10. Johnson cited her purported concern that ████████████████████ ██████████████████████████████████████████. Ex. 24 at 2841. Johnson briefly described ███████████████████████████████████████ ████████████████████████████████. *Id*. at 2842-43.

A week later, Johnson emailed Kingston to ask ██████████████████ ███████████████████████. Ex. 39 at 2781; Ex. 8 at 144:19-145:13. Kingston replied that "███████████████████████████████████████████████ ██████████████████████ Ex. 39 at 2781. Johnson testified that she agreed with Kingston's statements. Ex. 8 at 145:14-146:8. Yet Johnson reported Kingston for that very thing – ███████████████████████████████████. Ex. 24 at 2841. Neither Johnson nor anyone else at IBM has been able to identify what quota Kingston should have added. Ex 8 at 88:22-92:5; Ex. 11 at 71:10-72:19; Ex. 22 at 173:21-174:10.

The timing of Johnson's allegation in relation to HCL deal, her sharp reversal on the Donato payment, and the contradictory nature of her allegations suggest that IBM recognized the company's differential treatment of Beard was a problem and began looking for fault with the Donato payment to cover its actions with Beard.

       2.   <u>Larkin's report is incomplete and inconsistent with IBM policies and heavily influenced by Johnson.</u>

Charles Larkin, an internal audit investigator at IBM, began his investigation in late October or early November of 2017. Ex. 40 at 37:1-4; 86:3-15. He worked "closely" and

PLAINTIFF'S RESPONSE TO DEFENDANT
INTERNATIONAL BUSINESS MACHINES' MOTION
FOR SUMMARY JUDGMENT - 11
CASE NO. 2:19-CV-01488 MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   extensively with Johnson, whom he had known for years, and relied on her and her team to

2   "keep [him] honest" about "all the specifics and all the nuances of the incentives and

3   commissions program." *Id*. at 77:7-20; 86:21-87:10; 196:12-197:6; 240:9-14. Larkin conducted

4   most of his interviews in January 2018 and submitted his completed report on February 28,

5   2018. *Id*. at 86:16-18; Ex. 21 at 399. The report introduced a new alleged "failure" by Kingston

6   that was not included in Johnson's allegation or raised by any of the commission, finance, or

7   sales executives who had previously reviewed the report. According to Larkin, ███████████

8   ████████████████████████████████████████████e. Ex. 21 at 401. But as detailed below,

9   the evidence shows that the significant transaction clause conflicted with IBM's other

10  commission policies, and IBM did not have a process or provide guidance for applying the

11  clause. Ex. 8 at 119:8-120:16. In other words, it was just another reason concocted by IBM

12  after the fact to justify capping Beard and to silence Kingston.

13          Several of the individuals responsible for the decision to terminate Kingston based their

14  decision on Larkin's report. Ex. 5 at 123:18-124:6; Ex. 8 at 160:19-161:6; Ex. 11 at 79:20-81:3;

15  Ex. 14 at 163:8-22; Ex. 22 at 189:19-190:6; Ex. 30 at 82:15-83:19; Ex. 56.

16                  a.      *Larkin did not consider IBM's no-capping policy.*

17          Larkin acknowledged that Kingston and Temidis approved Donato's commission

18  because they were "████████████████████████████████████████████." Ex.

19  21 at 401; *see also* Ex. 41 at 3934. Kingston told Larkin this during an interview in January

20  2018. Ex. 40 at 63:11-16; 186:5-188:14. And Kingston followed up and provided Larkin with

21  the IBM documents stating the no-capping policy. Ex. 42 at 2097; Ex. 40 at 164:22-165:1.

22  Kingston also shared his concerns that Beard's commissions had been improperly capped and

23  that the capping was racially motivated. Ex. 1 at 81:24-82:18; Ex. 40 at 56:5-12. Beard came up

24  in interviews Larkin conducted with other witnesses as well. *Id*. at 59:18-61:2.

25          Despite this, and despite admitting that comparative situations were relevant, Larkin did

26  not investigate IBM's capping policy or Beard's capped commissions. Ex. 40 at 55:5-25, 57:7-

27  10, 59:18-61:2, 80:10-19. Nor did Larkin include any of the documentation instructing

PLAINTIFF'S RESPONSE TO DEFENDANT
INTERNATIONAL BUSINESS MACHINES' MOTION
FOR SUMMARY JUDGMENT - 12
CASE NO. 2:19-CV-01488 MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

managers not to cap commissions in the process guidance section of his report. Ex. 21 at 400-01. Instead, Larkin followed advice from ████████████████████████████████
████████████████████████████████████████████.” Ex. 43 at 3946. (Larkin "████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████████").

        b.    *Larkin admits that IBM's policies contradict his findings and that managers were given no guidance on the significant transaction clause.*

Larkin admits the guidance IBM provided to managers contradicts his finding that "████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████ Ex. 21 at 401; Ex. 40 at 144:10-24. Larkin also acknowledged in his February 14, 2018 meeting minutes that he and Johnson agreed IBM's no-capping policy and the significant transaction language "can be viewed as contradictory." Ex. 41 at 3934. Lisa Mihalik, an HR executive and one of the people responsible for Kingston's termination, likewise testified that IBM's guidance was contradictory. Ex. 14 at 212:20-23.

Larkin did not identify any training or guidance on when or how to implement the significant transaction clause—because no guidance exists. Ex. 8 at 74:20-75:4, 120:10-16; Ex. 40 at 108:10-13. Johnson confirmed IBM had no process for managers to follow to apply the significant transaction provision; IBM only had a high achievement review process. Ex. 8 at 119:8-17. Kingston followed this. Ex. 1 at 111:13-117:12. Johnson also testified that around the time she reviewed Larkin's report in February 2018, IBM knew sales managers were unclear on the meaning and use of the significant transaction clause. Ex. 8 at 117:22-118:9.

After terminating Kingston, IBM changed its commission review process by eliminating "management high achievement review as part of the process." Ex. 8 at 44:5–45:11. Now, the "worldwide process team" reviews any payment in excess of $400,000 to confirm the territory and quota are validated. *Id.* at 48:3–50:21, 52:14–55:11. The team does

PLAINTIFF'S RESPONSE TO DEFENDANT
INTERNATIONAL BUSINESS MACHINES' MOTION
FOR SUMMARY JUDGMENT - 13
CASE NO. 2:19-CV-01488 MJP

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

not consider whether the significant transaction provision should be applied. *Id.* at 55:12–56:11, 66:8-16. Likewise, the team does not consider "any information about the employee's contribution to the deal." *Id.* at 56:12-19.

Johnson agrees the current process is the "same" as what was in place when Donato's payment was reviewed; the only difference is that "[her] team is handling the part that line management used to handle." *Id.* at 58:4-20. It is still IBM's policy that commissions on individual quota plans are uncapped and, as a result, "no one at IBM would be allowed to cap a commissions payment" even today. *Id.* at 58:21–59:9.

                c.      *IBM took no action against other employees Larkin found to be at fault.*

Larkin also found problems with the commission team, stating the commission review process "pretty much sucks as far as I can see." Ex. 21 at 405; Ex 40 at 260:6-14, 264:1-4; Ex. 44 at 2063; Ex. 45 at 2068. Larkin concluded ███████████████████████████████████████████████████████████████████n. *Id.* at 264:14-24; Ex 21 at 405.

Larkin also found ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Ex. 21 at 401. ██████████████████████████████████████████████████████████████████. Ex. 46 at 2122; Ex. 5 at 88:9-16. But two weeks later, incentive analyst Stephanie Yuri Kajishima told Lee ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" Ex. 46 at 2121. IBM's 30(b)(6) designee, Johnson, agreed that Kajishima's advice was proper and that it was reasonable for Lee to rely on it. Ex. 8 at 111:1-112:13. Larkin still believed ███████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 21; Ex. 5 at 88:17-89:20; Ex. 46. The only difference between Finnecy and Kajishima, on the one hand, and Kingston, Temidis, and Lee, on the other, is that the latter three complained of racial discrimination and the former two did not. Ex. 1 at 64:1-66:14, 69:17-24, 70:2-17,

71:11-15, 74:23-75:18; Ex. 3 at 260:14-20; Ex. 7 at 150:12-21; Ex. 38 at 2403-04; Decl. of

Michael Lee, ¶¶ 4-19; Decl. of Andre Temidis, ¶¶ 4-17.

**G.     Kingston is terminated.**

After reviewing Larkin's report in early April 2018, IBM HR executive Linda Kenny

recommended terminating Kingston, Temidis, and Lee. Ex. 30 at 24:7-26:10; Ex. 14 at 99:17-

100:8. She sent the recommendation to consistency reviewer Russ Mandel, Dorothy Copeland,

and a "review board" consisting of Lisa Mihalik, Cindy Alexander, and Scott Ferrauiola." Ex.

30 at 266:4-268:16. Copeland reviewed the recommendation with her boss, Stephen Leonard.

*Id.* at 268:17-24. The "[u]ltimate[]" "decision-makers" on Kingston's termination were

"Dorothy Copeland, Ste[ph]en Leonard, Lisa Mihalik, Scott Ferrauiola, and Cindy Alexander."

Ex. 14 at 99:22-100:6. Copeland was involved with discussions with the review board because

they "need[ed]" her "to support the decisions of the board and/or make a different decision" *Id.*

at 109:11-110:2. "Ultimately Dorothy [Copeland] agreed with the recommendations. *Id.* at

111:18-112:8; *see also* Ex. 47 at p. 3, ¶ 3.

> 1.     Alexander emailed Larkin and Kenny about the Beard matter during the period
>         when she and the rest of the review board were reviewing Kingston's case.

Several of the decisionmakers testified that they did not consider the Beard situation in

their decision. Ex. 14 at 237:12-238:3; Ex. 22 at 251:7-12; *see also* Ex. 5 at 54:23-56:16

(testifying she could not recall whether Beard's commissions were discussed during Kingston

investigation). The evidence suggests otherwise. Alexander forwarded an email string about the

Beard commission to Kenny and Larkin on April 4, just two days after the review board met

with Kenny and Larkin to review Kingston's case. Ex. 2 at 248:8-22; Ex. 30 at 288:4-289:11;

Ex. 31; Ex. 48 at 2340. IBM refuses to divulge the contents of that or any other meetings held

by the review board, taking the position these conversations are privileged because Ferrauiola

is an attorney. Ex 14 at 122:14-124:20; Ex. 30 at 289:2-293:7. It is clear from Alexander's

email that she was aware of Beard's capped commission and that Kingston had concerns about

it, as early as November 2017. Ex. 31 at 2358-59. And it is undisputed that Copeland knew

PLAINTIFF'S RESPONSE TO DEFENDANT
INTERNATIONAL BUSINESS MACHINES' MOTION
FOR SUMMARY JUDGMENT - 15
CASE NO. 2:19-CV-01488 MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

about Kingston's concerns about capping and racial discrimination because he complained to her several times. Ex. 1 at 71:11-15, 74:23-75:18; Ex. 38 at 2403-04; Ex. 5 at 53:3-54:3.

2.  <u>Decisionmakers testified they relied on incorrect information and their basis for termination conflicts with testimony from IBM's designated representative.</u>

Testimony and emails from the individuals involved in Kingston's termination reveal additional inconsistencies in the basis for Kingston's termination. First, Mihalik testified she relied on the fact that Kingston's case was consistent with other actions taken by IBM. Ex. 14 at 101:15-103:5. *see also* Ex. 5 at 72:10-17, 136:13-16 (testifying she was told by Mihalik and Leonard that Mike Lee's termination was in line with actions taken by IBM in similar situations). But IBM did not consider any other specific cases in determining whether this result was consistent. Ex. 49 at 59:6-11; Ex. 30 at 273:7-274:2; Ex. 50 at 3:10-21.

Second, the assertion by IBM decisionmakers that Kingston's error was failing to apply the significant transaction clause conflicts with the testimony of IBM's designated representative and interrogatory responses stating Kingston's error was the failure to add quota. *Compare* Ex. 5 at 216:21-217:1 (testifying Kingston failed Step 18, "review and respond to achievement payment validation notifications.") *and* Ex. 30 at 89:24-90:10 (same) *with* Ex. 8 at 87:19-88:8 (testifying Kingston's failure was not with Step 18, but Steps 4 and 5, defining and approving territory and assigning individual quota); *see also* Ex. 51 at 274; Ex. 52 at 2:9-3:3. Again, IBM's purported legitimate basis for terminating Kingston is rife with inconsistencies.

**H.  Kingston was not paid his full commissions for work in the first quarter of 2018.**

After the close of each sales period IBM "recognized" the revenue for that period "within the accounting system." Ex. 1 at 152:25-153:12. After the "first pass of the ledger report[,]" "the revenue recognition people would recognize that revenue in that first report had not been accrued correctly" and adjust the revenue totals. *Id.* at 153:4-17. All that revenue "was attributed to the first quarter, not to a following period." *Id.* at 153:17-19. Kingston was paid commissions for his work in Q1 2018 based on the revenue recognized in the ledger at the time that he was terminated. *Id.* at 153:20-154:4. He was not paid commissions for the additional Q1

2018 revenue recognized in the ledger after he was terminated, which totals $113,728. *Id.* at 152:10-24, 154:5-155-3; Ex. 52 at 4-6; Exs. 53-54.

**I.      Employees involved in the Kingston's termination knew he was over 40.**

Larkin testified that he "assumed" Kingston was over 40 just by meeting him. Ex. 40 at 295:16-22. Copeland testified that she knew that Kingston, Temidis and Lee had worked at IBM a long time. Ex. 5 at 223:8-12. Mandel testified that he knew Kingston worked at IBM for 17 years. Ex. 49 at 175:15-17.

Around the time Kingston was fired, the EEOC determined IBM was discriminating against older workers. *See* Ex. 55. The agency uncovered "top-down messaging from [IBM's] highest ranks directing managers to engage in an aggressive approach to significantly reduce the headcount of older workers . . . ." *Id.* The EEOC's "[a]nalysis shows it was primarily older workers (85.5%) in the total potential pool of those considered for layoff." *Id.*

## II.  AUTHORITY AND ARGUMENT

**A.      Genuine issues of material fact exist as to Kingston's retaliation claim.**

1.      <u>Kingston can establish a prima facie case of retaliation.</u>

IBM argues that Kington cannot establish the "causal connection" required for a prima facie case of retaliation under RCW 49.60.210. But "to avoid summary judgment on causation, the employee must show *only* that a reasonable jury could find that retaliation was a substantial factor in the adverse employment decision." *Cornwell v. Microsoft Corp.*, 192 Wn.2d 403, 412-13, 430 P.3d 229 (2018). And "if the employee establishes that he or she participated in an opposition activity, the employer knew of the opposition activity, and he or she was discharged, then a rebuttable presumption is created in favor of the employee that precludes [the court] from dismissing the employee's case." *Kahn v. Salerno*, 90 Wn. App. 110, 131, 951 P.2d 321 (1998); *see also Cornwell*, 430 P.2d at 413. The evidence here satisfies these standards.

It is undisputed that Kingston objected Beard's commission was capped because of race, that IBM had knowledge of his objection, and that Kingston was terminated. Ex. 1 at 19:16-18, 64:1-66:14, 69:17-24, 70:2-17, 71:11-15, 74:23-75:18; Ex. 3 at 260:14-20; Ex. 5 at

PLAINTIFF'S RESPONSE TO DEFENDANT
INTERNATIONAL BUSINESS MACHINES' MOTION
FOR SUMMARY JUDGMENT - 17
CASE NO. 2:19-CV-01488 MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   53:3-54:3; Ex. 7 at 150:12-21; Ex. 38 at 2403-04. Dorothy Copeland, one of the

2   "decisionmakers" responsible for Kingston's termination, admits Kingston shared with her his

3   concerns that Beard was being paid differently because he is Black. Ex. 5 at 53:3-54:3. This is

4   sufficient evidence of knowledge. *See Cornwell*, 192 Wn.2d at 413-21 (knowledge satisfied if

5   employer had "actual knowledge" or "knew or suspected" employee engaged in protected

6   activity); *Mackey v. Home Depot USA Inc.*, 12 Wn. App. 2d 557, 576, 459 P.3d 371 (2020)

7   (sufficient that at least one decision-maker had knowledge of protected activity).

8       IBM argues that Copeland was not a decisionmaker, but review board member Mihalik

9   testified that Copeland was a "decisionmaker[]" on Kingston's termination, that her support for

10  the decision was needed, and that she agreed with the decision. Ex. 14 at 99:22-100:6, 109:11-

11  110:2, 111:18-112:8. IBM relies on Kingston's testimony that Copeland's involvement was

12  irrelevant, but Kingston was not involved in decision-making process—Mihalik was.

13      Even if Copeland's knowledge alone was insufficient, there is evidence that others

14  involved in Kingston's termination knew he had objected to capping Beard's commission. *See*

15  Ex. 1 at 81:24-82:18; Ex. 22 at 248:8-22; Ex. 30 at 288:4-289:11; Ex. 31; Ex. 40 at 56:5-12,

16  59:18-61:2; Ex. 48 at 2340. IBM's reliance on what its own employees said they knew or what

17  they told other IBM employees is also improper at the summary judgement stage because it "is

18  frequently impossible for a plaintiff in the employee's position to discover direct evidence

19  contradicting someone's contention that he did not know something." *Cornwell*, 192 Wn.2d at

20  417 ("[w]hat-did-he-know-and-when-did-he-know-it questions are often difficult to answer,

21  and for that reason are inappropriate for resolution on summary judgment" (citation omitted)).

22      Kingston has also submitted sufficient circumstantial evidence to establish a prima facie

23  case of retaliation. *Id.* at 411 ("Ordinarily the prima facie case must . . . be shown by

24  circumstantial evidence, since the employer is not apt to announce retaliation as his motive."

25  (citation omitted)). For example, Kingston's three years of glowing performance reviews

26  suggest a retaliatory motive. Ex. 2 at 11-17; Ex. 6. Just six weeks before his termination,

27  Kingston received an overwhelmingly positive review from his manager, who said he expected

PLAINTIFF'S RESPONSE TO DEFENDANT
INTERNATIONAL BUSINESS MACHINES' MOTION
FOR SUMMARY JUDGMENT - 18
CASE NO. 2:19-CV-01488 MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Kingston to be even more sought out for his knowledge in the future. Ex. 4 at 33. This suggests retaliatory motive. *Vasquez v. State, Dep't of Soc. & Health Servs.*, 94 Wn. App. 976, 985, 974 P.2d 348 (1999). And the proximity in time between Kingston's complaints and his termination suggests a retaliatory motive. *Cornwell*, 192 Wn.2d at 416 n.10 ("few months" is "brief enough to give rise to a reasonable inference of retaliatory motive"); *see also Anica v. Wal-Mart Stores, Inc.*, 120 Wn. App. 481, 491, 84 P.3d 1231 (2004) (causation satisfied where employee was discharged about three months after filing claim). Kingston was terminated five months after he first raised his concerns with Nunez and Mitchell and three months after he raised them with Copeland, one of the decisionmakers. Ex. 1 at 19:16-18, 64:1-66:14, 69:17-24, 70:2-17, 71:11-15, 74:23-75:18; Ex. 3 at 260:14-20; Ex. 5 at 53:3-54:3; Ex. 7 at 150:12-21; Ex. 38 at 2403-04.[3]

IBM argues that Kingston fails to show a causal link because he complained after the investigation was initiated. But as IBM's own case shows, it is the timing of the adverse action—here termination—and not the investigation that suggests retaliatory motive. *See Ramsey v. City of Philomath*, 182 F. App'x. 678, 680 (9th Cir. 2006) (no causal link where *decision to take adverse employment action* made prior to protected activity); *see also Vasquez*, 94 Wn. App. at 985 ("Among the factors suggesting retaliatory motivation is proximity in time between the *discharge* and the protected activity" (emphasis added)). Kingston was terminated in April after repeatedly raising his concerns about Beard's commission. Ex. 1 at 19:16-18, 64:1-66:14, 69:17-24, 70:2-17, 71:11-15, 74:23-75:18; Ex. 3 at 260:14-20; Ex. 5 at 53:3-54:3; Ex. 7 at 150:12-21; Ex. 14 at 99:17-100:8; Ex. 30 at 24:7-26:10; Ex. 38 at 2403-04.

IBM also cites *Harris v. City of Seattle*, but there the court found the adverse action—a reassignment—had been contemplated before the plaintiff complained. 315 F. Supp. 2d 1112, 1125-26 (W.D. Wash. 2004). Although Johnson initiated her allegation on October 16, Larkin did not start his investigation until late October or early November, did not start interviews

---

[3] The case IBM cites to contest this point was brought under Title IV and involved the "but-for" test for causation rather than Washington's more liberal substantial factor test. *Serlin v. Alexander Dawson Sch., LLC,* 656 F. App'x 853, 855 (9th Cir. 2016).

PLAINTIFF'S RESPONSE TO DEFENDANT
INTERNATIONAL BUSINESS MACHINES' MOTION
FOR SUMMARY JUDGMENT - 19
CASE NO. 2:19-CV-01488 MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  until January 2018, and did not recommend disciplinary action until February 28. Ex. 21; Ex.

2  24; Ex. 40 at 86:3-18. Kingston first complained about Beard's treatment on or around

3  November 13 and continued to voice his concerns over the following months. Ex. 1 at 63:21-

4  64:19; Ex. 31 at 2358. Kingston has also cited evidence that Johnson's real motive was to cover

5  up Beard's differential treatment—the very issue Kingston complained about and alleges was

6  the reason he was fired. *See* section F.1.

7        2.   A jury could find IBM's asserted justification for Kingston's termination is pretext.

8        "An employee can demonstrate that the reasons given by the employer are not worthy

9  of belief with evidence that: (1) the reasons have no basis in fact, or (2) even if based in fact,

10  the employer was not motivated by these reasons, or (3) the reasons are insufficient to motivate

11  an adverse employment decision." *Renz v. Spokane Eye Clinic, P.S.*, 114 Wn. App. 611, 619,

12  60 P.3d 106 (2002). An employee "is not required to produce 'direct or smoking gun

13  evidence.'" *Id.* at 623 (citation omitted). "Rather, 'circumstantial, indirect, and inference

14  evidence is sufficient to discharge the plaintiff's burden.'" *Id*. (citation omitted). "Multiple,

15  incompatible reasons may support an inference that none of the reasons given is the real

16  reason." *Id.*; *see also Bengtsson v. Sunnyworld Int'l, Inc.*, 14 Wn. App. 2d 91, 102-03, 469 P.3d

17  339 (2020). "Generally, when an employee produces his or her prima facie case plus evidence

18  of pretext, a trier of fact must determine the true reason for the action because the record

19  contains reasonable but competing inferences of both discrimination and nondiscrimination."

20  *Rice v. Offshore Sys., Inc.*, 167 Wn. App. 77, 90, 272 P.3d 865 (2012).

21        IBM has presented multiple shifting and incompatible reasons for Kingston's

22  termination that contradict IBM's policies. First, Johnson initiated the allegations against

23  Kingston on the basis that he failed to add quota to the SAS deal, which contradicts her initial

24  conclusion that Donato should be paid under a share of credit and her testimony that quota

25  should not be added after a deal closes. Ex. 8 at 166:8-167:20; Ex. 17 at 2831-32; Ex. 18 at

26  1557. The timing of her allegation—a week after she reviewed the commission and found no

27  problem—makes it even more suspect, as does her reversal after finding out IBM intended to

PLAINTIFF'S RESPONSE TO DEFENDANT
INTERNATIONAL BUSINESS MACHINES' MOTION
FOR SUMMARY JUDGMENT - 20
CASE NO. 2:19-CV-01488 MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  cap Beard's commission on a similar sale.

2        Second, Larkin recommended ████████████████████████████

3  ███████████████. Ex. 21. But Larkin admitted, as did IBM's 30(b)(6) designee, that

4  IBM gave sales managers no guidance on how to do this and that the clause conflicted with the

5  no-capping policy. Ex. 8 at 74:20-75:4, 119:8-17, 120:10-16; Ex. 21 at 401; Ex. 40 at 108:10-

6  13, 144:10-24; Ex. 41 at 3934. Larkin also admitted his investigation relied heavily on Johnson,

7  and he did not investigate Kingston's basis for not capping Donato's commission. Ex. 40 at

8  55:5-25, 57:7-10, 59:18-61:2, 80:10-19, 86:21-87:10, 196:12-197:6, 240:9-14. The

9  decisionmakers relied on Larkin's flawed report, Ex. 5 at 123:18-124:6; Ex. 8 at 160:19-161:6;

10 Ex. 11 at 79:20-81:3; Ex. 14 at 163:8-22; Ex. 22 at 189:19-190:6; Ex. 30 at 82:15-83:19; Ex.

11 56, and at least some also relied on the assertion that Kingston's case was consistent with other

12 actions despite never reviewing other cases. Ex. 5 at 72:10-17, 136:13-16; Ex. 14 at 101:15-

13 103:5; Ex. 30 at 273:7-274:2; Ex. 49 at 59:6-11. These inconsistencies give rise to an inference

14 that IBM's reasons for firing Kingston are pretext. *Bengtsson*, 14 Wn. App. 2d at 103.

15       Even if the reasons IBM gave for Kingston's termination were based in fact, that other

16 employees who made the same or similar purported "mistakes" were not disciplined suggests

17 Kingston was fired for speaking out against IBM's treatment of Beard. *See* section F.2.c.

18 **B.**     **Genuine issues of material fact exist as to Kingston's wrongful termination claim.**

19       IBM correctly articulates the burden-shifting analysis applicable to Kingston's wrongful

20 termination claim but fails to properly apply it. Kingston has met his initial burden of showing

21 "that his 'discharge may have been motivated by reasons that contravene a clear mandate of

22 public policy.'" *Martin v. Gonzaga Univ.*, 191 Wn.2d 712, 725, 425 P.3d 837 (2018) (quoting

23 *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 232, 685 P.2d 1081 (1984)). Washington has

24 a clear public policy against racial discrimination. RCW 49.60.030 ("The right to be free from

25 discrimination because of race … [or] color … is … a civil right."). As discussed above, a

26 genuine issue of material fact exists as to whether Kingston's reporting of racial discrimination

27 was a significant factor in IBM's decision to fire him.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   Washington also has a clear public policy in favor of ensuring employees are paid their

2   full wages earned. *See* RCW 49.52.050; *Morgan v. Kingen*, 166 Wn.2d 526, 536-38, 210 P.3d

3   995 (2009) (RCW 49.52.050 and .070 express legislature's "strong policy in favor of ensuring

4   the payment of the full amount of wages earned"). IBM argues that Kingston has not identified

5   an employee protected by Washington's Wage Act whose rights under the Act were violated.

6   But Kingston's claim turns on the state's public policy of paying employees the full wages they

7   have earned and not a violation of the Wage Act. The Washington Supreme Court recognizes

8   that Washington's wage statutes reflect this strong state policy. *Morgan*, 166 Wn.2d at 538; *see*

9   *also Dries v. Sprinklr, Inc.*, No. C20-47-MLP, 2020 WL 6119423, at *6-8, 9 (W.D. Wash. Oct.

10  16, 2020) (denying summary judgment of claim for wrongful discharge in violation of public

11  policy where plaintiff alleged employer failed to pay owed commissions even though defendant

12  had "absolute discretion" to deny the commission "for any 'justifiable reason'").

13      Kingston does not need to show IBM violated a specific provision of the Wage Act to

14  prevail on his wrongful termination claim; indeed, the case IBM relies on expressly holds that

15  the tort turns on whether "the employer's conduct constituted *either* a violation of the letter *or*

16  *policy* of the law" and that "clear statutory violations" are not required. *Dicomes v. State*, 113

17  Wn.2d 612, 620, 624, 782 P.2d 1002 (1989) (emphasis added) ("restricting … wrongful

18  discharge claims to reports of clear statutory violations ... is unduly restrictive"); *see also*

19  *Singleton v. Intellisist, Inc.*, No. C17-1712-RSL, 2018 WL 2113973, at *3 (W.D. Wash. May 8,

20  2018) (claim for wrongful termination in violation of public policy based on "whistle-blowing

21  does not require a violation of an explicit statutory requirement"). The Court's prior ruling that

22  Kingston failed to allege IBM violated the Wage Act by not paying him commissions is thus

23  irrelevant to this claim. It is also irrelevant because Beard and Donato were subject to the laws

24  of California and Pennsylvania law, respectively, so the Court's determination that the

25  language in the IPL does not give rise to a Wage Act claim does not extend to their

26  commissions. IBM fails to establish in its motion that Beard had no right to be paid the

27  withheld commissions under California law or that Donato had no right to be paid under

PLAINTIFF'S RESPONSE TO DEFENDANT
INTERNATIONAL BUSINESS MACHINES' MOTION
FOR SUMMARY JUDGMENT - 22
CASE NO. 2:19-CV-01488 MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  Pennsylvania law for the commissions he received. A jury could find IBM fired Kingston in

2  violation of the Washington policy favoring payment to employees of wages owed because he

3  reported IBM's failure to pay Beard his full commission and because he ensured Donato was

4  paid his earned commissions

5  **C.      Genuine issues of material fact exist as to Kingston's age discrimination claim.**

6          IBM does not dispute that Kingston was over 40 and doing satisfactory work when he

7  was discharged, establishing a prima facie case of age discrimination. *Grimwood v. Univ. of*

8  *Puget Sound*, 753 P.2d 517, 520 (Wash. 1988). As discussed above, IBM has not met its burden

9  of articulating a legitimate, non-discriminatory reason for firing Kingston. *Id.* at 364. And

10  contrary to IBM's contentions, Kingston's age discrimination claim is based on more than mere

11  speculation. The EEOC's determination that IBM engaged in age discrimination through a

12  nationwide effort to terminate older employees at the very time Kingston was fired, Ex. 55,

13  supports his claim and distinguishes this case from *Grimwood*, where the plaintiff offered

14  nothing more than "conclusory opinions" to counter his employer's evidence that "[o]ver a

15  long period of time" it "had called job deficiencies to plaintiff's attention in writing." 753 P.2d

16  at 521-22; *see also Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas Cnty.*, 189 Wn.2d 516, 536,

17  404 P.3d 464 (2020) (plaintiff provided no evidence that employer treated older employees

18  differently); *Trzebiatowski v. Walgreen Co.*, No. C09-0228-RSM, 2011 WL 307377, at *4

19  (W.D. Wash. Jan. 27, 2011) (plaintiff offered "speculation alone" of age discrimination to

20  counter employer's evidence that he admitted to "repeatedly violat[ing] Walgreen policy on at

21  least 89 occasions"). The jury should be permitted to decide whether the "top-down messaging"

22  from IBM's "high ranks directing managers to engage in an aggressive approach to

23  significantly reduce the headcount of older workers" played a substantial role in Kingston's

24  termination. Ex. 55. This company-wide directive is relevant to Kingston's claim even though

25  the employees who filed the EEOC charges were terminated as part of "resource actions."

26          Moreover, there is evidence that those responsible for Kingston's investigation and

27  termination knew he was over 40. *See* Ex. 40 at 295:16-22; Ex. 49 at 175:15-17; Ex. 5 at 223:8-

PLAINTIFF'S RESPONSE TO DEFENDANT
INTERNATIONAL BUSINESS MACHINES' MOTION
FOR SUMMARY JUDGMENT - 23
CASE NO. 2:19-CV-01488 MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  12. Viewed in the light most favorable to Kingston, this evidence presents genuine issues of

2  material fact as to whether Kingston's firing was substantially motivated by age discrimination.

3  *See Scrivener v. Clark College*, 334 P.3d 541, 547-48 (Wash. 2014) (employer's expressed

4  desire to hire "younger talent" constituted "circumstantial evidence probative of discriminatory

5  intent"); *see also id.* at 445 ("summary judgment to an employer is seldom appropriate in the

6  WLAD cases because of the difficulty of proving a discriminatory motivation"); *Coghlan v.*

7  *Am. Seafoods Co. LLC*, 413 F.3d 1090, 1095 & n.6 (9th Cir. 2005) (an "employer's animus

8  toward the class to which the plaintiff belongs" constitutes direct evidence of bias and "is so

9  probative" that "very little" is required to preclude summary judgment (citation omitted)).

10  **D.      Genuine issues of material fact exist as to Kingston's unjust enrichment claim.**

11          In its motion, IBM cites the language in the IPL stating that an employee who leaves a

12  plan early will be paid based on business results credited to that employee as of the last day of

13  the last full month he was on that plan. Dkt. 48 at 18. In other words, an employee who worked

14  on a deal that was closed prior to leaving IBM should be paid for his work on that deal. Thus,

15  Kingston should have been paid all commissions associated with accounts he worked on that

16  were closed in the first quarter of 2018, which ended February 28, 2018. Although Kingston

17  was paid commissions for Q1 2018 based on the revenue recognized in the ledger at the time

18  that he was terminated (Ex. 1 at 153:20-154:4), he was not paid commissions for the additional

19  Q1 2018 revenue recognized in the ledger after he was terminated. *Id.* at 152:10-24, 155-3;

20  Exs. 52-54. IBM misstates Kingston's testimony in claiming that he made a "damning

21  admission" that "he was paid all commissions he owed." Dkt. 48 at 17-18. In fact, Kingston

22  testified that IBM "chose not to pay" him for "commissions . . . earned on the revenue while I

23  was still employed at IBM[.]" Ex. 1 at 152:14-24. Viewing the evidence in the light most

24  favorable to Kingston, there is a genuine issue of material fact as to whether Kingston is

25  entitled to recover his unpaid Q1 2018 commissions under a theory of unjust enrichment.

26                                **III.  CONCLUSION**

27          IBM's motion should be denied in its entirety.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    RESPECTFULLY SUBMITTED AND DATED this 4th day of January, 2021.

2                            TERRELL MARSHALL LAW GROUP PLLC

3                            By: _/s/ Toby J. Marshall, WSBA #32726_
4                                Toby J. Marshall, WSBA #32726
                                 Email: tmarshall@terrellmarshall.com
5                                Brittany J. Glass, WSBA #52095
                                 Email: bglass@terrellmarshall.com
6                                936 North 34th Street, Suite 300
7                                Seattle, Washington 98103
                                 Telephone: (206) 816-6603
8                                Facsimile: (206) 319-5450

9                                Matthew E. Lee, *Admitted Pro Hac Vice*
                                 Email: matt@wbmllp.com
10                               Jeremy R. Williams, *Admitted Pro Hac Vice*
                                 Email: jeremy@wbmllp.com
11                               WHITFIELD BRYSON & MASON, LLP
12                               900 W. Morgan Street
                                 Raleigh, North Carolina 27603
13                               Telephone: (919) 600-5000
                                 Facsimile: (919) 600-5035
14

15                               *Attorneys for Plaintiff*

16

17

18

19

20

21

22

23

24

25

26

27

PLAINTIFF'S RESPONSE TO DEFENDANT
INTERNATIONAL BUSINESS MACHINES' MOTION
FOR SUMMARY JUDGMENT - 25
CASE NO. 2:19-CV-01488 MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com