1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SCOTT KINGSTON, | CASE NO. C19-1488 MJP |
| Plaintiff, | ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; |
| v. | |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | GRANTING IN PART DENYING IN PART PLAINTIFF'S MOTION TO SEAL |
| Defendant. | |

This matter comes before the Court upon Defendant's Motion for Summary Judgment (Dkt. No. 48) and upon Plaintiff's Motion to Seal (Dkt. No. 59). Having reviewed the motions, the responses (Dkt. Nos. 63, 68), the replies (Dkt. Nos. 64, 70), and the related record, the Court DENIES Defendant's Motion for Summary Judgment and GRANTS in part DENIES in part Plaintiff's Motion to Seal.

//

//

//

**Background**

**A.  Factual Background**

Before he was terminated on April 16, 2018, Plaintiff, Scott Kingston, worked for Defendant, International Business Machines Corporation ("IBM") for nearly 18 years.  (Marshall Decl., Ex. 1, Deposition of Scott Kingston ("Kingston Dep.") at 19:13-18.)  Plaintiff managed a team that sold embedded solutions agreements ("ESA"), which permit the customer to use IBM's software tools in its own products.  As a second-line manager, Plaintiff directly supervised two first-line managers, Andre Timidis and Greg Mount, who in turn supervised ESA sales representatives Nick Donato and Jerome Beard.

Plaintiff was described as "very ethical and very committed and [] smart" by his direct supervisor, Dave Mitchell.  (Marshall Decl., Ex. 3, Deposition of Dave Mitchell ("Mitchell Dep.") at 88:18-23.)  And his most recent performance review, issued just six weeks before he was terminated, noted that his team brought in $162 million on a fiscal year target of $111.6 million and he exceeded or met expectations on four of his five performance ratings.  (Marshall Decl., Ex. 4 at 2.)

Plaintiff and the other members of the ESA team were paid through a commissions program called the Individual Quota Plan (IQP).  (Marshall Decl., Ex. 8, Rule 30(b)(6) Deposition of Karla Johnson ("Johnson Dep.") at 84:10-15.)  Every six months Plaintiff's team received an electronically issued Incentive Plan Letter (IPL), which set their target sales quotas based on an account's baseline sales from the previous sales period and any "uplift" "based on [IBM's] desired growth rate."  (Kingston Dep. at 32:3-7.)

IBM's policies barred capping commissions for anyone working under an IQP.  (Johnson Dep. at 24:11-25:15.)  IBM used this policy to motivate sellers and made sure managers

1  understood that capping commissions was a violation of IBM policy.  (Marshall Decl., Ex. 11,

2  Deposition of Stephen Leonard, ("Leonard Dep.") at 32:8-10.)

3      1.  Donato Commission

4      On June 20, 2017, another sales division asked Plaintiff's team for help closing a deal

5  with SAS Institute.  (Marshall Decl., Ex. 15 at 8.)  The deal was in Plaintiff's territory, which

6  included all ESA sales in North America, but because there had been no sales to SAS in the prior

7  year, no member of Plaintiff's team had been assigned a required sales quota for the account.

8  (Kingston Dep. at 98:14-16.)  Plaintiff assigned the SAS deal to Nick Donato and his first-line

9  manager Temidis because "[Donato] was in the correct territory for SAS" and "may have

10 actually covered SAS at some point and [Temidis] was his manager."  (Kingston Dep. at

11 92:19-22.)

12     After the deal with SAS closed, there was confusion regarding who would be paid.  IBM

13 finance executive Mark Baglini emailed an incentives team leader that "[i]t is being suggested"

14 that only three people should be paid commissions for the $18.266 million-dollar sale, "Is this

15 possible? How should this be managed?"  (Marshall Decl., Ex. 16 at 6.)  The following week, as

16 part of a group email chain with Baglini, another executive wrote that Andre Temidis and

17 Nicholas Donato "SHOULD get paid for this deal."  (Id. at 5.)  But Baglini and several other

18 executives, including Karla Johnson, the Director of Sales Commissions in North America and

19 Latin America, and North American Finance VP Cindy Alexander, had an extended debate about

20 how commissions should be paid.  (Marshall Decl., Ex. 17.)  Alexander wrote:

> Why did Temidis and Donato work on this deal if not in their territory, and how
> did everyone think they were going to be comp'd?

21

22 (Id. at 6.)  The executives agreed that Temidis and Donato should be compensated through a

23 "share of credit" process.  (Id.)  But they did not tell Plaintiff they wanted him to use a share of

24

credit to compensate Donato, which was a "mistake." (Johnson Dep. at 168:20-169:5; 169:13-25.)

On July 19, 2017, the SAS transaction was added to Donato, Temidis, and ESA Tech Employee Bill Sherrin's territory assignment, nearly 20 days after the deal had closed. (Marshall Decl., Ex. 21 at 3.) Eventually Donato, who worked on the deal for approximately 10 days, earned a commission of $1.6 million under IBM's commissions formula because the sale was more than 2000% of his SAS quota, which was zero before the deal. (Kingston Dep. at 93:5-11; 109:14-22; Marshall Decl., Ex. 25 at 3.)

2. Beard Commissions

Around the same time Donato received his $1.6 million commission, one of Plaintiff's other team members, Jerome Beard, who is Black, had two commissions worth approximately $1.5 million each capped at less than 15%, a multi-million-dollar reduction. In both cases, Beard's commissions were capped at the insistence of Brian Mulada, the VP, CFO, and COO of IBM's Cognitive Solutions Group.

On October 7, 2017, Mulada contacted Vice President of IBM Global Sales Incentives and the head of commissions at IBM, Maria Lipner, about reducing Beard's commissions. (Johnson Dep. at 132:2-19.) On November 21, 2017 Rose Nunez, IBM's Director of Channel Management, emailed Mulada and Johnson with her recommendation that Beard's commissions be "'capped' at between 200 and 250 percent of his sales quota. Johnson responded by informing Nunez that IBM does not cap commissions and that 'setting a pre defined cap is not consistent with the design and terms within our plane [sic].'" Beard v. Int'l Bus. Machines Corp., No. C 18-06783 WHA, 2020 WL 1812171, at *4 (N.D. Cal. Apr. 9, 2020) (citations omitted). Nevertheless, Beard's commissions were capped, while Donato kept his.

After an internal investigation found no wrongdoing, Beard filed suit.  See Beard, 2020 WL 1812171.  In denying IBM's motion for summary judgment on Beard's race discrimination claim in that case, the court found that "[a]tleast with respect to Donato, Beard has shown that Donato was a similarly situated employee outside of his protected class whom IBM treated more favorably, or so a jury could reasonably find."  Id. at *12.

3. Plaintiff Reports Discrimination

Plaintiff did not learn that Beard's commission would be capped until November 13, 2017, when Nunez called to tell him.  Plaintiff testified that he immediately told Nunez that capping Beard's commission "was a violation of the company's policies and potentially the laws" and complained about the "incongruity" of capping Beard when Donato had recently received an uncapped commission.  (Kingston Dep. at 64:1-66:14.)  Plaintiff "pointed out the possibility of racial discrimination and the fact that it was an appearance that would be hard to overlook, given that Nick Donato was white and Jerome Beard was black."  (Id. at 65:16-19.)

Following that call, Nunez wrote to Brian Mulada that she "connected with [Plaintiff] yesterday" and described Plaintiff's "general comments":

> Make sure these 'caps' are known up-front going forward. They are okay with the limitation but they don't want reps [to] think they are being singled out or treated unfairly
>
> - It is like playing football, winning the game, then someone tells you the touchdowns are now worth 3 pts instead of 7 pts.

(Marshall Decl., Ex. 31 at 2.)  The following day Mulada forwarded the message to Cindy Alexander, the North American Finance VP who would later play a role in terminating Plaintiff.  (Id.)

After speaking with Nunez, Plaintiff called his supervisor Dave Mitchell and told him "the fact that [Beard] was a minority and we had paid a nonminority in the preceding months left

the discrimination possibility as open and valid" and "begged him to carry up my escalation to get proper review and hopefully resolve the problem in a logical way." (Kingston Dep. at 70:11-17.) Plaintiff also told his new supervisor, Dorothy Copeland, about his concerns, bringing up Beard's commission "every time [he] spoke to [Copeland] or [Mitchell] in the subsequent days and weeks." (Id. at 71:14-15.) In early January, Plaintiff had a call with Nunez, Copeland, Mitchell, Greg Mount, "and maybe some others," where he explained that the "treatment [of Beard] was unfair, there was no policy for it, it was contrary to the written policy and that [Beard's] race was the obvious remaining root cause for the behavior." (Id. at 75:11-18.)

    4. Internal Audit

On October 7, 2017, the same day Mulada contacted Lipner about reducing Beard's commissions, the Director of Finance of IBM's North America Systems emailed Johnson about Donato's commission: "do you know how these payments were validated before they were made?" (Marshall Decl., Ex. 20 at 3.) In response, Johnson wrote, "first it is IBM's policy that we do not cap payments." (Id. at 2.) She then noted that Donato's commission approval had followed the normal process for significant overachievement. (Id.) Johnson did not note any surprise or any kind of problem at that point. (Johnson Dep. at 131:8-11.) Johnson's manager, Maria Lipner, also did not indicate "any kind of a problem" with Donato's commission. (Id. at 131:19-22.)

But the following week, October 16, 2017, Johnson reported Plaintiff to Internal Audit because he added SAS to Donato's territory without adding any quota requirement for the account. (Johnson Dep. at 29:19-30:5; Marshall Decl., Ex. 24.) Johnson would later testify that she agrees quotas should not be added after a deal closes because it would not be fair to the sales representative. (Johnson Dep. at 145:14-146:8.)

In late October, early November 2017, Charles Jeffrey Larkin from the Internal Audit Department began investigating Johnson's referral; he did not conduct interviews until January 2018.  (Marshall Decl., Ex. 40, Deposition of Charles Larkin ("Larkin Dep.") at 86:3-18.)  When Larkin interviewed Plaintiff in January, Plaintiff told him "Jerome Beard was the first time [he]'d ever seen the company arbitrarily decide to cap somebody's pay without a logical explanation and the fact that he was a minority left a – a possibility at that point in time that it was race related."  (Kingston Dep. at 82:2-7; see also Larkin Dep. at 56:5-12.)

5.  Plaintiff is Terminated

On February 28, 2018, Larkin submitted his final report on Donato's commission to IBM HR executive Linda Kenny, concluding:

> Mr. Temidis and Mr. Kingston were negligent in not initiating an adjustment (reduction) of Mr. Donato's commission for his work in closing a significant transaction into an account (SAS) for which he had no quota . . . both told IA that they were familiar with the significant transaction clause which allows IBM the latitude to reduce commissions in such circumstances. However, both . . . were uncomfortable about capping commissions under any circumstances[.]

(Marshall Decl., Ex. 21 at 4.)

After reviewing Larkin's report in early April 2018, Kenny recommended terminating Plaintiff and his first-line manager, Temidis.  (Ex. No. 30, Deposition of Linda Kenny ("Kenny Dep.") at 26:1-10.)  Lisa Mihalik, a Human Resources VP who was on the Disciplinary Action Review Committee, testified that "[u]ltimately" "Dorothy Copeland, Ste[ph]en Leonard, Lisa Mihalik, Scott Ferrauiola, and Cindy Alexander . . . are the decision-makers," who decided Plaintiff would be terminated.  (Ex. No 14, Deposition of Lisa Mihalik ("Mihalik Dep.") at 100:2-6.)

Plaintiff's direct supervisor, Copeland, told Plaintiff he was terminated.  Plaintiff describes Copeland during that discussion as unwilling to "own any of the responsibility and –

1    pretend[ing] such a level of ignorance of both the facts and the investigation and the conclusions

2    that her involvement was as close to irrelevant as I could imagine."  (Kingston Dep. at

3    135:25-136:4.)  Copeland testified she felt she could not reject the findings of the investigation

4    without the support of Leonard and Mihalik, which she did not have.  (Marshall Decl., Ex. 5,

5    Deposition of Dorothy Copeland ("Copeland Dep.") at 139:4-11.)

6          Yet Copeland is the only member of the Committee who admits knowing that Plaintiff

7    complained about discrimination, testifying that Plaintiff told her Beard's capped commission

8    "was inconsistent and [happened] because Jerome Beard is African-American."  (Id. at 54:1-3.)

9    But she also testified that she never told anyone about Plaintiff's concerns because "[i]t wasn't

10   something that occurred to [her]."  (Id. at 54:8-22.)  And she does not recall whether Beard's

11   commission was discussed during the Committee meeting.  (Id. at 54:23-56:16.)

12         However, just two days after the Committee met, Alexander, an "ultimate

13   decisionmaker" forwarded Nunez's email describing Plaintiff's concerns about Beard's

14   commission to Larkin and Kenny, the Internal Audit investigator and the HR executive who

15   recommended terminating Plaintiff.  (Marshall Decl., Ex. 31 at 2.)  IBM has taken the position

16   that the topics discussed during the Committee meeting are privileged. (Mihalik Dep. at 122:14-

17   124:20; Kenny Dep. at 289:24-293:7)

18         6.   Remaining Commission Payments

19         When Plaintiff was terminated, he was paid his commissions for Q1 based on the ledger

20   at that time.  (Kingston Dep. at 152:10-155:3.)  But after April 1, 2018, the ledger was revised

21   and $2,485,186.86 was added to the revenue credit from deals closed within Plaintiff's territory.

22   (Kingston Dep. at 152:10-155:3; Marshall Decl., Ex. 52 at 3-4, 5-7.)  Plaintiff alleges he is owed

23   an additional $113,728 from this adjustment based on his commission formula.  (Dkt. No. 63 at

24   23; Kingston Dep. at 152:10-155:3; Marshall Decl., Ex. 52 at 5-7.)

7. <u>Age</u>

In addition to his allegation that he was terminated as retaliation for his reports of racial discrimination, Plaintiff also alleges his age—he was 58 in April 2018—was a factor in his termination. (Kingston Dep. at 140:4-5.) Plaintiff recalls "general conversations about the desire to place younger people in roles." (<u>Id.</u> at 144:5-7.) He heard Stephen Leonard, who was on the Disciplinary Action Review Committee, suggest he supported Project Sunrise, allegedly an IBM program to lay off older workers in favor of younger ones. (<u>Id.</u> at 144:17-19.) And around the time Plaintiff was terminated, the EEOC issued a determination based on charges brought by older employees of IBM who alleged they were discharged based on their age. (Marshall Decl., Ex. 55.) "The investigation uncovered top-down messaging from [IBM]'s highest ranks directing managers to engage in an aggressive approach to significantly reduce the headcount of older workers to make room for Early Professional Hires." (<u>Id.</u> at 3.)

Further, several people involved in Plaintiff's termination had reason to believe he was older than 40. Larkin testified that he "would have assumed" Plaintiff was over 40 (Larkin Dep. at 295:16-22), Copeland understood that Plaintiff had "worked at IBM for a long time" (Copeland Dep. at 223:8-12), and consistency reviewer Russ Mandel, who reviewed Larkin's recommendation before sending it to the Committee, testified that he read in Larkin's report that Plaintiff had been with IBM for 17 years (Marshall Decl., Ex. 49, Deposition of Russell Edward Mandel ("Mandel Dep.") at 175:15-17).

**B. Procedural Background**

Plaintiff filed this action on September 16, 2019, alleging claims for (1) retaliation in violation of the Washington Law Against Discrimination (WLAD); (2) breach of express unilateral contract; (3) breach of implied-in-fact contract; (4) unpaid wages on termination; (5) failure to pay wages pursuant to RCW 49.52.050; (6) unjust enrichment; (7) wrongful

1   termination in violation of public policy; and (8) age discrimination in violation of RCW

2   49.60.180.  (Dkt. No. 20.)  On April 15, 2020, the Court dismissed Plaintiff's claims for breach

3   of express unilateral contract, breach of implied-in-fact contract, violation of RCW 49.48.010,

4   and failure to pay wages pursuant to RCW 49.52.050.  (Dkt. No. 27.)  IBM now moves for

5   summary judgment on Plaintiff's remaining claims of (1) retaliation; (2) wrongful termination;

6   (3) unjust enrichment, and; (4) age discrimination.  (Dkt. No. 48.)

7                                                            **Discussion**

8   **I.      Legal Standard**

9          Summary judgment is proper where "the movant shows that there is no genuine dispute

10  as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

11  56(a).  The movant bears the initial burden of demonstrating the absence of a genuine issue of

12  fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In assessing whether a party has met

13  its burden, the underlying evidence must be viewed in the light most favorable to the non-

14  movant.  Matsuhisa Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

15  **II.     IBM's Motion for Summary Judgment**

16  **A.   Retaliation**

17         Plaintiff alleges he was terminated as retaliation for his reports of illegal discrimination

18  against Beard.  To establish a prima facie case, Plaintiff must prove (1) he engaged in statutorily

19  protected activity; (2) Defendants took an adverse employment action; and (3) there was a causal

20  link between the protected activity and the adverse action.  See Harris v. City of Seattle, 315 F.

21  Supp. 2d 1112, 1125 (W.D. Wash. 2004) (citing Bierlein v. Byrne, 103 Wn. App. 865, 871

22  (2000)).  "'If the employee makes out a prima facie case, the burden shifts to the employer to

23  show a legitimate, nondiscriminatory basis' for its actions."  Tyner v. State, 137 Wash. App. 545,

24

563-64 (2007) (quoting <u>Milligan v. Thompson</u>, 110 Wash.App. 628, 636 (2002)).  If the employer succeeds, the employee must produce evidence that the articulated reason is mere pretext for discrimination.  <u>Id.</u>

   1. <u>Prima Facie Case</u>

   IBM argues that Plaintiff has not established the element of causation, alleging that no one responsible for terminating Plaintiff was aware Plaintiff reported discrimination and Plaintiff only reported discrimination after Johnson's referral to Internal Audit.  (Dkt. No. 48 at 11-14.)  IBM's arguments do not withstand scrutiny.

   First, IBM alleges that Plaintiff only told three people about his concerns that Mr. Beard was being discriminated against based on his race—Nunez, Mitchell, and Copeland—these people "did not tell anyone about Plaintiff's concerns," and they were not the ultimate decisionmakers in deciding to terminate Plaintiff.  (<u>Id.</u> at 11.)  The evidence suggests otherwise.

   In January, around the time Larkin began his investigation, Plaintiff had a call with Nunez, Copeland, Mitchell, Mount, "and maybe some others," where he explained that the "treatment [of Beard] was unfair, there was no policy for it, it was contrary to the written policy and that his race was the obvious remaining root cause for the behavior."  (Kingston Dep. at 75:11-18.)  Plaintiff also reported racial discrimination in his interview with Larkin (Larkin Dep. at 56:5-12) and two days after the Disciplinary Committee met, but before Plaintiff was terminated, Alexander, an "ultimate decisionmaker," forwarded the email describing Plaintiff's concern that capping Beard's commission "made reps think they are being singled out or treated unfairly" to Kenny, another "ultimate decisionmaker" and Larkin.  (Ex. 31 at 2.)  After this email, Mitchell, Copeland, Mount, Nunez, Mulada, Alexander, Kenny, Larkin, "and maybe some

1    others," were all aware that Plaintiff raised concerns about Beard's capped commission.

2    (Kingston Dep. at 75:11-18.)

3          Further, a reasonable fact-finder might wonder why Plaintiff's supervisors did not report

4    his concerns of illegal conduct to "anyone."  (Dkt. No. 48 at 11.)  Plaintiff's first supervisor

5    admits Plaintiff relayed Mr. Beard's concerns that his delayed commission was because of his

6    race, but contends he "never told anyone about any concerns [Plaintiff] may have had about race

7    discrimination," apparently including HR.  (Dkt. No. 49, Ex. K, Declaration of Dave Mitchell,

8    ¶¶ 5-6.)  Plaintiff's next supervisor, Dorothy Copeland, testified that after Plaintiff explained his

9    concerns that Beard's capped commission "was inconsistent" and happened "because Jerome

10   Beard is African-American" she never told anyone else about his report because "[i]t wasn't

11   something that occurred to [her]."  (Copeland Dep. at 54:8-22.)

12         IBM also admits Plaintiff reported his concerns about discrimination to Copeland and she

13   ultimately terminated Plaintiff, but argues she was not actually a "decision-maker," instead

14   "merely implement[ing] the recommendations."  (Copeland Dep. at 54:8-22; Dkt. No. 48 at 12.)

15   Copeland testified she could not reject the findings of the investigation without the support of

16   Leonard and Mihalik, which she did not have (Copeland Dep. at 139:4-11), and Plaintiff testified

17   that when Copeland terminated him "she wouldn't own any of the responsibility and -- pretended

18   such a level of ignorance of both the facts and the investigation and the conclusions that her

19   involvement was as close to irrelevant as I could imagine."  (Kingston Dep. at 135:25-136:4.)  At

20   most, however, this testimony creates a genuine issue of disputed material fact when weighed

21   against Copeland's role in terminating Plaintiff and the assertion of another member of the

22   Committee (see Mihalik Dep. at 100:2-6) that Copeland was one of a handful of "ultimate"

23   decisionmakers.

24

1    Finally, IBM contends that because Johnson reported Plaintiff to Internal Audit on

2 October 16, 2017, a month before Plaintiff first reported his concerns about discrimination, the

3 timing precludes "a finding of any causal connection between his termination and his alleged

4 protected activity."  (Dkt. No. 48 at 12.)  But the adverse employment action at issue here is

5 Plaintiff's termination, not his referral to Internal Audit.  See Boyd v. State, Dep't of Soc. &

6 Health Servs., 187 Wash. App. 1, 13 (2015) ("An adverse employment action involves a change

7 in employment that is more than an inconvenience or alteration of one's job responsibilities.").

8 And it is undisputed that by the time Plaintiff was terminated not only was his direct supervisor

9 aware he reported discrimination, but so was the Internal Audit investigator and likely many

10 others.

11    1.  Pretext

12    IBM proffers the following reasons for terminating Plaintiff and Mr. Temidis:

13    [T]hey did not add quota for the SAS deal to Mr. Donato's quota as required, they
     were aware of but did not use the [Significant] Transaction provision or speak
14    with anyone about using that provision, and they exercised poor business
     judgment by not speaking with the upline manager before approving the
15    commissions even though Plaintiff said he expected his manager to raise red flags
     that never materialized.

16 (Dkt. No. 48 at 13.)  Plaintiff notes that each of these proffered reasons is contrary to IBM

17 policy, and thus demonstrates that IBM's reasons are merely pretextual.  First, as a Rule 30(b)(6)

18 witness, Johnson agreed that quotas should not be added after a deal closes.  (Johnson Dep. at

19 145:14-20.)  She also testified that using the significant transaction provision to cap Donato's

20 commission would have violated IBM's written policies.  (Id. at 25:7-17.)  IBM's final proffered

21 reason—that Plaintiff failed to speak with his upline manager before approving the

22 commission—is a new reason, listed nowhere in Larkin's report, that is undercut by Johnson's

23 contemporaneous email concluding that Plaintiff followed the "normal process for significant

24

1    overachievement," which "requires the First Line and Second Line Manager's approval and

2    when >400% achievement a report is also sent to the BU VP," all of which was done in this case.

3    (Marshall Decl., Ex. 20 at 2; see also Ex. 21.)  IBM has therefore yet to articulate a reason for

4    terminating Plaintiff that is consistent with its own policies.

5        This was a confused process where Plaintiff—who followed IBM's written policies to the

6    letter—was terminated for failing to violate those policies. Meanwhile, Donato, whose

7    commission was apparently so egregious that Plaintiff was terminated for failing to cap it, kept

8    his commission unlike his Black colleague, whose commission was capped at 15%.  Under these

9    circumstances, a reasonable fact-finder could determine that IBM's proffered reasons for

10   terminating Plaintiff are pretextual.

11       **B.  Wrongful Termination**

12       Plaintiff alleges he was terminated in violation of public policy for reporting IBM's

13   misconduct.  To establish a prima facie case of wrongful discharge in violation of public policy,

14   an employee must show (1) that "his or her 'discharge may have been motivated by reasons that

15   contravene a clear mandate of public policy,'" Martin v. Gonzaga Univ., 191 Wash. 2d 712, 725

16   (2018) (quoting Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 232-33 (1984) (additional

17   citation omitted)), and (2) that the public-policy-linked conduct was a significant factor in the

18   decision to discharge the worker.  Martin, 191 Wash.2d at 723.

19       Plaintiff alleges that he was terminated for reporting IBM's misconduct under the Wage

20   Act and for reporting racial discrimination against Beard.  Because the Court previously found

21   that under the terms of the IPL, IBM had the right to "cancel the commissions altogether" and

22   therefore dismissed Plaintiff's Wage Act claim (Dkt. No. 27 at 10), Plaintiff has failed to meet

23

24

1  his burden of demonstrating that he was protecting any employee's public-policy backed right to

2  the commissions.

3      However, because Washington has a public policy against racial discrimination see RCW

4  49.60.030, and as discussed, supra, material issues of disputed fact exist as to whether Plaintiff

5  was terminated for reporting discrimination against Beard, Plaintiff's claim of wrongful

6  discharge survives IBM's motion for summary judgment.

7  **C. Age Discrimination**

8      Plaintiff also alleges he was terminated because he was an older employee, 58 at the time

9  he was discharged.  Under the WLAD, it is unlawful for an employer to "discharge or bar any

10  person from employment because of age." RCW 49.60.180(2). "The employee has the initial

11  burden of presenting a prima facie case of age discrimination." Becker v. Washington State

12  Univ., 165 Wash. App. 235, 252 (2011).  After the plaintiff establishes a prima facie case of

13  discrimination, the burden shifts to the employer, who must articulate a legitimate,

14  nondiscriminatory reason for the adverse employment action.  Mikkelsen v. Pub. Util. Dist. No.

15  1 of Kittitas Cty., 189 Wash. 2d 516, 533 (2017).  If the employer meets this burden, "the

16  employee needs only to present evidence sufficient to create a genuine issue of material fact

17  whether 'discrimination was a substantial factor in an adverse employment action, not the only

18  motivating factor.'" Id.

19      IBM does not contest specific elements of Plaintiff's prima facie case but argues that

20  "Plaintiff bases his age discrimination claim on nothing besides speculation" and has failed to

21  demonstrate that age discrimination was a substantial factor in his termination.  (Dkt. No. 48 at

22  16-17.)  IBM cites only one case in support of its argument, Grimwood v. Univ. of Puget Sound,

23  Inc., 110 Wash. 2d 355, 361 (1988), abrogated on other grounds by Mikkelsen, 189 Wash. 2d

24

1    516.  In <u>Grimwood</u>, when asked during his deposition for the basis of his claim, the plaintiff

2    explained he alleged age discrimination "because I don't feel I was given sufficiently good

3    reason for my termination so I feel it has to be fundamentally another reason and that's all I can

4    come up with."  <u>Id.</u> at 361.

5          In contrast, Plaintiff has introduced some evidence of age discrimination here. He heard a

6    member of the Disciplinary Action Review Committee mention he supported Project Sunrise, a

7    program allegedly designed to lay off older employees.  (Kingston Dep. at 144:17-19.)  Plaintiff

8    also recalls "general conversations about the desire to place younger people in roles."  (Kingston

9    Dep. at 144:5-7.)   And around the time Plaintiff was terminated, the EEOC found evidence of

10   "top-down messaging from [IBM]'s highest ranks directing managers to engage in an aggressive

11   approach to significantly reduce the headcount of older workers to make room for Early

12   Professional Hires."  (<u>Id.</u>)

13         Plaintiff has also presented evidence that several people involved in his termination—

14   Larkin, Copeland, Mandel—knew he was older than 40.  (<u>See</u> Dkt. No. 63 at 23 (citing Larkin

15   Dep. at 295:16-22; Copeland Dep. at 223:8-12; Mandel Dep. at 175:15-17.)  And a reasonable

16   fact-finder could find it implausible that the individuals who terminated him, including his direct

17   supervisor, believed he was younger than the protected age category of 40, or that the HR

18   committee terminated him without reviewing his personnel file.  Viewing the evidence in the

19   light most favorable to Plaintiff, there are genuine issues of fact regarding his age discrimination

20   claim that should be presented to the jury.

21         **D.  Unjust Enrichment**

22         Plaintiff also brings a claim for unjust enrichment, alleging that after his termination,

23   IBM's revenue team recalculated the ledger for deals Plaintiff worked on in Q1 2018 and he is

24

1  owed additional commissions pursuant to this recalculation.  Adequately pleading an unjust

2  enrichment claim requires Plaintiff to assert "a benefit conferred upon the defendant by the

3  plaintiff," plus "the acceptance or retention by the defendant of the benefit under such

4  circumstances as to make it inequitable for the defendant to retain the benefit without the

5  payment of its value." Young v. Young, 164 Wn.2d 477, 484 (2008).  Unjust enrichment claims

6  rely on "quasi-contracts" that "arise from an implied legal duty or obligation, and are not based

7  on a contract between the parties, or any consent or agreement."  Chandler v. Washington Toll

8  Bridge Auth., 17 Wash. 2d 591, 600 (1943).

9        IBM has admitted that after April 1, 2018, $2,485,186.86 was added to the revenue credit

10  from deals closed within Plaintiff's territory.  (Dkt. No. 63 at 23; Kingston Dep. at 152:10-155:3;

11  Marshall Decl., Ex. 52 at 5-7.)  IBM has not contested Plaintiff's calculation that this increased

12  revenue calculation would entitle him to an additional $113,728 based on his commission

13  formula. (Dkt. No. 63 at 23; Kingston Dep. at 152:10-155:3; Marshall Decl., Ex. 56 at 5-7.)  And

14  if, as Plaintiff alleges, he was terminated for reporting illegal discrimination, IBM's retention of

15  his commission would be inequitable.

16        While IBM argues that Plaintiff's claim is foreclosed by a provision in the IPL (Dkt. No.

17  48 at 18), the Court previously dismissed Plaintiff's contractual claims (Dkt. No. 27 at 5), and a

18  claim of unjust enrichment is not based on a contract between the parties.  IBM's second

19  argument fares no better.  It contends "Plaintiff admitted in his deposition that he was paid all

20  commissions he was due as of the last day of his employment."  (Dkt. Nos. 48 at 17; 64 at 10.)

21  This is simply not true.  Plaintiff testified that he was paid all commissions "[a]ccording to the

22  revenue that was on the ledger [when he was terminated]."  (Kingston Dep. at 154:3 4.)  But he

23

24

1  learned the ledger was subsequently revised to reflect additional commissions for "revenue [that]

2  was attributed to that first quarter, not to a following period."  (Id. at 153:17 19.)

3  Viewing the evidence in the light most favorable to Plaintiff, the Court could find that

4  retention of the benefit conferred by Plaintiff without payment of its full value is inequitable.

5  **III.  Plaintiff's Motion to Seal**

6  Plaintiff moves to seal 33 exhibits submitted in support of its brief that IBM designated

7  as confidential during discovery.  (Dkt. No. 59.)  In response, IBM concedes that 14 of these

8  exhibits should be public, but asserts that 17 should remain completely under seal, and portions

9  of two additional deposition transcripts should remain partially redacted.  Plaintiff argues IBM

10  waived its right to designate deposition testimony as confidential by failing to do so in

11  accordance with the Parties' agreed timeline.  (Dkt. No. 70 at 3 (citing Dkt. No. 37 at 5.2(b).)  In

12  order to keep the exhibits under seal, IBM must demonstrate "compelling reasons supported by

13  specific factual findings . . . outweigh the general history of access and the public policies

14  favoring disclosure."  Kamakana v. City & Cnty. of Honolulu, 447 F.3d 1172, 1178-79 (9th Cir.

15  2006) (internal citations omitted).  The Court finds that IBM has met this standard for the 17

16  exhibits it wishes to keep completely sealed, and for two of the four deposition excerpts it seeks

17  to redact.

18  IBM argues that 17 documents should be filed completely under seal because they

19  contain confidential and proprietary information, including confidential sales compensation

20  information, customer information, and information related to IBM's business operations,

21  including quota setting, commissions reviews, internal investigations, and financial processes.

22  (Dkt. No. 68 at 3.)  IBM supports its position with the Declarations of Linda Kenny, Karla

23

24

1  Johnson, and Nancy LaCivita in support.  (Dkt. No. 68, Ex. A-C.)  The Court finds that these

2  documents should remain sealed.

3  But IBM also seeks to redact deposition testimony discussing IBM's changing use of

4  acronyms (Kingston Dep. at 89:3-25), IBM's policy of not capping payments (discussed publicly

5  in Beard, supra) (Johnson Dep. at 129:10-131:3), adding quotas after a deal closes (Id. at

6  145:1-146:25), and IBM's recent sales history with SAS (Id. at 170:19-171:12).  While IBM's

7  failure to seal these excerpts pursuant to the timeline set forth in the Parties' protective order

8  undercuts its argument that these excerpts are highly confidential, the Court finds the last two

9  excerpts are sensitive and were not previously made public (Johnson Dep. at 145:1-146:25,

10  170:19-171:12).  These excerpts will therefore remain redacted.

11  **Conclusion**

12  Because Plaintiff has raised a genuine issue of material fact as to each of his claims, the

13  Court finds IBM has failed to meet its burden and its Motion for Summary Judgment (Dkt. No.

14  48) is DENIED.  Further, Plaintiff's Motion to Seal (Dkt. No. 59) is GRANTED in part,

15  DENIED in part. The Exhibits to the Declaration of Toby J. Marshall (Dkt. No. 61) shall

16  remained sealed.  Plaintiff is ORDERED to submit unsealed copies of the following exhibits

17  within 14 days of the date of this Order:

18  (1) Exhibit Nos. 3, 5, 7, 11, 14, 22, 25, 27, 29, 30, 35, 37, 40, and 49;

19  (2) Exhibit No. 35 (Johnson Dep.) shall be unsealed except as redacted at 145:1-146:25

20  and 170:19-171:12.

21  //

22  //

23  //

24

The clerk is ordered to provide copies of this order to all counsel.

Dated March 1, 2021.

Marsha J. Pechman
United States Senior District Judge