1          UNITED STATES DISTRICT COURT

2      WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3   _____

                              )
4   SCOTT KINGSTON,           ) C19-01488-MJP
                              )
5              Plaintiff,     ) SEATTLE, WASHINGTON
                              )
6   v.                        ) April 13, 2021 -
                              ) 8:40 a.m.
7   INTERNATIONAL BUSINESS    )
    MACHINES CORPORATION, a New )
8   York corporation,         ) TRIAL - DAY 7 -
                              ) via ZoomGov platform
9              Defendant.     )
                              )
10  _____

11          VERBATIM REPORT OF PROCEEDINGS
        BEFORE THE HONORABLE MARSHA J. PECHMAN
12          UNITED STATES DISTRICT JUDGE

13  _____

14  APPEARANCES:

15  For the Plaintiff:      Matthew E. Lee
                            Jeremy R. Williams
16                          Whitfield Bryson
                            900 W. Morgan Street
17                          Raleigh, North Carolina  27603

18                          Toby J. Marshall
                            Brittany J. Glass
19                          Terrell Marshall Law Group
                            936 N. 34th Street, Suite 300
20                          Seattle, WA 98103

21  For the Defendant:      Paul R. Taylor
                            Byrnes Keller Cromwell
22                          1000 Second Avenue, 38th Floor
                            Seattle, WA 98104
23
                            Justin R. Barnes
24                          Kelli N. Church
                            Jackson Lewis
25                          171 17th Street N.W., Suite 1200
                            Atlanta, GA 30363

Proceedings stenographically reported and transcript produced with computer-aided technology

1                    EXAMINATION INDEX

2     EXAMINATION OF                                    PAGE

3     ROSALVA NUNEZ        DIRECT EXAMINATION           1169
                          BY MR. TAYLOR
4                         CROSS-EXAMINATION            1176
                          BY MR. MARSHALL
5                         REDIRECT EXAMINATION         1197
                          BY MR. TAYLOR
6                         EXAMINATION                  1200
                          BY THE COURT - Juror Questions
7     DAVID MITCHELL      DIRECT EXAMINATION           1201
                          BY MR. BARNES
8                         CROSS-EXAMINATION            1215
                          BY MR. LEE
9                         REDIRECT EXAMINATION         1224
                          BY MR. BARNES
10                        EXAMINATION                  1227
                          BY THE COURT - Juror Questions
11                        RECROSS-EXAMINATION          1230
                          BY MR. LEE
12    LINDA KENNY         DIRECT EXAMINATION           1231
                          BY MR. BARNES
13                        CROSS-EXAMINATION            1243
                          BY MR. MARSHALL
14                        REDIRECT EXAMINATION         1255
                          BY MR. BARNES
15                        RECROSS-EXAMINATION          1257
                          BY MR. MARSHALL
16    BRIAN MULADA        DIRECT EXAMINATION           1259
                          BY MR. BARNES
17                        CROSS-EXAMINATION            1271
                          BY MR. LEE
18                        REDIRECT EXAMINATION         1282
                          BY MR. BARNES
19    LISA MIHALIK        DIRECT EXAMINATION           1285
                          BY MR. BARNES
20                        CROSS-EXAMINATION            1296
                          BY MR. LEE
21                        REDIRECT EXAMINATION         1305
                          BY MR. BARNES
22                        RECROSS-EXAMINATION          1306
                          BY MR. LEE
23                        EXAMINATION                  1310
                          BY THE COURT
24                        REDIRECT EXAMINATION         1313
                          BY MR. BARNES
25                        RECROSS-EXAMINATION          1314
                          BY MR. LEE

1    DOROTHY COPELAND         DIRECT EXAMINATION                1315
                              BY MR. TAYLOR
2                             CROSS-EXAMINATION                 1318
                              BY MR. MARSHALL
3                             REDIRECT EXAMINATION              1338
                              BY MR. TAYLOR
4                             EXAMINATION                       1340
                              BY THE COURT - Juror Questions

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        (The following occurred outside the presence of the jury.)

 2              THE COURT:  Good morning, counsel.

 3              MR. BARNES:  Good morning.

 4              MR. MARSHALL:  Good morning, Your Honor.

 5              THE COURT:  Mr. Cogswell, do we have our court reporter

 6   here?

 7              THE CLERK:  Yes, Your Honor, Ms. Drury is here.

 8              THE COURT:  All right.  Well, good morning.

 9        It's my understanding that, Mr. Barnes, you wanted to make

10   your halftime motions.

11              MR. BARNES:  That's correct, Your Honor.

12              THE COURT:  So let's move forward with those.

13        And, Mr. Marshall, I take it you are defending those?

14              MR. MARSHALL:  That's correct, Your Honor.  Thank you.

15              MR. BARNES:  Thank you, Your Honor.

16        So IBM moves for a judgment as a matter of law on all of the

17   plaintiff's claims in this case, and I want to be as efficient as

18   possible on this, so I'm going to put them into buckets.  The

19   first bucket is the termination claims; the second bucket is the

20   unjust enrichment claim.

21        As to the first bucket, all three counts, one through three

22   of the plaintiff's claims, related to his termination, all

23   require plaintiff to prove that his protected activity was a

24   substantial factor motivating IBM's decision to terminate

25   Mr. Kingston.  Plaintiff has not established that his alleged
```

 1    protected activity was a substantial motivating factor.

 2         First, it's undisputed that the investigation started before

 3    Mr. Kingston ever complained of anything.  So we know that the

 4    investigation was not motivated by any retaliatory animus.

 5    Second, Mr. Kingston has not even established that the

 6    decision-makers knew of his protected activity.  And, in fact, he

 7    testified on cross-examination that he had no evidence, no reason

 8    to believe that any of the decision-makers harbored any

 9    retaliatory animus towards him or that they were motivated at all

10    by any retaliatory animus, much less that it was a substantially

11    motivating factor.

12         So this trial has really become about were IBM's policies

13    clear, did he know about those policies, and should IBM have done

14    more to make him aware of those policies, but none of that has

15    anything to do with whether he -- whether his protected activity

16    was a substantially motivating factor in IBM's decision to fire

17    him.  And so he has not presented sufficient evidence to survive

18    a directed verdict on that issue, and the jury should not --

19    those -- all three of those claims should not be presented to the

20    jury.

21         As for the second bucket, which only has one claim in it, the

22    unjust enrichment claim, his -- and I'm going by the jury

23    instructions here -- one of the things that Mr. Kingston has to

24    prove for this claim is that IBM either knew or should have known

25    that the services were performed and received with the

 1  expectation of payment of reasonable value.

 2      Now, the only evidence that Mr. Kingston has presented on the

 3  unjust enrichment claim is testimony by him that he was paid

 4  based on an accrual, and that after he was fired, those accruals

 5  changed.  That's the first piece of evidence.  The only other

 6  piece of evidence is testimony by his expert, who admitted that

 7  he is not opining on liability and simply assumed liability in

 8  calculating the damages.

 9      So Mr. Kingston has offered no evidence that IBM either knew

10  or should have known that the services were performed and

11  received with the expectation of payment of reasonable value.

12  And this is -- it's important because if we look at

13  Mr. Kingston's own Incentive Plan Letter -- Are you able to pull

14  up Exhibit 211?

15      We're going to pull up Exhibit 211 on the screen here because

16  there's a particular provision in here which is very important to

17  this claim.

18      Go to the second page, please.  Actually, go to the third

19  page, and call out the "Leaving the Plan Early" section.

20      So this Incentive Plan Letter -- excuse me -- this clearly

21  states IBM's intent and understanding as it related to Mr.

22  Kingston's commissions.  It says, "If for any reason, including

23  leaving IBM's employment, you leave your currently assigned

24  incentive plan before the last day of its full plan period, your

25  final achievement for that plan will be based on business results

 1    credited to you as of the last day of the last full month you

 2    were on that plan."

 3         This means it was IBM's intent that Mr. Kingston would be

 4    paid based on the revenue as of April 30th, 2018.  He's presented

 5    no evidence that IBM ever gave him any contrary understanding or

 6    indication, and he's presented no evidence that he was not paid

 7    everything he was owed as of April 30th, 2018.

 8         So for that reason, Your Honor -- It's also our position that

 9    plaintiff has not presented sufficient evidence to survive a

10    motion for judgment as a matter of law on his unjust enrichment

11    claim.

12         And I'm happy to provide briefing on this.  I just wanted to

13    present these issues as efficiently as possible to Your Honor

14    this morning.

15         THE COURT:  Mr. Barnes, a couple of questions about the

16    unjust enrichment claim.  Your argument might make more sense if

17    this were a contract action, but it's not.  It's an unjust

18    enrichment action, which is common law.  And as we have been over

19    before, IBM has declared that this letter is not a contract.  So

20    IBM certainly knew at the time Mr. Kingston was working that they

21    knew that he had accounts, correct?

22         MR. BARNES:  That's correct.

23         THE COURT:  And how could they not know that there were

24    funds coming in from those accounts, in other words --

25         MR. BARNES:  So --

1          THE COURT:  Go ahead.

2          MR. BARNES:  So, first off, on the contract piece, we

3     agree.  I don't point to the IPL to suggest that it's a contract

4     that should overrule Mr. Kingston's claim.  That's not what I'm

5     suggesting.  I'm suggesting that that provision in the IPL is

6     evidence of what IBM knew or reasonably should have known at the

7     time.

8          And the key issue here is -- and this is why this issue

9     should not go to the jury -- is because Mr. Kingston has not

10    presented evidence explaining his theory.  But I will explain his

11    theory.  His theory is that he was paid based on the revenue as

12    of -- He admits he was paid based on the revenue that was

13    recognized as of his last day of employment.  His contention is

14    that there were revenue adjustments after he left IBM.  So after

15    April 30th, 2018, there were adjustments to the revenue on deals

16    that he had participated in before he left, and that those

17    revenue adjustments should -- he should be paid on those.  And

18    this provision in his IPL clearly shows that was not IBM's

19    understanding or expectation.  And he has offered no evidence

20    that IBM had a contrary understanding or expectation.

21         THE COURT:  Well, it depends on where the expectation or

22    understanding comes.  IBM certainly knew that they do

23    adjustments.

24         MR. BARNES:  That's correct.

25         THE COURT:  There's been lots of testimony that there's

1   a rush at the end of the quarter or at the end of the six-month

2   period to get things booked, and we've heard lots of testimony

3   about that.  But we also know that payments come in even after

4   that deadline, and that's one of the reasons why they have

5   delayed payments is so they can make those adjustments.

6       So IBM, it could be argued, has an understanding that monies

7   are going to be accrued after the initial deadline.

8           MR. BARNES:  And that's why --

9           THE COURT:  Regardless of what they put in their

10  letters, so that's --

11          MR. BARNES:  I apologize.  I didn't mean to interrupt.

12      I was just going to say, that's why they put this provision

13  in the IPL, is for that reason.

14          THE COURT:  Right.  Well, they can claim to have

15  knowledge or they can claim to try and limit it; however, we know

16  that it's not a contract and, therefore, we fall back on the

17  common law.

18      Was there something earned that should have been paid?  You

19  know, it's really that simple.

20          MR. BARNES:  And our point is simply, Your Honor, that

21  Mr. Kingston has offered no evidence of what IBM's reasonable

22  expectations were about those changes in revenue that happened

23  after he left the company.  No evidence.

24          THE COURT:  Okay.

25      Okay.  Mr. Marshall, what would you like to say?

1          MR. MARSHALL:  Thank you, Your Honor.

2      I'm not going to address the unpaid commissions point because

3  you have made the points that I was going to raise.

4      With respect to the other three claims, there's an

5  overwhelming amount of evidence here that shows that a reasonable

6  jury could rule in Mr. Kingston's favor on those claims.  While

7  it's true that the investigation was started before he

8  complained, there's a couple of key points about that.

9      First of all, you have seen extensive evidence of what was

10 happening on October 7th that was tying the SAS deal to the HCL

11 deal, that there were all of these communications going back and

12 forth that put those two deals together.  It was after that that

13 Ms. Johnson completely changed her mind and decided to open an

14 investigation into Mr. Kingston.

15     And I think the thing that is key here -- the key thing -- is

16 that IBM did not have to terminate him.  Had he kept his mouth

17 shut and gone along with everyone else's decisions to cap Jerome

18 Beard's payment, perhaps he would have just been written up,

19 perhaps he wouldn't have been written up at all.  But all of this

20 evidence shows that they didn't like this guy who was a cog in

21 the wheel, you know, putting an end to their plans, as someone

22 who was accusing people of engaging in discriminatory conduct,

23 someone who was accusing people of wrongfully withholding wages.

24 These are serious violations, and he's speaking up.  He's the

25 only one that is speaking up.  The only one.  And he's the only

 1  one that gets terminated for speaking up.

 2      And you see in early April we're back to HCL coming into the

 3  view again.  He's allegedly terminated because of SAS, but Cindy

 4  Alexander is forwarding those communications between Brian Mulada

 5  and Rose Nunez, two people who are making this decision to

 6  terminate our client.

 7      I think the jury definitely can see through the pretext here

 8  and the jury can definitely come to a conclusion that what

 9  happened was Mr. Kingston was silenced for standing up.  That

10  essentially proves the elements of all three of the claims, and

11  this should go to the jury.

12          THE COURT:  Mr. Barnes, any rebuttal?

13          MR. BARNES:  Yes, Your Honor.

14      I'm getting some feedback.  I don't know if you are.

15      Oh, that sounds better.  That sounds better.

16      My only response is that, in Mr. Marshall's presentation, I

17  didn't hear him say anything to link the protected activity to

18  the termination.  He referenced an e-mail that was forwarded by

19  Cindy Alexander, but that one e-mail is the only thing he

20  referenced and that is just simply not enough to show that

21  Mr. Kingston's alleged protected activity was a substantially

22  motivating factor in IBM's decision to terminate Mr. Kingston.

23          THE COURT:  Based upon the evidence that I have reviewed

24  and the arguments that have been made, I'm going to deny the

25  motions.  I think that there is sufficient evidence, particularly

 1   circumstantial evidence concerning timing that is important.

 2        At this point in the proceedings, the Court does not -- it

 3   views the evidence in the light most favorable to the non-moving

 4   party, and there's sufficiency here in terms of circumstantial

 5   evidence as to the timing, when the complaints are made, when the

 6   investigation is launched, when everyone starts talking about

 7   these two deals link together, and then, of course, there's the

 8   issue of whether or not there has been a rational explanation

 9   given for why this happened to Mr. Kingston.  Actually, it was

10   quite telling yesterday that one of the jurors asked a question

11   that I think is key in this proceeding, and that is, if zero

12   isn't the right number for a quota, IBM hasn't come up with one,

13   nor did Mr. Larkin even seem to be able to understand how to do

14   that.

15        So there's sufficiency here both for the timing of showing

16   retaliation and for the fact that IBM's explanation could be a

17   pretext.  The jury is going to have an opportunity to hear those

18   arguments and make that decision.

19        All right.  Counsel, anything else that needs to be clarified

20   on that ruling?

21        MR. BARNES:  No, Your Honor.  Thank you for hearing our

22   motion this morning.

23        THE COURT:  All right.  We have some other issues that

24   are of import here.

25        And, Mr. Marshall, is Mr. Lee with you?

 1              MR. MARSHALL:  He is with me, Your Honor.

 2              THE COURT:  Okay.  You've got a problem.  You used 232

 3   minutes yesterday, and you have a balance of 62 minutes.  And the

 4   defense used 61 minutes, for a balance of 879.

 5       I don't know what you want to do about that, but you are

 6   going to run out of time.

 7              MR. MARSHALL:  Yes.  We were going to bring this to your

 8   attention as well this morning.

 9       What we would respectfully ask is for an extra two hours or

10   less.  Essentially, what we're -- our plan is, at this point, is

11   to have no more than one hour for closing and no more than 15

12   minutes for, collectively, each of our cross-examinations of

13   their six witnesses.  And so 15 minutes times six, I believe, is

14   an hour and a half.  One hour for closing.  That's two and a half

15   hours.  Subtract the 62 minutes.  That puts us at asking for, I

16   believe, 88 minutes, if my math is correct.

17              THE COURT:  Well, Mr. Taylor, I see has risen and he is

18   going to tell me that you have laid out the rules, Judge, and you

19   ought to follow them.  And, you know, what am I going to say to

20   him?

21              MR. MARSHALL:  Well, our key argument, Your Honor, is

22   that you saw this yourself, we got filibustered.  We had to

23   present the majority of our case through adverse witnesses.  We

24   did so, we think, efficiently and fairly.  We were ultimately

25   able to, you know, because of what we were able to get from

1  certain witnesses, cut out four or five witnesses from our

2  witness list.  But the fact of the matter is, is that when you

3  take Karla Johnson, Maria Lipner, and Jeff Larkin, there was

4  just constant filibustering.  In fact, several times you had to

5  instruct the witness to answer the question that was asked.  We

6  delayed going to you, you know, even though we could have

7  probably earlier.  But, you know, the fact of the matter is, is

8  that, with those witnesses, we burned a lot more time than we had

9  expected.  And I can assure you, we had our expert ready to go,

10  thinking we were going to go at 9:30 yesterday, and he didn't get

11  on until really late because Mr. Larkin just kept going around

12  and around in circles on questions that were very straight

13  forward.

14       So for that reason we would ask for leave.  I would also

15  point out there's no prejudice.  The Court set aside ten days for

16  trial.  Everyone agrees we're going to be in closing arguments on

17  Wednesday.  So this is going to go to the jury with plenty of

18  time for the jury to deliberate within the ten days.  And for

19  those reasons, we would respectfully ask that you use your

20  discretion to give us a little extra time.

21            THE COURT:  Mr. Taylor, what would you like to say?

22            MR. TAYLOR:  Your Honor, you set out the rules, I

23  believe, in the second pretrial conference, and it was made

24  crystal clear, as were other rules.  For example, the notion that

25  we can't call in our case someone who has already testified.  We

1    have some issues with that, and we will take them up at an

2    appropriate time.  However, the rules are the rules.  They knew

3    the rules.  They knew their clock was ticking.  Mr. Lee spent an

4    inordinate amount of time asking the same questions repeatedly on

5    issues, such as impeaching Mr. Larkin because his report said

6    "red flags" but his notes only said "flags."  That was an utter

7    waste of time.  He knew his clock was ticking.  You had

8    repeatedly warned them.

9         And if the rules aren't going to be followed, we might as

10   well not have rules, Your Honor.

11        THE COURT:  Well, Mr. Taylor, you make excellent points,

12   and I'm not in the habit of making rules that I don't enforce.

13   But here is the problem for you:  Is that the issue you really

14   want to go to the Court of Appeals on, is that the Court abused

15   its discretion for not adding, you know, another hour or so to

16   their time?

17        MR. TAYLOR:  I recognize the Court's discretion and I

18   recognize this is a discretionary matter, but if we're going to

19   have rules, we have got to enforce them equally on both sides.

20   We have tried to stay within our time, and we have managed our

21   time in order to do that.

22        THE COURT:  One correction, Mr. Taylor.  I didn't say

23   that you couldn't call witnesses if they were called in your case

24   in chief.  I said that they could be called in rebuttal.  So let

25   me make it clear that if there is a rebuttal case, you would be

 1  allowed to put on a surrebuttal.  But you can't call the same

 2  witness again in your case in chief.

 3          MR. TAYLOR:  Your Honor, we do intend to address the

 4  fact that there were issues raised after Ms. Johnson testified

 5  that were not on the table and were not addressed in either

 6  direct or cross of her but then were raised through other

 7  witnesses.  We believe we're entitled to call her to respond to

 8  those new issues.

 9          THE COURT:  Okay.  Well, if that's what you want to do,

10  you can raise those issues with me.

11          MR. TAYLOR:  Very well.

12          THE COURT:  But that's not what we need to work on right

13  now.

14          MR. TAYLOR:  I understand.

15          MR. LEE:  Your Honor, if I may very quickly?  I would

16  just note two things.  One, we saw this coming in the very first

17  break in this trial with Ms. Johnson.  She was doing exactly what

18  Mr. Marshall described, and it concerned us immediately about our

19  time because we knew at that point that we had to present our

20  case, by and large, through IBM's witnesses, and we were ready to

21  do that.  The only problem was the time it would take to do it

22  because of the witnesses', frankly, their demeanor.

23      Mr. Larkin, I thought it was very telling that he really

24  responded to your questions, one of them, the same way he

25  responded to mine, where he didn't answer it.  The jury had a

1   simple question for him about the steps, the specific steps, that

2   Mr. Kingston should have taken, and his answer was something

3   entirely different.  And we wasted time.  In that moment, we

4   wasted time.  And, you know, sometimes you have no perspective

5   when you are taking the examination, but I felt like I dealt with

6   that 30 to 40 times during his examination, the same thing.

7        And the same thing with Ms. Johnson and very similar with

8   Ms. Lipner.  I could have gotten those examinations done in half

9   the time but for that dynamic.  And we saw it coming.  When we

10   spoke about this in that very first break, I remember Your Honor

11   telling us not to worry about that impact on our time.  And

12   that's not to say that we didn't try to remain efficient because

13   we did.

14        Mr. Marshall is exactly right.  We cut six -- I think five or

15   six witnesses off of our list, five to six witnesses, because we

16   didn't have time.  We would have loved to call them.  We would

17   love to present that evidence, but we didn't have time.

18        And so now what we need is, like Mr. Marshall said, about 15

19   to 20 minutes, just to deal with these six witnesses they're

20   going to call, and then a sufficient amount of time to close,

21   which an hour should be fine.

22             THE COURT:  Okay.  Well, Mr. Lee, Mr. Marshall, I have

23   been running timed trials now for probably 25 years, and you

24   might stand as the first that actually ran out of time.  I can't

25   think of another time that having limits didn't make the case

1   more efficient and actually make a better presentation.

2        So, Mr. Lee, I understand that you think that these witnesses

3   were obstreperous at times and that they didn't respond to the

4   question directly, and I see that that happened many times, but

5   I'm also going to tell you you rose to the bait and you circled

6   back and made points again and again and again and failed many

7   times to understand that the impeachment that you wished to offer

8   was minuscule as opposed to picking out the most salient

9   impeachment to make.  So I don't think you're without part of the

10  problem here.  But I also think that I would be remiss, and the

11  Court of Appeals, who, as you know, don't try cases -- in fact,

12  many of them have little experience trying cases -- would look

13  unfavorably on me if I didn't grant you your small request.

14       And, Mr. Taylor, I've got to agree with you, it pains me to

15  do this, but I am going to give you an hour for your closing and

16  I will give you 15 minutes for each of the witnesses,

17  collectively, to finish up your case.

18       Part of the reason being is that the person who's going to

19  be -- if I don't, the person who will be harmed is Mr. Kingston,

20  and the defense has ample time left to be able to put on the case

21  as they desire.

22       Now, we will talk with Mr. Taylor later about what the

23  understanding was of who can be called back and if there are

24  issues that could not be anticipated.  I personally thought that

25  Ms. Johnson was pretty thoroughly questioned up one side and down

 1   the other, as I just mentioned, many times, Mr. Lee, to your

 2   team's detriment.  So that's what we'll do.

 3           MR. MARSHALL:  Thank you.

 4           MR. LEE:  Thank you, Your Honor.

 5           THE COURT:  Everybody understand?

 6           MR. TAYLOR:  Understood, Your Honor.

 7           THE COURT:  All right.  Then, Mr. Cogswell, are we ready

 8   to bring in our jurors?

 9           THE CLERK:  We are, Your Honor.

10       (The following occurred in the presence of the jury.)

11           THE CLERK:  Your Honor, it looks like we're just waiting

12   for No. 7 to connect.

13                   (Juror No. 7 connected.)

14           THE COURT:  Good morning, ladies and gentlemen.

15           THE JURY PANEL:  Good morning.

16           THE COURT:  Do you want to unmute?

17           THE JURY PANEL:  Good morning.

18           THE COURT:  So I realized when I was thinking about

19   talking with you this morning that I have been asking all the

20   questions and I haven't let you ask any questions, and I was

21   thinking that maybe you have got some that you want to ask about

22   the court, you know, about how we run business, anything that you

23   would like.  I'm not going to answer questions about the case.

24   But any of you curious about how we do things?

25           JUROR NO. 3:  I have been wondering about something.

1          THE COURT:  Uh-huh.

2          JUROR NO. 3:  It's totally unimportant.  It's my

3    understanding that anyone can come in and view a court case in

4    progress, right?

5          THE COURT:  Yes.  It's a public forum.

6          JUROR NO. 3:  Well, are there people, like, watching

7    this case?

8          THE COURT:  Yes, there are.

9          JUROR NO. 3:  Okay.  And they would need a Zoom link.

10   So how would they go about that?

11         THE COURT:  Well, there's a link to be able to listen --

12         JUROR NO. 3:  Uh-huh.

13         THE COURT:  -- on the website.  There's a schedule for

14   all the judges in the court every day, and so people can go to

15   that link and listen, and then if they wish to view, they need to

16   make a request to be allowed in to view, in which case they have

17   to give their name as well as their credentials for getting the

18   link back.

19      And Mr. Cogswell is the one who basically supplies them with

20   that information.  So we have had about 35, 40 people every day

21   have been watching.

22         JUROR NO. 3:  Oh.

23         JUROR NO. 5:  I didn't know that.

24         THE COURT:  Some of the Zoom trials that I have had, I

25   have had as many as 200 people watching.  To be perfectly honest,

1    it's mostly lawyers who are, you know, curious, or concerned

2    about the next time they have to do this because both the state

3    and the federal courts are doing these via Zoom.

4        And there's some discussion that portions of this will

5    continue on even after COVID.  For example, rather than bringing

6    people in, 30, 40 at a time for jury selection, that we would

7    bring them in remotely, select the jury, and then only bring in

8    those that have been selected to hear the testimony.

9            JUROR NO. 5:  Nice.

10           THE COURT:  So the lawyers are curious.  I have been to

11   lots of seminars -- I think I did five in the past month --

12   around the country because the Western District of Washington is

13   actually the first federal court to do this.  So there are 97

14   other districts.  Ours was the first to start doing this in order

15   to deal with the backlog.

16           JUROR NO. 3:  It's interesting.

17           JUROR NO. 5:  That is interesting.

18           THE COURT:  Any other questions?

19           JUROR NO. 7:  I have a question.  How does -- Like a

20   case that gets national attention and is televised daily, how is

21   that treated differently in a sense that we're not supposed to

22   talk to even our housemates, but in a case like that, everybody

23   sees everything, and how can the jury keep it separate if it's on

24   the news as soon as they leave the courthouse?

25           THE COURT:  Well, first of all, you should know that

1   federal trials are not televised.  State court trials are in many

2   instances, and actually that is one of the raging debates between

3   the two systems.  Chief Judge Roberts of the Supreme Court does

4   not believe that cameras should be in the courtroom.  There are

5   many judges, including myself, who disagree with that position,

6   mostly because I think the public should see how their government

7   functions.

8       And so what we do is we trust, we trust jurors that when we

9   tell them not to watch the news, just as I did with you, that you

10  don't.  Sometimes the media is so intense that judges have orders

11  that they sequester their jurors, and that's happened in various

12  cases.  If you remember the Boston Marathon bombing, jurors were

13  sequestered.  And so it's very rare that we do that and that we

14  put you up in a hotel and have the marshals guard you.  But that

15  does, in fact, happen and that is one option that we have, if a

16  judge feels that they cannot keep the media from the jury.  And

17  that's an evaluation that the judge makes with the consultation

18  of counsel because everybody wants to make sure, as we have

19  talked many times before, that you decide the case upon the

20  evidence that's presented and not what the media might be

21  putting on the tube or the radio or in the newspaper.

22          JUROR NO. 7:  Has it ever happened that the sequestering

23  occurs a couple of days after the trial begins?

24          THE COURT:  Well, sometimes it starts that way.

25          JUROR NO. 7:  Out of anticipation?

 1          THE COURT:  Out of anticipation because the judge and

 2    the parties know that there's a -- there is a lot of publicity

 3    that is swirling around the issue.

 4        Some years ago Mr. Taylor tried a case in front of me that

 5    probably had more publicity than anything I have ever had in my

 6    career.  Fair enough, Mr. Taylor?

 7          MR. TAYLOR:  I agree, Your Honor.  That was quite a

 8    trial.

 9          THE COURT:  So it's an individual issue that, you know,

10    judges worry about, and I told you before, we are problem

11    solvers, that's what we are, and we try and anticipate and solve

12    some of those problems.

13        Now, you need to understand that there are thousands of cases

14    every single day that get tried that nobody has ever heard of.

15    It's the sensational ones that get written up in the newspaper,

16    and I think that kind of skews how people think about the work of

17    juries.  But most of it is fairly routine.  And judges take time

18    and thought with each one.

19        Does that answer your question?

20          JUROR NO. 7:  Yes.  Thanks.

21          THE COURT:  There was a time not too long ago that we

22    made you deliberate into the night, and judges had places to

23    sleep in their chambers because they were waiting on juries to

24    get done at midnight.  We don't do that anymore.

25          JUROR NO. 5:  That's good.

```
 1            THE COURT:  All right.  Well, now.  Okay.  Does that
 2    take care of your questions for today?
 3        All right.  Then let's turn our attention back to the serious
 4    business at hand.  And, Mr. Taylor, I think you have an
 5    announcement to make before the jury?
 6            MR. TAYLOR:  I think you're referring to the plaintiffs,
 7    Your Honor.
 8            THE COURT:  Oh, I'm sorry.  Yes.
 9        Mr. Marshall, you've got something to tell them?
10            MR. MARSHALL:  I do, Your Honor.  Plaintiff rests.
11            THE COURT:  Okay.  Plaintiff rests.
12        Ladies and gentlemen, what that means is that the plaintiff
13    has had an opportunity to present its case in chief, or the
14    principles of its case, and now Mr. Taylor and Mr. Barnes have
15    the opportunity to put on the defense case.
16        So, Mr. Taylor.
17            MR. TAYLOR:  Thank you, Your Honor.
18        The defense calls Rosalva Nunez.
19            THE COURT:  Mr. Cogswell, will you invite the witness
20    in, please?
21            THE CLERK:  Yes, Your Honor.  She is here, and it looks
22    like she is connecting.
23        It appears we may have just lost her, Your Honor.
24            THE COURT:  Okay.  Go chase her, Mr. Cogswell.
25                          (Off the record.)
```

 1              THE COURT:  Did we lose her again, Mr. Cogswell?

 2              THE CLERK:  Your Honor, she reconnected, but it does not

 3    show that she has video or audio yet.

 4              THE COURT:  Okay.

 5              THE CLERK:  And it looks like she's here now.

 6              THE COURT:  There we go.

 7         Ms. Nunez, can you please unmute?

 8              THE WITNESS:  Sorry about that.  Hello.

 9              THE COURT:  Ms. Nunez, I'm Judge Marsha Pechman.  Can

10    you see me?

11              THE WITNESS:  I can see you perfectly.

12              THE COURT:  And can you hear me?

13              THE WITNESS:  I can hear you perfectly.

14              THE COURT:  Would you please raise your right hand to be

15    sworn?

16                           ROSALVA NUNEZ,

17         having been sworn under oath, testified as follows:

18              THE COURT:  Mr. Taylor, you may examine.

19              MR. TAYLOR:  Thank you, Your Honor.

20                         DIRECT EXAMINATION

21    BY MR. TAYLOR:

22    Q    Ms. Nunez, you work for IBM?

23    A    Yes, I do.

24    Q    How long have you been at IBM?

25    A    For 20 years.

1   Q   What do you do?

2   A   Today, I do -- I'm responsible -- I'm a part of the IBM

3   partner ecosystem team and I have three responsibilities.  The

4   first one is strategy specific to our partner IBM ecosystem team;

5   the second one is for new go-to-market models and routes to

6   market; and the third one I'm responsible for the diverse partner

7   initiative.  So that's recruiting diverse partners across a

8   variety of different spectrums.

9   Q   We will come back to the diverse partnership in a minute.

10  But IBM ecosystem, put that in English for us, please.

11  A   Sure thing.

12      IBM works with a variety of different -- we call them

13  business partners or third-party legal entities.  These third-

14  party legal entities we really partner with and really leverage a

15  mutual relationship to go to market with IBM's technology.

16  Q   So you sell IBM technology to these other companies?

17  A   Through them.  Sometimes to them.  Both, yes.

18  Q   Very well.

19      You indicated you're involved in a diverse partners

20  initiative.  Can you explain a little bit about that, please?

21  A   Sure.

22      So we just launched a diverse partner initiative program in

23  October, and as part of this program, it focuses on a couple of

24  different groups.  First and foremost, it focuses on

25  underrepresented minorities.  So African American, Hispanic,

1   Asian, Native American.  It also focuses on women, LGBTQ, as well

2   as veterans.  And it's really about recruiting and elevating

3   these partners that are unconditionally, wholly owned by one of

4   these groups.

5   Q   And you are responsible for that initiative?

6   A   Yes, I am.

7   Q   All right.  Do you know Mr. Jerome Beard?

8   A   I do know Jerome Beard.

9   Q   How long have you known Mr. Beard?

10  A   Since about 2017.

11  Q   And in what context have you gotten to know him?

12  A   Sure.

13      The first time I met Jerome Beard was on a client transaction

14  back in 2017, where we engaged together in a client transaction,

15  excuse me, in New York City.

16  Q   What do you think of him?

17  A   Highly respected.  He's a very skilled salesman.  He can

18  handle a lot of different complex transactions, fast on his feet,

19  very creative, highly respected.

20  Q   Would you ever do anything to discriminate against Mr. Beard?

21  A   No.  No, I would not.

22  Q   I want to take you back to 2017.  Did you ever discuss

23  Mr. Beard's HCL commission with Mr. Scott Kingston?

24  A   Yes, I did.

25  Q   In the course of these discussions, did Mr. Kingston say one

 1    word about Mr. Beard's race?

 2    A    No, he did not.

 3    Q    Did he say anything about Mr. Beard being discriminated

 4    against because of his race?

 5    A    No, he did not.

 6    Q    If he had, what would you have done?

 7    A    At first I would definitely be shocked, as just

 8    considering -- the circumstances considering that Jerome is,

 9    first and foremost, you know, he's definitely respected,

10    well-respected among the broader sales organization for the

11    reasons I had just mentioned.

12         But I think, you know, as far as what would I have done, I

13    definitely recommended the appropriate paths.  You know, we

14    definitely would have to pull in -- There's a variety of

15    different things within IBM that we have access to should

16    something like this occur.  Whether it be racial discrimination,

17    gender discrimination, any sort of discrimination, there's

18    different things that we can access so that we can report that

19    appropriately.

20    Q    Is there any question in your mind you would have taken

21    action --

22    A    Absolutely.

23    Q    -- if something had taken place?

24    A    Absolutely.  Absolutely.

25    Q    In your discussions with Mr. Kingston about Mr. Beard, did

 1  you ever tell him "Don't put anything in writing about race or

 2  discrimination"?

 3  A   No, I did not do that.

 4  Q   Wait a minute.  Mr. Kingston testified here last Thursday

 5  afternoon that you said just that.  Are you sure you didn't say

 6  that?

 7  A   I'm absolutely positive.

 8  Q   Any doubt in your mind?

 9  A   No doubt.  No doubt in my mind.

10  Q   When you learned last Thursday evening that Mr. Kingston had

11  made this claim about you, what was your reaction?

12  A   Offensive.  I was offended.  I think I find that to be very

13  offensive.  I think it's offensive, first and foremost,

14  obviously, because I am a minority, I am Hispanic, so I wouldn't

15  do something like that.  Second, I think it's, you know, just

16  incredibly slanderous and I think it's shameful.  I think it's a

17  terrible accusation.

18  Q   If you had said something like that to Mr. Kingston, he had

19  an obligation to report it immediately to others along the paths

20  you have described, true?

21  A   That's correct.  That's correct.

22  Q   Did he do that?

23  A   Not that I'm aware of, no.

24  Q   I want to change gears on you a little bit now.  Did you and

25  Mr. Kingston discuss in January of 2018 why Mr. Donato left the

```
 1   company?

 2   A    I think it was around the February time frame, yes.

 3   Q    Okay.

 4   A    Yes.

 5   Q    And did Mr. Kingston say why Mr. Donato left the company?

 6   A    He speculated as to why, but he didn't --

 7   Q    What did he say?

 8   A    He was paid a large commission and then he just said he

 9   probably left for fear of getting it clawed back.

10   Q    After Mr. Kingston was terminated, did he call you?

11   A    Yes, he did.

12   Q    And do you remember that discussion?

13   A    Yes, I remember the discussion.

14   Q    Where were you when he called?

15   A    I actually was in Disney World.  I took my daughter to Disney

16   World for her fifth birthday, and we were actually on our way

17   back home to New York and I was on the Disney Magical Express

18   Bus, shuttle bus, back to the airport.

19   Q    In that conversation, did Mr. Kingston say anything about

20   race?

21   A    No, he did not.

22   Q    Did he say anything about retaliation?

23   A    No, he did not.

24   Q    Did he even mention Mr. Beard?

25   A    No.
```

1    Q    You were deposed by Mr. Lee.  Do you remember that?

2    A    Yes.

3    Q    When he deposed you, did he ask you if you had instructed

4    Mr. Kingston not to put anything in writing about race or

5    retaliation?

6    A    No, he did not.

7    Q    Before last Thursday afternoon, had anybody -- lawyers,

8    witnesses, anybody -- suggested that you told Mr. Kingston not to

9    put anything in writing about race?

10   A    No.

11   Q    Or discrimination?

12   A    The first I heard about myself being involved in any sort of

13   racial discrimination was Thursday.

14   Q    Okay.  Mr. Kingston was terminated.  Did you agree with that

15   decision?

16   A    No, I did not.

17   Q    Do you know why he was terminated?

18   A    I do not know why.  The only thing I know is it's related to

19   an investigation, but those are confidential, so I don't know

20   beyond that.

21   Q    Did you have any involvement in how Mr. Kingston handled

22   Mr. Donato's commission on the --

23   A    No.

24   Q    -- on the SAS deal?

25   A    No, I didn't.  I did not.

 1   Q    Thank you.

 2              MR. TAYLOR:  Nothing further, Your Honor.

 3              THE COURT:  Any cross-examination?

 4              MR. MARSHALL:  Yes, Your Honor.

 5                             CROSS-EXAMINATION

 6   BY MR. MARSHALL:

 7   Q    Good morning, Ms. Nunez.

 8   A    Hi, good morning.

 9   Q    My name is Toby Marshall.  I'm one of the attorneys that's

10   representing Scott Kingston.

11        You called Scott Kingston on November 13th of 2017, correct?

12   A    November 13th of 2017?  I could have, yes.

13   Q    You knew Scott well at that point in time?

14   A    Correct.

15   Q    The two of you talked regularly?

16   A    Yes.

17   Q    You would usually call him while driving to pick up your

18   daughter from school; is that right?

19   A    Usually to catch up on deal transactions, just different

20   things in flight.  Yes, that's correct.

21   Q    You talked almost every day?

22   A    Yeah, I would say so.

23   Q    And on November 13th of 2017, you were calling about Jerome

24   Beard specifically?

25   A    Okay.  I don't recall specifically.

 1  Q   Jerome Beard had closed a deal with HCL in the third quarter

 2  of that year; is that correct?

 3  A   That's correct.

 4  Q   And the deal generated a large commission for Mr. Beard,

 5  nearly 1.5 million?

 6  A   Okay.  I'm not aware of that, but okay.

 7  Q   Okay.  Scott was Jerome's second-line manager, correct?

 8  A   Yes, I think so.

 9  Q   And you had some news for Scott on that phone call, correct?

10  A   I don't recall that, Mr. Marshall.

11  Q   You told Scott they're not going to pay Jerome the full

12  commission, didn't you?

13  A   No, I don't recall that, Mr. Marshall.

14  Q   You don't recall this phone call at all?

15  A   I've had many phone calls, again, deal transactions, things

16  like that, but I don't recall anything specific to how Jerome

17  Beard was going to be paid.

18  Q   Okay.  Scott -- Let me see if I can refresh your recollection

19  here.  Scott asked you for an explanation, "Why aren't they going

20  to pay Jerome Beard his full commission?"  Isn't that right?

21  A   Not that I recall.

22  Q   And you told Scott the commission was more than 10 percent of

23  the ESA portion of the deal; is that right?  You still don't

24  recall this?

25  A   Yeah, I don't recall.  I don't recall that, Mr. Marshall.

1  Q    Okay.  Scott said he had never heard of such an excuse.  Do
2  you recall that?
3  A    No.
4  Q    Then Scott objected and told you this isn't right because
5  commissions are uncapped, didn't he?
6  A    I don't recall, Mr. Marshall.
7  Q    Scott asked you who was behind this decision, but you didn't
8  tell him, did you?
9  A    Again, like, I don't understand -- I don't understand the
10 context of the call.  I apologize.  I don't understand.
11 Q    Well, let's get to that then.  Before that call with Scott,
12 you had spoken with Brian Mulada, correct?
13 A    I talked to Brian Mulada regarding HCL, correct, and Jerome
14 Beard's compensation, yes.
15 Q    Right.
16      So you do know about Jerome Beard's payment of 1.5 million
17 because Brian Mulada told you that isn't going to work for me,
18 I'm not going to pay him that much, didn't he?
19 A    No.  I think there's a misunderstanding of my role.  If I may
20 take a bigger step back?  My --
21 Q    Okay.  Go ahead.
22 A    Yeah.  My role at the time when Scott was employed with IBM,
23 I was in a worldwide role.  So I had seven different "Scotts," so
24 to speak, right?  So I would have responsibility for North
25 America, Latin America, Asia Pacific, the Middle East/Africa,

1    Europe, Japan, and China, and in that role, I played more of a --

2    think of it as facilitation, providing them with vehicles in

3    which to transact operations, processes, as it related to --

4    specific to the individual role -- or the individual route to

5    market, excuse me.

6        As far as getting into the specifics of individual rep

7    quotas, plans, all of that is left to the individual geographies.

8    And the main reason why that is because there's hundreds of reps

9    that engage in this route to market.  So it would be impossible

10   for me to go into the details of specific reps.  Now, when Jerome

11   Beard -- Because, again, there's so many, I would spend my entire

12   job as incentives and commissions.

13       As it relates to Jerome Beard, there were very specific

14   questions as about how to get paid.  So in my discussions with

15   Scott, Scott was inquiring about what to do, right?  So, in other

16   geographies, most of the sales leaders are independent, right?

17   They handle this on their own.  Where they come into issues, I

18   help bring the people together, I help the sales leader and I

19   help facilitate the discussion.

20       So, in that context, I think that context is very important

21   because I don't do Jerome's, you know, payments.  I don't

22   establish that.  I help facilitate and bring people together to

23   talk, make that decision based upon what they understand, what

24   they have.  Again, I don't have that level of detail for

25   individual reps as I manage seven different geographies, all

 1  different time zones around the globe.

 2  Q   Respectfully, Ms. Nunez, that's just not true.  Scott did not

 3  come to you for guidance, did he?

 4  A   Absolutely he did.  That's -- What you are saying is not

 5  correct, sir.  It's not correct.

 6  Q   In 2017, Brian Mulada worked at IBM's headquarters in Armonk,

 7  New York; is that correct?

 8  A   That's correct.

 9  Q   You also worked at IBM's headquarters in Armonk, New York?

10  A   That's correct.

11  Q   You had known Brian Mulada for six years at that point,

12  correct?

13  A   2017?  Yeah, that's about right.

14  Q   Because you used to work for him, correct?

15  A   That's true.  That's correct.

16  Q   And Brian Mulada told you he did not want to pay a full

17  commission to Jerome Beard, didn't he?

18  A   That's not correct.

19       MR. MARSHALL:  Can you pull up Exhibit 110, please?

20  Q   Ms. Nunez, I'm showing you what's been marked as Exhibit 110?

21       MR. MARSHALL:  Thank you.  Can we please turn to the

22  third page?  Oh, that's where we're at.  Okay.

23  Q   Do you see here this is an e-mail from Brian Mulada to you

24  dated November 11th, 2017?

25  A   Yep, I see it.

 1    Q    The e-mail subject line is "Private - do not distribute,"
 2    right?
 3    A    Yes.
 4    Q    "E-mail No. 3."  So this is a series of e-mails that
 5    Mr. Mulada is sending to you; is that correct?
 6    A    That's correct.
 7    Q    And he says, "As we discussed, the $1.5 million full payment
 8    is inappropriate and unacceptable."  Didn't he?
 9    A    Yep, that's what it says.  Yes.
10    Q    Right.
11         And he's reaching out to you because, as you said, you
12    handled ESA channels worldwide, correct?
13    A    That's correct.
14    Q    And at this point he had already talked with Karla Johnson
15    and Maria Lipner, right?
16    A    Yes.
17    Q    Okay.  And he told you he wanted to cut the commission
18    because the HCL deal related to broader deals coordinated by John
19    E. Kelly, didn't he?
20    A    Again I don't remember the precise context, but I do -- I do
21    know that the deal from this time was related to nondisclosure
22    deals, intellectual -- what we call IPD deals, intellectual
23    property deals.  So I do, that's correct.
24    Q    And John Kelly, he's an important guy at IBM, isn't he?
25    A    Correct.

1   Q   At this time he was the third highest executive in the

2   company, wasn't he?

3   A   At the time, I'm not so sure -- I'm not so sure about that.

4   Q   He was Ginny Rometty's No. 2, wasn't he?

5   A   He wasn't an SVP in the company.  He was only an EVP,

6   Mr. Marshall.

7   Q   Mr. Kelly invented Watson, the computer that beat Ken

8   Jennings at *Jeopardy*, right?

9   A   Correct.

10  Q   Okay.  So he's an important guy.  He's got a lot of power at

11  IBM, doesn't he?

12  A   Correct.

13  Q   He was the Senior VP of IBM's Cognitive Solutions and

14  Research department at that time in 2017, right?

15  A   I don't recall specifically.

16  Q   And Brian Mulada was the CFO of that department in 2017,

17  wasn't he?

18  A   Yes, I do recall Brian being John Kelly's CFO, that's

19  correct.

20  Q   And so when Mr. Mulada called you, he wasn't asking for a

21  favor, was he?  He was instructing you to address this issue with

22  Jerome Beard's payment?  We see it in this e-mail right here,

23  don't we?  "This requires your immediate review, Rose."  That's

24  what he wrote, right?

25  A   Correct.

1  Q   Now, you're savvy with internal politics at IBM.  You have

2  been there 20 years, right?

3  A   Correct, I have been there for 20 years.  Yes.

4  Q   When Mr. Mulada reaches out to you, you are not going to rock

5  the boat, are you?

6  A   Well, if it deals with something that's immoral, illegal, or

7  unethical, that's a big difference, right?  So just because

8  somebody asks you to do something doesn't mean you disregard your

9  own integrity or your own morals.

10 Q   I understand, Ms. Nunez.

11      At this point in time you had no problem.  You knew what you

12 needed to do.  You needed to go to Scott Kingston and make sure

13 that Jerome Beard was not paid in full.  That's what your role

14 was at this time, right?

15 A   No.  Again, there's many decisions that are made,

16 Mr. Marshall, and many -- many times we are bringing people

17 together to have appropriate discussions, bring together any

18 concerns.  It's not just about looking at something in a vacuum,

19 without absolutes, any absolute context.  It's about bringing

20 people together to have the appropriate discussion, review plans,

21 review trends, review facts, not look at things in isolation.  So

22 just because somebody says one thing, it doesn't mean that, okay,

23 that's it, that's the end of it.

24 Q   You said you would take care of it.  You told Mr. Mulada:

25 I'll take care of it, right?

 1   A    If you mean "take care of it" meaning implement something

 2   without questioning, no.  Bringing people together to have a

 3   discussion, yes, that's exactly what I mentioned earlier.

 4   Q    Okay.

 5   A    My goal is to make sure that people -- I facilitate the

 6   discussion and bring people together to have the appropriate

 7   conversation.

 8            MR. MARSHALL:  Can we look at page 2 of Exhibit 110,

 9   please?  Actually, it may be page 4.  Oh, no.  It's page 2.  I'm

10   sorry.  It is page 2.

11   Q    While that's being pulled up, let me say this:  At this time,

12   when you said that you would facilitate this discussion about not

13   paying Jerome Beard in full, you didn't usually get involved in

14   commission issues, did you?

15   A    No, I didn't.

16   Q    It wasn't your responsibility to do that, was it?

17   A    No, it's not.

18   Q    And it wasn't Mr. Mulada's responsibility to deal with

19   commission issues either, right?

20   A    Not -- Not necessarily, no.  I mean, I don't -- I can't speak

21   for his roles and responsibilities.

22   Q    In fact, you thought it was inappropriate for CFOs to make

23   decisions about the commissions paid to sales employees, didn't

24   you?

25   A    No, that's not correct.

 1    Q    All right.  Let's -- Can we pull up her deposition at
 2    page 66, please?
 3    A    Just for what you are pulling up, I apologize, but I cannot
 4    read this very clearly.
 5    Q    That's okay.  We're going to move on to something else.
 6    A    Okay.
 7    Q    And if you have trouble reading this, let me know.
 8    A    No.  This one is okay.
 9    Q    Okay.  So you were asked -- Well, let me step back.  It's
10    already been made clear that Mr. Lee deposed you at one point in
11    time in this case; is that correct?
12    A    That's correct.
13    Q    You understood your testimony was being given under oath?
14    A    Yes, I do.
15    Q    You understood that there was a court reporter there taking
16    everything down?
17    A    Yes, I do.
18    Q    And Mr. Lee asked you, "But CFOs don't typically make
19    decisions about how much sales employees should be paid, do
20    they?"  And you said, "No."  Is that correct?
21    A    Not typically, no.
22    Q    And then he said, "That wouldn't be appropriate, would it?"
23    And what was your answer?
24    A    "Correct."
25    Q    Right.

 1      But you still told Mr. Mulada you would do this, and so you

 2   called Scott Kingston, right?

 3   A    Again, I don't recall calling him on that specific date.

 4   Q    Now, Mr. Kingston protested.  He said that this wasn't the

 5   right thing to do, to cut Jerome Beard's payment.  Is that

 6   correct?

 7   A    Again, I don't recall that.  I don't recall that.

 8   Q    You don't recall.  Okay.

 9   A    No.

10          MR. TAYLOR:  Your Honor, per the Court's ruling this

11   morning, I believe the allotted time has concluded.

12          THE COURT:  Mr. Taylor, the allotted time is collective.

13          MR. TAYLOR:  Very well, Your Honor.

14          MR. MARSHALL:  Thank you, Your Honor.

15   Q    Scott kept coming back to you.  So he came back to you in

16   this first -- I mean, he said to you, in this first call, that

17   capping Jerome Beard is not appropriate, right?

18   A    I don't recall that specifically.

19   Q    Okay.  He pointed out that another employee, Nick Donato, had

20   been paid, just a couple of months earlier, $1.6 million and

21   nobody capped him; isn't that right?

22   A    No.  That's absolutely false.  That's unequivocally false.  I

23   did not -- I was not aware of how much Nick Donato was paid.

24   Q    And Scott told you:  Nick is white and Jerome is black, the

25   optics certainly don't look good on this, do they?

1  A   No, that's not -- That's not appropriate.  That's not

2  appropriate.  That's not true.  Scott did not bring up his race.

3  Q   Over the next several days --

4  A   He never brought up his race.

5  Q   Over the next several weeks, Scott kept coming back to you

6  and trying to get an explanation as to what was going on so that

7  he could explain that to Jerome Beard, but you never gave him

8  that explanation, did you?

9  A   Again, my role was to try to bring together -- We wanted to

10 go to incentives and commissions for guidance.  We pulled Scott

11 into those calls.  We pulled in incentive and commissions into

12 those calls.  My role was to help these folks come together to

13 get the appropriate guidance.

14     And Scott's questions, Scott even provided proposals,

15 proposals on how the incentive should be treated.  I facilitated

16 those discussions.  I documented those discussions.  We put them

17 forward as proposals as well.

18         MR. MARSHALL:  Can you block the top half?  I'm sorry.

19 The bottom half.

20 Q   So I'm showing you here one of the e-mails that Scott

21 forwarded to you.  This is just four days after your initial call

22 with him --

23 A   Uh-huh.

24 Q   -- he forwards an e-mail from Jerome.  You knew at this point

25 that Jerome was black, right?

1  A   Yes, I did.  Yes.

2  Q   Of course.

3      And Jerome is saying, hey, this is negatively bias against

4  me.  This decision not to pay me full commissions is a negatively

5  bias decision.  Isn't that what he said?

6  A   I'm just reading through right now.

7      Okay.

8  Q   Okay.  And if we can go up to the top half, please.

9      Scott said to you:  As I warned you, Rose.  As I warned you,

10 Jerome is going to find out about what these other employees are

11 getting paid.  He's going to know that other employees weren't

12 capped.  Isn't that what he wrote to you here?

13 A   That's correct.

14 Q   And he says, "This is a real problem, Rose," doesn't he?

15 A   Correct.

16     Give me just one sec -- If you could, Mr. Marshall, can you

17 give me just one second to read through?

18     Okay.

19 Q   So by this point, well, actually two days after this, Scott

20 figures out that Brian Mulada is the one that is behind capping

21 Jerome Beard's commission and he tells you that he knows that and

22 he asks you to send Jerome's complaint to Mr. Mulada, correct?

23 A   I don't recall him asking me to forward this.

24 Q   Okay.  You did speak to Mr. Mulada and he did not change his

25 mind on capping Jerome Beard's payment; is that correct?

1  A    Again, I don't know -- For both Nick Donato and for both

2  Jerome Beard, I just want to make it clear, Mr. Marshall, I don't

3  know what these reps ultimately were paid at the end for any of

4  their individual transactions.  I don't know any specifics.

5  Q    Okay.  We have got other e-mails in which, in January,

6  Mr. Kingston is continuing to bring this to your attention.  He

7  tells you this is a sensitive issue, he tells you that Jerome is

8  quite sore, he tells you the policy is still undocumented.  Do

9  you remember all of that?

10 A    Yes, I do.  I remember him -- I remember him discussing and

11 looking for guidance and requesting guidance.

12      And, again, my role was to help facilitate that.  You know, I

13 participated to help facilitate those discussions and bring the

14 people together to figure out what are -- you know, what do

15 we do, how do we address it, and what are the facts.  And, again,

16 I am not an incentives and commission expert, but what was really

17 important to Scott was to make sure it was clear for the reps and

18 to be -- so that he could explain.

19 Q    Ms. Nunez, let's make this very clear for the jury, please.

20 Scott did not come to you for guidance.  You were the very first

21 person to tell him that Jerome Beard was going to be capped; is

22 that right?

23 A    No, that's not true.  Mr. Marshall, that's not -- that's an

24 absolute false statement.

25 Q    You just --

 1          MR. MARSHALL:  Can we go back to Exhibit 110, please?

 2     The very first page, the bottom half.

 3     Q    "Brian, I connected with Scott yesterday."

 4     A    It's -- Mr. Marshall, it disappeared.

 5     Q    It's on my screen.

 6          Is it back now?

 7     A    Yeah, it's back.

 8     Q    Okay.  So this is from you to Brian Mulada on November 14th,

 9     is that right, 2017?

10     A    That's correct.

11     Q    And what do you say?  You say, "I connected with Scott

12     yesterday.  He was not thrilled but understood."

13          That is not Scott coming to you for guidance.  That is you

14     telling Scott we're not going to pay Jerome Beard in full, isn't

15     it?

16     A    No.  This is taken out of context.  You're missing more notes

17     behind this.  So there's more that was behind this, where we

18     actually -- Scott and I -- sat down, I think we sat down with one

19     of his managers, and we actually came together to look at how to

20     resolve it before we went into the discussion for incentives and

21     commissions as it relates to how the reps are paid.  And I

22     documented what Scott's -- what Scott's position would be, how do

23     we look at it from a go-forward perspective, how do we take this

24     guidance into account for reps going forward, going back.

25          I think this is in a vacuum.  It's not -- It doesn't have the

1   proper context of the whole line of what we went back and forth

2   with.

3       I would definitely say, Mr. Marshall, like, looking at this

4   in a -- like just this way, I could understand your line of

5   questioning.  But it's out of context with the broader iterative

6   because we have definitely more iterative here.

7   Q   Ms. Nunez, what you are saying is simply false.  On

8   November 11th, Brian Mulada reached out to you, and he said,

9   "Rose, as we discussed, the 1.5 million is inappropriate and

10  unacceptable."

11      At this point in time, Scott Kingston had already approved it

12  weeks earlier.  Why would he come to you for guidance when he's

13  already approved a payment?  He's approved it, his first-line

14  manager has approved it, his third-line manager has approved it.

15  Why would he come to you for guidance when he's already approved

16  it?  That's not what happened, is it?

17  A   I mean, again, Mr. Marshall, the context is really important

18  here.  There --

19  Q   Yes, it is.  On November 11th --

20          MR. TAYLOR:  Your Honor, she's entitled to finish her

21  answer.

22          THE COURT:  Sustained.

23  Q   Please continue, Ms. Nunez.

24  A   Again, there is more notes behind the discussion.  As I

25  mentioned, you know, at first glance, I understand kind of the

1    rationale for the argument.  But, again, I think what's really

2    important here is that Scott participated in the discussion.  I

3    see what you are --

4    Q    Is Scott on this e-mail?

5    A    No, he's not.

6    Q    No, he's not, is he?

7         And here is what you wrote back to Mr. Mulada.  You're

8    agreeing with him right off the bat, Jerome should be capped,

9    aren't you?

10   A    No, that's not what I'm saying.  Again --

11   Q    What you said --

12   A    Wait.  So, Mr. Marshall, what you are highlighting is very

13   important.  Because, as I mentioned, it was iterative, right?  So

14   it was going back and forth to try to get an understanding of

15   what to do.

16        I am, by no means, an incentive and commissions expert on how

17   one individual specific rep should be paid.  There is -- If -- if

18   I was saying this is greater than 8 percent of the deal value,

19   you know, the cut should be roughly this, you know, we're going

20   back and forth on this.  This is different even from what you

21   stated before.  This is -- So there's obviously, you know, folks

22   going back and forth on this, within the geography, within

23   incentives and commissions, there was guidance from legal.

24        Again, just throwing out one document without any other

25   broader context -- Because Scott had a lot of input in this as

1   well, right?  He made recommendations, you know, himself.  So,

2   again, it's really important not to look at this in a vacuum.

3   It's incredibly important to take into consideration the broader

4   context and to understand that Scott had a voice as well.  That's

5   really important.

6   Q   Ms. Nunez, Scott Kingston made recommendations after you came

7   to him, after he had approved the $1.5 million payment, and you

8   came to him and you said, "We're not going to pay that"; that's

9   when he started to make recommendations, that's when he started

10  to say, "Well, if this is going to be the case, then give me some

11  clear instructions that I can give to my salespeople."  That's

12  his participation, right?

13  A   Yeah.  Exactly.  Exactly.

14  Q   Exactly.  Exactly.

15  A   Again, so your point on the 1.5 million and, you know,

16  addressing the 1.5 million, you know, payout, or whatever, what

17  was approved on the tool, again, I don't have visibility to

18  individual geography tools.  But, again, it's -- that was, I

19  think, a starting point to have the discussion of what was going

20  on.  I don't have the specific details.  I don't manage -- I did

21  not manage Jerome's incentives and commissions.  I did not see

22  his Incentive Plan Letter.  I did not see what -- The Incentive

23  Plan Letter goes much farther beyond an individual transaction,

24  right?  So it was just a starting point.

25          You are on mute, Mr. Marshall.

 1              MR. MARSHALL:  Page 4, please.

 2     Q    Sorry.  I was talking to my assistant.

 3          Scott appealed IBM's decision to fire him, correct?

 4     A    Yes, he did.

 5     Q    You were interviewed in relation to that appeal, right?

 6     A    No.

 7          To the appeal?  I apologize.  I don't understand the

 8     question.

 9     Q    There was an appeal.  Someone from the appeals department

10     interviewed you about Scott's appeal, on April 27th, 2018, 11

11     days after he was fired, correct?

12     A    I don't recall this, Mr. Marshall.

13     Q    I will show you it to you here in just a second.

14              MR. MARSHALL:  Can you blow up the bottom half, please?

15     Q    The interviewer asked you about the commission on the third-

16     quarter HCL deal, right?

17     A    Uh-huh.

18     Q    Do you see that there?

19     A    I do.

20     Q    Okay.  And you told the interviewer that Scott Kingston and

21     Dave Mitchell brought this commission payment issue to your

22     attention in December of 2017.  That was not true, was it?

23     A    I'm not sure of the timing.  To be honest with you,

24     Mr. Marshall, I'm getting the deals confused because there was a

25     deal in December of '17 and there was one, I think it was in

 1  September of '17.

 2      So are we referring to both deals, or just one of the

 3  transactions?

 4  Q   This is about the third-quarter payment to Jerome Beard.

 5  You said that Scott Kingston and Dave Mitchell brought that to

 6  your attention.  And that's not true.  Brian Mulada brought that

 7  to your attention.  He asked you to get involved.  He asked you

 8  to cap Jerome Beard's commission, correct?

 9  A   I don't -- I don't recall that, Mr. Marshall.

10  Q   Okay.

11  A   If you can, can you just give me a second to read for proper

12  context?

13  Q   I'm going to move on, actually.

14          MR. TAYLOR:  Can we get the exhibit number, please?

15          MR. MARSHALL:  The exhibit number is 33.

16  Q   Let me just say this.  When Scott Kingston came back to you

17  and said that is not right to cap Jerome Beard, he put you in a

18  pickle, didn't he?

19  A   No.

20  Q   You had Brian Mulada, who's above you, instructing you to cap

21  the commission; you had Scott Kingston, who is not above you,

22  telling you this is wrong, it's discriminatory; and you were put

23  in a pickle because you were now involved in a discriminatory

24  action to cap Jerome Beard's commission.  Is that correct?

25  A   That's not correct.  That's not correct.  Again,

1  Mr. Marshall, I think this is a real stretch here.  If there is

2  an issue and folks bring this issue to me because they knew me to

3  be overseeing a global route to market, my responsibility is just

4  to get these folks together to talk, to make sure that it's clear

5  as to what the decision is going to be -- what is the decision

6  that is going to be made, what is the context in which it's made.

7  Not just piece parts, individual things, in a vacuum.

8      But to state that, again, right, to state that I am, you

9  know, in a pickle because of something Brian Mulada asked me and

10  especially as it relates to racial discrimination, you're saying

11  that I'm basically participating in racial discrimination and

12  discarding my own position, my own morals here, my own integrity,

13  which is an attack on my integrity, which is -- No, absolutely.

14  My integrity stands first before anything.

15  Q    After your interview with the folks in the appeals

16  department, you told Scott that IBM made you sign a

17  confidentiality agreement; is that correct?

18  A    Say that one more time.

19  Q    Sure.

20      You had one last conversation with Scott in April of 2018 and

21  you told him, "I can't talk to you about anything because IBM

22  made me sign a confidentiality agreement," right?

23  A    No, that's not correct.  Close.  But -- Close.  But, if I

24  may, it's a -- there is -- If someone files a suit, a lawsuit

25  against IBM, you have to sign -- or, excuse me, you don't have to

 1  sign anything.  You get a notice that just says "Retain records,"

 2  and it says "Do not discuss the case or any details."

 3  Q    And in April of 2018, Scott Kingston had not filed a lawsuit,

 4  but you told him you signed a confidentiality agreement.  Was

 5  that true, or was that untrue?

 6  A    That's not true, no.  I apologize.  I thought you were

 7  referring to when he filed his lawsuit.  I apologize on the

 8  timing.

 9       But when he filed the lawsuit, we do get an e-mail, just

10  standard template, records retention and don't discuss the

11  contents.

12            MR. MARSHALL:  I have no further questions, Your Honor.

13            THE COURT:  Mr. Taylor, do you wish to redirect?

14            MR. TAYLOR:  I do, Your Honor.

15                      REDIRECT EXAMINATION

16  BY MR. TAYLOR:

17  Q    Mr. Marshall says you signed a confidentiality agreement of

18  some sort in April 2018.  Have you ever seen such a document?

19  A    No.

20  Q    Did Mr. Marshall show you such a document?

21  A    No.

22  Q    Did Mr. Lee show you such a document when he took your

23  deposition?

24  A    No.

25  Q    Mr. Marshall says you're a liar.

 1   A    Yes, I get that.

 2   Q    Agree or disagree?

 3   A    No.  I completely disagree.

 4   Q    Mr. Kingston says you told him not to put anything about race

 5   or discrimination in writing.  Do you remember that?

 6   A    Yeah.  That's absolutely false.

 7   Q    Take a look at Exhibit 69, please.  We will put that up on

 8   the screen for you.  The top left, please.

 9        This is Mr. Kingston to you, Mr. Mitchell, and Mr. Mount.

10   This has to do with Mr. Beard.  Did Mr. Kingston say one word

11   about Mr. Beard's race in this e-mail?

12   A    No, he did not.

13   Q    Did he say anything about discrimination?

14   A    No.

15   Q    Did you ever get a single e-mail from Mr. Kingston about

16   Mr. Beard's race or discrimination?

17   A    No.

18   Q    If you had received something like that, what would you have

19   done?

20   A    I think I would have been very upset.  Again, we have quite a

21   bit of different vehicles in which to engage and to report any

22   sort of discriminatory activity within the company.

23   Q    And if Mr. Kingston genuinely believed at the time there was

24   an issue about race and discrimination involving Mr. Beard, he

25   was required by IBM policy to elevate the issue to the

 1  appropriate people, right?

 2  A    That's correct.

 3  Q    And you can't just let it die if you don't get satisfaction

 4  the first time; you've got to take it to the next level, true?

 5  A    That's correct.

 6  Q    And all the way up -- Ultimately, all the way to an Open Door

 7  procedure?

 8  A    Correct.  That's one of the ways, yes.

 9  Q    Did Mr. Kingston do any of that?

10  A    Not that I'm aware of.

11           MR. TAYLOR:  Nothing further.  Thank you.

12           THE COURT:  Anything further, Mr. Marshall?

13           MR. MARSHALL:  No, Your Honor.

14           THE COURT:  Ladies and gentlemen, do you have any

15  questions for the witness?  If so, would you please put them into

16  the chat?

17      All right.  Ladies and gentlemen, I'm going to excuse you to

18  the jury room for a moment.

19      (The following occurred outside the presence of the jury.)

20           THE COURT:  I have one question, counsel.  The question

21  is:  Does Nick Donato's employment status affect IBM's ability to

22  call back his commission?

23           MR. TAYLOR:  Your Honor, I don't know that she has the

24  foundation to answer that question.

25           THE COURT:  Well, is the question improper?  She

 1  certainly can say, "I don't know."

 2          MR. TAYLOR:  A fair point, Your Honor.  The question is

 3  fine for us.

 4          THE COURT:  Mr. Marshall?

 5          MR. MARSHALL:  No objection, Your Honor.

 6          THE COURT:  All right.  Let's bring them back in,

 7  please.

 8          THE CLERK:  Yes, Your Honor.

 9      And the witness may have disconnected.  The defense may need

10  to call her.

11          MR. TAYLOR:  We're on it, Your Honor.

12      (The following occurred in the presence of the jury.)

13          THE COURT:  Ladies and gentlemen, our witness

14  disconnected, so we're attempting to get her back.

15          THE CLERK:  Your Honor, she is here and connecting to

16  the main courtroom.

17          THE COURT:  Ms. Nunez, would you please unmute yourself?

18          THE WITNESS:  There we go.

19          THE COURT:  Okay.  The jury has a question for you.

20                          EXAMINATION

21  BY THE COURT:

22  Q   Does Nick Donato's employment status affect IBM's ability to

23  call back his commission?

24  A   I'm not sure.  I'm not sure on that.

25          THE COURT:  Okay.  Anything further, counsel?

 1          MR. TAYLOR:  No, Your Honor.

 2          MR. MARSHALL:  No, Your Honor.  Thank you.

 3          THE COURT:  Thank you, Ms. Nunez.  You may be excused.

 4          THE WITNESS:  Thank you.

 5          THE COURT:  The next witness, please, Mr. Taylor.

 6          MR. BARNES:  Your Honor, IBM calls Dave Mitchell, who

 7  should be logging in now.

 8          THE COURT:  Good morning, Mr. Mitchell.  I'm Judge

 9  Marsha Pechman.  Can you see me?

10          THE WITNESS:  Yes.  Yes, Your Honor.  I can see you

11  fine.

12     Can you hear me okay?

13          THE COURT:  Yes.

14     And can you hear me?

15          THE WITNESS:  I can.

16          THE COURT:  All right.  Would you please raise your

17  right hand to be sworn?

18                         DAVID MITCHELL,

19      having been sworn under oath, testified as follows:

20          THE COURT:  Go ahead, Mr. Barnes.

21          MR. BARNES:  Thank you, Your Honor.

22                       DIRECT EXAMINATION

23  BY MR. BARNES:

24  Q   Good morning, Mr. Mitchell.

25  A   Good morning, Mr. Barnes.

 1  Q    You're currently employed at IBM; is that correct?

 2  A    That's correct.

 3  Q    How long have you worked for IBM?

 4  A    Just over 25 years.

 5  Q    What's your current role with the company?

 6  A    I am the Vice President of Build Partners for IBM Americas.

 7  Q    What does that mean?  What's your elevator speech in layman's

 8  terms?

 9  A    I guess the best way I can explain it is if you buy a car,

10  the chances are that the tires or the audio system within that

11  car are made by somebody else.  So, in that analogy, I'm

12  basically providing tires or audio systems to software companies

13  that then deliver on top of our platform.

14  Q    Understood.  Thank you.

15       What was your role at IBM in 2017?

16  A    I had two roles, somewhat similar to what I have today.  We

17  were organized a little differently then.

18       I was the executive in charge of our embedded solution team,

19  and I was also running our cloud service provider team as well.

20  Q    And the embedded solution team, was that team like the

21  automotive part example you just gave us?

22  A    Exactly, yeah.

23  Q    Got it.

24       Do you know Jerome Beard?

25  A    I do.

1    Q    Do you work with Mr. Beard now?

2    A    Yeah.  I'm his second-line manager.  So he reports to one of

3    my managers.

4    Q    What is your impression of Mr. Beard as an employee?

5    A    I like him.  I think he's very good.  He's very creative.

6    One of the more creative members on my team.  Very passionate

7    about the business.  And as I say, really creative at trying to

8    find new ways to work with partners.

9    Q    Does Mr. Beard seem happy on your team at IBM?

10   A    Yeah.  Yeah.  I think he is.  I think he is.  I think he

11   loves what he does and I think he -- I think he seems very happy

12   at the moment.

13   Q    Has Mr. Beard ever complained to you about discrimination?

14   A    No, he hasn't.

15   Q    Do you recall a deal in 2017 with an IBM customer called HCL?

16   A    I do.  There were two deals that we did, one in September and

17   one in December.

18   Q    Was Mr. Beard involved in that deal?

19   A    Yeah, he was involved in both of them.

20   Q    What was his role in that deal?

21   A    So those deals were a little unusual in that they were tied

22   to the divestiture of some assets from IBM to HCL.  And it was

23   determined that as part of that divestiture, we would also have

24   an embedded solution agreement with them.  And Jerome was

25   selected to work with the divestiture team to provide

1  subject-matter expertise around the embedded solution model.

2  Q   Okay.  Let's unpack that a little bit to make sure we

3  understand.

4      When you say "divestiture," you mean IBM was selling products

5  or sending products to HCL to develop?

6  A   We were basically selling all rights to those products,

7  effectively, to HCL.  So, you know, unlike a regular sale, where

8  we can sell to, you know, you, but we can sell to other people.

9  When we divest of a product, that means we're no longer owning

10 it, and all future development of that product, all future

11 revenue directly -- you know, from thereon with that product goes

12 to HCL.

13 Q   Got it.

14     And then as part of that transaction, IBM was also embedding

15 some of its software in the products that HCL was then going to

16 be selling?

17 A   Correct.  Correct.  I don't have a lot of the details about

18 that, but, yeah, there was -- I think the idea was that HCL would

19 continue to support some of our clients and that would be done

20 under the ESA model, the embedded solution model, in the time

21 frame.

22 Q   Okay.  Understood.  Thank you.

23     At some point Mr. Beard's commissions on the HCL deal came

24 under review.  Do you recall that?

25 A   I do.

1   Q    You approved Mr. Beard's commissions via e-mail.  Do you

2   remember doing that?

3   A    Yeah.  The way it played out is commissions are typically

4   reviewed around the middle of the month following the quarter of

5   close.  So this would have been around the middle of October.

6   And I was sent an e-mail early in the morning that said this is

7   the commission payment due to Jerome Beard for the entire period,

8   but, obviously, HCL was the major contributing factor.  I reached

9   out -- It was a very large amount, and so I reached out to Scott

10  and said, "Hey, look, before I do anything, you know, I want to

11  have a conversation about this, and let's just make sure that,

12  you know, Jerome gets what he's entitled to."

13        Before I could talk to Scott, the Brazil team that manages

14  the commission payment reached out to me and told me that I

15  really had two options.  I either had to approve the commission

16  payment or I had to reject the commission payment.  So it was

17  kind of an all or nothing.  I said, "Well, I don't want to reject

18  it.  So if I approve it, what will happen?"  And they told me if

19  I approved it, it would go to Karla Johnson, who was the head of

20  our incentives, and also our CFO would get copied on that

21  incentive payment.

22        So that's what I did.  I sent it forward as approved.  And

23  within a couple of hours, the CFO called me and said, "Look, this

24  is a really large payment.  We should take a look at this."  And

25  then within about an hour after that, Karla Johnson reached out

1  and said that we were going to do a review of everybody involved

2  in the HCL transaction and the commission payments involved.

3  Q    And that's an important point, Mr. Mitchell.  The review of

4  commissions on HCL, was that review limited solely to Jerome

5  Beard's commissions?

6  A    No.  No.  My understanding was it involved everybody

7  involved.

8  Q    At some point did you discuss Mr. Beard's commissions on the

9  HCL deal with Scott Kingston?

10 A    Yeah.  Shortly after this -- So Jerome was notified that the

11 commissions were being reviewed.  About a day after, I believe --

12 I think it was around the 20th of October that Jerome was

13 informed that it was under review.  And at some point after that,

14 before the final -- before the review had been completed, so some

15 point between incentives saying the review is going to happen and

16 the review actually being completed, Scott reached out to me and

17 said that Jerome was frustrated that this was being reviewed,

18 that he felt he was entitled to be paid for the work that he had

19 done on HCL, and that he was even talking about requesting an

20 Open Door, and that he had mentioned that, you know, he felt this

21 could even be race discrimination.

22 Q    So to be clear, Mr. Mitchell, did Mr. Kingston tell you he

23 thought there was race discrimination going on?

24 A    No.  No.  It was really exactly as I said.

25      It was a case that he was frustrated.  He, you know, felt he

 1  should be entitled to everything.  He wanted to -- He was talking

 2  about potentially doing an Open Door.  Which Open Door is our

 3  kind of internal policy for if you have any grievance of any

 4  kind, you can request an Open Door.  Any employee can request an

 5  Open Door.  And it's widely understood that there's no

 6  retaliation, no repercussions of requesting an Open Door.  And

 7  then Scott said, "Look, he even feels it could be, you know,

 8  discrimination because of race."

 9  Q   Did Scott express an opinion to you about --

10          MR. BARNES:  And, Your Honor, could I ask that

11  plaintiff's counsel refrain from gestures during the

12  questioning?

13          THE COURT:  I'm sorry.  I did not see that.  I was

14  focused on the witness.

15      So let's move on.

16          MR. BARNES:  Thank you, Your Honor.

17  Q   Mr. Mitchell, did Mr. Kingston ever express any opinion to

18  you about whether he thought this was race discrimination?

19  A   No.  Beyond that one comment, you know, that I just made,

20  there was no other comment from Scott about race discrimination.

21  Q   And did you share Mr. Kingston's comments about what

22  Mr. Beard had said?  Did you share that with anyone?

23  A   No.  No, I didn't.  I mean, if I thought for -- I certainly

24  encouraged Jerome that if he felt that it was race

25  discrimination, or any discrimination, that he should raise an

```
 1   Open Door.  You know, I thought that if, for a moment, it was

 2   discrimination, obviously, of any kind -- race or sex or any

 3   discrimination -- I would have raised that up to our HR

 4   department.  But I felt this was -- this was just frustration,

 5   honestly, and that he was -- You know, it was probably a little

 6   premature because we were still in the process of doing the

 7   review of what that payment would be.

 8   Q   Do you think Mr. Beard's race had anything to do with his

 9   commission payments on HCL?

10   A   Not at all.

11   Q   What would you have done if you did think that?

12   A   I would have raised it up to our HR department, absolutely.

13   Q   Did Mr. Kingston ever ask you to escalate any concerns about

14   discrimination?

15   A   No.  No, he didn't.  And it wouldn't have been appropriate at

16   that time.  I mean, again, if Jerome felt that it was

17   discrimination, then the Open Door policy is the, you know,

18   procedure to go for.

19       You know, really, my understanding was, and the fact was,

20   that the executives involved in the deal were doing a review of

21   everybody involved in the deal.

22   Q   Thank you, Mr. Mitchell.

23       Let's switch gears for a second and talk about the SAS deal.

24   Are you aware of a deal that closed with an IBM customer, SAS, in

25   June of 2017?
```

 1    A    I am.

 2    Q    And did a sales rep named Nick Donato work on that deal?

 3    A    Yes, he did.

 4    Q    At some point did you become aware of a commission payment

 5    amount that was going to be paid to Mr. Donato?

 6    A    Not until the February after, when there was an investigation

 7    into the payment.

 8    Q    Let's pull up Exhibit 134, please.  We're pulling up an

 9    exhibit on the screen, Mr. Mitchell.  You can either look on the

10    screen or -- or if you have some binders with you, whatever is

11    easier for you.

12    A    Yeah.

13    Q    This was an e-mail that was sent to you by, I believe,

14    someone from the Brazil team; is that correct?

15    A    Correct.

16    Q    And this e-mail is notifying you about Nick Donato's

17    commission achievement; is that correct?

18    A    Correct.

19    Q    Does it say anywhere on here the commission amount?

20    A    It doesn't.

21    Q    And this note specifically says, "This note is just for your

22    information - no action is required from you," correct?

23    A    Correct.  Yep.

24    Q    Then it goes on to say, "The achievements were previously

25    approved by the manager of the seller," correct?

1  A    Correct.

2  Q    Why did you not do anything when you received this e-mail?

3  A    Well, really, I mean, as it said, no action is required from

4  me.

5       We really go through the review of the incentive payments, as

6  I mentioned, in the month after the quarter closes.  So,

7  typically, in July.  If there's any unusual payments, they are

8  either brought forward to me by the manager or the second-line

9  manager or by the Brazil team.  So, usually, I'm kind of

10  notified.  And then I -- you know, in those cases, I get urgent

11  e-mails with big capital letters saying:  You need to review this

12  payment.

13       This e-mail here came to me in August, so we were kind of

14  well past the close of the commission cycle by that time, and as

15  you see, it was kind of just this is for your information, no

16  action required.  So, honestly, I would have just glanced at it

17  and kind of moved on.

18  Q    Was it your expectation that the managers under you would

19  have paid attention to this?

20  A    Well, absolutely.  I mean, the managers -- you know, the

21  managers are involved in the commission payments for their

22  sellers in July.  The second-line managers get involved if

23  there's an excessively large commission payment or anything that

24  gets flagged.  And then, obviously, I look at my managers'

25  commission payments if they get flagged.  But if nothing is

1  flagged, then, typically, you know, the commission process just

2  flows through.

3  Q   Did you know that SAS was added to Nick Donato's territory

4  after the deal closed without any quota being added?

5  A   I found that out sometime afterwards, as part of the

6  investigation.

7  Q   Were you involved in adding SAS to Mr. Donato's territory

8  without adding quota?

9  A   Not at all.

10 Q   All right.  Let's switch gears again, and I want to take a

11 look at Mr. Kingston's performance review.  If we could pull up

12 Exhibit 135, please.

13     This appears to be a copy of Mr. Kingston's 2017 performance

14 review; is that correct?

15 A   That's correct.

16 Q   And, just for the record, this and the previous exhibit we

17 looked at have both been admitted into evidence already.

18     This particular performance review, you delivered this

19 performance review to Mr. Kingston; is that right?

20 A   Exactly, I did.  At that time he wasn't reporting to me

21 anymore.  I moved into a different role in the beginning of 2018,

22 but, you know, typical practice is that the person who managed

23 the person the year before completes the performance review.

24 Q   Got it.

25     I notice that you don't say anything in here about the SAS

 1  investigation; is that right?

 2  A   Correct.  I mean, that was a confidential, ongoing

 3  investigation at the time, so that wouldn't be appropriate for me

 4  to mention that in this.

 5  Q   Got it.  You anticipated my next question.  Thank you.

 6      If we could look at the second page and highlight the

 7  "Responsibility to Others" section.  And scroll down a little

 8  bit.  There we go.

 9      I see that for most of these various sections you rated

10  Mr. Kingston either an "Exceeds" or "Achieves."  But for this

11  section you rated him as an "Expects more"; is that correct?

12  A   That's correct.

13  Q   Why did you give him an "Expects more" for "Responsibility to

14  Others"?

15  A   Well, I think, if you look across the evaluation, there's

16  some areas that Scott was very good.  I mean, he was a very

17  valued employee and his business results were excellent.  But,

18  you know, Scott had -- and we had talked about this, you know,

19  multiple times -- Scott had a bit of a my-way-or-the-highway way

20  of working with other teams.  And this team, this business, the

21  ESA business, it was important that we had to collaborate across

22  many different parts of IBM, and, you know, Scott would -- you

23  know, Scott obviously was a subject-matter expert on this topic,

24  and so he would get onto calls with people who weren't as

25  knowledgeable and would be kind of often, "Hey, look, this is how

1  you have to do things."  In fact, you know, on a few occasions,

2  he would kind of say, "Well, let me tell you why you are wrong,"

3  and I felt that was -- you know, that was only going to wind

4  somebody up the wrong way.  So I just felt that was an area that

5  he needed to work on, around collaborating with others within the

6  business.

7  Q   Got it.  Okay.  We can take that exhibit down.

8      Mr. Mitchell, were you involved in the decision to terminate

9  Mr. Kingston's employment?

10 A   No, I wasn't.

11 Q   And I believe Mr. Kingston called you after he learned of his

12 termination.  Do you remember that conversation?

13 A   I do.  I was actually on vacation at the time.  It was spring

14 break in Connecticut.  I was on vacation, so I do remember it.

15 Q   Sounds like it was spring break for a lot of people around

16 then.

17 A   Yeah.  Yeah.  All of Connecticut goes on spring break at the

18 same time for some reason.

19 Q   On that phone call, when Mr. Kingston called you, did he say

20 anything about retaliation or discrimination on that call?

21 A   No.  No.  My recollection of the conversation is he said that

22 he had been terminated, he said that it was to do with Nick

23 Donato's payment, and his -- you know, the questionable business

24 decision around that.  And that was really about all I remember

25 about the conversation, honestly.  That was really it.  I was

1  kind of shocked.  I was like, oh, my God, I'm shocked.  That was

2  it.

3  Q   He never mentioned anything about race?

4  A   No.  No.  Definitely not.

5             MR. BARNES:  No further questions.

6             THE COURT:  Mr. Lee, we are very close to our morning

7  recess, so I'm going to have you do your examination after we

8  return.

9             MR. LEE:  Thank you, Your Honor.

10            THE COURT:  Okay.  We will be at recess for 15 minutes,

11 ladies and gentlemen.  You may be excused.

12    (The following occurred outside the presence of the jury.)

13            THE COURT:  All right.  Counsel, is there anything else

14 we need to take care of before we recess?

15            MR. LEE:  Not from us, Your Honor.

16            MR. BARNES:  Not from us either, Your Honor.

17            THE COURT:  All right.  I will see you back in 15.

18            MR. LEE:  Thank you.

19            MR. BARNES:  Thank you.

20                        (Recessed.)

21            THE COURT:  All right.  Counsel, are we ready to go

22 again.

23            MR. LEE:  We are, Your Honor.

24            MR. BARNES:  Yep.

25            THE COURT:  All right.  Then, Mr. Cogswell, will you

 1   please invite our jurors in, please?

 2         (The following occurred in the presence of the jury.)

 3              THE COURT:  All right.  Mr. Lee, you may examine.

 4              MR. LEE:  Thank you, Your Honor.

 5                          CROSS-EXAMINATION

 6   BY MR. LEE:

 7   Q   Good morning, Mr. Mitchell.  I am on the clock, so I am going

 8   to go pretty quickly here today.

 9       In your time working with him, you were able to form an

10   impression of Mr. Kingston, weren't you?

11   A   Yes.

12   Q   And your impression is that Scott Kingston is very ethical,

13   correct?

14   A   Yes.

15   Q   He's very committed?

16   A   Yes.

17   Q   And he's very smart?

18   A   Yes.

19   Q   He can be opinionated and tends to see things quite black and

20   white, right?

21   A   I would agree with that.

22   Q   He works hard for IBM, or he used to, right?

23   A   Yes.  He was definitely a valuable employee.

24   Q   His knowledge of the space was incredibly high, right?

25   A   It was.  That's right.

1    Q    He was a very good guy.  That was your impression of Scott,

2    correct?

3    A    I liked him a lot.

4    Q    And you trusted that Scott was going to do the right thing

5    for the business, didn't you?

6    A    I did.

7    Q    And you like him.  You like Scott a lot, don't you?

8    A    I do.

9    Q    He's a good guy, isn't he?

10   A    I think so, yes.

11   Q    And you never knew Scott to not do the right thing for the

12   business, did you?

13   A    Up until this point, in the case we're talking about here,

14   that's correct.

15   Q    But you testified at your deposition, which was after that,

16   you said that you never knew Scott to not do the right thing for

17   the business, didn't you?

18   A    I mean, outside of this situation, yes, that's correct.

19   Q    Well, that's not what you said at your deposition, is it?

20   A    Okay.  I was -- I mean, obviously, I don't feel what happened

21   in the case of the SAS payment was appropriate.

22   Q    Well, you can't tell us of any time you saw Scott fail to do

23   the right thing for the business?  Wasn't that your testimony?

24   A    I do believe at the deposition I talked about -- Yeah,

25   really, the exception is the SAS situation.  And also at the time

 1    I was not aware of the changing of the quota.

 2    Q    Yeah.  If you just look at the ELMO here, on page 94,

 3    lines 19, can you see that?

 4    A    Yeah, I see that.

 5    Q    "Did you ever know Scott to not do the right thing for the

 6    business?"  "No, no.  I couldn't tell you of any time I saw him

 7    do that."  Right?

 8    A    Correct.

 9    Q    Okay.  So Scott has never done anything that wasn't entirely

10    fair with how he allocated quota on his team, has he?

11    A    To the best of my knowledge, that's correct.  Yes.

12    Q    And you think Scott is fair, don't you?

13    A    I would say generally, yes, very fair.

14    Q    And you talked to Mr. Barnes about the performance review

15    that you completed on March 1st, 2018, correct?

16    A    Correct.

17    Q    And everything you said in there was true, right?

18    A    That's right.

19    Q    And you had already been interviewed for the SAS

20    investigation when you completed this, Exhibit 135, correct?

21    A    That's right.

22    Q    And even knowing that Scott had approved Nick Donato's

23    commissions, you had no problem giving him a very positive

24    review, did you?

25    A    Well, as I said earlier, that was really a confidential

 1  investigation that was still ongoing at that time, so it wasn't

 2  appropriate for me to mention that in the assessment review.

 3  Q   Well, you were surprised that IBM fired Scott, weren't you?

 4  A   I was surprised.

 5  Q   Okay.  I want to talk about conversations that you had with

 6  Mr. Kingston about discrimination, and something a little

 7  troubling to me, but IBM, in its opening statement, told us at

 8  the very end, if you could look at the ELMO -- and this is an

 9  official transcript of IBM's opening statement -- said that they

10  had made promises to us about what the case is about and asked us

11  to hold them responsible for those promises.

12      Do you see that?

13  A   I see that.

14  Q   And, of course, I know you didn't see the opening statement,

15  but I would like to show you one of the promises that IBM made

16  that has to do directly with you.

17      There it is.  The very first page.  This is like maybe the

18  first ten sentences of IBM's opening statement.  They say, "This

19  case is about credibility."  Credibility is honesty, isn't it?

20  A   I would agree with that, yes.

21  Q   And they said -- and they're talking about our opening

22  statement on behalf of Mr. Kingston -- that the jury had heard "a

23  supposed conversation between Mr. Kingston and Mr. Mitchell where

24  discrimination was mentioned and discussed," and he said, "That

25  conversation never happened.  Let me repeat, it never happened."

 1  Do you see that?

 2  A   I see that, yes.  That's correct.

 3  Q   Well, that's not true, is it?

 4  A   The only conversation that -- where discrimination ever came

 5  up was the conversation I recounted earlier, where Scott said,

 6  "You know, Jerome is frustrated that he's not getting the

 7  commission payment, you know, he wants to do an Open Door," which

 8  again, I encouraged, and he said that, "You know, he's even, you

 9  know, threatening to talk about discrimination."  That was the

10  only time that discrimination was ever mentioned between Scott

11  and myself.

12  Q   Mr. Mitchell, I have a limited amount of time.  The

13  conversation you just described was about discrimination, wasn't

14  it?

15  A   It was, really, in my mind, about frustration and that -- You

16  know, it was hard to even consider it being discrimination when

17  the investigation into the payment was still going on.

18  Everybody -- I mean, everybody who was involved in the HCL deal,

19  their commission was being reviewed, and --

20  Q   Just so the testimony is clear, let's look back at your

21  deposition transcript on page 160, line 14.  I asked you, "Did

22  Scott Kingston ever say anything to you about being concerned

23  that Jerome was being -- Actually, that's my fault.  This was

24  Mr. Barnes.  Mr. Barnes was asking you this question about being

25  concerned that Jerome was treated differently because of his

1    race.  And you say, "He mentioned it in one conversation around

2    the time of November."

3    A    Yeah.  That was the time I'm talking about.

4    Q    And that's a conversation where discrimination was mentioned

5    and discussed?

6    A    Well, discussed?  It wasn't discussed.  It was mentioned in

7    passing, in the context of him being frustrated generally in the

8    fact that his payment was being delayed.  That wasn't really a

9    discussion.  That was just one thing mentioned about it.

10   Q    It never happened; is that right?  Is that your --

11   A    There was never any conversation.  There was never any.  I

12   would agree with that statement completely.  There was never a

13   conversation where we discussed race.

14   Q    You slice that pretty thin, don't you, Mr. Mitchell.

15        Let's look at the declaration that you filed on

16   December 14th, 2020, just four months ago.

17   A    Okay.

18   Q    You discuss that again.  "That in late 2017, in a discussion

19   about Jerome Beard's commissions on the HCL deal, Scott Kingston

20   told me Mr. Beard was frustrated over a delayed commissions

21   payment and that Mr. Beard mentioned race as a possible reason

22   among others."  That's true, isn't it?

23   A    I think that I have been pretty consistent on that

24   recollection of the conversation.

25   Q    Okay.  Do you have any idea why IBM would flatly deny that a

1   conversation about discrimination happened between you and

2   Mr. Kingston that you had testified about twice under oath and

3   one of them just four months ago?

4   A    Well, I think I have been consistent on this point the whole

5   way round.  There wasn't a conversation about discrimination for

6   race.  There was a mention of that being one of the reasons why

7   Jerome felt he might want to do an Open Door.  That wasn't a --

8   you know, between us, not a conversation; that is someone venting

9   their frustration and mentioning things that they could possibly

10  be frustrated about.

11       And, again, I felt the appropriate action was to wait for the

12  assessment of the payment to be completed, and then they could

13  decide, you know, who would get paid what.  Now, at that time, if

14  Jerome had felt that he was being discriminated against, then

15  that would have been the appropriate time for me to raise it up

16  with the right people.  But, you know, in the middle of the

17  investigation, it didn't make any sense.

18  Q    Mr. Mitchell, perhaps this case is about credibility, isn't

19  it?

20       I want to understand your testimony at this point because, to

21  be honest, it's confusing to me.  You're saying that Scott

22  Kingston came to you, as Jerome Beard's manager, in November of

23  2017; you two talked about Jerome; you talked about the HCL

24  commissions; you talked about how Jerome was frustrated that he

25  wasn't getting paid; and Scott told you, "Jerome is threatening

1    an Open Door investigation, he's very frustrated, he's saying

2    it's because of race."  And so, like, right at that moment, you

3    know that Jerome has raised an allegation of racial

4    discrimination, don't you?

5    A    No.  I think that's someone venting their frustration and

6    throwing around, you know, different reasons why it could be

7    discrimination.  And, again, I really felt that if Jerome

8    honestly felt that race was any factor, that his right, you know,

9    path to go was through an Open Door.  That's the right path to

10   go.

11   Q    Which he did, right?

12   A    I encouraged him to do Open Door.

13   Q    He did that, right?

14   A    I did.

15   Q    Wait.  You're familiar with the Business Conduct Guidelines,

16   aren't you?

17   A    I am, yes.  Of course.

18   Q    You have an obligation under the Business Conduct Guidelines

19   to report racial discrimination, don't you?

20   A    Absolutely, yes.

21   Q    But you testified that you didn't report Mr. Beard's

22   concerns, did you?

23   A    I really didn't see it as -- Again, I saw it as someone

24   venting their frustration.  I think he had the correct path to

25   take if he felt it was a legitimate case of discrimination.  If I

 1  thought for a moment that there was discrimination of any kind, I

 2  absolutely would have raised it up to the appropriate channels.

 3  But, really, you know, I think it had to wait for the

 4  investigation to run its course.  Everybody --

 5  Q   Mr. Mitchell --

 6  A   -- everybody involved in that deal was being assessed at that

 7  time.  It wasn't Jerome being separated out.  Everybody involved

 8  in the deal, all sexes, all races, were being evaluated.

 9  Q   Mr. Mitchell, I just asked you if you had reported it, and

10  you didn't.

11  A   All right.

12  Q   The Business Conduct Guidelines require you to report

13  potential discrimination, correct?

14  A   I don't know for sure.  I would have to read them again.

15  Q   Oh, okay.  Well, you could have lost your job for failing to

16  report if the Business Conduct Guidelines require it, couldn't

17  you?

18  A   I'm sure I would be investigated, absolutely.

19  Q   But you still work at IBM, don't you?

20  A   I do.

21  Q   And did you know that IBM thought about firing you?

22  A   I do not.

23  Q   But they didn't, did they?

24  A   They didn't fire me, no.

25  Q   Now, when we met at your deposition, I didn't get the

 1   impression that you were frustrated -- that was with Mr. Beard's

 2   lawsuit -- I didn't get the impression that you were frustrated

 3   about that lawsuit, were you?

 4   A    With Mr. Beard's lawsuit?

 5   Q    Right.

 6   A    I wouldn't say I had an opinion on it one way or another.

 7   Q    Did you wish he didn't file it?

 8   A    It's up to him.  It's up to him.  If he felt that he was

 9   discriminated on race, again, he can absolutely do that.

10   Q    You understood why he chose to file that lawsuit, didn't you?

11   A    I'm not sure I understood it.  You know, I really don't,

12   honestly.  But, you know, to each his own.  You know, I don't

13   think there was much of a case there for race discrimination, but

14   I'm not an expert on this.  But that was his decision to do it.

15   Q    IBM resolved that case to its satisfaction and Jerome Beard's

16   satisfaction; is that correct?

17   A    I'm not familiar with the facts.

18             MR. LEE:  Mr. Mitchell, thank you for your time.

19             THE WITNESS:  Thank you.

20             THE COURT:  Anything further?

21             MR. BARNES:  Yes, Your Honor.

22                         REDIRECT EXAMINATION

23   BY MR. BARNES:

24   Q    Two questions for you, Mr. Mitchell.

25        One, we heard reference to Mr. Taylor's opening statement in

1   this case.  Well, in plaintiff's counsel's opening statement,

2   they said that Mr. Kingston asked you to raise the issue of race

3   discrimination to your superiors.

4        Did Mr. Kingston ever ask you to do that?

5   A    Absolutely not.

6   Q    Let's be clear.  Let's be absolutely clear about this next

7   point.  Did Scott Kingston ever tell you that he thought IBM was

8   discriminating against Jerome Beard?

9   A    No.

10            MR. BARNES:  No further questions.

11            THE COURT:  Anything further, Mr. Lee?

12            MR. LEE:  Your Honor, I have a lot of questions, but no

13   time, so nothing further.  Thank you.

14            THE COURT:  Ladies and gentlemen, do you have any

15   questions for the witness?

16        All right.  Ladies and gentlemen, have you had enough time to

17   complete your questions?  If so, then, Mr. Cogswell, will you

18   excuse them to the jury room, please.

19        (The following occurred outside the presence of the jury.)

20            THE COURT:  Mr. Mitchell, the jury may have some

21   questions for you, so I'm going to excuse you to the waiting room

22   while I discuss them with counsel.

23        All right.  The questions are as follows:  Mr. Mitchell

24   mentioned that Scott changed the quota.  Can he discuss this?  I

25   was under the impression the quota was set to zero all along.

 1      Second question:  What specific factors came into play for

 2   the reduction of Mr. Beard's commission payment?

 3      Another question:  Did anyone else get capped on the HCL

 4   deal?  Have you had to approve any other commission adjustments?

 5   Did Jeff Larkin tell you the reason for the investigation?  Did

 6   you know quotas could be set at zero?

 7      The next question:  You stated that Open Door is the

 8   appropriate forum for discrimination complaints.  Do you know if

 9   IBM has statistics on how many race discrimination complaints are

10   brought to Open Door and how many result in a determination of

11   valid?

12      All right.  Any response to those questions?

13          MR. BARNES:  Your Honor, we are -- we don't have any

14   objections to any of those questions except for the last one

15   about statistics on race discrimination complaints.  We don't

16   think that other complaints of race discrimination would be

17   relevant.  We think it would be unduly prejudicial under 403.

18   And I would add that I don't think Dave Mitchell has any

19   foundation to answer that question.  But the primary objections

20   are relevance and unduly prejudicial.

21          THE COURT:  Mr. Lee?

22          MR. LEE:  I think it's right on point, Your Honor.  We

23   don't have problem with any of the questions.  There's going to

24   be evidence later today even that IBM -- they're putting up, at

25   least I guess, one witness, Linda Kenny, who has investigated

 1  hundreds of discrimination cases and never substantiated one.  So

 2  I would like to see what Mr. Mitchell knows about that.

 3          THE COURT:  Well, perhaps the question goes to Ms. Kenny

 4  and will be answered later.

 5          MR. BARNES:  We would agree with that.

 6          MR. LEE:  That would be fine.

 7          THE COURT:  All right.  Let's bring in our jury.

 8      (The following occurred in the presence of the jury.)

 9          CLERK KALEEL:  The jury has returned, Your Honor.

10          THE COURT:  Okay.  Mr. Mitchell, there are some

11  questions that the jurors have for you.

12          THE WITNESS:  Okay.

13                          EXAMINATION

14  BY THE COURT:

15  Q   You mentioned that Scott Kingston changed the quota.  Can you

16  discuss this further?

17  A   Yes.  Sure.

18      So every seller at IBM when they get their -- at the

19  beginning of each six-month period, they are given a quota letter

20  which defines the territory that their bonus payment will be

21  based on.  So you get a number of accounts typically that you are

22  going to be covering.  You will get a baseline of revenue

23  associated with those accounts, and that becomes your quota.

24      In the case of the SAS transaction that happened with Nick

25  Donato, SAS was not in Nick's quota at the beginning of that pay

1   period, and so, as such, if you add an account into someone's

2   quota during the period, you have to add some quota with it.  And

3   that's really what should have happened here.  There should have

4   been a discussion around adding an account into Nick's territory

5   and what amount of quota should have come with that account.

6   Q   Wasn't the quota set to zero all along?

7   A   No.  Every account will have, typically, some level of quota

8   attached to it.  Sometimes zero.  But, generally, you know, an

9   account will be looked at and they will make a determination.

10  But certainly there should have been a conversation about what

11  quota should have been added when we added SAS into their

12  territory, into Nick's territory.

13  Q   What specific factors came into play for a reduction of

14  Mr. Beard's commission payment?

15  A   So what they did is they really looked at the size of the

16  deal, they talked about, you know, how much of that, I believe,

17  was tied to the transition -- sorry, the transaction.  So they

18  looked at a number of factors.

19      But I do believe Brian Mulada is going to be on the witness

20  list later on, and Brian would be much better positioned than me

21  to actually talk about how they considered and how they

22  determined the payment to be paid.

23  Q   Did anyone else get paid on the HCL deal?

24  A   I don't have -- Again, that's probably a better question for

25  Brian.  He will be able to go through all the details.  I can

 1  tell you that there was one person on my team who didn't get any
 2  payment for the HCL deal, and she was the client rep who covered
 3  HCL, but she wasn't involved in the deal at all, and the
 4  determination was made that she wouldn't get any payment for it.
 5  Q   Have you had to approve any other commission adjustments?
 6  A   Yes.  Yes.  Not -- They're fairly infrequent, but there have
 7  been some.  You know, it usually ties to one of two factors.
 8  Either it was an adjustment in quota that needed to be done, or
 9  territory, or it's due to a significant transaction.  But it's
10  pretty rare.
11  Q   Did Jeff Larkin tell you the reason for the investigation?
12  A   I can't recall exactly.  But my best recollection is that he
13  said it was to do with the payment to Nick Donato.
14  Q   This follows up on one of your other answers.  Did you know
15  that quota could sometimes be set at zero?
16  A   Yes.  I mean, I do know that.  There are accounts that you
17  can have in your territory that have zero quota because they're
18  completely new to IBM, so there's no history, there's no revenue
19  history with them.  But, you know, someone like SAS, which is,
20  you know, a big account, has revenue history with IBM, that would
21  not be a zero quota account.
22          THE COURT:  Counsel, are there any questions based upon
23  those questions?
24          MR. BARNES:  Nothing from us, Your Honor.
25          MR. LEE:  Your Honor, I have one.

 1                      RECROSS-EXAMINATION

 2   BY MR. LEE:

 3   Q   Mr. Mitchell, what should the SAS quota have been?

 4   A   I think it's difficult to kind of answer that definitively.

 5   I mean, I think it should have been a conversation and looked at

 6   the revenue history.  Typically, we look at a multiyear revenue

 7   history with that account, and then they determine the quota

 8   based on that.

 9   Q   Okay.  It sounds like you don't know; is that right?

10   A   I don't know at all.  I would have to look at the data.

11   Q   Okay.  And you had approved other adjustments, right?

12   A   Yeah.  Not -- I mean, I'm trying to recall one.  But, yes, I

13   have approved adjustments in the past.

14   Q   Yeah.  And, specifically, you approved Jerome Beard's

15   commissions, right?

16   A   I did, yeah.  That's a good example, yes.

17   Q   Okay.

18           MR. LEE:  That's all from the plaintiff.  Thank you,

19   Your Honor.

20           THE COURT:  All right.  Thank you, Mr. Mitchell.  You

21   may be excused.

22           THE WITNESS:  All right.  Thank you.  Thank you, Your

23   Honor.

24           THE COURT:  The next witness, please.

25           MR. BARNES:  The defendant calls Linda Kenny.  And she

 1   is logging in now.

 2           THE CLERK:  Your Honor, she is joining the courtroom

 3   now.

 4           THE WITNESS:  Hi.  Can you hear me?

 5           THE COURT:  Yes.  Ms. Kenny, this is Judge Pechman.  Can

 6   you see me?

 7           THE WITNESS:  Yes, I can, Judge.

 8           THE COURT:  And can you hear me clearly?

 9           THE WITNESS:  Yes, I can.

10           THE COURT:  Would you please raise your right hand to be

11   sworn?

12                         LINDA KENNY,

13       having been sworn under oath, testified as follows:

14           THE COURT:  Go ahead, Mr. Barnes.

15           MR. BARNES:  Thank you, Your Honor.

16                       DIRECT EXAMINATION

17   BY MR. BARNES:

18   Q   Hi, Ms. Kenny.

19   A   Hi, Mr. Barnes.

20   Q   You currently work for IBM; is that correct?

21   A   Yes, that's correct.

22   Q   How long have you worked for the company?

23   A   Next month will be 22 years.

24   Q   Congratulations in advance on your anniversary.

25   A   Thank you.

 1    Q    What's your current role at IBM?

 2    A    I'm currently on the HR Employee Concerns & Appeals team.

 3    Q    What does that mean?  What sort of functions or job

 4    responsibilities do you have?

 5    A    Two main functions.  The first is where the people on my

 6    team, including myself, we do investigations into employment

 7    matters, and the second piece is where a separate team called

 8    "Internal Audit" does investigations into financial recording and

 9    reporting and business processes, and then members of my team

10    would get involved at the end when it comes time for disciplinary

11    action.

12    Q    Okay.  So as it relates to investigations that are conducted

13    by a separate team, an internal audit team, your team gets

14    involved after those investigations are completed; is that what

15    you're saying?

16    A    That's correct.

17    Q    And what role do you play after those investigations are

18    completed?

19    A    So once an investigation report is published, then I send an

20    e-mail to the manager that's responsible to take actions with the

21    employees involved, I let them know who I am, and that my role

22    will be to assist them with the disciplinary action and

23    obtaining the approvals for the required disciplinary action.

24    Q    Okay.  And let's back up because I do want to walk through

25    the steps that you take here in a minute.  But just big picture,

1  what is it that you do in terms of after the internal audit is

2  completed?

3  A   So big picture, I review what's in the investigation report.

4  I would talk to the investigator, if there's any questions.  I

5  make a judgment and come up with a recommended disciplinary

6  action.  I obtain all the approvals for the action or actions.

7  And then I work with the manager to make sure that those actions

8  are carried out.

9  Q   Got it.

10      So you're the one who makes the initial recommendation about

11  the level of discipline; is that correct?

12  A   That is correct.  While I make the recommendation, it's other

13  people that approve it.

14  Q   Understood.

15      In that situation, where an investigation is conducted by

16  internal audit and then it comes to you, are you involved in the

17  actual investigation itself?

18  A   So, no.  The investigator makes all of those determinations.

19  I have no say as to who is investigated, what the topic is, what

20  the questions are, what makes it into the report.  That's all

21  done before it comes to me, with no consultation with me.

22  Q   Got it.

23      Are you familiar with an investigation that was conducted

24  into the commission payments on the SAS deal?

25  A   Yes, I am.

1    Q    Who conducted that investigation?

2    A    Jeff Larkin.

3    Q    And as you just explained to us, were you involved in that

4    investigation at all with Mr. Larkin?

5    A    I was not.

6    Q    Did you discuss with Mr. Larkin who he interviewed or what

7    documents he looked at during his investigation?

8    A    So I definitely discussed about him talking to the three

9    employees that were involved in the report that he released for

10   this and a couple other employees that had come up, yes.

11   Q    And maybe my question wasn't clear.  Before he completed the

12   investigation, did you discuss with him who he spoke to or what

13   he looked at?

14   A    I'm sorry.  No, I did not.

15   Q    Let's pull up Exhibit 221, please.

16        And you should be able to see this on the screen, or you can

17   look in your notebook.  Whatever is easier for you.

18   A    I have it right here.

19   Q    Okay.  Is this the investigation report that Mr. Larkin

20   published related to the investigation on the SAS commissions?

21   A    Yes, it is.

22   Q    And if we look at the top of page 2, Mr. Larkin's findings

23   were that the allegations were substantiated; is that correct?

24   A    That's correct.

25   Q    And if we go to page 3, "Synopsis of Findings," Mr. Larkin

 1  specifically concluded that inappropriate commissions were paid

 2  to IBM Global Markets - Global Business Partners employees and a

 3  sales manager, and that he substantiated that those allegations

 4  were true, correct?

 5  A    Correct.

 6  Q    And he specifically goes on to say, "In the assessment of

 7  executive sales management, Mr. Temidis and Mr. Kingston were

 8  negligent in not initiating an adjustment (reduction) of

 9  Mr. Donato's commission for his work in closing a significant

10  transaction into an account (SAS) for which he had no quota,"

11  correct?

12  A    Correct.

13  Q    If we go down to page 7, the "Recommendations," Mr. Larkin

14  recommended that IBM take appropriate disciplinary action with

15  respect to Mr. Temidis, Mr. Kingston, and Mr. Lee, correct?

16  A    Correct.

17  Q    Did Jeff Larkin ever tell you what disciplinary action he

18  thought IBM should take?

19  A    No.  That's not the way the process works.

20  Q    The process works that you're the one who makes that

21  recommendation, right?

22  A    It's a separation of duties between the two teams, yes.

23  Q    Why is that?

24  A    To make sure that there's no conflict.

25  Q    So IBM intentionally has a different person decide the level

 1    of discipline from the person who decides whether there should be

 2    any discipline at all; is that what you are saying?

 3    A    A different person and different team, yes.

 4    Q    Got it.

 5         Okay.  We can pull that down.

 6         So the process of you receiving an investigation report to

 7    where the discipline is delivered, how long does that process

 8    usually take?

 9    A    The target is 30 days from the release of the final report.

10    It doesn't always happen that way.

11    Q    How long did the process take in this situation?

12    A    It was about 45 days for this situation.

13    Q    Why did this one take longer?

14    A    There was a number of factors.  The number of employees

15    involved, the level of disciplinary action involved, the

16    complexity in the case.

17    Q    All right.  So let's talk through the steps that you took in

18    your role in the process.  So you get the investigation report.

19    What was the first thing that you did?

20    A    The first thing I do is I e-mail.  I send an e-mail to the

21    manager that's responsible to take the actions -- that's who the

22    report is released to, amongst other people -- and I identify

23    myself, I let them know who I am, what my role will be, and that

24    I will be in touch with them regarding the disciplinary actions

25    and obtaining the approvals.

1  Q    And who was that individual in this case?

2  A    Dorothy Copeland.

3  Q    What is the next step that you take in these situations?

4  A    So the next step is to have a call with the investigator to

5  make sure that I understand what's in the report before I come up

6  with my recommended disciplinary action.

7  Q    And in this case that would have been Mr. Larkin?

8  A    That's correct.

9  Q    And did you have that conversation with Mr. Larkin?

10  A    Yes, I did.

11  Q    In your conversation with Mr. Larkin about his investigation,

12  did Jerome Beard's name ever come up?

13  A    No.

14  Q    So, Ms. Kenny, after you spoke with Jeff Larkin, and your

15  typical process, after you speak with an investigator, what's the

16  next step you take?

17  A    The next step I take is I draft a summary, which are the

18  facts from the case, I put a little information about the

19  employees, and at the bottom, I put in, after I make a judgment,

20  I put in the recommended disciplinary action.

21  Q    How do you go about deciding what level of discipline to

22  recommend?

23  A    It's all depending upon the facts of the case.  We do have

24  the DA continuum, which I did not need to reference for this

25  case.

1    Q    In this situation, you recommended termination, correct?

2    A    Yes.

3    Q    Why did you recommend that?

4    A    Termination is never an easy decision or recommendation to

5    make.  I realize that it has a major impact on the employees

6    involved.  However, given the facts of this case, I felt then,

7    and I still feel today, that that was the appropriate action to

8    recommend.

9    Q    So you mentioned you prepare a summary of your

10   recommendation.  Do you do anything with that summary?

11   A    I send it -- I use that to obtain approvals for the

12   recommended actions.  So the first thing I did was send it to the

13   person that coordinates the consistency call.  The first stop for

14   approval is the North America Consistency Leader.  His name was

15   Russ Mandel.  He has since retired from IBM.

16        So my first stop is to get on his agenda and review the

17   recommended actions with him.

18   Q    Let's pull up Exhibit 226, please.  And this exhibit has been

19   admitted into evidence.

20        Is this the e-mail that you sent to get on Mr. Mandel's

21   agenda for the Consistency Review?

22   A    Yes, it is.

23   Q    And, presumably, Nancy is the individual who coordinates

24   that?

25   A    That is correct.

 1   Q    So we can see this e-mail is quite lengthy.  You prepared

 2   this summary?

 3   A    I did.

 4   Q    And in your meeting with Mr. Mandel, you shared -- did you

 5   share your recommendations with him?

 6   A    Yes, absolutely.

 7   Q    What was Mr. Mandel's response?

 8   A    He approved them.

 9   Q    What's the purpose of a Consistency Review?

10   A    So the purpose of the Consistency Review is for cases that

11   have similar violations to make sure that the recommended actions

12   are consistent, that we're not treating one employee different

13   from another.

14   Q    In your conversations with Mr. Mandel about this case, did

15   Jerome Beard ever come up in those conversations?

16   A    No, he did not.

17   Q    I think you mentioned Mr. Mandel is retired.  Is that what

18   you said?

19   A    That's correct.

20   Q    Do you know how long he worked for IBM?

21   A    I know it was over 40 years.  I don't know the exact number.

22   Q    Okay.  After you met with Mr. Mandel and after, in your

23   typical process, after you go to the North America Consistency

24   Reviewer, what do you do next?

25   A    My next stop is to go to management.  So in this case it was

1    Ms. Copeland.

2    Q    Let's pull up Exhibit 100, please.  This has already been

3    admitted into evidence.  Is this the e-mail -- Let's go to the

4    top of the second page.  Is this the e-mail that you sent to

5    Ms. Copeland advising her of the recommended actions?

6    A    Yes, it is.

7    Q    And you're specifically telling Ms. Copeland "Please do not

8    take any action until we review/discuss"; is that correct?

9    A    Yes, absolutely.

10   Q    Why did you tell her that?  Were there additional steps that

11   needed to be taken?

12   A    Yes.  All approvals have to be obtained before management can

13   take action with the employees.

14   Q    That's an important point.  So you don't decide whether to --

15   what level of discipline to impose, you simply recommend it; is

16   that correct?

17   A    I simply recommend it.  I have no authority or approval

18   process, approval authority in this process.

19   Q    Is that an intentional part of the process, that there's a

20   different level who actually decides the level of -- a different

21   group who decides the termination?

22   A    Yes.  Again, it's separation of duties.

23   Q    So after you inform the manager of the actions, as you did

24   with Ms. Copeland here, what is your next step in the process?

25   A    So my next step is each business unit has their own review

1   board made up of three people.  I then went to the review board

2   for this case.

3   Q    Who's on the review board?

4   A    The three people:  The first person is an HR representative,

5   and that was Lisa Mihalik in this case; the second person is from

6   finance, and that was Cindy Alexander, and the third person is

7   from legal, and that was Scott Ferrauiola.

8   Q    Does the review board decide or review every disciplinary

9   action that gets taken?

10  A    Everything that comes out of an internal audit report, yes,

11  the review board reviews and approves.

12  Q    Okay.  And why are there three people on this review board?

13  A    They come from different backgrounds, so they have different

14  perspective and different lenses that they're looking at the case

15  and exhibiting their expertise.  So, as I mentioned, you have an

16  HR person, you have a finance person, and you have a legal person

17  that are all reviewing it from their own perspective and lenses.

18  Q    And in this situation, did the review board approve your

19  recommendation for termination?

20  A    Yes, they did.

21  Q    Okay.  After you consult with the review board, what's the

22  next step?

23  A    The next step is a piece of administrative work that goes

24  into -- internal audit has a tracking tool, so we actually get

25  final approval in that tracking tool.

1    Q    Okay.  And you did that in this situation?

2    A    Yes, we did.

3    Q    What's the next step you take?

4    A    The next step is for me to send a notification to the manager

5    that all approvals are in and it's time for them to take the

6    action with the employees.

7    Q    And that would have been Ms. Copeland in this situation?

8    A    Yes, that's correct.

9    Q    And is Ms. Copeland the one who ultimately delivered the

10   termination decision?

11   A    Yes, she did.

12   Q    You mentioned earlier that it's never an easy decision to

13   recommend termination.  Was that the case here?

14   A    Yes.  Again, given the results of what that termination means

15   and the impact it's going to have on an individual, you realize

16   that it's a big weight and a big decision.

17   Q    But, ultimately, you recommended termination in this

18   situation, right?

19   A    Yes, I did.

20   Q    And, again, please tell us why you felt like termination was

21   appropriate here?

22   A    So, in this case, the employee who received the commission,

23   the deal was not part of that employee's quota, and when

24   management, in this particular instance, Mr. Kingston, received

25   the high-alert notification, he did not, when asked if everything

 1  was okay with the quota and the territory and everything else, he

 2  did not raise the issue that this deal was not part of the quota,

 3  and he approved it, he overtly approved that high alert.

 4      In addition, in the report, Mr. Larkin called out that, when

 5  asked, Mr. Kingston said that he raised red flags about this, and

 6  when pushed what red flags he raised, he said he actually didn't

 7  raise red flags, he was expecting questions to be asked of him,

 8  which never materialized, nor did he ask anybody questions.

 9  Q   Let's be clear.  At the time you made your recommendation for

10  discipline, did you even know who Jerome Beard was?

11  A   No, I did not.

12  Q   And were you ever aware of Scott Kingston making internal

13  complaints about commission payments?

14  A   No, I was not.

15  Q   So any complaints by Scott Kingston, did that play any role

16  at all in the level of discipline you recommended?

17  A   No.

18          MR. BARNES:  No further questions.

19          MR. MARSHALL:  May I proceed, Your Honor?

20          THE COURT:  Yes, Mr. Marshall, you may go ahead.

21          MR. MARSHALL:  Thank you very much.

22                          CROSS-EXAMINATION

23  BY MR. MARSHALL:

24  Q   Good morning, Ms. Kenny.

25  A   Good morning to you.  It's my afternoon.

 1   Q   Yes, good afternoon.  My name is Toby Marshall.  I represent

 2   Scott Kingston in this matter.

 3       You have been on the Employee Concerns & Appeals team since

 4   2008, correct?

 5   A   Yes.

 6       I'm sorry.  I don't see you on the screen.  Should I see you?

 7   Q   Yes, I believe you should.

 8   A   It says you are talking, but I don't actually see you.

 9   Q   Are you able to see the judge?

10   A   Yes.  I see Mr. Barnes, the judge, myself, a Grant Cogswell,

11   and Mr. Kingston.

12   Q   Do you have it in gallery view?

13   A   Let me expand.  I'm sorry.  I don't mean to hold anybody up.

14       There you are.  Okay.  Let me see if I can move you around.

15       I have you now.  I'm sorry about that.

16   Q   That's okay.

17       You have been on the Employee Concerns & Appeals team since

18   2008, correct?

19   A   That's correct.

20   Q   Your role is to recommend disciplinary action, right?

21   A   For this particular instance, recommend the action and obtain

22   approvals.

23   Q   And there are several options for discipline, correct?

24   A   There are.

25   Q   You can recommend counseling?

 1   A    Depending upon the facts of the case, yes.

 2   Q    You can recommend a warning letter?

 3   A    Yes.

 4   Q    You can recommend a warning letter with restrictions, such as

 5   no increase in salary for a year?

 6   A    You could.

 7   Q    You can recommend removal from position, take someone out of

 8   management, for example?

 9   A    That is an option.

10   Q    Or you can recommend termination, the most severe option,

11   right?

12   A    That is -- Yes.

13   Q    And in Mr. Kingston's case, this was your first internal

14   audit involving commissions, correct?

15   A    I believe so.  I -- Without crawling through the ten-plus

16   years of history, I can't say definitely for this type of

17   commission payment, yes.

18   Q    But that's what you testified to in this case, that this was

19   your first time dealing with this issue, right?

20   A    Yes.  This type, this level of commission payment, yes,

21   absolutely.

22   Q    But you decided to impose the most severe discipline on

23   Mr. Kingston because you felt he didn't follow the transaction

24   clause in the Incentive Plan Letter; is that correct?

25   A    So I recommended termination.  I made a judgment and

1    recommended termination based on the facts that the policies and

2    procedures weren't followed and this deal was not part of the

3    quota.

4    Q    The only facts that you considered were those in the report

5    of Jeff Larkin, correct?

6    A    That is correct.

7    Q    You did not review comparable situations in making your

8    decision?

9    A    So that is the role of the North America Consistency

10   Reviewer --

11   Q    Right.

12   A    -- is to have comparable cases to look at that at that time.

13   Q    But to be clear, Ms. Kenny, you made a recommendation of

14   termination without looking at comparable situations, correct?

15   A    The facts of this case were clear to me that that was the

16   appropriate recommendation, yes.

17   Q    And at the time that you made that decision to fire Scott

18   Kingston, you did not understand how commissions were paid, did

19   you?

20   A    So I am not a commission expert, nor am I expected to be.

21   Again, the facts of this case stood on its own that allowed me to

22   make that recommendation.

23   Q    And, in fact, you didn't think it was necessary to know how

24   commissions were paid in order to make your recommendation,

25   right?

1   A   So, again, this case doesn't hinge on how a commission is

2   paid.  It hinged on this deal was not part of the quota and he

3   didn't correct that during the high-alert notification.

4   Q   You did not know whether IBM even uses the word "uncapped"

5   with respect to its commission plans, did you?

6   A   I believe the word was "capped" that came up.

7   Q   Okay.  You did not look at the quota setting guidelines.  So

8   you say this was based on quota, but you did not look at those

9   guidelines, did you?

10  A   The facts in the report of this case stated that this deal

11  was not in his quota, and it needed to be.

12  Q   Not my question, Ms. Kenny.  My question was:  You, in

13  deciding to recommend termination, did not look at the quota

14  setting guidelines, correct?

15  A   That is outside of the review of the investigator.  The

16  investigator puts it in the report.  I am not supposed to do an

17  independent review of facts.

18  Q   I'm not saying what should or should not happen.  I'm just

19  getting to the facts here, Ms. Kenny.  Please answer the question

20  "Yes" or "No."

21      Did you or did you not look at the quota setting guidelines

22  in making your recommendation of termination?

23  A   No.

24  Q   Okay.  You knew they existed, right?

25  A   Again, I'm not a subject-matter expert on commissions.

 1    Q    Again, not my question.  You knew they existed, right?

 2    A    The details behind -- I'm sorry.  I'm not sure of what your

 3    question is.

 4    Q    You knew the quota setting guidelines existed at the time you

 5    made the recommendation, right?

 6    A    So I know that prospective deals and opportunities are

 7    supposed to be in quota, yes.  I don't know the details behind

 8    that.

 9    Q    Ms. Kenny, you knew there were guidelines at the time you

10    made your recommendation, right?  You knew they existed?

11    A    Yes.

12    Q    Okay.  You knew they were extremely complex, right?

13    A    I would assume so.  Again, having not looked at them, I

14    assume that commissions are complex.

15    Q    But you didn't ask anybody about them?

16    A    I didn't need to.

17    Q    You didn't review how the ESA team handles territory

18    modifications before making your recommendation, correct?

19    A    No.

20    Q    You weren't familiar with the written procedures for

21    reviewing commissions, correct?

22    A    I am aware of what is in the report, that the high alert was

23    the opportunity to call out there was an issue that this deal was

24    not part of the quota.

25    Q    I understand you looked at the report and the report only,

1  but I need to make clear for the record here, for the jury, you

2  were not familiar with the written procedure for reviewing

3  commissions when you made your recommendation, correct?

4  A   I wasn't and didn't need to be.

5  Q   Okay.  But you concluded that Mr. Kingston should have known

6  better, right?

7  A   I made the recommendation for termination, although I did not

8  approve it, yes.

9  Q   Others relied on your recommendation?

10  A   Everybody else are levels above me.  I'm the lowest-level

11  person making the recommendation.  All of the approvers are

12  levels above me and would have the ability, if they felt my

13  recommendation was inappropriate, to modify it.

14  Q   You were deposed in this case, correct?

15  A   Yes, I was.

16  Q   Okay.  And you based your decision, in part, on what you call

17  a make-a-deal clause, which is the specific transaction clause in

18  the Incentive Plan Letter, correct?

19  A   Right.

20  Q   And you were shown education that IBM provides to managers

21  about commissions and you agreed that make-a-deal clause

22  contradicted the education that IBM provided to its managers,

23  right?

24  A   So --

25  Q   It's just a yes-or-no.  You agreed that those two things

 1  contradict each other, right?  I understand this is after your

 2  recommendation.  I'm just saying, in that deposition, you were

 3  shown this information and you came to the conclusion they

 4  contradicted, right?

 5  A   It could be.  But commissions, you have to follow the

 6  policies and procedures for commission payments, and that was not

 7  followed in this case.

 8  Q   The Disciplinary Action Review Committee met in early April

 9  to discuss your recommendation to fire Mr. Kingston, correct?

10  A   Is that the review board piece that you are talking about?

11  Q   Yes.

12  A   Yes.

13  Q   Cindy Alexander was on that committee, right?

14  A   She was on the committee.

15  Q   And the question was:  Should Mr. Kingston be fired?  Should

16  they follow your recommendation, right?

17  A   Yes.

18  Q   And no decision was being made regarding Jerome Beard's

19  commissions, right?

20  A   No.

21  Q   I'm going to show you an exhibit.  This is 110, page No. 1.

22  This has been admitted into evidence.  If you've got it right

23  there, you just flip to 110.  Can we see the top half, please?

24      April 4th is right in the middle of the review board's

25  decision-making process, right?

 1   A    So, actually, I believe in this case Cindy wasn't able to

 2   make the call with Scott and Lisa.  I think I met with them a

 3   couple days prior.  And that was Cindy on the 4th.

 4   Q    And on the 4th, Cindy Alexander forwarded you this e-mail,

 5   right?

 6   A    She did.

 7   Q    And the e-mail in the subject line it says "Private," it says

 8   "do not distribute," right?

 9   A    Correct.

10   Q    And she's forwarding something that's five months old almost

11   at this point, right?  Take a moment to look at it.  Is that

12   correct?

13   A    I'm sorry.  Is there a question?

14   Q    Yeah.  The question is:  She is forwarding you information

15   from almost five months previous, right?

16   A    From November, correct.

17   Q    That information concerns the handling of Jerome Beard's

18   commission payment, right?

19   A    Yes, it does.

20   Q    Now, Mr. Kingston has alleged that IBM has discriminated

21   against Mr. Beard on account of his race and the way that they

22   handled that commission payment.  Did you know that?

23   A    No, I did not.

24   Q    And all of you are looking at this at the time that you are

25   deciding Mr. Kingston's fate?

 1   A    So I made a recommendation well before it went to the review

 2   board.

 3   Q    Now, you said that you talked with Mr. Mandel, correct?

 4   A    That is correct.

 5   Q    Are you aware that we have asked for any comparable

 6   situations in which IBM fired a manager under similar

 7   circumstances?

 8   A    Am I aware that you asked that?  No.

 9   Q    Yes.

10        Okay.  Let me tell you -- Well, let me ask you:  Are you

11   aware that IBM has given us no comparable situations in which it

12   fired a manager under these circumstances?

13   A    No, I'm not aware of that.

14   Q    Okay.  You've investigated hundreds of complaints of

15   discrimination by IBM employees over your past 13 years, correct?

16   A    I can't give you a number, but it's been multiple, yes.

17   Q    Well, in your deposition, you said hundreds.  Do you want me

18   to show you that?

19   A    I can tell you that each year I review between 60 and a

20   hundred.  I can't give you the makeup that each case is

21   discrimination.  There's multiple types of cases that we look at.

22   Q    Okay.  So it's possible it's been more than a thousand.

23   Sixty to a hundred over 13 years.  Sixty to a hundred every year,

24   I mean, let's just do the easy math, a hundred.  That would be

25   1,300 complaints of discrimination; is that correct?

 1  A    So, again, when I say 60 to a hundred cases a year, they're

 2  not all discrimination, they're not all one type.

 3  Q    Okay.  Fair.

 4  A    I can't give you the breakdown of how many discrimination

 5  versus another type.

 6  Q    Fair enough.  Fair enough.

 7       But, in your deposition, you said hundreds of complaints of

 8  discrimination over the years.  But you have never once found

 9  that IBM discriminated against someone; is that correct?

10  A    I -- Without crawling through all the details, I can't

11  recall -- I cannot recall a case where discrimination has been

12  substantiated.

13  Q    And the same is true for Mr. Mandel.  Let me show you his

14  testimony from this case.

15            MR. MARSHALL:  Can you put up the ELMO, please?

16  Q    So, right here, let me try to zoom in for you so you can read

17  this a little more easily.

18  A    Is that an exhibit number I could look at easier?

19  Q    Unfortunately, it's not.  So you are just going to have to

20  read on the screen.  Is that big enough for you?

21  A    No.

22            MR. BARNES:  Your Honor, there are portions of the

23  testimony that are being shown on the screen that should not be.

24            THE COURT:  Well, first of all, let's excuse our jury

25  for a moment.

 1        (The following occurred outside the presence of the jury.)

 2        THE COURT:  All right.  Mr. Marshall, can you explain

 3   to me what's on the screen?  What you are attempting to put up?

 4        MR. MARSHALL:  Yes.  So what I was going to put up,

 5   since she had referenced going to Mr. Mandel as the Consistency

 6   Reviewer, I was going to put up his testimony that, in 20 years

 7   with the company reviewing discrimination complaints, he also

 8   cannot recall a single instance in which IBM has found in favor

 9   of the employee.

10        THE COURT:  Well, how can you do that?  You are not

11   impeaching her.  And is there -- is Mr. Mandel going to be one of

12   the witnesses that's coming?

13        MR. MARSHALL:  I believe the defendants have chosen not

14   to call him.

15        THE COURT:  Well, Mr. Barnes, what would you like to

16   say?

17        MR. BARNES:  We do not intend to call Mr. Mandel at this

18   time as a witness.

19        And I would also add that in addition to Your Honor's

20   comments about trying to impeach Ms. Kenny with another witness's

21   testimony, there's also reference to a Mr. Castelluccio on the

22   pages that Mr. Marshall just published to the jury, and that is

23   another case where an individual sued IBM for age discrimination,

24   and we agreed before this trial that there would be no reference

25   to Mr. Castelluccio, and I think it's improper to show reference

 1  to that in the testimony on the screen to the jury.

 2        MR. MARSHALL:  I can assure you, Your Honor, that was

 3  not my intention.  This came up simply because she referenced

 4  Mr. Mandel, she referenced going to him, and so I pulled this,

 5  where we knew that Mr. Mandel said that he's never found

 6  discrimination.  That was all I was getting at.

 7        THE COURT:  Well, the point is you are trying to get in

 8  his testimony through the other witness.  What does she know

 9  about his testimony?

10        MR. MARSHALL:  Okay.  I will withdraw it.

11        THE COURT:  All right.  Let's bring them back, please.

12     (The following occurred in the presence of the jury.)

13        THE COURT:  Mr. Marshall, the next question, please.

14        MR. MARSHALL:  I have no further questions, Your Honor.

15  Thank you.

16        THE COURT:  Mr. Barnes, do you wish any further

17  examination?

18        MR. BARNES:  Yes, Your Honor.  I do.  I have some

19  follow-up.

20     If we could please put Exhibit 110 on the screen?  And,

21  again, as Mr. Marshall noted, this is an exhibit that has already

22  been admitted into evidence.

23                    REDIRECT EXAMINATION

24  BY MR. BARNES:

25  Q   Ms. Kenny, Mr. Marshall just asked you some questions about

 1  this e-mail that Cindy Alexander sent to you, right?

 2      You are muted, Ms. Kenny.

 3  A   Sorry.

 4  Q   Thank you.

 5      You recall Mr. Marshall asking you some questions about this

 6  e-mail from Ms. Alexander?

 7  A   Yes.

 8  Q   Do you know why Ms. Alexander sent this to you?

 9  A   Unfortunately, I don't recall.  I tried looking in my notes,

10  and I had no notes that I was able to refer back to as to why she

11  sent me this e-mail.

12  Q   If we look down at the bottom of page 1, there's a summary of

13  a conversation between Rose Nunez summarizing a conversation she

14  had with Scott Kingston.  Do you see that?

15  A   Yes, I do.

16  Q   And in here, this says, "Brian, I connected with Scott

17  yesterday.  He was not thrilled but understood."  Do you see

18  that?

19  A   Yes.

20  Q   And then in the first bullet point, under "His general

21  comments," it says, "They are okay with the limitation."  Do you

22  see that?

23  A   Yes.

24  Q   And then if you scroll down a little bit, it says, "Other

25  than that, he gets it ... he agrees that 1.5 million is a lot."

1   Do you see that?

2   A   Yes, I do.

3   Q   Other than the contents of this e-mail, did you have any

4   other knowledge about how Mr. Kingston felt about Jerome Beard's

5   commissions?

6   A   No.

7   Q   And does it say anything about race in here?

8   A   No, it does not.

9           MR. BARNES:  No further questions.

10          MR. MARSHALL:  Just a couple of follow-up questions,

11  Your Honor.

12          THE COURT:  All right.

13                      RECROSS-EXAMINATION

14  BY MR. MARSHALL:

15  Q   You weren't a part of that conversation, correct?

16  A   Which conversation is that?

17  Q   The one that was just shown to you, the conversation between

18  Ms. Nunez and Mr. Kingston.

19  A   No, I wasn't.

20  Q   You have no way of knowing whether what Ms. Nunez reported

21  was accurate, right?

22  A   No, I do not.

23  Q   You had discussions with the members of what's referred to as

24  the DARC, right?

25  A   Yes.

 1  Q   And you're aware that we have not been given information as

 2  to what those discussions entailed; we've only received what was

 3  put forward in writing?

 4        MR. BARNES:  Objection.  Counsel is improperly

 5  commenting on the discovery process and the invocation of the

 6  attorney-client privilege.

 7        MR. MARSHALL:  Let me rephrase, then, if I may?

 8        THE COURT:  All right.  Go ahead.

 9  Q   Ms. Alexander did not put anything in writing when she

10  forwarded that e-mail to you, correct?

11  A   She just forwarded the e-mail.

12  Q   Right.

13      Then there's no way for Mr. Kingston to know what was

14  discussed after that e-mail was forwarded; would you agree with

15  that?

16  A   I don't know what he could know or doesn't know if I'm not

17  privy to it.

18        MR. MARSHALL:  No further questions, Your Honor.

19        THE COURT:  All right.

20      Ladies and gentlemen, do you have any questions that you wish

21  to ask the witness?  If so, please put them in the chat.

22      All right.  Ladies and gentlemen, I'm not seeing any

23  questions for this witness.

24      Thank you, Ms. Kenny.  You may be excused.

25        THE WITNESS:  Thank you, Judge.

 1          THE COURT:  The next witness, please.

 2          MR. BARNES:  The defendant calls Brian Mulada, who

 3   should be logging in now.

 4          THE COURT:  Does anyone know what the phrase "a watched

 5   pot never boils" means?  It always seems like it's longer when

 6   we're watching, doesn't it?  It's actually not that long of a

 7   period of time.

 8          MR. LEE:  I know that very well from waiting for videos

 9   to start.

10          THE COURT:  Mr. Mulada, I'm Judge Pechman.  Can you see

11   me?

12          THE WITNESS:  I can see you, Judge.  This is Brian

13   Mulada.

14          THE COURT:  Can you hear me?

15          THE WITNESS:  I can hear you.

16          THE COURT:  Would you please raise your right hand to be

17   sworn?

18                          BRIAN MULADA,

19        having been sworn under oath, testified as follows:

20          THE COURT:  Go ahead, Mr. Barnes.

21          MR. BARNES:  Thank you, Your Honor.

22                       DIRECT EXAMINATION

23   BY MR. BARNES:

24   Q   Good afternoon, Mr. Mulada.

25   A   Good afternoon.

1    Q    You're currently employed at IBM; is that correct?

2    A    That is correct.

3    Q    How long have you worked for IBM?

4    A    Since 2004.

5    Q    What's your current role with the company?

6    A    I'm the Vice President of Finance for Global Markets and

7    Pricing.

8    Q    Tell us just a little bit what that means in terms of your

9    duties and responsibilities.

10   A    So I am the -- In that role, I support the head of global

11   sales, Bridget van Kralingen.  So that has to do with forecasting

12   and planning revenue and our financial objectives and also

13   supporting the general manager on delivering those.

14        And on the pricing side, my organization evaluates and prices

15   the transactions that our company does.

16   Q    Thank you.

17        What was your role in 2017 at IBM?

18   A    I was the Chief Financial Officer for our Competent Solutions

19   Software business that was run by John Kelly who was a senior

20   vice president.

21   Q    In that position, just tell us briefly what were your

22   responsibilities?

23   A    Similar to the role I have now, I was supporting the general

24   manager and his leadership team, and what we would do is we would

25   forecast and plan the business and also support the leadership

 1   team in delivering our financial objectives.

 2   Q   Got it.

 3       What's your educational background?

 4   A   I went to the University of Pennsylvania for mechanical

 5   engineering and economics, undergraduate, and I got a graduate

 6   degree from Harvard Business School.

 7   Q   Is that an MBA you received from Harvard?

 8   A   Correct.

 9   Q   Do you recall, back in 2017, a deal that closed between IBM

10   and its customer HCL?

11   A   Yes, I do.

12   Q   Were you involved in that deal?

13   A   I was heavily involved in the transaction with HCL and IBM.

14   And I was the chief financial officer for the business unit that

15   did it.  I was involved with the general manager and the

16   leadership team in structuring it, designing it, and negotiating

17   it.

18   Q   You mentioned the general manager.  Who was the general

19   manager on that team?

20   A   Inhi Cho.

21   Q   Tell us a little bit about this.  It was actually two deals

22   between IBM and HCL in 2017, right?

23   A   That's correct.

24   Q   Tell us a little bit about the transactions between IBM and

25   HCL.  What types of transactions they were?

1    A    So we started out with looking at an intellectual property

2    sale -- it's called an intellectual property partnership -- with

3    HCL where IBM would give them access to our licenses, they would

4    do development for that licenses, and then we would pay them a

5    revenue royalty for it.  So that's called an intellectual

6    property transaction.

7         It started out with that, and then we -- as we were working

8    on it, we added to that transaction a bundled deal to sell IBM's

9    software alongside it.

10        So it was a very unique transaction because we had coupled an

11   IP transaction with a software sale.

12   Q    And part of the software that was bundled with that

13   transaction, is that what we have been hearing about, the ESA

14   portion of the deal?

15   A    Yes.  It was called an embedded software agreement

16   transaction.

17   Q    And you mentioned that you were directly involved in

18   negotiating, structuring, and closing these deals?

19   A    That's correct.

20   Q    This transaction with HCL, was that a typical type of deal

21   that you see?

22   A    No, it's not.  We typically -- we don't do many intellectual

23   property transactions to begin with, and I have never seen us

24   doing an IP transaction alongside an ESA transaction like this

25   in my career at IBM.

1        So we structured it this way as we were trying to maximize

2    value for IBM and also to generate revenue in a transaction.  So

3    the IP transaction in itself generates no revenue.

4    Q    So it sounds like this was a pretty unique deal then?

5    A    It was a very unique deal in the fact that it was bundling

6    these two types of transactions together that we don't do often.

7    Q    At some point you reached out to Maria Lipner to ask about

8    the commissions on the HCL deal; is that right?

9    A    That is correct.

10   Q    Why did you do that?

11   A    So Maria Lipner is the head of incentives and commissions

12   within IBM, so she knows that area very well.  And because I had

13   spent so much time working on this transaction, developing and

14   structuring it, designing it, I wanted to understand and make

15   sure that it wasn't going to create any distortions in our

16   commissions.  And so I reached out to Maria Lipner's team, to

17   Maria directly, and asked her to check and make sure that this

18   unique transaction that we had just worked on would not result in

19   any disproportionate commission payouts to our sales force.

20   Q    We have heard about there being an NDA involved in the HCL

21   transaction, a nondisclosure agreement.  Do you have a

22   recollection of whether there was an NDA involved in the deal?

23   A    There was an NDA around the IP transaction, given the

24   sensitive nature of IP transactions involve moving resources

25   between companies.  So there was an NDA associated with the IP

1    transaction.

2    Q    Simply because there was an NDA, is that why you reached out

3    to Maria about the commissions, just because there was an NDA

4    involved?

5    A    Well, no.  I reached out to Maria, again, because this was a

6    very unique transaction where we had bundled an IP transaction

7    and an embedded software agreement, and it was very large, and I

8    wanted to make sure that, given the nature of this transaction,

9    it would not disproportionately impact IBM's commissions.

10   Q    The review of commissions, was it focused on Jerome Beard in

11   particular?

12   A    No.  It was focused on whatever individuals would be impacted

13   and then if that impact would be outside what you would typically

14   experience.

15   Q    There were a number of individuals who had the HCL deal

16   removed entirely from their achievement; is that correct?

17   A    My understanding is that it was removed from those who were

18   not working on the transaction.  So one -- If -- if the NDA was

19   not -- if you were not part of the nondisclosure list, then you

20   were not working on that transaction at all, and then you would

21   have been removed from the commission payout.

22   Q    And so Mr. Beard was not the only one who had commissions

23   impacted by this commission review; is that what you are saying?

24   A    Yes, that is what I'm saying.  So there was a small group of

25   individuals who were part of the NDA list who were -- received

1    commissions associated with the transaction.

2    Q    Was Mr. Beard ultimately the highest-paid individual on the

3    HCL transaction?

4    A    Yes.

5    Q    When you were going about deciding how to pay Mr. Beard on

6    this transaction, what sort of factors did you consider?

7    A    What I looked at was what we would typically see from

8    transactions of embedded software agreements.  So, historically,

9    when we've sold ESA software, what are the ranges of those

10   transactions, and then we also looked at the pipeline of

11   opportunities to see what size deals these typically would be.

12   Q    And did you come to a conclusion of the pipeline of deals

13   that you typically see, what the size of those are?

14   A    Yes.  So we reviewed several scenarios, and then I reviewed

15   them with the general manager, Inhi Cho, and what we decided was

16   to attribute $2 million of revenue flow to this transaction

17   because that is typically what you would see on an embedded

18   software agreement.  It would be $2 million or less.  And this

19   transaction was larger than that, in the range of 15- to 20-,

20   because it was directly associated with an IP transaction and had

21   value in the IP in it.

22        THE COURT:  Mr. Barnes, we need to find a place to stop

23   for our lunch.

24        MR. BARNES:  This is a good place, Your Honor.

25        THE COURT:  All right.  Mr. Mulada, we will see you back

1    again at one o'clock.

2            THE WITNESS:  Okay.  Thank you, Judge.

3            THE COURT:  All right.  Ladies and gentlemen, time for

4    lunch.  You probably can give me the drill by now, right?

5    Please, it's very important, no research, no investigation.  Just

6    enjoy yourselves over the lunch hour and come back to us ready to

7    go again.

8        Have a good lunch.

9            JUROR NO. 6:  Thank you.

10    (The following occurred outside the presence of the jury.)

11            THE CLERK:  Your Honor, everybody has been excused.

12            THE COURT:  All right.  Counsel, can you give me some

13    idea of how much more we have for today?

14            MR. BARNES:  Your Honor, I suspect that, given Your

15    Honor's ruling this morning on time for cross-examination, we

16    should be able to finish up our witnesses today.

17            THE COURT:  Okay.  So how many more do we have?

18            MR. BARNES:  We are finishing up with Mr. Mulada, we

19    will be calling Lisa Mihalik, and we will be calling Dorothy

20    Copeland.  And we are planning at lunch to talk amongst ourselves

21    about recalling Ms. Johnson and to what extent we want to raise

22    that issue with the Court.  And we will be prepared to do that

23    when we come back from lunch.

24            THE COURT:  All right.  So, counsel, I'm going to be

25    reviewing our proposed jury instructions over the lunch hour as

 1  well.  So if there's anything else you want to bring to

 2  Mr. Mensher's attention, please do so because he's going to be

 3  forwarding on to me everything that you have given him so far.

 4  So if we have time, we will talk about that at end of the day.

 5  If we don't have time, we will talk about it first thing tomorrow

 6  morning.

 7            MR. BARNES:  That works, Your Honor.

 8            THE COURT:  Okay.  Have a good lunch.  I will see you

 9  back at one o'clock.

10            MR. BARNES:  Thank you.

11            MR. LEE:  Thank you, Your Honor.

12                      (Recessed.)

13            THE COURT:  All right.  Good afternoon, counsel.  Are we

14  ready to begin again?

15            MR. LEE:  We are, Your Honor.

16            MR. BARNES:  Yeah.  We are as well, Your Honor.

17       We were going to go ahead and address the issue of recalling

18  Ms. Johnson, if now is a good time to address that.

19            THE COURT:  Well, why don't we get through the material

20  that you know you are going to be able to put on before we get to

21  recalling Ms. Johnson?

22            MR. BARNES:  That will be fine, Your Honor.

23            THE COURT:  Okay.  You may want to add something that

24  you want to pitch to me.

25            MR. BARNES:  Understood.  We may.

```
 1              THE COURT:  Okay.  All right.

 2       Mr. Cogswell, can we bring in our witness as well as our

 3  jury, please?

 4          (The following occurred in the presence of the jury.)

 5              THE COURT:  All right.  Ladies and gentlemen, welcome

 6  back.

 7       Mr. Barnes, you may continue your examination of Mr. Mulada.

 8              MR. BARNES:  Thank you, Your Honor.

 9  Q   (By Mr. Barnes:)  Mr. Mulada, before the break, we were

10  talking about the factors that you considered in considering what

11  to pay Jerome Beard on the HCL deal, and I want to make sure I

12  understood one of the points you were making.

13       You said that, in deciding how much achievement to flow to

14  Jerome Beard, you ultimately decided to flow $2 million of

15  achievement, right?

16  A   That's correct.

17  Q   And that was based on what you thought were -- Estimated size

18  of other ESA deals were in that range; is that right?

19  A   That's correct.

20  Q   And I believe you said that the ESA piece of this particular

21  deal was in the 12- to $15 million range; is that right?

22  A   Yes.

23  Q   And was it your belief that that 12- to $15 million size of

24  the ESA piece, that that was larger than it would have been had

25  this just been a stand-alone ESA deal?
```

1    A    That's correct.  The size of the ESA transaction was directly

2    linked to the IP partnership.  So if there was no IP partnership,

3    there would be no ESA transaction.  It would be zero.

4         Because we had a bundled deal with the IP transaction, which

5    brought a lot of the value, we were able to do the ESA

6    transaction along with it and allocate total value to each

7    component.

8    Q    Did race ever come up in any conversations about how to pay

9    the commissions on the HCL deal?

10   A    Absolutely not.  Race had no -- race had no involvement in

11   any of this transaction or activity at all.

12   Q    You have been accused of treating Jerome Beard differently

13   because of his race in this case.  How does that make you feel?

14   A    I am extremely offended at being accused of discriminating in

15   that way.  I have always gone about my business to treat people

16   appropriately, equitably, and fairly.  And I think that it is

17   completely untrue and distorting reality to accuse me and IBM of

18   any racial discrimination in this matter.

19   Q    Did Scott Kingston ever complain to you about race

20   discrimination?

21   A    No, he did not.

22   Q    All right.  Let's switch gears and talk about another

23   transaction that has come up in this case.  There was a

24   transaction between IBM and a customer called SAS Institute

25   which closed in June 2017.  Were you involved in that deal?

 1    A    No, I was not.

 2    Q    Do you know who Nick Donato is?

 3    A    No, I do not.

 4    Q    Were you involved in any decisions about how to pay Nick

 5    Donato?

 6    A    No, I was not.

 7    Q    Were you involved in the investigation into the commissions

 8    paid on the SAS deal?

 9    A    No, I was not.

10    Q    And were you involved or even consulted about the decision to

11    fire Scott Kingston?

12    A    I was not.

13    Q    Do you think IBM takes race discrimination seriously?

14    A    IBM takes race and diversity and discrimination very

15    seriously.  It's an important pillar in our culture as a company,

16    and I take it extremely seriously.  I lead a team today of 1,400

17    people, globally, around the world, in different backgrounds,

18    different genders, different cultures, different races, and I do

19    not tolerate any discrimination of any kind in my organization

20    and with my teams, and nor does IBM.

21    Q    Are you involved in any diversity and inclusion initiatives

22    at IBM?

23    A    We do a number of -- We recently formed a diversity council

24    in my organization to help improve representation in the black

25    community.  I hold roundtables with individuals, I hold one-on-

 1  ones to talk about careers and to give people coaching and

 2  opportunities to develop and grow their careers.  So I spend a

 3  lot of time to ensure that we support and encourage diversity in

 4  IBM and in my team.

 5  Q   Thank you, Mr. Mulada.

 6          MR. BARNES:  No further questions from me.

 7          THE COURT:  Mr. Lee.

 8                      CROSS-EXAMINATION

 9  BY MR. LEE:

10  Q   Good afternoon, Mr. Mulada.

11  A   Good afternoon.

12  Q   I'm Matt Lee, and I represent Scott Kingston.  But we have

13  met before, of course.

14      Mr. Barnes asked you about your background.  I have got a few

15  additional questions on that.  Mr. Mulada, you grew up in New

16  York; is that right?

17  A   Correct.

18  Q   On Long Island?

19  A   Yes.

20  Q   In, I think, the City of Huntington, New York, correct?

21  A   Correct.

22  Q   And that's on the North Shore of Long Island, right?

23  A   Yes.

24  Q   And that's also known as the Gold Coast of Long Island,

25  right?

1    A    Yes.  I believe the many towns along the North Shore are

2    referred to as that.

3    Q    Yeah.  I think that's the same area where the novel the *Great*

4    *Gatsby* was set; isn't that right?

5    A    I do not know if that was in my town.

6    Q    Okay.  But wasn't that set on the Gold Coast of Long Island?

7    Do you know?

8    A    I believe so, yes.

9    Q    Okay.  Okay.  And you still live in that area, in the town of

10   Oyster Bay; is that correct?

11   A    I live in Syosset.

12   Q    But the town you live in is Oyster Bay; isn't it?

13   A    I live in the town of Syosset, but it might be a county that

14   includes the town of Oyster Bay.  But I live in the town of

15   Syosset.  My home address is Syosset, New York, 11791.

16   Q    Right.  29 Shady Lane, Syosset, New York, right?

17   A    That's correct.

18   Q    And that's in the Village of Laurel Hollow, the school

19   district of Cold Sprig Harbor, and the town of Oyster Bay, right?

20   A    Yes.

21   Q    Okay.  And would it surprise you to learn that, according to

22   the U.S. Census Bureau, the black or African American population

23   in Oyster Bay is 2.3 percent compared to a national average of

24   13.4 percent?

25              MR. BARNES:  Objection, Your Honor.  What's the

 1   relevance of this?

 2           THE COURT:  Overruled.

 3   Q   Mr. Mulada, did you hear my question?

 4   A   Yeah, I heard your question.

 5       That would not surprise me.

 6   Q   Okay.  And, Mr. Mulada, you went to Cold Spring Harbor Junior

 7   and Senior High School, correct?

 8   A   I did.

 9   Q   And you were a district champion wrestler three years in a

10   row; is that right?

11   A   Yes.

12   Q   Is Cold Spring Harbor a good school?

13   A   It's a public school, and I believe it's a good school, yes.

14   Q   Yeah.  And the minority enrollment there is 4 percent, with 2

15   percent Asian, 1 percent black, and 1 percent Hispanic, white

16   enrollment is 96 percent; is that right?

17   A   It sounds -- It could be right, correct.

18   Q   And I'm sure that this was a nice area to grow up in, but you

19   can acknowledge that it's not very diverse, can't you?

20   A   Maybe it's not diverse, but my background is very diverse.

21   Q   Okay.  Let's talk about that.  After that, you went to

22   college, right?

23   A   Yes.

24   Q   You went to an Ivy League school, the University of

25   Pennsylvania, the Wharton School, correct?

 1    A    I was in Wharton and the engineering school.

 2    Q    I mean, that's an excellent school, of course.  And a lot of

 3    successful people have gone there, right?

 4    A    Yes.  And I wrestled on the wrestling team there.

 5    Q    That's great.  Including our most recent former president

 6    went to the Wharton School, right?

 7    A    Correct.

 8    Q    Okay.  And from there, you graduated from the University of

 9    Pennsylvania and you went straight to Morgan Stanley, right?

10    A    That's correct.

11    Q    That's like an investment firm or bank?

12    A    Yes.

13    Q    Okay.  And then you went from Morgan Stanley to a private

14    equity firm, correct?

15    A    Yes.

16    Q    And you worked for two years and then you went back to school

17    and got your MBA, as you discussed with Mr. Barnes.

18         You went to the Harvard Business School, correct?

19    A    That's correct.

20    Q    And that's an excellent program, of course.  These are some

21    of the best business schools in the world, right?

22    A    I believe so.  And they're also very diverse.

23    Q    Yep.  And you finished your MBA at Harvard, right?

24    A    I did.

25    Q    Then you went straight to IBM from there, and you have been

 1  at IBM ever since, right?

 2  A    That's correct.

 3  Q    But you have never been in sales for your entire career, have

 4  you?

 5  A    I have not been in a sales organization, but I have been

 6  heavily involved in negotiating and selling activities.

 7  Q    Yes.  Mr. Mulada, let's go to your deposition, page 45,

 8  please, on line 11.

 9         MR. LEE:  If we could go to the ELMO, Ms. Nuss?

10  Q    Just let me know when you can see that.

11  A    I'm sorry.  I can't see anything.  I can see you.

12  Q    Just give me one minute.  I think it will come up in just a

13  minute.

14       Okay.  There we go.

15       Yeah.  It's your deposition.  Line 11, I asked, "So you have

16  never been in sales for your entire career?"  You said, "I have

17  not been in IBM sales."  I said, "Have you been in sales with

18  another company?"  "No, I have not."  "And you have never managed

19  a sales team before, have you?"  "No, I have not."

20       That was your testimony?

21  A    Correct.

22  Q    Okay.  For many years, you worked for John Kelly, correct?

23  A    For a few years, yeah.

24  Q    Then, in 2017, John Kelly was the third-highest executive at

25  IBM, correct?

1   A    I don't know if he was the third highest, but he was

2   definitely a high-level executive at IBM.

3   Q    Right.  I mean, John Kelly is the guy.  As Mr. Marshall

4   mentioned earlier today, he's the guy who invented Watson, the

5   computer program that beat Ken Jennings at *Jeopardy*, right?

6   A    I think -- He was involved in it.  I don't know if he was the

7   individual who invented it, but ...

8   Q    He gets a lot of credit for it, doesn't he?

9   A    (No audible response.)

10  Q    Mr. Mulada, did you hear me?

11  A    Does he get a lot of credit?  I don't know.  I don't know if

12  John Kelly gets a lot of credit for Watson.

13  Q    That's fair.

14       But John Kelly, he was a pretty powerful person at IBM,

15  wasn't he?

16  A    I would say he was a senior executive and very influential.

17  Q    He was a senior vice president of IBM's Cognitive Solutions,

18  I think you testified earlier, right?

19  A    That's correct, yes.

20  Q    He ran that department, and you were the CFO of that

21  department in 2017, right?

22  A    That's correct.

23  Q    Mr. Mulada, you made the decision -- you made the decision --

24  on what Jerome Beard deserved to be paid on the HCL deal in

25  September of 2017; is that correct?

1    A    I was heavily involved in evaluating the different scenarios

2    on what commission revenue would flow to him and what he would

3    get paid out.  And I reviewed that with the general manager, Inhi

4    Cho, of the business, in terms of what we ultimately determined.

5    So, yes, I was heavily involved.  And I had worked with the

6    leadership team in my business unit.

7    Q    I think you told me in your deposition that you made that

8    decision, didn't you?

9    A    I was heavily involved with it and made a recommendation and

10   reviewed it with the leadership team.

11   Q    Fair enough.

12        And you did that based on the achievement and the payment

13   that you thought was appropriate, as you've discussed with

14   Mr. Barnes, right?

15   A    That's correct.

16   Q    And that payment was $205,000, correct?

17   A    Yes.

18   Q    I mean, that's a lot of money, isn't it?

19   A    I do believe it's a lot of money, yes.

20   Q    And Mr. Beard's commissions formula had calculated a lot more

21   than that, though, hadn't it?

22   A    Yes, it did.

23   Q    It calculated over 1.4 million, right?

24   A    In that range, correct.

25   Q    But you found that amount inappropriate and unacceptable,

1   didn't you?

2   A    Yes, I did.

3   Q    And you demanded to know who had approved that, didn't you?

4   A    I found that amount inappropriate because this was a very

5   unique transaction bundled with the intellectual property deal

6   that I described.  It was abnormally high in size for these types

7   of transactions, and that's why I asked Maria Lipner and the

8   incentives team to go look at it and evaluate it with me and then

9   take corrective action to get to an appropriate payout that was

10  indicative of this type -- what this transaction should be.

11  Q    Mr. Mulada, if you can just listen to my question.  I just

12  asked if you demanded to know who approved that.  I basically

13  took your answer as a "Yes."

14      And you found that the entire line management had approved it

15  before you saw it, right?

16  A    Yes.  I wanted to know that it was being reviewed and who

17  reviewed it and who approved it --

18  Q    Well --

19  A    -- and the reason -- Can I finish?

20  Q    Please.

21  A    The reason is because I was heavily involved in structuring,

22  negotiating, designing that deal, and the other individuals in

23  that management team were not.  So I wanted to know who had

24  reviewed it and why and make sure that the people who were

25  involved in the transaction were reviewing it, including myself.

1    Q    And if you hadn't stepped in, Mr. Beard's full commission

2    would have been paid, wouldn't it?

3    A    I believe it would have.

4    Q    And you also made a decision on the HCL deal in 2017 with

5    Mr. Beard's commissions, right?

6    A    That would be -- The one we're talking about, with the IP

7    transaction, was in the third quarter of '17, and the one you

8    just referenced is the fourth quarter, correct, which followed.

9    Q    Yeah.  And then you made the decision on those commissions,

10   even though you hadn't even been involved in the December deal,

11   right?

12   A    No, that's incorrect.  I was involved in both heavily.

13   Q    Well, Karla Johnson told you on January 18th, 2018, that she

14   was getting resistance from sales leadership about the

15   commissions decisions on HCL, didn't she?

16   A    I believe that's accurate.

17   Q    And she told you, on January 29th of 2018, that this was a

18   one-time thing, what happened with HCL, you're cutting those

19   commissions is a one-time thing; if there are going to be

20   additional transactions like this going forward, we cannot

21   continue to exclude these the way we have.

22        That's what she told you, right?

23   A    Yes.

24        So we did the two transactions that you talked about, and

25   then when Karla said, as -- if we expect these types of unique

1    transactions to continue, we should put communications in place

2    so that the sales team would understand and know how they would

3    be treated.

4         So we had the third-quarter transaction and the fourth-

5    quarter transaction, both with the same client and both highly

6    unique for software transactions in the IBM company.

7    Q   Mr. Mulada, I will ask you straight.  You knew that Jerome

8    Beard was black when you made these commissions decisions, didn't

9    you?

10   A   I knew he was black, but that had nothing to do with my

11   involvement, my review, and my recommendation in adjusting the

12   commissions.

13   Q   Well, at some point you learned that Jerome Beard wasn't

14   happy with your commissions decisions, didn't you?

15   A   I did learn that, yes.

16   Q   You learned that an allegation of racial discrimination had

17   been raised in relation to Jerome Beard's HCL commissions, didn't

18   you?

19   A   I don't know if it was -- I don't know if I learned it was

20   racial discrimination.

21   Q   Well, Rose Nunez told you that, didn't she?

22   A   I don't recall, Matt.

23   Q   Okay.  And then after that, Mr. Beard filed a lawsuit against

24   IBM, correct?

25   A   That's correct.

1  Q   Of course, your name was in the complaint since you had made

2  the decision, correct?

3  A   That's correct.

4  Q   And it sounds like that was pretty frustrating for you; is

5  that fair to say?

6  A   Frustrating in the fact that I was getting blamed for racial

7  discrimination when that is not accurate and is completely false.

8  That was frustrating.

9  Q   Well, Mr. Mulada, it was so frustrating that, in late 2018,

10  you asked IBM executive German Ospina to have Mr. Beard removed

11  from future HCL deals, didn't you?

12  A   I don't know if I asked that.

13  Q   And that you would not tell Mr. Ospina why you wanted

14  Mr. Beard removed, would you?

15  A   I don't recall doing that or why.

16  Q   And when he went to Rose Nunez about it, she told him not to

17  get in the middle of it; isn't that right?

18  A   I don't know, Matt.

19  Q   Well, do you know German Ospina?

20  A   I worked with German Ospina on other transactions in IBM.

21  Q   He's a former IBM executive, right?

22  A   Yes.

23  Q   Are you aware that he testified under oath in an affidavit to

24  the facts that I have just asked you about?

25  A   No.

1        MR. LEE:  Mr. Mulada, I appreciate your time.

2        THE WITNESS:  You got it.

3        THE COURT:  Anything further?

4        MR. BARNES:  Yeah.  A couple of questions, Your Honor.

5                        REDIRECT EXAMINATION

6   BY MR. BARNES:

7   Q    You mentioned that you consulted with Inhi Cho about

8   Mr. Beard's commissions; is that right?

9   A    That's correct.

10  Q    And Ms. Cho is the general manager of this business unit?

11  A    Yes, she was the general manager of the business unit where

12  we did the IP transaction and the software transaction.

13  Q    Ms. Cho is an Asian female, correct?

14  A    That's correct.

15  Q    Last question:  Does your neighborhood have anything to do

16  with this case?

17  A    My neighborhood has nothing to do with this case.

18        MR. BARNES:  Nothing further, Your Honor.

19        THE COURT:  Mr. Lee?

20        MR. LEE:  Nothing from us, Your Honor.  Thank you.

21        THE COURT:  Ladies and gentlemen, do you have any

22  questions for the witness?  If so, would you put it in the chat?

23     Okay, ladies and gentlemen, I'm not seeing any questions.

24     Thank you, Mr. Mulada.  You may be excused.

25        THE WITNESS:  Thank you, Your Honor.

```
 1              THE COURT:  The next witness, please.

 2              MR. BARNES:  Your Honor, IBM calls Lisa Mihalik.  I know

 3    she's logging in now.

 4              THE CLERK:  Mr. Barnes, I do not see her, but somebody

 5    named "David" just joined.

 6              MR. BARNES:  That's not us.

 7       I just received a note that she had an unfortunately timed

 8    computer reboot, which we have seen before in this case.  So I

 9    think she's restarting her computer and joining.  I apologize for

10    the delay.

11              THE COURT:  All right.  Ladies and gentlemen, I'm going

12    to send you to the jury room where you can take a stretch, and we

13    will bring you back out when the witness is ready to go.

14       (The following occurred outside the presence of the jury.)

15              MR. LEE:  Your Honor, I was worried you might fall out

16    of your chair when I finished two crosses in under 15 minutes.

17              THE COURT:  Well, I noticed that, Mr. Lee.

18              MR. LEE:  I was worried.  I didn't want you to get hurt.

19    I didn't want to surprise you too much.

20              THE COURT:  While I have you here, a couple of things

21    that I'm going to need from you:  any additions to the appendices

22    in your jury instructions, any terms that you want to add, and,

23    also, the list of witnesses should be edited down since there

24    were several witnesses who were not called.

25       Can you take a look at those things for me?
```

 1            MR. LEE:  Certainly, Your Honor.

 2            MR. BARNES:  Yes, Your Honor.

 3            MR. LEE:  Are there any additions to the appendices that

 4    you would suggest, Your Honor?  Anything that you have been

 5    thinking about that's not on there?

 6            THE COURT:  I haven't looked at the appendices for a

 7    while, but I just want to make sure that if there were terms that

 8    came up during the course of the trial that aren't on the list,

 9    that perhaps we should add them.  So, you know, take a look.

10            MR. LEE:  Okay.  We will.  Off the top of my head -- I

11    looked at it last night -- I can't think of any kind of glaring

12    omissions on there.  But it warrants another look.

13            MR. BARNES:  Apologies for the delay, Your Honor.  We're

14    almost there.

15            THE COURT:  That's fine.

16         Counsel, your ratings are going down today.  We've only got

17    28 followers.  We have been having 38 to 42.

18            MR. BARNES:  Maybe I'm just a little more boring.

19            THE CLERK:  Your Honor, it looks like the witness is in

20    the waiting room.

21            THE COURT:  All right.  Then let's bring everybody in,

22    please.

23         (The following occurred in the presence of the jury.)

24            THE WITNESS:  Hello.

25            THE COURT:  Hello.  Ms. Mihalik, I'm Judge Pechman.  Can

```
 1   you see me?

 2             THE WITNESS:  Yes, I can.

 3             THE COURT:  And can you hear me?

 4             THE WITNESS:  Yes, I can.

 5             THE COURT:  Could I please have you raise your right

 6   hand to be sworn?

 7                       LISA MIHALIK,

 8             having been sworn under oath, testified as follows:

 9             THE COURT:  Go ahead, Mr. Barnes.

10             MR. BARNES:  Thank you, Your Honor.

11                      DIRECT EXAMINATION

12   BY MR. BARNES:

13   Q   Good afternoon, Ms. Mihalik.

14   A   Good afternoon.

15   Q   You currently work for IBM, correct?

16   A   Yes, I do.

17   Q   How long have you worked for the company?

18   A   Just going on 33 years.

19   Q   What is your current role with IBM?

20   A   My current responsibilities are as the Vice President of HR

21   Services.

22   Q   Tell us a little bit about what that means in terms of your

23   job responsibilities.

24   A   Certainly.

25       So there's multiple facets to the organization and the
```

1    mission I am responsible for.  It includes what we call case

2    management, where we handle employee investigations and appeals,

3    globally.

4        I also have responsibility for our service delivery centers

5    which, essentially, is where the majority of our managers and

6    employees interact with HR on things like their benefits, their

7    compensation, questions that they have around navigating

8    different approaches and practices that we have that support them

9    as employees.

10       I am also responsible for our HR budget globally as well as

11   audit and compliance responsibilities for the HR team.

12       And then, lastly, I have responsibility for HR technology.

13   So all of the systems and tools that we provide to our employees

14   owned by HR.

15   Q   Sounds like a lot of responsibilities.

16   A   It is.

17   Q   Do you have responsibilities as it relates to internal audit

18   investigations and disciplinary actions arising out of those

19   investigations?

20   A   Yes, I do.  So I am responsible for the team that manages

21   multiple channels through which our employees can raise issues or

22   concerns.  We also have responsibility to work with internal

23   audit, where they are responsible for conducting investigation,

24   but where HR plays a role in helping to deliver on the outcomes

25   of those investigations and what we need to do in the way of

 1   employee treatment.

 2   Q   We have heard reference to a Disciplinary Action Review

 3   Committee or a Disciplinary Action Review Board.  Do you know

 4   what that is?

 5   A   I do.  I'm not a big fan of the name.

 6       But it is a review committee.  And, essentially, what happens

 7   is in each of our geographies around the world, so the United

 8   States as an example, there is a representative from human

 9   resources, a representative from legal, and a representative from

10   finance where we are responsible for reviewing the

11   recommendations and the findings out of investigations after, you

12   know, multiple layers of review, before it gets to us.

13   Q   And the name you are referring to that you are not a big fan

14   of is the DARC, right?

15   A   Yes.  Yes.

16   Q   Did you choose that name?

17   A   I did not choose that name.

18   Q   Okay.  So you mentioned that HR, legal, and finance sit on

19   the review board.  Why do you have these three separate

20   individuals sitting on the review board?

21   A   The expectation is that we bring a diverse set of

22   perspectives.  Typically, the investigations could touch upon any

23   or all of our areas.

24       My own personal involvement, or that of others in HR, is

25   really about making sure that we are bringing the employee

1  perspective.  So we are looking at the case that's brought before

2  us through the lens of the employee, but we're also being

3  thoughtful about the appropriateness of the disciplinary actions

4  based on the facts presented.

5  Q   Do you take this responsibility seriously?

6  A   I absolutely do.  You know, when an investigation makes it to

7  the level of the review committee, it is a very serious thing,

8  and it involves employees who are people and who are humans, and

9  so it's really important that we look at a full set of facts and

10 that we have an opportunity to ask questions.

11 Q   In this particular situation, you sat on the review board

12 that reviewed the recommendation for the termination of Scott

13 Kingston; is that correct?

14 A   Yes, I did, in my prior job responsibilities.

15 Q   And you sat on that board with Cindy Alexander, who was a

16 representative from finance; is that right?

17 A   Yes, that is correct.

18 Q   And then also Scott Ferrauiola who was a representative from

19 legal; is that correct?

20 A   Yes.

21 Q   How many times did the review board meet to discuss this

22 case?

23 A   For this particular case, we met three times, which is

24 actually unusual.  Typically, we may meet once, maybe -- we will

25 meet once, we may meet twice, but, in this instance, it was

 1  involving some pretty serious matters, and so, ultimately, three

 2  conversations.

 3  Q   So you think the review board took this seriously in this

 4  particular situation?

 5  A   I know we took this seriously.

 6  Q   And the review board ultimately approved the recommendation

 7  for termination, correct?

 8  A   We did.  So we supported the recommendations of the various

 9  reviewers that came before us.

10  Q   Why did you approve termination here?

11  A   Very succinctly, the evidence demonstrated that Mr. Kingston

12  had acted in a deliberate manner, in adding his employee to a

13  deal after the fact, and in my view, at the time, it was a pretty

14  egregious action for an experienced sales manager.

15  Q   Was this an easy decision?

16  A   These are never easy decisions.  It's very difficult to make

17  a decision about terminating an employee.

18  Q   So it sounds like there is no one decision-maker with respect

19  to deciding to terminate Scott Kingston's employment; is that

20  correct?

21  A   That is absolutely correct.

22  Q   Were you aware of any complaints of race discrimination by

23  Scott Kingston at the time you approved his termination?

24  A   I was not, no.

25  Q   So did any potential complaints of discrimination by

1    Mr. Kingston, did that play any role in your decision to approve

2    Mr. Kingston's termination?

3    A    It absolutely did not.  The termination decision was based on

4    the facts presented and the actions of Mr. Kingston.

5    Q    Does IBM take race discrimination seriously?

6    A    We absolutely do.  It's very much a part of who we are as a

7    company, it's a part of our DNA, and we have a very long history

8    around being proactive in this area.

9    Q    Can you tell us a little bit about some of the things that

10   IBM does to be proactive, as you said it?

11   A    So our history goes back a very long time.  So, you know,

12   there's -- we have been a company where we have made decisions

13   because of our belief in treating people equitably long before

14   there were laws to guide corporations or long before the topic of

15   diversity was even on the agenda of companies.  An example is the

16   fact that ten years before the Civil Rights Act, the IBM Company,

17   and actually our CEO, issued an Equal Opportunity memorandum to

18   our employees in the corporation.

19        There's other instances where, as a company, we instituted

20   things like evaluating the pay equity of our employees before it

21   was legally required.  So we looked at gender and ethnicity.

22        And so while we're not perfect, it's a part of the social

23   fabric of who we are as a company.  So we are always trying to

24   make sure that we are respectful and thoughtful of the role that

25   we play in society and representing our employees.

1    Q    And are there some things that IBM is doing today to try to

2    address diversity and inclusion and combat racism?

3    A    Yeah.  There's many, many things that we are doing at IBM.

4    So given the many events in the United States in 2020 and into

5    2021, as an example, in response to the treatment of blacks in

6    society and how our employees were experiencing that, but as a

7    corporation, we introduced very quickly additional education to

8    help build awareness, to refocus on being upstanders versus

9    bystanders, what it means to be an ally.

10        We had our executives partnered, black and nonblack

11   executives, doing listening tours of employees to say "What else

12   can we do?  We know we have policies and programs, but what else

13   can we do to help you be comfortable?"

14        We have now just done the same thing, given the things that

15   are occurring with Asian Americans in the public at large, and so

16   we have literally just kicked off a very similar approach, again,

17   about how do we make you more comfortable in the workplace and

18   recognizing that these experiences may be weighing on you.

19   Q    Is there anything that IBM does to try to recruit diverse

20   employees and increase its diversity?

21   A    Yes.  And we actually have.  So that's one facet of our

22   approach.  And the answer is yes.  So we really focus on three

23   things, which is education, outreach, and then what we do around

24   recruitment and retention.

25        So in the case of recruitment, you know, we do many things,

 1  but two examples would be what we do around experienced,

 2  professional hiring.  So we invest in and partner with, provide

 3  funding to organizations where, you know, diversity is more

 4  prevalent -- as an example, Society of Black Engineers -- and

 5  helping to advance what they focus on and using that as also a

 6  recruiting engine.

 7      We are also very focused on diverse recruiting on campus.

 8  And so, again, there are investments that we make in support of

 9  underrepresented populations in order to both help progress their

10  education but then ultimately leverage that as a recruiting

11  mechanism.

12  Q    Thank you, Ms. Mihalik.

13           MR. BARNES:  I have no further questions.

14           THE WITNESS:  Okay.  Thank you.

15           THE COURT:  Mr. Lee.

16           MR. LEE:  Your Honor, can we address a matter briefly

17  with the Court?

18           THE COURT:  Yes, Mr. Lee.

19      Ladies and gentlemen, I'm going to excuse you for just a

20  moment.

21      (The following occurred outside the presence of the jury.)

22           THE COURT:  Just one moment, Mr. Lee.

23      Mr. Cogswell, is everyone excused?

24           THE CLERK:  They are, Your Honor.

25           THE COURT:  Okay.  Yes, Mr. Lee.

1          MR. LEE:  Your Honor, I must say I'm, like, borderline

2     shocked right now.  That entire examination elicited character

3     evidence about IBM and how it treats discrimination.

4          We know, as we sit here today, that there has been a final

5     determination by the EEOC that IBM had a top-down aggressive

6     message and pattern of discrimination.

7          I'm just shocked by the witness's testimony.  She didn't

8     acknowledge that at all.  And that's a big, big deal, as we all

9     know.

10          I think they have clearly opened the door to it.  They have

11     opened the door to the EEOC letter, and they have, at a minimum,

12     opened the door to Mr. Mandel's testimony that he has reviewed

13     hundreds of cases of discrimination, just like Ms. Kenny, and

14     never validated one.

15          THE COURT:  Mr. Barnes?

16          MR. BARNES:  Your Honor, the EEOC letter found cause on

17     age.  Ms. Mihalik didn't say anything about age in her testimony.

18     And that EEOC letter specifically found that there was no

19     evidence of discrimination on the basis of race or any other

20     classification other than age.  And it would be -- In addition to

21     the EEOC letter having just zero relevance to this case, it would

22     be highly, highly prejudicial and confusing to the jury to

23     introduce a letter from the EEOC about age when there's not even

24     an age discrimination claim in this case anymore.

25          MR. LEE:  Your Honor, what's prejudicial is 15 minutes

1   of:  We are an enlightened company that never discriminates

2   against people and look at all the good things that we do to not

3   discriminate against people.

4       She did not limit it to racial discrimination.  She said

5   "discrimination."  We have evidence that that's not true, and we

6   have to be able to use it to contextualize this for the jury.

7           MR. BARNES:  Your Honor, we have just heard six days of

8   testimony about how IBM is a racist company.  I think 15 minutes

9   of responding to that is entirely appropriate and does not open

10  the door to matters which are completely irrelevant to the claims

11  in this case.

12          THE COURT:  Can you give me one second?  I'm going to

13  review her testimony here for a second.

14      Mr. Barnes, I believe that she opened the door.  She did not

15  talk about any particular form of discrimination, but touted the

16  long history of IBM as being in the forefront, before the Civil

17  Rights Movement, listing a -- coming forward with memorandums on

18  Equal Opportunity Employment.

19      Age is one of the categories that's protected.  You had her

20  go on about things that the company is doing to make it appear

21  that they are progressive in this area and have always felt that

22  way.  So I think Mr. Lee is entitled to inquire as to whether or

23  not IBM has ever had any difficulties in this area, the numbers

24  of suits that have been brought, the fact that they apparently

25  have done hundreds of evaluations and never found discrimination.

1    That, in and of itself, one might find fantastical.  And then, of

2    course, there's the EEOC that has their finding concerning age.

3    So you've opened the door.

4        Mr. Lee, this is not -- this is not, however, the -- I don't

5    know how to put this -- it is a door, it is not a barn door.  So

6    I'm expecting you to stick to the topics that you discussed with

7    me.

8            MR. BARNES:  Your Honor, one point of clarification.  If

9    Mr. Lee is going to show the EEOC letter to the jury, he needs to

10   show the whole letter, which includes a specific finding by the

11   EEOC that there was no race discrimination.

12           MR. LEE:  You know, if Mr. Barnes wants to rehabilitate

13   his witness with that, I think that would be his choice.

14           THE COURT:  That's fair, Mr. Barnes.  If you want to put

15   that forward, you can.

16       All right.  Are we ready to go?  Mr. Lee, you understand the

17   parameters?

18           MR. LEE:  I believe I do, Your Honor.  But what I have

19   is Exhibit 41, as redacted, per pretrial.  Is this what I should

20   use, or should I use the unredacted copy?  I guess I'm a little

21   unclear.

22           THE COURT:  Well, it sounded to me like Mr. Barnes was

23   looking for the unredacted copy.

24           MR. BARNES:  That's correct, Your Honor.  We obviously

25   are opposed to introduction of either copy, but if it's going to

 1  be introduced, we would insist that it be the unredacted copy.

 2          THE COURT:  Do you have a copy, Mr. Lee?

 3          MR. LEE:  I do.  I have got -- My team has gotten me

 4  one.

 5          MR. BARNES:  And if it's going to be used solely to

 6  impeach the witness, Your Honor, we would ask that it not be

 7  introduced into evidence, but that it just be used to impeach.

 8          MR. LEE:  Your Honor, I think it's substantive evidence.

 9  The jury should be able to take it back to the jury room.

10          THE COURT:  That's not the way impeachment exhibits

11  work, Mr. Lee.  It means that you can impeach with it, but it

12  doesn't come in as an exhibit.

13          MR. LEE:  Will we have an opportunity -- Well, thank

14  you, Your Honor.  That's fine.

15          THE COURT:  All right.  Let's bring them back in,

16  please.

17      (The following occurred in the presence of the jury.)

18          THE COURT:  All right.  Ladies and gentlemen, we're back

19  again.

20      Mr. Lee, you may continue.

21          MR. LEE:  Thank you, Your Honor.

22                      CROSS-EXAMINATION

23  BY MR. LEE:

24  Q   Ms. Mihalik, you just testified that IBM takes discrimination

25  very seriously, didn't you?

 1              THE COURT:  You need to unmute, please.

 2              THE WITNESS:  Sorry.  It automatically muted me.

 3    A    Sorry, Mr. Lee.

 4    Q    That's all right.

 5         Ms. Mihalik, you just testified that IBM takes discrimination

 6    very seriously, didn't you?

 7    A    Yes, I did.

 8    Q    All types of discrimination?

 9    A    Yes.

10    Q    And no matter what?

11    A    Yes.

12    Q    Would you consider IBM to be very progressive in that

13    respect?

14    A    Yes, I would consider IBM to be progressive.

15    Q    Has IBM discriminated against people before?

16    A    IBM does not discriminate.

17    Q    Well, Ms. Mihalik, are you aware that IBM has currently been

18    accused of age discrimination?  Are you aware of that?

19    A    Yes, I am aware of that.

20    Q    And are you aware that the EEOC, the government agency, the

21    Equal Employment Opportunity Commission, concluded that IBM had

22    discriminated against people based on their age?  Are you aware

23    of that?

24    A    I am not aware of that.  But the EEOC is also an entity

25    which, on their public website today, touts IBM as an example of

 1  having a very robust affirmative action plan.

 2  Q   Well, let's see what the EEOC said.  Could you please look at

 3  Exhibit 41?

 4  A   In whose -- I'm sorry.  I have three binders and a FedEX

 5  package.

 6  Q   You can look on the screen if you would like.

 7      This says "A determination by the United States Equal

 8  Employment Opportunity Commission"; isn't that right?

 9  A   That is correct.

10  Q   And it is sent to IBM Corporation; isn't that right?

11  A   That is correct.

12  Q   And down here, it says, the charging parties, they had

13  alleged age discrimination, hadn't they?

14  A   That is an allegation, yes.

15  Q   That was an allegation.  It might not be true, right?

16  A   Correct.

17  Q   Okay.  And they also allege other types of discrimination,

18  based on national origin, sex, race, retaliation, and disability,

19  right?

20  A   Yes, that is an allegation you're showing me.

21  Q   Yeah.

22      And do you know what happened with that?

23  A   I do not.

24  Q   Well, it made -- the EEOC made a final determination.  And do

25  you know what they determined?

 1    A    No, I do not.

 2    Q    They determined that IBM's defense "does not withstand

 3    scrutiny."  Do you see that?  "Does not withstand scrutiny."  And

 4    the Commission has determined that there is reasonable cause to

 5    believe that respondent, IBM, discriminated against the charging

 6    parties and others on account of their age.  Did you read that?

 7    A    I can read that.  I agree with that, yes.

 8    Q    But prior to your testimony here today, this moment right

 9    now, you didn't know that?

10    A    I -- I did not.

11    Q    And you are a vice president in IBM's human resources and you

12    didn't know that IBM had been determined by a government agency

13    to have discriminated against people; is that right?

14    A    That is correct.

15    Q    And do you see what the EEOC found?  "The investigation

16    uncovered top-down messaging from respondent's highest ranks,

17    directing managers to engage in an aggressive approach to

18    significantly reduce the head count of older workers to make room

19    for early professional hires."  Isn't that what this letter says?

20    A    That is what that letter says, yes.

21    Q    And, again, it says, "The determination is final," doesn't

22    it?

23    A    Yes, those are the words on the page.

24    Q    And you just told our jury that IBM is the type of company

25    that doesn't discriminate, didn't you?

1   A    Yes, I did.  In my experience, we are not a company that

2   discriminates.

3   Q    And now you know that's not true, don't you?

4   A    I do not know that to be true.

5   Q    Well, you know that the Untied States government, the Equal

6   Employment Opportunity Commission, disagrees with you, don't you?

7   A    I understand what this letter says.  And as I've indicated,

8   that same entity, on their public website today, touts IBM's

9   affirmative action plan.

10  Q    Well, and do you know who Russ Mandel is?

11  A    He's a retired IBMer, yes.

12  Q    Well, did you know that Mr. Mandel, who was a Consistency

13  Reviewer in this case, do you know how many times he's been

14  involved in a discrimination investigation at IBM?

15  A    I do not.

16  Q    Well, he had been there for 20 years, right?

17  A    Who?

18  Q    Mr. Mandel.

19  A    I don't know.

20  Q    The IBM --

21  A    Are you asking me if I have been there 20 years, or

22  Mr. Mandel?

23  Q    I'm sorry, Ms. Mihalik.  I'm asking if you knew Mr. Mandel

24  had been working on investigations involving discrimination for

25  20 years at IBM?  Did you know that?

 1   A   I knew that Mr. Mandel was involved in investigations of all

 2   types.  I did not know for how long.

 3   Q   And did you know, in those 20 years, he could not recall a

 4   single instance where he'd concluded that IBM had discriminated

 5   against someone, not once?  Did you know that?

 6   A   I am not aware of that, no.

 7   Q   Does that concern you, Ms. Mihalik?

 8   A   Yes, that would concern me.

 9   Q   Well, let's go back to the SAS deal.  You agree that if the

10   SAS deal was in Nick Donato's territory, the algorithm and

11   numbers calculated a $1.6 million payment, then that's what

12   Mr. Donato should be paid, right?

13   A   I don't know the specific math behind the calculations.  What

14   I can tell you is that incentive is tied to quota and territory,

15   and in this case, the details that I saw would indicate this was

16   neither in his quota or his territory.

17   Q   But if our jury were to disagree with you about that and find

18   that this was in Nick Donato's territory, your testimony is that

19   it's just formula and math after that; whatever payment is

20   calculated is what's calculated, correct?

21   A   I did not testify to that effect.  Those were your words.

22   Q   Okay.  Well, let's go to page 75 and 76 of your deposition,

23   or you can look at the screen.  I asked you, page 16, "If it was

24   in Donato's territory, would you feel differently?"  You said,

25   "If it were in his territory, and the incentive design said

1   that the literal algorithm and numbers said this should be the

2   payment, then, yes, that would have been -- yes, this would be

3   the payment."

4   A    Yes.

5   Q    We continue:  "Because, at that point, it's just the formula

6   and the math.  There's no judgment that comes into that, right?"

7   A    I said it's large -- Yes, I'm reading my words.  It says,

8   "Largely formula and math."

9   Q    Yeah.  Ms. Johnson told you, however, that IBM can't cap

10  individual deals, didn't she?

11  A    We -- I'm sorry.  I'm not understanding your question.

12  Capping deals?

13  Q    Yeah.  That's what Ms. Johnson told you as the commissions

14  expert.  Our jury heard a lot from Ms. Johnson.  She told you

15  that IBM can -- "can" -- cap on individual deals, correct?

16  A    There is -- there is a possibility where it is not in

17  somebody's quota and territory.

18  Q    Okay.  And Ms. Johnston told you that IBM can limit how much

19  a rep gets paid based on contribution, didn't she?

20  A    If it is -- Yes, if it is not in their territory and quota.

21  Q    And you're not aware and no one told you about IBM's primary

22  commissions education that tells managers not to assess

23  contribution for individual quota plans?  You didn't know about

24  that, did you?

25  A    Can you repeat your question?  I'm sorry.

1  Q   Sure.

2      You are not aware, and no one has told you, about IBM's

3  primary commissions education, a PowerPoint, that tells managers

4  not to assess contribution when considering payments on

5  individual quota plans; isn't that correct?

6  A   I do not recall that element being specifically in training

7  documents.

8  Q   Well, our jury knows that very well at this point.  But you

9  would be surprised if that was the case, wouldn't you --

10 A   If --

11 Q   -- if that's what you were told?

12 A   If there was -- I'm sorry.  I would be surprised if there was

13 an adjustment?

14 Q   If there was education that said you can't -- you can't miss

15 a payment on contribution.

16     You said you would be surprised by that at your deposition,

17 didn't you?

18 A   I would be surprised.  Not everything that happens in a

19 training is found in the words in hardcopy documents.

20 Q   Okay.

21 A   It is not a perfectly scripted training where everything in

22 the document is exactly what is said in the training.  There is

23 additional insight that is provided.

24 Q   All right.  Well, you might be more sympathetic to

25 Mr. Kingston if you learned that that was true, that he was

1  trained not to consider contribution; isn't that correct?

2  A   If he was trained not to consider contribution?  I don't know

3  if I would be sympathetic or not.

4  Q   Well, that's what you said in your deposition.  Would you

5  like to see it?

6  A   If that's what you are telling me is in my deposition.

7  Q   Do you agree or disagree?

8  A   I agree.

9  Q   Okay.  You are familiar with the Business Conduct Guidelines,

10  correct?

11  A   Yes, I am.

12  Q   And they require IBM employees to immediately report

13  potential racial discrimination, don't they?

14  A   Yes, they do.

15  Q   And if Dorothy Copeland were to receive a complaint of racial

16  discrimination and she failed to report it, that would violate

17  IBM policy, wouldn't it?

18  A   Yes, it would.

19  Q   And she could be fired for that, couldn't she?

20  A   She could, yes.

21  Q   But she was not fired, was she?

22  A   I don't know.  No claim was brought to me during this period,

23  so I don't know.

24  Q   Ms. Mihalik, I appreciate your time.

25          MR. LEE:  No further questions, Your Honor.

```
 1              THE COURT:  Any redirect?
 2              MR. BARNES:  Yes, Your Honor.  Two quick points.
 3         Could we pull up Exhibit 41?
 4                        REDIRECT EXAMINATION
 5    BY MR. BARNES:
 6    Q    This is a letter from the EEOC that Mr. Lee just discussed
 7    with you, Ms. Mihalik.
 8              MR. BARNES:  If we could go to the bottom paragraph and
 9    call that out, please?
10         One second.  We will pull it back up.
11         There we go.  That works.
12    Q    Ms. Mihalik, you see on the last paragraph here it says,
13    "Respondent denies discriminating against charging parties."  Do
14    you see that?
15    A    Yes, I do.
16    Q    So IBM denied these allegations, right?
17    A    Yes, that is what it says.
18    Q    And IBM continues to deny these allegations, right?
19    A    I would gather so, yes.
20              MR. BARNES:  Now, let's go to the second page of this
21    document, please.  You have it pulled up.  There we go.  The
22    paragraph that says -- the second -- I guess the third full
23    paragraph, "Based on the above, the evidence obtained," can we
24    call that out?
25    Q    Can you see it?
```

1   A    Now, I can, yes.

2   Q    This paragraph says, "Based on the above, the evidence

3   obtained during the investigation was insufficient to establish a

4   violation of Title VII of the Civil Rights Act of 1964, as

5   amended, and Title I of the Americans with Disabilities Act of

6   1990, as amended, based on national origin, sex, race,

7   retaliation, and disability."  Did I read that correctly?

8   A    Yes, you did.

9   Q    So the EEOC specifically found there was insufficient

10  evidence of race discrimination or retaliation here, right?

11  A    That is correct.

12          MR. BARNES:  No further questions.

13          THE COURT:  Anything further, Mr. Lee?

14          MR. LEE:  Very briefly, Your Honor.

15          THE COURT:  Go ahead.

16                    RECROSS-EXAMINATION

17  BY MR. LEE:

18  Q    Ms. Mihalik, the second page here, I want you to look at the

19  last sentence of the first paragraph, starting at "EEOC."  Could

20  you read along with me?

21  A    Yes.

22  Q    This letter says, "The EEOC received corroborating testimony

23  from dozens of witnesses nationwide supporting a discriminatory

24  animus based on age."  Did I read that correctly?

25  A    Yes, you did.

1  Q   And then down here, I showed you this, "This determination is

2  final," but let's look at what part of the resolution was.  It

3  says, "Having determined that there is reason to believe that

4  violations have occurred, the Commission now invites respondent,

5  IBM, to join with it in an effort toward a just resolution of

6  this matter."  Did I read that correctly?

7  A   Yes, you did.

8  Q   And now I know this is super small, but I'm going to give it

9  a shot, the date there, it looks like it was signed by the New

10  York District Office Director on September 3rd, 2020.  Is that

11  what that looks like to you?

12  A   Yes.

13  Q   And as you sit here today, that was months ago, and you had

14  no idea that this had even happened, did you?

15  A   No.  This is not in my area of responsibility.

16  Q   Ms. Mihalik, IBM is all talk, isn't it?

17  A   I disagree with you.

18         MR. LEE:  I have no further questions, Your Honor.

19         THE COURT:  All right.  Ladies and gentlemen, do you

20  have any questions for our witness?  If so, would you put them

21  into the chat, please.

22     All right.  I'm going to excuse you -- Any more questions

23  coming in?

24     Juror No. 8, I have a question here that I don't know if it

25  went to this witness or the previous witness.

 1          JUROR NO. 8:  No, Your Honor.  It was for the last

 2    witness.

 3          THE COURT:  Okay.  Well, I'm sorry I did not pick that

 4    up.  I'm going to excuse you all to the jury room, please.

 5          JUROR NO. 8:  Okay.

 6      (The following occurred outside the presence of the jury.)

 7          THE COURT:  Counsel, it's just come to my attention

 8    that, from the last witness, Juror No. 8 basically said, "A few

 9    more questions," but then it didn't show up on my screen, and so

10    that's why I asked him the question.

11       I'm going to read to you the questions.  We no longer have

12    the witness with us to ask, but you may want to hear what the

13    questions are.

14       Number 1, it says:  Other than the disclaimer in the sales

15    plan, are there any other written policies that clearly discuss

16    adjustments on commissions?

17       Number 2:  With a deal as large as Mr. Beard's, why didn't

18    upper management discuss the details with all line managers,

19    including the adjustment of commissions as you've described to

20    us?

21       And No. 3:  Why do you feel the Donato commission situation

22    was worthy of the termination rather than less severe discipline

23    for Mr. Kingston?

24       And No. 4:  Other than monetary awards, what things does IBM

25    do to show their loyalty to long-term employees?

1        Now for this witness, the question is:  Why is there no

2   representative from the department in question on the DARC panel?

3        Two:  If there is always the same three departments on the

4   panel, is it always the same people or do they rotate?

5        The next question:  Why did the review board hold three

6   meetings?  What additional information did you seek and from

7   whom?

8        The next question:  How often does a review board challenge a

9   recommendation for termination?

10       The next question:  Did you only look at the investigation of

11   Jeff Larkin as evidence?

12       Okay.  Any problems with those questions?

13             MR. LEE:  Not from us, Your Honor.

14             MR. BARNES:  No objections, Your Honor.

15             THE COURT:  All right.  Then let's bring them back.

16             THE CLERK:  It looks like the witness just disconnected.

17             THE COURT:  All right.  Let's get her back.

18             MR. BARNES:  It seems to be happening with a number of

19   people.

20        (The following occurred in the presence of the jury.)

21             THE COURT:  Ladies and gentlemen, we lost our connection

22   with the witness, so we're waiting for her to come back.

23        All right.  There's our witness back.  The jury has a few

24   questions for you.

25             THE WITNESS:  Okay.

 1                          EXAMINATION

 2   BY THE COURT:

 3   Q   Why is there no representative from the department in

 4   question on the DARC panel?

 5   A   So the review committee is at the tail end of the review

 6   process, which means that for prior individuals who reviewed this

 7   case, they may or may not have interviewed managers' management.

 8   But the review committee is ultimately the three roles that I

 9   talked about, to make sure that we look at it from a fiscal, a

10   legal, and an HR perspective.

11   Q   If there is always the same three departments on the panel,

12   is it always the same people, or do they rotate?

13   A   I'll answer specific to the United States.  So there are

14   different review committees.  It is always the same three roles.

15   It depends on who is occupying the role at the time.  So I am

16   not, as an example, on it in perpetuity.

17   Q   Why did the review board hold three meetings?

18   A   So the first meeting is to understand -- So what happens is

19   there's an HR representative who brings the case and the facts

20   and the details to the review committee.  It is our opportunity

21   to ask questions, to seek additional information, if we think

22   it's appropriate.  It's also an opportunity, generally, to

23   interview the investigator, where appropriate.

24       In this instance, we sought additional information.  We then

25   needed to reconvene regarding that additional information, and

1    then we needed to think about the conversation and the

2    information and what our recommendation was, including did we

3    uphold the recommendation brought to us.

4    Q    What additional information did you seek and from whom?

5    A    So there was an attorney present.  But I can tell you that,

6    as an example, I wanted to understand if the manager in question

7    was an experienced manager, were they new to the sales management

8    position, or were they experienced and, therefore, had been

9    managing employees who sold for some period of time and,

10   therefore, they understood at some level how we manage quota and

11   territory and its impact on incentive.

12   Q    How often does a review board challenge a recommendation for

13   termination?

14   A    Not all -- So not all recommendations that come to the board

15   are for termination.  So what comes to the board is

16   recommendations for disciplinary action.  Sometimes that

17   discipline involves termination.  I would say, in my personal

18   experience, approximately 5 percent of the time we will challenge

19   some element of the recommended disciplinary action.  And

20   "challenge" may include changing it based on what others brought

21   to us.

22   Q    Clarification.  Is that 5 percent of all recommendations, or

23   5 percent of the termination recommendations?

24   A    Five percent of all recommendations.

25   Q    Did you only look at the investigation of Jeff Larkin as

1   evidence?

2   A    No, we did not.

3   Q    I'm not sure that you understood the question.  What else --

4   If you didn't limit yourself to the Larkin investigation, what

5   else did you look at?

6   A    So as I indicated, as an example, I wanted to know the tenure

7   of the manager in question, how long had they been a sales

8   manager, I wanted to understand what additional information might

9   have been shown to other members of the management team.

10  Q    The second part of that question is:  Who did you seek the

11  information from?

12  A    So the way that it works is that we ask the individuals who

13  are presenting the details to us to help solicit that information

14  and feedback.  That included going back to HR records to

15  understand how long someone has been a manager, it also included

16  needing to go back to the incentives team to understand some

17  additional information.  So that would have been Karla Johnson.

18  Q    And is that the only additional information that the panel

19  sought?

20  A    To my recollection, those were the primary.  So there was

21  information -- So we asked, as part of incentives, trying to

22  understand was something in someone 's territory and quota or

23  not, what exact kind of information did the upline management see

24  related to potential payments.  And so I would say that's it.

25  And then information about management duration.

1    Q    Again, who did you seek this information from?

2    A    So we worked through Linda Kenny and Karla -- and,

3    ultimately, Karla Johnson to get additional information.  So

4    Linda for the employment information, Karla Johnson for the

5    incentive details, as well as trying to determine what kind of

6    alerts for information are given to upline managers about, in

7    this example, the commissions that might have been paid.

8              THE COURT:  Any questions based upon those questions,

9    counsel?

10             MR. BARNES:  I have one, Your Honor.

11                       REDIRECT EXAMINATION

12   BY MR. BARNES:

13   Q    Ms. Mihalik, why did you want to know about the length of

14   tenure of the managers involved in this investigation, including

15   Mr. Kingston?

16   A    I wanted to understand if they were brand new sales managers

17   who may not have had the opportunity to go through, as an

18   example, the myriad of training that we put managers through, and

19   would that weigh differently on what type of disciplinary action

20   we should take.  I wanted to -- So that's the primary thing that

21   I was trying to understand.  As an experienced -- if they were an

22   experienced sales manager, then I would expect that they have had

23   at least one cycle of opportunity.

24        In this case, this was a sales manager who had been a people

25   manager of sellers for some period of time and would have had

 1  multiple opportunities to receive education and, more

 2  importantly, to have been responsible for managing the territory

 3  and quota of people under their management.

 4          MR. BARNES:  Thank you.

 5          MR. LEE:  I have one question, Your Honor.

 6          THE COURT:  Go ahead.

 7                          RECROSS-EXAMINATION

 8  BY MR. LEE:

 9  Q   Ms. Mihalik, can you admit that when the DARC met on April

10  4th, 2018, you discussed and considered the commissions paid on

11  the HCL deal?

12  A   I can admit no such thing.

13  Q   I thought so.  That's fine.

14          THE COURT:  All right.  Thank you very much.  You may be

15  excused.

16      And our next witness, please.

17          MR. TAYLOR:  Your Honor, the defense calls Dorothy

18  Copeland.

19          THE COURT:  Ms. Copeland, would you please unmute

20  yourself?

21          THE WITNESS:  Can you hear me?

22          THE COURT:  Yes, I can hear you.

23      Ms. Copeland, I'm Judge Pechman.  Can you see me?

24          THE WITNESS:  Yes.

25          THE COURT:  And can you hear me clearly?

 1          THE WITNESS:  Yes, I can hear you clearly.

 2          THE COURT:  Would you please raise your right hand to be

 3   sworn?

 4                       DOROTHY COPELAND,

 5       having been sworn under oath, testified as follows:

 6          THE COURT:  Go ahead, Mr. Taylor.

 7          MR. TAYLOR:  Thank you, Your Honor.

 8                       DIRECT EXAMINATION

 9   BY MR. TAYLOR:

10   Q   Good afternoon, Ms. Copeland.

11   A   Good afternoon.

12   Q   In 2018, you worked for IBM?

13   A   Yes, I did.

14   Q   Do you still work for IBM?

15   A   No, I don't.

16   Q   Did you change jobs?

17   A   Yes, I did.

18   Q   All right.  What do you do now, briefly?

19   A   I lead the partner ecosystem for a company called Stripe.

20   Q   We will leave it at that.

21       In January -- I want to take you back to January of 2018.

22   When you were working at IBM, what did you do?  What was your

23   job?

24   A   I lead the North America partner agent system at IBM.

25   Q   In English, what does that mean?

1    A    That means working with other companies that are providing

2    the IBM technology to their customers, something like Accenture,

3    Deloitte, small integrators, software companies.

4         So third parties that are providing full solutions to their

5    customers with IBM technology.

6    Q    And reporting-wise, what was your relation with Mr. Kingston,

7    Scott Kingston?

8    A    Scott Kingston and his team were transferred over to me early

9    that year in a reorganization at IBM.

10   Q    In January of 2018, right around the time of the

11   reorganization, did you talk with Mr. Kingston about Jerome

12   Beard's commission payments?

13   A    Yes.  He talked with me about that in relation to --

14   Q    What do you mean?

15   A    In relation to another compensation, kind of a complicated

16   compensation situation.

17   Q    What did he say?

18   A    He was updating me on the organization and told me that there

19   were two complicated commission payments related to large

20   opportunities that his team had closed for IBM.

21   Q    Did one of them relate to Jerome Beard?

22   A    Yes.

23   Q    What did he say about Mr. Beard?

24   A    He said that -- he said that -- which it was related to the

25   other one.  There was one that included someone named Nick Donato

1   that was very complicated that was involving an IBM

2   investigation, which he told me about.  And then he told me there

3   was a second complicated commission situation with someone named

4   Jerome Beard, who was also on his team, and it was related to a

5   different -- a different agreement that IBM had put together with

6   a customer.

7   Q   Did he say anything about Mr. Beard's race?

8   A   In that conversation, he talked about the issues with the

9   first example I brought up, with Nick, and said that there was an

10  investigation going on.  And then he brought up, in the second

11  one, he brought up the fact that there was also -- the commission

12  team at IBM was looking at the compensation for Jerome Beard and

13  he made a very offhanded comment saying, and, "Oh, by the way,

14  Jerome Beard is African American."  And I had not met his team

15  yet because they had transferred over to me.

16  Q   Did Mr. Kingston say that he thought race had anything to do

17  with the review of Mr. Beard's commissions?

18  A   He -- No.  It was a very off -- kind of an offhanded comment.

19  And it was the only time I ever heard him talk about race.

20  Q   Did Scott Kingston tell you that he thought Mr. Beard was

21  being discriminated against?

22  A   He did not.

23  Q   If he had, would you have done something about that?

24  A   Yes, absolutely.

25  Q   What would you have done?

 1  A    I would have talked to HR about it, as well as my manager.

 2  Q    Well, given that he said that Mr. Beard is black, why didn't

 3  you take that up with HR?

 4  A    It was a very offhanded comment and it didn't have anything

 5  to do with the complex compensation situation that we were

 6  dealing with in both of these cases.

 7  Q    Did you and Mr. Kingston ever discuss Mr. Donato?

 8  A    We did, in that same conversation, yes.

 9  Q    Did Mr. Kingston ever tell you Nick Donato resigned?

10  A    Yes, he did.

11  Q    What did he say?

12  A    It was in that same conversation, actually.  When Scott told

13  me about the investigation, he said, "Due to the investigation

14  that the IBM sales commission organization was conducting on the

15  commission that was paid to Nick, Nick resigned because of that."

16          MR. TAYLOR:  Nothing further.  Thank you.

17          THE COURT:  Mr. Marshall.

18          MR. MARSHALL:  Thank you, Your Honor.

19                        CROSS-EXAMINATION

20  BY MR. MARSHALL:

21  Q    Good morning, Ms. -- or good afternoon, Ms. Copeland.  My

22  name is Toby Marshall.  I'm one of the attorneys representing

23  Scott Kingston.

24       That conversation that you had with Scott, that was in very

25  early January of 2018, correct?

 1  A    Yes.

 2  Q    The conversation was, in part, a transition from Dave

 3  Mitchell to you as you were taking over the team, correct?

 4  A    Yes, correct.

 5  Q    Dave Mitchell was on the phone?

 6  A    No.  This was a one-on-one conversation with Scott.

 7  Q    And on what date was it in January?

 8  A    I don't recall the exact date.

 9  Q    You just recall that it was early January?

10  A    I recall that it was in January.

11  Q    When you talked with Scott, he did not know there was an

12  investigation at that time into Nick Donato, did he?

13  A    No, that's not true.  Scott told me there was an

14  investigation into Nick Donato at the time that we had the

15  conversation.

16  Q    Okay.  I'm going to show you what's been marked as Exhibit 74

17  here.

18         MR. MITCHELL:  Can we get the ELMO pulled up, please?

19  Q    I just want to see if this helps refresh your recollection as

20  to the time frame.  This is --

21  A    Hang on.  Can you put that in presentation mode?  That's

22  like -- It's really small.  Is that possible?

23         MR. MARSHALL:  Can you just call up 74?  Okay.  Can you

24  pull up the bottom half, please?

25         Thank you.

 1   Q   Is that better, Ms. Copeland?

 2   A   It's -- You know what?  It's actually showing up as this

 3   little tiny square on my screen.  If there is a -- Is it possible

 4   to show it as a presentation mode on like share-screen mode.  If

 5   you go down below in Zoom, there's a little up arrow, that says

 6   "share screen."  Is that possible?  Oh, that's -- Yeah, exact --

 7   oh, that's better.  Perfect.  Thank you.

 8   Q   Yeah, you're welcome.

 9       So here it is, January 5th of 2018 -- can you scroll up just

10   slightly, please, Ms. Nuss -- Scott Kingston sends an e-mail to

11   Dave Mitchell, Rose Nunez, and you, correct?

12   A   Correct.

13   Q   He's talking about a sensitive issue, right?  It's right

14   there on the first line?

15   A   Yes.

16   Q   And that sensitive issue is that Jerome Beard is quite

17   unhappy with the way he's being treated for the third-quarter HCL

18   deal and his commission payment on that, right?

19   A   Yes, correct.

20   Q   And if you scroll up, Dave Mitchell says, let's get on the

21   phone to discuss this, the following day, January 6th, right?

22   A   Yes, it says that.

23   Q   And you did get on the phone with Dave Mitchell and Rose

24   Nunez and Scott Kingston, and you talked about IBM's unfair

25   treatment of Jerome Beard, correct?

1    A    That -- The way you asked that question is not what we talked

2    about.  My memory is we got on the phone.  We also talked with

3    the IBM compensation organization and talked about the way that

4    IBM sets commissions.  So I don't remember the particular -- if

5    there -- this particular conversation happened.  The conversation

6    I remember was with Dave Mitchell and the compensation team at

7    IBM.

8    Q    I'm sorry.

9    A    So the conversation I had with Scott was one on one, the one

10   that I referred to earlier.  It wasn't what you are referring to

11   here.

12   Q    No.  I understand that Scott probably talked with you several

13   times about this.

14         But let's get clear that while you may have discussed other

15   things, this was a specific request by Mr. Mitchell to get on the

16   phone with you and Scott to discuss the treatment of Jerome

17   Beard.  And this is early January of 2018, right?

18   A    Yes, this e-mail is early January of 2018.

19   Q    And so you remember the one call, but you don't remember the

20   other call and the specifics of it, is that --

21   A    I don't remember the -- I don't remember whether there was or

22   was not a call the following day.

23   Q    Okay.  And so you don't remember whether there was or was not

24   a discussion of race discrimination against Mr. Beard; is that

25   correct?

 1    A    No, that's not correct.

 2    Q    So you can remember some things, but you can't remember

 3    others; is that what your testimony is?

 4    A    No, that's not my -- My testimony is we're talking about

 5    three years ago, so I don't -- You probably don't remember

 6    exactly what you did on a particular date three years ago either.

 7         My testimony is that I only heard Scott talk about race the

 8    one time in a really offhanded way, and then, "Oh, by the way,

 9    Jerome is African American."  That's my testimony.

10    Q    And that, "Oh, by the way, Jerome is African American," that

11    came with, oh, by the way, I have concerns about IBM's treatment

12    of Jerome Beard's commission on the HCL deal; is that correct?

13    A    He -- Scott had concerns about both situations.

14    Q    Right.

15    A    He was updating me on both situations, both the Nick Donato

16    as well as the Jerome Beard situation.

17    Q    Sure.  Ms. Copeland, you have made that clear.  So I only

18    have a couple of minutes to ask you questions, so if I can get

19    you to just focus on my questions, I would appreciate it.

20         So I just want to be clear, it seems you agree Scott said to

21    you, "I have concerns about the way that IBM is treating Jerome

22    Beard," correct?

23    A    He said that in the e-mail, but he did not say that in the

24    phone call I had with him.

25    Q    Will you pull up her deposition transcript, please?  This is

```
 1    going to be at page 53.
 2            THE COURT:  Mr. Marshall, we need to find a place for
 3    our afternoon recess.  So when you get to a point to stop, would
 4    you please let me know?
 5            MR. MARSHALL:  Yes, Your Honor.  I think now is a good
 6    time because that will give us a chance to pull up the testimony
 7    while the jurors are on their break.
 8            THE COURT:  All right.  We are going to be at recess for
 9    15 minutes.
10      (The following occurred outside the presence of the jury.)
11            THE COURT:  All right.  Anything else we need to take
12    care of before we recess?
13            MR. MARSHALL:  No --
14            MR. TAYLOR:  Your Honor, I -- Go ahead, Toby.
15            MR. MARSHALL:  I was going to say "Not here."  So please
16    go ahead, Mr. Taylor.
17            MR. TAYLOR:  Thank you.
18      Your Honor, I expect that there is probably five minutes or
19    less of Ms. Copeland at this point, and our next witness we
20    intend to call is Ms. Johnson.  But before we do that, we
21    obviously have to convince you that we are entitled to do that.
22    So we could do that now, or we could do it at the end of the
23    break, or whatever suits you.
24            THE COURT:  All right.  Let's try that now then.
25            MR. TAYLOR:  Okay.  We want to bring her on on two
```

1    limited points.  The first is that Mr. Kingston testified, on

2    direct examination, that the significant transaction clause does

3    not apply to Mr. Beard's plan.  He said it was boilerplate.  It

4    didn't apply.  That was the first time in the history of this

5    lawsuit he had taken that position.  And, of course, while the

6    events were occurring -- while the events were occurring, he told

7    Mr. Beard that it did apply.  Ms. Johnson will rebut the

8    contention, the new contention by Mr. Kingston, that the

9    significant transaction clause did not apply.

10        Second, Mr. Kingston said, on direct examination, that he had

11   to add the customer, SAS, after the deal closed because there was

12   no customer number.  Ms. Johnson will establish that there was

13   indeed a customer number that he could have used.

14        That was new information.  We did not have a chance to

15   address it with her in -- either of these issues in her direct

16   examination when we put her on.  We believe we're entitled to now

17   call her in our case to rebut this new information -- or to

18   address this new information.

19            THE COURT:  Any response, Mr. Lee?

20            MR. LEE:  Absolutely, Your Honor.  And I -- I don't -- I

21   feel like there's been, like, so much history in this case

22   because the Beard case came before.  And, of course, I think it's

23   a lot to catch up on for Mr. Taylor, so I don't slight him at all

24   for this and I know it was just a mistake.

25        But Mr. Kingston was clear in his Beard deposition.  You

1  know, Mr. Barnes asked him questions, and he testified about his

2  conclusion that the significant transaction provision does not

3  apply because it talks about contribution and contribution is not

4  a part of the plan.  And then he pointed out the pool language

5  above it, and, like, obviously, that doesn't apply to an IQP.

6      This has been an issue that's gone back and forth in

7  deposition probably -- I took all the depositions on our side --

8  and so I mean, I think at least half of them have asked witnesses

9  that same thing.  It is not new.  It's the furthest thing from

10  new.  And Mr. Kingston testified about it in the Beard

11  deposition.  So that falls flat.

12      I feel the same way about adding the customer numbers.

13  That's something that's been an issue since 2019, when we started

14  taking depos and doing discovery.  I'm kind of at a loss.

15  Ms. Johnson was on the stand here for almost two days.  I don't

16  have any interest in asking her any more questions, just to be

17  clear.

18          THE COURT:  Mr. Lee, over the break, can you show

19  Mr. Taylor the reference that you're talking about?

20          MR. LEE:  I would be glad to.

21          THE COURT:  Actually, there should be two different

22  references if you are telling me that the issue concerning the

23  number came up previously as well.

24          MR. LEE:  We will do our best to find it.

25          MR. TAYLOR:  Your Honor, I can point him to page 67

1  where Mr. Kingston testified the clause does apply when he was

2  testifying in the Beard transaction.  I'm new to this case, no

3  doubt about it, but I have read these transcripts.

4          THE COURT:  Well --

5          MR. TAYLOR:  Page 67.

6          THE COURT:  -- Mr. Taylor, why don't you give Mr. Lee an

7  opportunity to show you.  I thought that was your point, is that

8  there were two different -- first, there was testimony that it

9  didn't apply and then there was testimony that it did.

10     So the issue is, is that something that is new, or is that

11  something that everybody knew when Ms. Johnson was on the stand.

12     So let's take a look at that, and we will have some further

13  discussion about it.

14          MR. TAYLOR:  Thank you, Your Honor.

15          THE COURT:  Okay.

16          MR. LEE:  Thank you, Your Honor.

17          THE COURT:  We will be at recess for 15 minutes.

18          MR. LEE:  All right.

19                    (Recessed.)

20          THE COURT:  All right.  Counsel, have any of those

21  issues been worked out?

22          MR. LEE:  You are muted, Mr. Taylor.

23          THE COURT:  I'm sorry, Mr. Taylor.  You are muted.

24          MR. TAYLOR:  I received nothing from Mr. Lee pointing

25  out the testimony he was referring to.

 1            MR. LEE:  You know, Mr. Taylor actually helped me.  We

 2    have got it here.  It's just on page 66.  Mr. Taylor pointed you

 3    to page 67.  If we could go on the ELMO?  I mean, this is what

 4    he's talking about.  "The plan precludes the meaning and use of

 5    the review of a specific transaction in the quota letter.  That's

 6    referring to people on a different kind of plan."  It goes on.

 7    But, I mean, it's clearly discussed.  And that's all Mr. Kingston

 8    said in his testimony.

 9            MR. TAYLOR:  That's not true.  Please show page 67,

10    line 6.

11            MR. LEE:  Sure, sure, sure.

12            MR. TAYLOR:  "So are you saying the review of a specific

13    transaction provision in Jerome Beard's IPL didn't apply to him

14    at all, under any circumstance?"  Mr. Kingston said, "No.  It

15    does apply."

16            MR. LEE:  Well, that might have been good on

17    Mr. Taylor's cross, but that door is closed.  What he's trying to

18    say is -- It's not new information.

19            MR. TAYLOR:  Your Honor, we did not know at the time we

20    put Ms. Kingston -- Ms. Johnson on the stand when we were -- when

21    we were cross-examining her, in further cross, we did not know

22    that later in the trial Mr. Kingston would take a position

23    contrary to what he said in the deposition.  It was new

24    information.  We didn't have a chance to address it.

25            THE COURT:  Would you put up the transcripts again for

 1    me?  You need to share it so I can see it.

 2              MR. LEE.  Oh.  Jodi, would you mind?

 3              THE COURT:  And this transcript is from Mr. Kingston's

 4    Beard deposition, or Mr. Kingston's Kingston deposition?

 5              MR. LEE:  This is from his Beard deposition.  But, you

 6    know, we have been trying to scramble to do word searches on

 7    these, and my memory is that it was also in the Kingston, but I

 8    can't swear to that right now before you, Your Honor.

 9              THE COURT:  All right.  Give me a moment, please.

10          I can't see what the question is.

11              MR. MARSHALL:  There you go.

12              THE COURT:  Okay.  Scroll it up.  Scroll it up, again.

13              MR. LEE:  Change pages here.

14              THE COURT:  Okay.  That's what he testified to in the

15    Beard case?

16              MR. TAYLOR:  Yes.

17              MR. LEE:  Right, Your Honor.

18              THE COURT:  All right.  So, again, Mr. Taylor show me

19    what you wanted to show me.

20              MR. TAYLOR:  Well, it was on the screen there, page 67,

21    line 6.

22              THE COURT:  Okay.

23              MR. TAYLOR:  So the question was, "Are you saying the

24    review of a specific transaction provision in Jerome Beard's

25    ... didn't apply to him under any circumstances?"  Mr. Kingston

1    said, "No.  It does apply."

2         THE COURT:  I am not understanding how this is different

3    from what he testified to in his case.

4         MR. TAYLOR:  You mean, on the stand, on direct

5    examination?

6         THE COURT:  Yeah.  When Mr. Kingston was on the stand,

7    I'm not understanding how this is somehow different, that you

8    were surprised.

9         MR. TAYLOR:  Mr. Kingston on the stand said the specific

10   transaction clause does not apply to Mr. Beard.  In the Beard

11   case, he says it does apply.

12        THE COURT:  That's not the way I read this.

13        MR. LEE:  Your Honor, have you seen what I have just put

14   on the ELMO?

15        THE COURT:  Yes, I see what you say.

16        MR. LEE:  It's dead on point.  Mr. Taylor is just wrong,

17   respectfully.

18        THE COURT:  Counsel, this is what I would like to do.

19   You know, maybe I'm not understanding Mr. Taylor's point because

20   I'm trying to read off the screen here.  But we're not going to

21   decide this at this moment.  We're going to finish up with the

22   witness that we have got.

23       Can you e-mail me the portions of the depositions that you

24   want me to take a look at?  And if there is a reference to the

25   transcript that I could look back on as to when it is you think

 1  that Mr. Kingston testified differently, I will take a look at

 2  it.  But I can't understand the point because what I'm reading

 3  here appears to me to be the same as what I understood

 4  Mr. Kingston to testify to in this case.

 5          MR. TAYLOR:  Can you e-mail page 67 of the Beard

 6  Kingston deposition to the Court, please?

 7          THE COURT:  Okay.  If you would send those to

 8  Mr. Mensher.  We need to get our jury back out here and finish up

 9  with the witness.

10      I'm sorry, Mr. Taylor.  You need to give me some time to

11  study this more carefully.

12          MR. TAYLOR:  Understood.  Thank you.

13          THE COURT:  All right.  Let's bring in our jurors.

14      (The following occurred in the presence of the jury.)

15          THE CLERK:  Your Honor, everybody has returned.

16          THE COURT:  All right.  Mr. Marshall, you may continue.

17          MR. MARSHALL:  Thank you very much, Your Honor.

18  Q   (By Mr. Marshall:)  Ms. Copeland, I'm going to try to make

19  this easy and relatively quick.  Would you agree with me that at

20  some point Scott Kingston told you he had concerns about IBM's

21  treatment of Jerome Beard's commission?

22  A   He told me he had concerns there was inconsistency between

23  Nick and Jerome, yes.

24  Q   Right.  Right.

25      And he told you that Jerome was African American and Nick was

1    white, right?

2    A   He never told me that -- I don't recall hearing that Nick was

3    white.  It was just one offhanded comment that Scott made to me

4    about, in the first conversation that we had, about Jerome Beard

5    being African American, kind of in an offhanded way.

6    Q   You know what discrimination is, don't you?

7    A   Yes, I do.

8    Q   And you knew what it was in early 2018, right?

9    A   Yes, I did.

10   Q   Do you understand that discrimination is rooted in unfair and

11   inconsistent treatment?

12   A   Yes, I do.

13   Q   Okay.  And you knew that IBM's Business Conduct Guidelines

14   required you to speak up if you saw discrimination, right?

15   A   Correct.

16   Q   And the guidelines required you to speak up even if you saw

17   potential discrimination, right?

18   A   Yes.

19   Q   Even if you suspected it, maybe you don't agree that it's

20   discrimination, but even if you suspected it, you were supposed

21   to speak up, right?

22   A   Yes.

23   Q   And discrimination, that's a violation of the guidelines that

24   IBM operates under, right?

25   A   Yes, of course.

1    Q    And it's actually unlawful, right?  There are laws that

2    prohibit discrimination?

3    A    Yes.  Correct.

4    Q    So discrimination must be reported, but you did not report

5    the concerns that Scott raised to you, correct?

6    A    Scott did not raise concerns that there was -- specific

7    concerns that there was discrimination.

8    Q    Why don't we put it this way:  You did not report anything

9    regarding Jerome Beard and discrimination, correct?

10   A    Scott, in an offhanded way, said to me, because I didn't know

11   the team, "Here are all of these really complex situations

12   between Nick -- between -- with Jerome, and, oh, by the way,

13   Scott happens to be African American."  And it was in one

14   conversation.  And he did not say -- Scott did not say there was

15   discrimination -- that he thought there was discrimination.

16   There was no time in which Scott ever told me that he thought

17   discrimination was happening.

18   Q    Right.

19        And my question to you is, let's set aside Scott for a

20   moment, you never reported anything about discrimination and

21   Jerome Beard; is that correct?

22   A    No.  Because there was no discrimination with Jerome Beard.

23   Q    Okay.  Now, you were involved in the firing of Scott,

24   correct?

25   A    It was a dismissal of Scott from working at IBM.

1    Q    You don't like the word "firing"?

2    A    Those were not the words that we used.

3    Q    Okay.  Is there a distinction between "dismissal" and

4    "firing"?

5    A    I don't know.  We -- we -- we -- Scott -- And this was

6    related to the handling of the Nick Donato commission situation.

7    Q    Okay.

8    A    And the investigation that occurred.

9    Q    You're the one that delivered the news to Scott Kingston on

10   April 16th that he was being dismissed, right?

11   A    Yes.  Correct.

12   Q    And when you dismissed Scott, you were not familiar with the

13   IQP commission plan, that's the individual quota plan that was in

14   place for the ESA team in the second half of 2017; is that

15   correct?

16   A    I was familiar with -- I myself was on that plan, but I was

17   familiar enough with it based on the investigation that had

18   occurred related to the Nick Donato case.

19   Q    You did not know whether contribution played a part in

20   determining commissions, correct?

21   A    Whether contribution played a part in commissions?  I don't

22   recall.  I don't recall whether -- what -- Can you give me more

23   specifics about what you are asking?

24   Q    Sure.

25        You were deposed in a lawsuit related to Jerome Beard,

1    correct?

2    A    Yes.

3    Q    And I believe it was Matt Lee that asked you questions?

4    A    Yes.  Correct.

5    Q    And your testimony was given under oath, correct?

6    A    Yes.

7    Q    And it was taken down by a court reporter, right?

8    A    Correct.  Yes.

9    Q    Would it help you to look at that?

10   A    Sure.

11   Q    Okay.  Can we pull up page 11 from the Beard deposition,

12   please?  And let's go ahead and try and put it on the screen

13   share if we can.  Thank you.

14       Okay.  So you were asked, "Would it be fair to say that you

15   were not familiar with how commissions were paid under IBM's

16   commission plan as its relates to IQPs for the second half of

17   2017?"  What was your answer to that?

18   A    My answer was it -- is "Correct."

19   Q    Okay.  And if we scroll down a little bit, another question

20   that was posed to you was, "Whether or not you know if

21   contribution was a part of the process for IQPs in the second

22   half of 2017?"  You said, "I don't understand what you mean by

23   'contribution,'" right?

24   A    Yes, that is what I said.

25   Q    So Mr. Lee went on to say, "Whether a sales representative's

1   contribution was a part of determining their commissions?"  What

2   was your answer?

3   A   I wasn't sure.  I -- My answer says, "I don't know exactly."

4   Q   Okay.  You also were not familiar with the high-achievement

5   review process that the SAS commission payment had gone through

6   at the time that you dismissed Scott Kingston, correct?

7   A   I was familiar with what the -- I was familiar with the

8   investigation and the reasons for the dismissal.

9   Q   No.  I understand.  My question was:  You were not familiar

10  with the high-achievement review process that applied to the SAS

11  commission payment when you dismissed Scott Kingston, right?

12  A   I don't recall.

13  Q   Would you like to see some more deposition testimony, or do

14  you want to just agree with me on that?

15  A   I would like to see more deposition testimony.

16  Q   Okay.  Can we pull up the Kingston deposition, page 110,

17  please?  This is going to be lines 8 through 16.

18      So you were asked, here at line 8, can you see that?  "Were

19  you aware that there was a high-achievement review conducted on

20  that transaction?"  You said you were not, right?

21  A   Yes, that's correct.  That is what it says, yep.

22  Q   You were also asked, "But if you found that there had been a

23  high-achievement review performed on that transaction, would that

24  change your opinion about their performance?"  And your answer

25  was, "I suppose so."  Is that correct?

 1   A    That is what it says, correct.

 2   Q    Okay.  You were hired by IBM in the spring of 2017; is that

 3   correct?

 4   A    Yes, May of 2017.

 5   Q    You came over from Amazon; is that right?

 6   A    Yes.  Correct.

 7   Q    Here in my hometown?

 8   A    Yes.

 9   Q    You actually moved your family from Seattle to New York; is

10   that right?

11   A    Correct.  Yes.

12   Q    And you received a signing bonus when you were hired; is that

13   correct?

14   A    Yes, that is correct.

15   Q    It was a large signing bonus, wasn't it?

16   A    I don't understand what that has to do with this -- with this

17   court case.

18   Q    Was it a large signing bonus?

19   A    I don't -- I don't feel comfortable talking about my

20   compensation.

21   Q    Well, let me ask you this:  Were there some conditions on

22   that signing bonus?  For example, did IBM --

23   A    Yes.

24   Q    -- have an opportunity to claw that bonus back under certain

25   conditions?

1    A    I don't feel comfortable answering questions about my

2    compensation.  That doesn't have anything to do with this court

3    case.

4            MR. MARSHALL:  Your Honor, I will be happy to not go

5    into the amount.  I would like her to answer the question as to

6    whether there were conditions under which IBM could claw back her

7    signing bonus.

8            MR. TAYLOR:  This is the best -- I object on relevance,

9    Your Honor.

10           THE COURT:  Ms. Copeland, Mr. Marshall is entitled to

11   probe your interest/biases towards any of the parties, and the

12   compensation you receive may be part of that.

13           THE WITNESS:  Okay.

14           THE COURT:  Answer the question.

15   A    So, yes, there were.  Like most tech companies, there were

16   standard provisions related to a signing bonus, which is very

17   standard in the industry.

18   Q    I understand.  I really do.  And I don't mean to pry,

19   Ms. Copeland.

20           But it's fair to say that, in April of 2018, when you called

21   Scott Kingston to tell him he was being dismissed from IBM, you

22   didn't want to do anything during that time to jeopardize your

23   job; is that correct?

24   A    The two didn't have anything to do with each other.

25   Q    Well, let me ask you this:  Do you typically prefer to

1  operate as to not do something that would jeopardize your job?

2  A   Yes, in general.  But the -- the reason why Scott was

3  dismissed was due to the results of the investigation from the

4  Donato case.

5  Q   Right.

6      And is it fair to say you didn't want to do anything to

7  jeopardize a large signing bonus; is that right?

8  A   The signing bonus didn't have anything to do with this case

9  or the investigation.

10      MR. MARSHALL:  Your Honor, may I have just one minute?

11      THE COURT:  Yes.

12      MR. MARSHALL:  Thank you.

13  Thank you very much.  No further questions.

14      THE COURT:  Mr. Taylor.

15      MR. TAYLOR:  Thank you, Your Honor.

16                    REDIRECT EXAMINATION

17  BY MR. TAYLOR:

18  Q   Mr. Marshall suggested that your actions with Mr. Kingston

19  and your testimony in this case were somehow influenced by your

20  employment agreement.  Did your employment agreement have

21  anything in the world to do with your testimony here in this

22  case?

23  A   Nothing to do with my testimony in this case.

24  Q   And did it impact in any way, shape, or form your actions

25  that you took while an employee of IBM?

 1   A   No, it did not.

 2   Q   Did you have any role in the decision to terminate

 3   Mr. Kingston?

 4   A   I was asked to take the action to terminate Mr. Kingston, but

 5   I was -- and I was asked to do this by my HR manager and my

 6   immediate supervisor based on the investigation outcome.

 7   Q   You were the messenger?

 8   A   Correct.

 9   Q   You were not the decision-maker?

10   A   I was not.

11   Q   Did you ever observe any form of discrimination against

12   Mr. Beard?

13   A   I did not, no.

14   Q   If Mr. Kingston -- if Mr. Kingston had complained to you

15   about racial discrimination and you did nothing, Mr. Kingston was

16   obligated under the guidelines to go above your head, true?

17   A   Yes, of course.

18   Q   And Mr. Kingston didn't do anything of the sort, did he?

19   A   No, not to my knowledge.

20           MR. TAYLOR:  Nothing further, Your Honor.  Thank you.

21           MR. MARSHALL:  Nothing further, Your Honor.  Thank you.

22           THE COURT:  All right.  Ladies and gentlemen, do you

23   have any questions?

24       All right.  Ladies and gentlemen, I'm going to excuse you.

25       Ms. Copeland, I want you to wait in the waiting room, and we

 1    will call you back for some further questions.

 2              THE WITNESS:  Okay.

 3        (The following occurred outside the presence of the jury.)

 4              THE CLERK:  Your Honor, everybody has been excused.

 5              THE COURT:  Okay.  I have two questions.

 6         Other than monetary awards, what things does IBM do to show

 7    their loyalty to long-term employees?

 8         And the second:  During your time at IBM, how often was the

 9    significant transaction review triggered for employees on IQPs

10    and who typically instituted the review process?

11              MR. MARSHALL:  No objections, right?

12              MR. TAYLOR:  None here, Your Honor.

13              MR. MARSHALL:  No objections.

14              THE COURT:  All right.  Then let's call them back in.

15         (The following occurred in the presence of the jury.)

16              THE COURT:  Ms. Copeland, I have some questions from the

17    jurors.

18                            EXAMINATION

19    BY THE COURT:

20    Q    Other than monetary awards, what things does IBM do to show

21    their loyalty to long-term employees?

22    A    Let's see.  What loyalty do they show?

23         Sometimes there's new job opportunities.  It can be for high

24    performance.  IBM has trips that they provide to high-performing

25    team members.  They're good about telling people, you know,

 1    congratulations on your 20th Anniversary or things like that.

 2         So, definitely, IBM is a company that works hard to make sure

 3    that they give employees, you know, attention and appreciation.

 4    Q    During your time at IBM, how often was a significant

 5    transaction review triggered for employees on IQPs?  And who

 6    typically instituted the review process?

 7    A    I don't know the answer to that.  This was the only -- this

 8    is the only one that I was familiar with during my time at IBM.

 9              THE COURT:  All right.  Any questions prompted by those

10    questions, counsel?

11              MR. TAYLOR:  No, Your Honor.

12              MR. MARSHALL:  No, Your Honor.  Thank you very much.

13              THE COURT:  Thank you, Ms. Copeland.  You may be

14    excused.

15              THE WITNESS:  Thank you.

16              THE COURT:  The next witness, please.

17              MR. TAYLOR:  Your Honor, subject to the matter we

18    discussed while the jury was out, the defense rests.

19              THE COURT:  Any rebuttal?

20              MR. MARSHALL:  We have no rebuttal, Your Honor.  Thank

21    you.

22              THE COURT:  All right.  Ladies and gentlemen, this might

23    be your lucky day because I'm sending you home 15 minutes early.

24    Don't ever say I never did anything nice for you, okay?

25         All right.  This is what's going to happen tomorrow.  I have

1    a ruling that I have to make tomorrow, and that will determine

2    whether or not we have an additional witness.

3        But the next thing that will happen is that I will be

4    instructing you on the law and then you will have an opportunity

5    to hear closing arguments by both sides.  Then you will have an

6    opportunity to go to the jury room to deliberate, and, there, you

7    will have a chance to talk all about the case.

8        But until you get a chance to talk about the case, I'm going

9    to ask you please don't be talking about it.  Don't be making up

10   your minds.  It's important that everyone keep an open mind until

11   they hear the deliberation process.

12       Remember, I told you that this process has been with us for

13   hundreds of years, and I'm asking you to let the process work.

14   That you work together and that you work collectively and that

15   you review the same evidence together.  So until you have a

16   chance to do that, please think about something else.

17       Please have a good time this evening.  We're going to start

18   tomorrow morning at the same time, and I'll look forward to

19   seeing you then.

20            JUROR NO. 6:  Thank you.

21            THE COURT:  Have a good rest of your day.

22            JUROR NO. 5:  You too.

23            JUROR NO. 3:  You too.

24            JUROR NO. 8:  You too.

25            JUROR NO. 5:  All right.  I'm out.  Oops.

1      (The following occurred outside the presence of the jury.)

2           THE CLERK:  Your Honor, all the jurors have been

3   excused.

4           THE COURT:  Okay.  Counsel, one other thing that I would

5   like to have you -- I take fairly copious notes throughout the

6   trial, but, Mr. Taylor, can you help me find in the transcript

7   where you believe Mr. Kingston testified about the two issues

8   that you wanted to bring up?  I'm not asking you to do that right

9   this moment.  I'm basically saying --

10          MR. TAYLOR:  We will get you the pages, Your Honor.

11          THE COURT:  Yeah.  You know, I'll later take a look at

12  my notes as well.

13      Now, you should have received a copy of the jury

14  instructions.

15          MR. TAYLOR:  We have, Your Honor.  We're prepared to

16  address them whenever the Court wants.

17          THE COURT:  Mr. Taylor, you're really fading on me.  I

18  can barely hear you.

19          MR. TAYLOR:  I'm sorry.  We have them and we are

20  prepared to argue them whenever the Court is ready.

21          THE COURT:  Okay.  Well, first of all --

22          MR. MARSHALL:  Your Honor, if I may?  I think there's a

23  couple of additional issues, that it would be helpful to hear

24  your initial thoughts on regarding Exhibit 253 that they want to

25  get in to with Ms. Johnson, before we send you additional

 1   information on that.

 2         THE COURT:  Okay.  What is it that you want to show me

 3   or have me take a look at?

 4         MR. MARSHALL:  Can we pull up 253 to make it easy?

 5      So I believe -- correct me if I'm wrong, Mr. Taylor -- but I

 6   believe that Mr. Taylor is asserting that it's necessary to get

 7   into this with Ms. Johnson, and we will certainly look at what

 8   Mr. Kingston had to say.  But there are two other points I would

 9   like to make.

10      Number one is, first of all, this wasn't produced to us in

11   discovery.  This came to us in the middle of trial.  It has no

12   Bates stamp.  We have never seen it before.  So I think that

13   right there is something that precludes this from being brought

14   up.

15         THE COURT:  Slow down, Mr. Marshall.  First, you're

16   telling me that you think that Mr. Taylor wants to put in 253?

17         MR. MARSHALL:  That's my understanding, is that he wants

18   to cover that with Ms. Johnson.

19         THE COURT:  Is that correct, Mr. Taylor?

20         MR. TAYLOR:  We don't need to put it into evidence, but

21   we will address the issue with Ms. Johnson.

22         THE COURT:  Okay.

23      Okay.  Go ahead, Mr. Marshall.

24         MR. MARSHALL:  The second thing would be, she does not

25   have the foundation to discuss this issue.  She testified --

 1          THE COURT:  Which issue are we talking about?

 2          MR. MARSHALL:  So -- Thank you, Your Honor.  I'm sorry.

 3   I know we have been steeped in this case for a long time.

 4      So what's going on here is this concerns the adding of

 5   account numbers to the TOP system which drives commission

 6   payments.  So, you know, there has to be the proper paperwork in

 7   place.

 8      This document -- I understand Mr. Taylor's argument to

 9   essentially be, look here, back in 2012, there was a customer

10   number associated with SAS.

11      Now, first of all, Mr. Kingston testified that SAS had been a

12   former client of ESA but not purchased in the baseline period

13   that was at issue.  But, secondly, he also testified that

14   customers of IBM often have dozens, sometimes even hundreds, of

15   different account numbers because they get into what they call

16   subaccount numbers.

17      I don't believe Ms. Johnson is someone who can testify to the

18   foundation of this document or even this issue at all.  And

19   certainly we can take a look at her testimony.  I believe we have

20   the rough transcripts and see what she had to say on that.  But I

21   just wanted to get these issues fleshed out a bit so that we can

22   make sure that we're being as efficient as possible in getting

23   you the information that you need to know to understand this

24   issue and whether she should be able to testify on this through

25   additional testimony.

1           THE COURT:  Mr. Taylor, is there anything that you want

2    to say?

3           MR. TAYLOR:  Yeah.  Mr. Kingston said he couldn't get

4    the -- Mr. Donato into the system because there was not a

5    customer number.  Well, there was a customer number in the

6    system, and it had been there for several years.

7           THE COURT:  Well, the issue is not whether or not

8    there's a customer number, but isn't the issue over -- Well,

9    that's different than quotas.  That's different than quota.

10   Excuse me.

11          MR. TAYLOR:  She does have the foundation.  We will

12   establish that before she addresses the substantive issue.

13          THE COURT:  Well, where do these numbers come from and

14   who has access to them?

15          MR. TAYLOR:  She has access to them, Your Honor.  They

16   come from IBM's system.

17          THE COURT:  And I take it this particular document was

18   withheld that has the customer number on it?

19          MR. TAYLOR:  I would not describe it as "withheld."  I

20   would describe it as not relevant to anything until Mr. Kingston

21   said, wait a second, I couldn't get it into the system because

22   there was no customer number.  This has not been an issue until

23   he gave that testimony on direct examination.

24          THE COURT:  Well, then, why wasn't it turned over in

25   discovery?  I mean, certainly if it has SAS Institute numbers on

 1  it, if that's what you're telling me, why wouldn't it be relevant

 2  to this case?

 3          MR. TAYLOR:  I don't believe it was asked for, Your

 4  Honor.  I was not involved in that point.  But that's my

 5  understanding, is that not every piece of paper in the entire

 6  company got produced.  I don't think it was asked for.

 7          THE COURT:  Mr. Taylor, you're telling me that nobody

 8  wrote an interrogatory or request for production that asked for

 9  all of the documentation that went to these transactions?

10          MR. TAYLOR:  Your Honor, I don't know the answer to

11  that, but I will find out the answer.

12          MR. BARNES:  I would be happy to --

13          MR. TAYLOR:  Yeah, Mr. Barnes can address that.

14          MR. BARNES:  Your Honor, I would be happy to address

15  that.

16      Of course there were broad requests about SAS, but the date

17  that SAS -- the SAS customer number was created was not an issue

18  until Mr. Kingston testified the other day.  It has not come up

19  previously in the case.  I have been involved in the case the

20  whole time.  And Ms. Johnson will be able to testify this

21  particular customer number is the one associated with the

22  June 2017 SAS Institute deal.  She will be able to testify that

23  she and her team have access to these records and that she pulled

24  that record in response to the allegation that Mr. Kingston

25  raised for the first time the other day.

 1          THE COURT:  And is she going to -- is she going to

 2   testify that Mr. Kingston had access to this?

 3          MR. BARNES:  She is going to testify that all that is

 4   needed in order to add an account to a sales representative's

 5   territory is a customer number.

 6          THE COURT:  No.  That's not the question I asked.  What

 7   makes you think that she can testify that Mr. Kingston had access

 8   to this?

 9          MR. BARNES:  She will not be able to testify whether he

10   had access to this particular record, but she will be able to say

11   that this customer number was in the system and could have been

12   added to the territory at any time during 2017.

13          THE COURT:  How is it relevant unless somebody can tell

14   me that Mr. Kingston could have called up this number?  He

15   basically said he didn't have the number.  And how does that

16   refute the fact of what he said?

17          MR. BARNES:  I'm sorry.  I misunderstood the question.

18   Ms. Johnson will be able to say that this customer number was

19   available within IBM systems.  Whether Mr. Kingston saw this

20   particular document, she won't be able to testify as to whether

21   he saw this particular document.  But she will be able to say

22   that the customer number was available in IBM systems and was

23   created in 2012 and that all that is needed in order to add an

24   account to territory is the customer number.

25          THE COURT:  Again, my question is, who's going to

1   testify that Mr. Kingston had access to whatever data that

2   Ms. Johnson pulled this from?

3           MR. BARNES:  She will not able be able to testify as to

4   whether he saw this particular document, but she will be able to

5   testify that this customer number was available to anyone in the

6   sales organization who tried to pull it up in the system.

7           THE COURT:  Well, that's what I asked you.  How does she

8   know that somebody has access to this data?

9           MR. BARNES:  She knows --

10          THE COURT:  Will she be able to testify that

11  Mr. Kingston, at whatever level he was, which was a Manager II,

12  had access to this information?

13          MR. BARNES:  Yes.  She will be able to explain who has

14  access to this information, including Mr. Kingston.

15          MR. MARSHALL:  The other thing I would like to point

16  out, Your Honor, is that Mr. Kingston testified that he left this

17  to his first-line manager.  So Andre Temidis is the one that was

18  actually trying to get the number into the system in the short

19  period of time that they had.  Mr. Kingston testified to the fact

20  that there's a vetting process because of Securities and Exchange

21  Commissions regulations that hold things up at the end of the

22  period.  But the point that I'm really trying to make here is

23  that whatever Mr. Kingston testified to regarding the

24  availability of the number really doesn't matter because he

25  left it to his first-line manager.  And if they're going to call

1  Ms. Johnson back, we're going to have to actually call

2  Mr. Temidis to address this.

3          MR. BARNES:  Your Honor, may I respond?

4          THE COURT:  Go ahead.

5          MR. BARNES:  They have the opportunity to present a

6  rebuttal case if they think that's necessary and they have the

7  time to do it.

8      My response would be that Mr. Kingston made a specific

9  allegation that his team could not add this to Mr. Donato's

10 territory, and this evidence, and Ms. Johnson's testimony about

11 this evidence, directly refutes that, and we should have the

12 opportunity to present that evidence to the jury.

13         THE COURT:  Well, that's slightly different, Mr. Barnes,

14 than what you told me before.

15     Was the testimony that Mr. Kingston couldn't add it

16 personally, or was the testimony that he left it to his

17 first-line manager?

18         MR. BARNES:  My recollection of his testimony was that

19 he was not entirely clear on that, but certainly the implication

20 I got from that was that Mr. Temidis was the one who tried to

21 actually do it and then Mr. Temidis conveyed this information to

22 Mr. Kingston, who then told it to us for the first time during

23 trial.

24         THE COURT:  Well, once again, show me in the transcript

25 exactly, because I'm getting two different versions here.  And,

1    honestly, at the time, the point didn't appear to be significant

2    to me as to who had access.  It appears to be significant now,

3    depending upon what the testimony was.  All right.

4         MR. MARSHALL:  Thank you.

5         THE COURT:  Let's move on.

6    Jury instructions.  I'm not asking you to take your formal

7    exceptions at this time.  I'm asking if you have had a chance to

8    take a look and are there problems with the instructions.

9    I do understand that the defense will want to preserve their

10   objection to the instruction that talks about the wages.  So talk

11   to me, Mr. Taylor, are there other problems with these

12   instructions you want to bring to my attention or ask me to

13   change?

14        MR. TAYLOR:  Yes, Your Honor.  First, with

15   Instruction 14, there's been an addition to the pattern.

16        THE COURT:  Yes.

17        MR. TAYLOR:  And the addition says, "Corporation is on

18   notice of facts known to its employees so long as the employee

19   had the authority," et cetera, et cetera.

20   The issue in this case is whether the people who made the

21   decision to terminate Mr. Kingston acted with a retaliatory

22   animus.  Knowledge possessed by other people is not imputed to

23   those decision-makers.  So if the people who made the decision

24   weren't acting retaliatory, the company can't be acting

25   retaliatory.  This is, essentially, an imputation-of-knowledge

```
 1   instruction, and that doesn't apply in these circumstances and
 2   would be misleading.  And you could end up in a situation where
 3   nobody acted with retaliation, but if you mix A, B, C, and D
 4   employees, you come up with the corporation acted in retaliation,
 5   and that's not the law.
 6           THE COURT:  Well, Mr. Taylor, you've touched repeatedly
 7   on the issue of, you know, had you heard it, you would have
 8   reported it, and --
 9           MR. TAYLOR:  Yes.
10           THE COURT:  -- that it's a violation of IBM policy not
11   to report it.
12           MR. TAYLOR:  Yes.
13           THE COURT:  And, yet, we have a credibility issue as to
14   whether or not there was anything to be reported.
15        So is it fair to say that if the jury finds that it was
16   reported, that IBM had knowledge of it and didn't take it up the
17   chain and allowed this termination to occur?
18           MR. TAYLOR:  That still doesn't get to the issue of
19   whether the people who made the decision were acting with
20   discriminatory animus.  You can't impute somebody else's
21   knowledge to them in their decision-making process.
22           THE COURT:  All right.  Mr. Marshall, do you want to --
23           MR. MARSHALL:  Well --
24           THE COURT:  -- talk about this?
25           MR. MARSHALL:  Yeah.  I mean, I think the point here you
```

 1    have already addressed.  I'm not sure why Mr. Taylor is

 2    discussing discriminatory animus because that's not something

 3    that we have to prove.  It's not an element of our claims.

 4         An element of our claims is that Mr. Kingston reasonably

 5    believed discrimination was occurring, that he reported that, and

 6    that he was retaliated as a result.

 7         Now, our case is largely circumstantial, for obvious reasons,

 8    and we think that this instruction is important for the jury to

 9    understand that when an employee higher up than Mr. Kingston

10    learns information, that information, you know, essentially puts

11    the corporation on notice.

12         I believe you granted very similar language, if not identical

13    language, in the Goldstine case.  And I think that something

14    similar was going on there.  You know, it's a pretext case.  And,

15    you know, there are big disputes, as you said, over credibility,

16    as to who said what, who heard what, who did what in response to

17    what they heard, and all of that.  And this is in accordance with

18    the law, and we just want to simply make sure that the jury is

19    properly instructed as to how to receive that evidence and deal

20    with it.

21         THE COURT:  Well, you're right, I did give it in the

22    Goldstine case, but the Goldstine case was slightly different

23    than this one, and there wasn't this siloing completely of who

24    the decision-maker was and who made the complaint.

25         I get Mr. Taylor's point, and out of an abundance of caution,

 1   I'm only going to give the pattern instruction.  So I will strike

 2   the last sentence.  That still gives you an opportunity to argue

 3   that any act or omission of an officer or employee is an act or

 4   omission of the company.

 5          MR. MARSHALL:  Thank you, Your Honor.

 6          THE COURT:  All right.  Mr. Taylor, anything else?

 7          MR. TAYLOR:  Yes.  On Instruction No. 16, and this is a

 8   small point, but on the second paragraph -- this is the race

 9   discrimination, termination in violation of public policy --

10   there's language on the third line of the second paragraph that

11   refers to "motivating IBM to terminate his employment was his

12   refusal to commit an unlawful act."

13      I don't think we have that situation here.  We do have their

14   contention that he was reporting what he reasonably believed to

15   be employer discrimination, and we get that.  But I'm not sure

16   what the unlawful act here is -- I'm not sure what the unlawful

17   act is here, given the allegations in the case and the evidence

18   in the case.  I don't think it's there.

19          THE COURT:  Mr. Marshall?

20          MR. MARSHALL:  Scott Kingston refused to go along with

21   IBM's discriminatory treatment of Mr. Beard.

22          THE COURT:  Again, I think that Mr. Taylor has a point

23   here, is that it's the reporting of the discrimination, it's not

24   whether or not Mr. Kingston had the power to act or not act.  He

25   didn't have the power to act.  So there wasn't anything for him

 1    to act on.  He wasn't the decision-maker in this.

 2        So I'll strike the commit -- "refusing to commit an unlawful

 3    act" and we'll put in that "his reporting what he reasonably

 4    believed to be employer misconduct."

 5            MR. MARSHALL:  Understood, Your Honor.  We will talk

 6    with our team tonight and see whether we want to make a formal

 7    exception in the morning.

 8            THE COURT:  All right.

 9        All right.  Mr. Taylor.

10            MR. TAYLOR:  Yeah.  The last issue I would like to be

11    heard on is the terminable at-will instruction.

12        They have made this case about a number of issues.  They

13    contend the investigation was sloppy, and we disagree.  They

14    argue others should have been disciplined.  They say there's no

15    guidance for the significant transaction review.  They complain

16    that IBM didn't tell Mr. Kingston what the interview was about in

17    advance.  They say Karla Johnson was biased.  They say the only

18    facts she considered were those in the report.  They complain

19    we didn't look at the quota guidelines.  They complain that

20    Mr. Kingston was supposedly not trained in how to handle

21    adjustments.

22        Through their questioning, they have made this case about

23    everything except retaliation, and retaliation is an element of

24    all of their claims, and given what they have argued, given the

25    significant evidence on all these other, frankly, irrelevant

 1    issues they have presented, I believe we're entitled to have the

 2    jury know that a corporation can terminate an employee for any

 3    reason or no reason.  They can terminate him because they don't

 4    like him.  They can terminate him because they think their

 5    guidelines are good and he thinks they're bad.

 6         But given the evidence, the jury is going to be inclined --

 7    you can see it from the questions -- was Scott Kingston treated

 8    fairly?  As odd as it sounds, this case isn't about whether Scott

 9    Kingston was treated fairly.  The case is about whether IBM broke

10    the law.  And the fact that somebody on the jury may believe he

11    was treated unfairly has nothing to do with anything, given their

12    claims.  This is not a case that he was fired because it was

13    unfair.  And they've created the need for this kind of

14    instruction.  They have addressed -- There's very little evidence

15    addressing the key element in the case.  They have had a wealth

16    of evidence addressing things that aren't relevant and are

17    misleading the jury.

18              THE COURT:  Mr. Marshall.

19              MR. MARSHALL:  Thank you, Your Honor.

20         We feel extremely strongly about this one, that this entire

21    instruction is inappropriate.  We have provided you with

22    extensive case law that says that.  We have pointed you to the

23    pattern jury instructions wherein WPI 330.32, it explicitly says

24    that when a Court properly instructs the jury on the elements,

25    this business judgment rule, which I understand has a couple of

 1    different contexts, but, here, in the employment context, it is
 2    not an instruction that need be given.  And the Ninth Circuit has
 3    said that, the Washington Supreme Court has said that, the
 4    Washington Court of Appeals has said that.  That's why it shows
 5    up in the pattern jury instructions.

 6        What they're asking the Court to do can be found nowhere in
 7    all the pattern jury instructions.  And the thing that we feel
 8    particularly strong about is, for example, the jury "may not
 9    second guess the defendant's decision."  That's precisely what a
10    jury does in a pretext case.  That's exactly what they do.  I
11    mean, this instruction entirely confuses the proper way of the
12    jury resolving this case.

13        The other thing I would point out is that the key here is
14    that we have to show there was a substantial factor, but that
15    factor need not be the only factor, it need not be the main
16    factor.

17        So the way this instruction can be read is that if there was
18    one lawful reason, the defendant is off the hook.  But that's not
19    how the law works.  If that one lawful reason was coupled with an
20    unlawful reason that was the substantial motivating factor, or a
21    substantial, I should say, motivating factor -- because it need
22    not be the only one -- then IBM is liable.  And this instruction
23    is extremely prejudicial to Mr. Kingston and should not be
24    allowed.

25            MR. TAYLOR:  The instruction provides that any reason or

1    no reason, so long as it is not an unlawful reason.  There will

2    be no confusion to the jury on this one.

3              THE COURT:  On this one, Mr. Taylor, you don't win.  It

4    would be extremely confusing to a jury to let them assume that an

5    at-will employee can be excused for any reason.  They can't be

6    when it's subject to discrimination.  So that's part of the

7    reason why we have the pretext, and the jury is entitled to take

8    a look at the rationales.  And Mr. Marshall is correct, it only

9    has to be a substantial reason; it doesn't have to be the only

10   reason.

11             MR. TAYLOR:  I will take two out of three, and we will

12   take an exception at the appropriate time.  Thank you, Your

13   Honor.

14             THE COURT:  All right.  Fine.

15        Okay.  Mr. Marshall, any objections?  Are there things you

16   want to bring to my attention?

17             MR. MARSHALL:  Nothing further, Your Honor.  Thank you.

18             THE COURT:  Okay.  So Mr. Mensher will make those

19   changes.

20        And let's take a look at the verdict form, then, to see if

21   you have got any problem with that.

22        I do see one problem because we have -- as to Claims 3 and 4.

23   Claim 4 goes to Mr. Kingston and Claim 3 goes to the withholding

24   of wages of Mr. Beard.  So I'm suggesting that we put in "... the

25   withholding of wages of Jerome Beard," just to make that clear?

```
 1            MR. TAYLOR:  Makes sense, Your Honor.

 2            MR. MARSHALL:  No objection, Your Honor.

 3       Your Honor, I don't believe we have anything else on this.

 4            MR. TAYLOR:  Your Honor, on Question No. 6 --

 5            MR. BARNES:  You need to get closer to the mic.

 6            MR. TAYLOR:  On Question No. 6, they will be instructed

 7   as to the particular types of damages, but I don't think we need

 8   a breakdown of the damages on the verdict form.

 9            THE COURT:  Well, it's been a long time since I was a PI

10   lawyer, but there are some tax ramifications, if I recall

11   correctly.

12       And, Mr. Marshall, is there a reason why you need the

13   breakout?

14            MR. MARSHALL:  There sure is, Your Honor.  There are a

15   couple of things.  So, one, if we were to prevail, we will be

16   seeking an offset for the tax ramifications on the economic

17   losses.  That doesn't apply, of course, to the emotional harm.

18   But our client does benefit from amounts that go to emotional

19   harm in terms of how those are taxed.

20       So, yes, it is important to us that these be broken out like

21   they are, and I believe this is routine.

22            MR. TAYLOR:  Their expert already factored in the tax

23   ramifications in his damage calculations, I believe.

24            MR. MARSHALL:  Mr. Taylor, he did not testify to that

25   because that's a post-trial issue.
```

 1          MR. TAYLOR:  I may have misheard his testimony, but we

 2    can check on that.  And if Mr. Marshall is right, he's right.

 3          THE COURT:  I don't remember him testifying as to the

 4    tax ramifications.  I mean, this issue is, if there's back pay,

 5    it's income, and that creates a taxable event.

 6          MR. TAYLOR:  Understood.

 7          THE COURT:  All right.  This is one thing that I would

 8    ask you to do.  These kinds of verdict forms are very easy to get

 9    wrong, and, honestly, the way I do it is I read it out loud to

10    myself.  I'm asking, would you go home tonight and would you read

11    it out loud to yourself to make sure that we have got the right

12    if you answer 1, 2, 3, you could, you know, skip 5, go to 6,

13    roundabout to 7?

14          MR. MARSHALL:  We will do that, Your Honor.  Thank you.

15          THE COURT:  Okay.  So we will take formal exceptions to

16    that tomorrow morning.  And if I could have you here at -- We

17    need to sort out the issue with Ms. Johnson, and I'm assuming you

18    are going to send me anything that you would like to have me look

19    at.

20          MR. TAYLOR:  We will, Your Honor.

21          THE COURT:  And why don't we start at 8:40 tomorrow?

22       Just so you remember, I tell the jury that we are going to be

23    deleting the preliminary instructions, they will be getting their

24    formal set of final instructions, along with the verdict form and

25    the appendices, and that's what they are governed by.

1       The other thing I need to have you do is go through what has

2   been admitted, with Mr. Cogswell, to make sure that everything

3   he's got is what you want him to have and that there's nothing

4   there that shouldn't be there.

5       I would ask that you think very carefully about withdrawing

6   something that was never mentioned.  You know, I think it becomes

7   very confusing to dump a whole lot of documents that nobody ever

8   spoke about and expect that the jury is going to figure out what

9   they're useful for.  So take a look at your list of what's

10  admitted and see.  Because then you are going to have to certify

11  that everything that you want there is appropriate.

12              MR. TAYLOR:  Understood.

13              THE COURT:  Okay.

14              MR. MARSHALL:  One question, Your Honor.

15              THE COURT:  Yes.

16              MR. MARSHALL:  Do you read the instructions to the jury

17  before closing argument or after?

18              THE COURT:  I read them before.

19              MR. MARSHALL:  Thank you.

20              THE COURT:  Does anybody read them after?

21       Actually, that leads me to one of my next questions for you

22  all.  Is Mr. Lee still on the screen?

23              MR. LEE:  Yes.

24              THE COURT:  Mr. Barnes?

25              MR. TAYLOR:  Yes.

 1          MR. BARNES:  Yes, Your Honor.

 2          THE COURT:  Tomorrow, after we get done and the jury is

 3    sent to deliberate, I'm wondering if you would entertain having a

 4    conversation with me about really two different things.

 5          As you know, I'm in charge of this project for Zoom trials,

 6    and, you know, we drafted handbooks and we did seminars

 7    nationally, and I'm in charge of reconvening that committee to

 8    take into account things that we can do better.

 9          So I'm asking if you would give me your honest feedback about

10    things that were difficult, things that you thought went well,

11    suggestions that you might have.  Because we'd really like to

12    make it the best process that we can for the time that we have

13    it.  And I'm particularly interested as to whether or not we have

14    got any cost savings or whether we cost you more, and, you know,

15    did you find the platforms difficult to work with.  Anything that

16    you would like to tell me.

17          I would like to have you tell me that before the verdict

18    comes back.

19          MR. TAYLOR:  We would be delighted to, Your Honor.

20    Thank you.

21          MR. LEE:  Yeah.  We would be honored to help.

22          THE COURT:  Okay.  Many of the other lawyers who have

23    done this have been very helpful to us, and we have really

24    incorporated a lot of their suggestions into what we do.

25          And, you know, I'm prepping at four o'clock the next one

1   that's going to start on Monday, and I would like to make that

2   the best experience that the lawyers can possibly have.

3       The other thing that I'm interested in is -- Unbelievably,

4   the only time judges get to see other judges work is before they

5   took the oath, and for me that was 32 years ago, so I'm always

6   curious about good ideas out there and I'm particularly curious

7   to get ideas from people who litigate in other districts.  And

8   so, you know, I know Mr. Barnes is from out of the district,

9   Mr. Lee is too, but I know that Mr. Taylor and Mr. Marshall also

10  litigate other places.  You know, what do you see as best

11  practices out there that you think that I ought to adopt?

12  Because, again, I would like to build a better mousetrap every

13  time I can.

14          MR. TAYLOR:  We would be delighted to, Your Honor.

15          THE COURT:  If you would be willing to talk with me

16  about that.

17      The other thing I wanted to tell you is after the verdict

18  comes in and is accepted, I am going to be debriefing the jury.

19  I am not a judge who talks to the jury about the verdict.  I

20  don't do that.  I think that there's still much to come after the

21  verdict is rendered with post-trial motions, so I do not talk

22  with juries normally.  I know lots of judges do.  But I am going

23  to talk to them about the Zoom experience and things that I can

24  make better for them or things that they like, disliked.  And you

25  will be part of that conversation, if you wish to be.

 1        But we will not be talking about the case.  We're simply

 2   going to be talking about their jury experience.

 3            MR. TAYLOR:  That raises one question, Your Honor, which

 4   is, when we get a verdict, is it the usual be ready on Zoom in 20

 5   minutes?  Because we plan to hang out at our office.  We're a

 6   ten-minute walk from Tsongas, and we don't -- can't all be in

 7   the same room, given the feedback issues.

 8            THE COURT:  That's fine.  Mr. Cogswell will let you

 9   know, and we will give you time to assemble.

10        The thing that I can't handle, though, is if he calls and it

11   goes to your voicemail.

12            MR. TAYLOR:  Understood.

13            THE COURT:  Okay.  So in addition to working on your

14   closing arguments, think about things that you want to tell me

15   about how to do things differently or better or don't do that

16   again, Judge, I can't abide by it.  I'm willing to listen to it

17   all.

18            MR. LEE:  Your Honor, can I ask you one question?

19            THE COURT:  Yeah.

20            MR. LEE:  And I imagine this might help all four of us

21   here.  I had a mentor tell me a long, long time ago, the best

22   thing you can do after a jury trial to get better is to ask the

23   jurors what resonated, what didn't, what they liked.  I know my

24   partner had a juror tell him one time, "I wish you would stop

25   jingling the damn change in your pocket," like that was just so

1    distracting, and, you know, I think that that really made an

2    impact on him, because he told me about it years after that.

3        So I had thought about that as the trial was going along,

4    because usually it's you walk out of the courtroom and then try

5    to catch who you can in the lobby.

6        Do you have any suggestions on that?  Is that something we

7    just kind of need to push on, given the format, or -- I just want

8    to hear your thoughts on that.

9            THE COURT:  Well, we actually have a rule about that in

10   the Western District of Washington.  Unlike catching people in

11   the lobby, we don't talk to jurors afterwards.

12           MR. LEE:  Fair enough.  That's an easy answer.

13           THE COURT:  If a juror approaches you, I do not expect

14   you to be rude.  In other words, I expect you to greet them and

15   stand and listen.  But we don't approach jurors.  And I tell them

16   they can talk to anybody that they wish.  But that's just the way

17   it is in the Western District of Washington.

18           MR. LEE:  That makes it easy.

19           THE COURT:  It cuts down on the post-trial motions too.

20           MR. LEE:  I imagine.

21           THE COURT:  Okay.  Is there anything else I can help you

22   with?

23           MR. LEE:  Not from us, Your Honor.  Thank you.

24           MR. MARSHALL:  Thank you.

25           MR. TAYLOR:  Not here, Your Honor.  Thank you.

April 13, 2021 - 1366

1              THE COURT:  Okay.

2         Actually, Mr. Taylor, when the juror was asking me about

3    publicity, I was thinking about the case we had, and, you know,

4    that was a bench trial, and, honestly, there were times I wanted

5    to sequester myself.

6              MR. TAYLOR:  There were times we wanted to hide too,

7    Your Honor.

8              THE COURT:  All right.  Okay.  I will see you tomorrow

9    morning at 8:40.  We will start up, we will take our exceptions,

10   and, hopefully, I will have noodled out this issue with

11   Ms. Johnson.

12             MR. TAYLOR:  Very well, Your Honor.  Thank you.

13             MR. BARNES:  Thank you, Your Honor.

14             MR. LEE:  Thank you, Your Honor.

15             MR. MARSHALL:  Thank you.

16             THE COURT:  All right.

17             MR. BARNES:  Good night.

18                       (Adjourned.)

19

20

21

22

23

24

25

April 13, 2021 - 1367

1          C E R T I F I C A T E

2

3          I, Nickoline M. Drury, RMR, CRR, Court Reporter for the

4     United States District Court in the Western District of

5     Washington at Seattle, do certify that the foregoing is a correct

6     transcript, to the best of my ability, from the record of

7     proceedings in the above-entitled matter.

8

9

10                         /s/ Nickoline Drury

11                         Nickoline Drury

12

13

14

15

16

17

18

19

20

21

22

23

24

25