UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SCOTT KINGSTON,<br><br>               Plaintiff,<br><br>    v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>               Defendant. | CASE NO. C19-1488 MJP<br><br>ORDER ON REMITTITUR, MOTION FOR ENTRY OF FINAL JUDGMENT, AND MOTION FOR ATTORNEYS' FEES |

This matter comes before the Court on the Ninth Circuit's Memorandum Decision remanding this matter on the issue of remittitur (Dkt. No. 198), Plaintiff's Motion for Entry of Final Judgment (Dkt. No. 216), and Plaintiff's Motion for Attorneys' Fees (Dkt. No. 220). Having reviewed: (1) Defendant's Brief on Remittitur (Dkt. No. 209), (2) Plaintiff's Brief on Remittitur (Dkt. No. 213), (3) Defendant's Motion for Leave to File a Reply on Remittitur (Dkt. No. 215), (4) Plaintiff's Opposition to the Motion for Leave (Dkt. No. 217), (5) the Reply (Dkt. No. 215-1), (6) Plaintiff's Motion for Entry of Final Judgment (Dkt. No. 216), (7) Defendant's Opposition to Plaintiff's Motion for Entry of Final Judgment (Dkt. No. 218); (8) Plaintiff's

ORDER ON REMITTITUR, MOTION FOR ENTRY OF FINAL JUDGMENT, AND MOTION FOR ATTORNEYS' FEES - 1

Reply (Dkt. No. 219), (9) the Joint Submission Regarding Plaintiff's Motion for Attorneys' Fees, and (10) all supporting materials, the Court ORDERS as follows: (A) the Court REMITS the award of non-economic damages to $1.5 million; (B) the Court DENIES Plaintiff's Motion for Entry of Final Judgment; and (C) the Court GRANTS in part Plaintiff's Motion for Attorneys' Fees.

## BACKGROUND

### A. Procedural Background

Plaintiff Scott Kingston won at trial on his claims for unpaid commissions, retaliation, and wrongful termination in violation of public policy and the Washington Law Against Discrimination against Defendant IBM. (Special Verdict Form (Dkt. No. 140).) The jury awarded: (1) $1,874,302 for past economic loss; (2) $3,097,642 for future economic loss; (3) $113,728 for unpaid sales commissions; and (4) $6,000,000 in emotional harm (i.e., non-economic damages). (Id.) After trial, the Court awarded: (1) $199,966.52 in prejudgment interest; (2) $1,117,508 as a tax offset; (3) $1,514,337 in attorneys' fees and $40,124.19 in nontaxable costs; and (4) set post judgment interest at .06% computed daily and compounded annually. (Dkt. No. 192.)

IBM appealed, asserting that: (1) there was insufficient evidence to support the verdict; (2) the jury instructions were erroneous; and (3) the Court erred in not subjecting the non-economic damages to remittitur. The Ninth Circuit rejected IBM's first two arguments, but agreed with IBM as to remittitur. (Memorandum Disposition (Dkt. No. 198).) The Court explained:

> Although we do not question that Kingston suffered psychological distress because of his termination, his distress does not appear to have been significantly greater than what anyone might suffer from being fired. Based on the evidence presented at trial, $6 million is shockingly excessive. It also far exceeds the amounts that Washington courts have

upheld in similar cases—so far as we have been able to determine, no Washington court has upheld an award of greater than $1.5 million in non-economic damages in a wrongful-termination case. See, e.g., Collins v. Clark Cnty. Fire Dist. No. 5, 231 P.3d 1211, 1231–32 (Wash. Ct. App. 2010) (upholding award of $875,000 in non-economic damages); Elias v. City of Seattle, 2 Wash. App. 2d 1039, 2018 WL 993644, at *4 (2018) (upholding awards of $1.5 million and $750,000 in non-economic damages). The district court is therefore ordered to reduce the non-economic damages award to an amount supported by the record and consistent with Washington law. If Kingston does not accept the remittitur, IBM is entitled to a new trial on the issue of non-economic damages.

(Id. at 6.)

On remand, the Parties have now briefed the question of remitter. Additionally, Kingston has moved for entry of partial judgment under Rule 54(b) as to the jury's award of past and future economic losses, and unpaid commissions, and the Court's award of attorneys' fees, nontaxable costs, and the tax offset. The Ninth Circuit also transferred Kingston's request for attorneys' fees on appeal to this Court. (Dkt. No. 201.) Kingston asks for an award of $401,754.50 in attorneys' fees with an additional 1.1 multiplier, while IBM urges that any award should be no more than $153,238.60.

**B.      Factual Background**

Given the issues presented in the briefing on remittitur, the Court reviews the evidence at trial concerning Kingston's emotional distress caused by IBM's retaliation and wrongful termination.

At trial, Kingston testified about a range of emotional trauma that IBM's conduct caused him. Kingston talked about his feelings of betrayal—that he was punished for doing the right thing. (Trial Tr. at 746, 753 (Dkt. No. 179).) After being fired, he testified:

> I'm frankly kind of lost. I feel betrayed. I had friends. The people that I worked with were closer to me than family in terms of the time I spent. I have lost a part of myself that I'm not sure how to deal with.

(Trial Tr. at 753.) He also expressed his feeling of shame that he had "screwed up" and that he "should have just kept [his] mouth shut and let it go." (Id.) Instead, he stood up and "got crushed

for it," which "harmed [him] in a way that [he's] not sure [he] can recover from." (Id. at 753-54.) He explained that he lost his courage and that he is "worried about how [he] appear[s] to [his] wife and [his] daughter and to [his] friends." (Id. at 754.) He explained that he was "not sure how to cope with the future that [he] can't predict." (Id.)

Kingston also testified that his struggles in finding new employment have caused him distress. (See Trial Tr. at 747-48, 753-54.) At the time of his termination, Kingston was 58-years old. (See Order Def. SJ at 9 (Dkt. No. 75).) He told the jury that after his termination at IBM, he had applied for over two-hundred positions without any success. (Trial Tr. at 748.) Even if there was a promising interview, Kingston was always given the "sorry-we-can't-use-you sort of answer." (Id.) He testified that his age "was obviously a handicap." (Id. at 747.) He also explained that he believed his reputation had been damaged because "it's a fairly small industry, people talk." (Id.) The emotional toll of this rejection and inability to find new employment was significant: "I don't know how I'm going to get to – through the rest of my life if I can't get a job." (Trial Tr. at 754.)

Kingston's wife also testified about the emotional toll that IBM's decision to terminate Kingston caused—"it was just horrible." (See, e.g., Trial Tr. at 877 (Dkt. No. 180).) Mrs. Kingston testified that before his termination, her husband was "pretty lively" and that they enjoyed "all kinds of different activities," including vacationing with work friends. (Id. at 872-73.) Mrs. Kingston explained that her husband's work seemed to dominate their lives: "it was just everything about our lives kind of evolved [sic] around IBM." (Id. at 874.) She explained that after being terminated, her husband no longer played guitar about which he was passionate, stopped working on his model train hobby, stopped reading books, no longer played with the

1 dogs, and had no interest in even going for a walk. (Id. at 875-77.) She testified that the
2 termination made her relationship "very hard":

> You know, it's kind of hard to be loving towards somebody who's that depressed. And, you know, he can be mean, so ... And I understand it, but, still, it's --it's very hard to just live our lives.

(Id. at 877.) Mrs. Kingston testified that before the termination she and her husband "were very, very affectionate and loving," and that the termination ruptured any sense of intimacy. (Id. at 880.) Mrs. Kingston explained how depressed her husband appeared in the face of rejection from his many job applications. (Id. at 883-84.) She further testified about her significant fear her husband would harm himself in his depressed state—a worry that would haunt her any time she had to leave him alone. (Id. at 878-80.)

**ANALYSIS**

**A.      Remittitur**

The Ninth Circuit concluded that Kingston's evidence of emotional injury was not sufficient to merit an award of $6 million in non-economic damages. IBM asks the Court to remit the award to $275,000, while Kingston asks for remittitur to an amount between $1.8 and $3 million. The Court first reviews a dispute over the scope of the remand and then analyzes the substance of the remittitur in support of its decision to remit the non-economic damages award to $1.5 million.

The Parties first dispute whether the Ninth Circuit placed a cap on the amount of non-economic damages. The Ninth Circuit concluded that Kingston's "distress does not appear to have been significantly greater than what anyone might suffer from being fired" and that the award "far exceeds the amounts that Washington courts have upheld in similar cases." (Mem. Disp. at 6.) The court explained that it based its decision on its own research: "so far as [the Ninth Circuit] ha[d] been able to determine, no Washington court has upheld an award of greater

than $1.5 million in non-economic damages in a wrongful-termination case. (Id. (citing Collins v. Clark Cnty. Fire Dist. No. 5, 231 P.3d 1211 (Wash. Ct. App. 2010) and Elias v. City of Seattle, 2 Wn. App. 2d 1039, 2018 WL 993644 (2018)).) Citing Collins and Elias, the Ninth Circuit "ordered [the district court] to reduce non-economic damages award to an amount supported by the record and consistent with Washington law." (Mem. Disp. at 6.) Based on the language of the Memorandum, the Court concludes that the Ninth Circuit did not expressly cap non-economic damages at $1.5 million. While the Ninth Circuit certainly indicated that this was likely a maximum, it left it to this Court's discretion to determine what award would be both supported by the record and "consistent with Washington law." The Court therefore rejects IBM's contention that the Order capped non-economic damages. And given the nature of the Ninth Circuit's Memorandum, the Court finds it proper to consider all of the Washington cases the Parties cite on remand regardless of whether they were argued on appeal or in the post-trial briefing on this issue. To this end, the Court GRANTS IBM's request for leave to file a reply, which has been helpful in deciding the issues.

Having reviewed the record and all of the cases cited by the Ninth Circuit and Parties, the Court finds that the non-economic damages should be remitted to $1.5 million. The Court finds that three cases, in particular, confirm the propriety of this amount: (1) Elias, (2) Collins, and (3) Houck v. Farmers Grp., Inc., 90 Wn. App. 1042 (1998). The Court reviews all three comparator cases.

Elias presents the most relevant comparator applying Washington law. In Elias, two plaintiffs were awarded significant non-economic damage awards for their successful retaliation claims. The plaintiff who was awarded $1.5 million in non-economic damages reported on sexual harassment, and, as retaliation, was reassigned to a new job in a new precinct without any

job assignments for five months. Elias, 2018 WL 993644, at *4. She was distressed from "the loss of overtime and employment opportunities plus exposure to rumors about why the SPD transferred her." Id. The transfer also forced her to have to work double shifts to make up for lost income. Id. "This resulted in her not seeing her son and feeling 'tired, crabby.'" Id. The court also upheld a $750,000 non-economic award to the other plaintiff, who was transferred for reporting misconduct related to the transferred plaintiff. He testified that his transfer was "emotionally 'gut-wrenching'" because he had to leave "his coworkers whom he considered family." Id. Similar to the plaintiff in Elias who was awarded $1.5 million, Kingston suffered from the emotional fall-out stemming from his decision to report on what he perceived to be racial discrimination. This caused him to question his own moral compass, and left him feeling rudderless and wracked with self-doubt. And while Kingston was fairly quickly terminated, he has endured the ongoing distress at not being able to find new employment, facing constant rejection in over two-hundred job applications as a 62-year-old looking for new employment. Like the "crabby" plaintiff in Elias, Kingston's overall depression, about which he and his wife provided compelling testimony, has caused significant stress to his relationship with his wife and cut him off from an overall enjoyment of life, particularly compared to his routines before he was terminated. While Kingston's emotional distress may have been somewhat more severe than this plaintiff in Elias, the Court finds that the award marks a reasonable line against which to measure this case.

Collins is another case cited by the Ninth Circuit which further supports an award of $1.5 million. In Collins, Court of Appeals upheld awards of non-economic damages ranging from $37,500 to $875,000 awarded to four individuals who endured sexual harassment and retaliation for reporting sexual harassment. Id., 155 Wn. App. 48, 74-77. Each of the plaintiffs described the

serious emotional and psychological harm caused by having to work with an abusive male co-worker, which included the manifestation of physical symptoms as well as depression, nightmares and insomnia. Id. at 64-72. Indeed, one of the plaintiff's physician and psychotherapist had recommended she should not continue to work given the stress and anxiety she suffered. Id. at 61-62. In considering this evidence, the Court of Appeals reversed the trial court's remittitur of the $875,000 non-economic award to $250,000. Id. at 87. The court cited the fact that the plaintiff showed she suffered from depression, anxiety, and stress-related neck pain and that she received therapy and counseling for these symptoms. Id. While the nature of the emotional injuries of the plaintiffs in Collins is perhaps more acute than what Kingston suffered, he similarly described the long-lived and adverse impact on his emotional wellbeing that IBM's conduct caused him. The sincerity of his testimony and that of his wife cannot be lightly discounted. And while the $875,000 award in Collins is lower than $1.5, it exceeds $1.2 million if adjusted for inflation. See United States Bureau of Labor Statistics CPI Inflation Calculator, available at https://www.bls.gov/data/inflation_calculator.htm (last accessed December 22, 2022). Moreover, the court in Collins was not asked whether a higher award would have been justified. The Court finds Collins to provide further support for the remittitur.

  Lastly, the Court finds instructive the outcome in Houck, where the jury's award of $920,000 for non-economic damages was upheld on appeal. Id., 90 Wn. App. 1042. In Houck, the plaintiff was both discriminated against due to his anxiety that prevented him from trying cases and for reporting sexual discrimination. He reported symptoms that were similar to those Kingston reported: depression and anxiety. But the plaintiff in Houck had a medical expert testify about his depression, and the defendant agreed he had a "major depressive disorder." Id. at *2. And the plaintiff had to take medical leave to treat the symptoms. Id. The depression in

Houck appears to be similar to what Kingston and his wife testified to at trial. While Kingston did not have a medical diagnosis, the testimony from his wife confirmed that his psyche suffered greatly as a result of his termination. And while Kingston did not seek out medical or psychological treatment, he could well have benefited from it. The Court finds that Houck supports an award of $1.5 million, given that the award would be higher than $1.5 million if adjusted for inflation and where the evidence shares a strong similarity to what Kingston presented at trial.

The Court therefore REMITS the non-economic damages to $1.5 million. Kingston shall have 14 days from entry of this order to either accept the remittitur or provide notice that he wants a new trial on non-economic damages.

In reaching this decision, the Court has considered the cases the Parties cited, which it reviews below. The Court first considers the five main cases IBM cites in support of its belief that the Court should reduce the award to $250,000. As explained below, Court is unconvinced that the smaller award IBM urges is appropriate given the record of this matter.

First, IBM cites Johnson v. Albertsons LLC, where the jury found in plaintiff's favor on her claim for retaliation under Title VII and the WLAD and awarded her $750,000 in emotional damages, $10 million in punitive damages, and $1.875 million in past and future economic damages. Id., C18-1678 RAJ, 2020 WL 3604107, at *1 (W.D. Wash. July 2, 2020). The Court then remit the non-economic award to $200,000 based on its observations that although the plaintiff was distressed and lost self-esteem, the retaliation was short-lived and her evidence was "garden variety." Id. While there is some similarity between Johnson and the present matter, the cases diverge in the nature and extend of the emotional harm. The Court does not find Kingston's emotional damages to be "garden variety" or short lived. Kingston and his wife

described the substantial adverse impact his termination has had and continues to have on his mental health, particularly given his inability to obtain new employment as a 62-year-old. The record also contained Mrs. Kingston's fear that her husband was sufficiently depressed he might engage in self-harm. This renders the comparison to Johnson unpersuasive.

Second, IBM cites to Clemens v. Qwest Corp., a 2015 a Title VII retaliation case where the court denied a request to remit the emotional damages award of $275,963. C13-1793 JPD, 2015 WL 13686810 (W.D. Wash. Feb. 10, 2015), rev'd on other grounds, 874 F.3d 1113 (9th Cir. 2017). The Court explained that even though the plaintiff was the only person to testify about the stress his termination caused, his discussion of the depression, anxiety, and worry that followed his termination supported the award. Id., at *7-8. But the Court is unpersuaded that Clemens is useful to determine the damages in this case. As the Ninth Circuit's Memorandum already suggested, similar cases upheld non-economic damage awards well in excess of $275,000. And the court in Clemens was not considering whether a higher award should be remit. Had the court engaged in that analysis and determined the $275,000 to be the maximum, it might be more useful to the issue presented here. Ultimately, Clemens is unhelpful.

Third, IBM cites to Zhang v. Am. Gem Seafoods, Inc., 339 F.3d 1020 (9th Cir. 2003), where the Ninth Circuit upheld an award of $233,155 for emotional damages including disappointment, humiliation, and damage to reputation and dignity. Zhang, 339 F.3d at 1040-41. The court noted that there was testimony concerning the plaintiff's humiliation and emotional distress, such that the award was supported by substantial evidence. Id. As with Clemens, the procedural posture of Zhang and the different evidence of emotional injury presented render its utility limited. Had the Ninth Circuit believed this case was a comparator, it would have cited it. And given that there was no higher award being remitted to a lower award, the Court cannot say

whether the same evidence could not have supported a higher award. As with Clemens, the Court finds this case of marginal utility.

Fourth, IBM cites Cosby v. AutoZone, Inc., 445 F. App'x 914 (9th Cir. Aug. 1, 2011) (unpublished), where the Ninth Circuit considered claims under California law for failure to provide reasonable accommodation and engage in the interactive process. There are two problems with reliance on this case. First, it applied California law, not Washington law. Under California law, "'to recover damages for emotional distress[,] the injury suffered must be severe, i.e., substantial or enduring as distinguished from trivial or transitory.'" Id. at 916 (quoting Young v. Bank of America, 141 Cal.App.3d 108, 190 Cal.Rptr. 122, 126 (1983)). That differs from Washington law, where the plaintiff "is only required to offer proof of actual anguish or emotional distress" and "[t]he distress need not be severe." Bunch v. King Cnty. Dep't of Youth Servs., 155 Wn.2d 165, 108 (2005) (citation and quotation omitted). Second, the evidence in Cosby did not support an award of $1.326 million for non-economic damages because the plaintiff returned from medical leave without restrictions, was "only slightly upset at being forced to take medical leave," had short-lived mental suffering, and found new employment. Cosby, 445 F. App'x at 916-17. These facts do not align with those presented at trial, where Kingston described long-lasting and substantial emotional harm. The Court does not find Cosby a useful comparator.

Fifth, IBM invokes Bunch, where the jury awarded the plaintiff $260,000 in non-economic damages on his WLAD discrimination claim. 155 Wn.2d at 180. In Bunch, "[t]he evidence of emotional distress [was] limited," though the plaintiff testified he "was overwhelmed by the discrimination, and that he was depressed and angry." Id. at 180. The discrimination occurred over a six-year period and the plaintiff had to find new work for less pay and suffer the

indignity of explaining to his family why he was fired. Id. Although the Ninth Circuit cited Bunch in its Memorandum, it did not do so for purposes of benchmarking the appropriate award. The Court is also unconvinced that the case is useful because the issue was not whether a larger award should be remit to $260,000. Instead, the question was whether the jury award was supported by the evidence and not unconscionably high. Had the Supreme Court remit a larger award to $260,000, the case might be instructive. Not only was that issue not presented, but the facts do not necessarily map over to those presented in the case before the Court. The Court concludes that Bunch does not support a lower award.

Kingston argues that six other cases support an award far in excess of $1.5 million. The Court is unconvinced, as it explains below.

First, Kingston cites Coachman v. Seattle Auto Mgmt., Inc., where the plaintiff "brought an action for discrimination against his employer and the employer's owner after he was fired following a laryngectomy necessitating the use of a voice prosthesis." Coachman, No. C17-187 RSM, 2019 WL 4695660, at *1 (W.D. Wash. Jan. 3, 2019), aff'd, 787 F. App'x 416 (9th Cir. 2019). The trial court refused to remit an award of nearly $4.7 million in non-economic damages, noting that the jury's award was supported by the evidence and the defendant failed to provide a reasonable basis to calculate noneconomic damages during closing argument. Id. at *5. The jury awarded half of the requested non-economic damages, and those were upheld. On appeal the Ninth Circuit explained: "[t]he appellants chose not to address damages during their closing argument, and there is support in the record for the size of the damages award; we find no persuasive reason to disturb the jury's verdict." Coachman, 787 F. App'x at 417. The Court finds this case unpersuasive given the difference in the nature of the emotional trauma. The plaintiff in Coachman was not only disabled, but he then endured direct discrimination on account of his

disability. The emotional injury was far more severe and personal than what Kingston endured. The Court finds the comparison to the facts in Coachman too attenuated to justify a higher award, though it confirms that an award of $1.5 million is reasonable.

Second, Kingston cites Erickson v. Biogen Inc., C18-1029 JCC, 2020 WL 858743 (W.D. Wash. Feb. 24, 2020), where the jury awarded $1.69 million in noneconomic damages on a set of claims brought under the WLAD, Title VII, the False Claims Act, and a claim for wrongful termination. The order Kingston cites does not contain any facts about the non-economic damages. And although the Court has independently reviewed the docket, it finds no evidence about the emotional distress. Erickson, 417 F. Supp. 3d 1369. This case is not helpful to deciding the issue before the Court.

Third, as with Erickson, Kingston's reliance on Zachrisson v. Port of Seattle, is unhelpful. Zachrisson, 2017 WL 6391343 (Wash. Sup. Ct. Aug. 21, 2017). In Zachrisson, there were two non-economic damage awards that greatly exceeded the economic damages ($7 million in noneconomic damages on $185,000 in economic damages and $10 million in noneconomic damages on a $300,000 award of economic damages). The case settled without any appellate review of the non-economic damages, and Kingston has not provided any record of what the emotional damages were in the case. This undermines the utility of this case.

Fourth, Kingston cites LaRose v. King Cnty. and Public Defender Assoc., 22 N.W.P.I.Lit.Rpts. 11, 2021 WL 7443115 (Wash. Super. 2021). According to the case summary cited by Kingston, the plaintiff "was assigned to represent a repeat stalker client against a charge of stalking" and the plaintiff "contended that her employer allowed the client to repeatedly call, harass and stalk her, and failed to reassign, withdraw, or call the police on the client during and after representation of him, resulting in disability." Id. The jury awarded $4.8 million in non-

economic damages. While the case summary Kingston cites is thin on details, the nature of the action suggested a far more emotionally scarring set of events than what Kingston suffered. And without more explanation of the record, the Court cannot rely on this case to increase the award beyond $1.5 million.

Fifth, Kingston cites to Goldstine v. FedEx Freight, Inc., where the jury awarded $1.75 million for emotional harm. C18-1164 MJP, 2021WL 952354 (W.D. Wash. 2021). The Court is familiar with the facts of Goldstine, having presided over the trial. The Court notes that the jury's award is similar to what the Court finds appropriate here on remittitur. But because the appeal in Goldstine was dismissed, the jury's award was never subject to appellate review. And while Kingston's emotional trauma may have been supported by more evidence than what was provided in Goldstine, the Court is unconvinced the jury's award in that case supports a higher award here.

Sixth, Kingston cites Sweeny v. State, but includes no explanation of why the record in that matter is relevant to the facts at issue in this case. 2011 WL 5390349 (King County) (complaint), 2014 WL 7779614 (verdict). The case is not helpful in deciding the issues presented here, given the lack of any details.

The Court's review of all of the cases cited by the Parties and the Ninth Circuit and the evidence at trial support the Court's determination that a remittitur of the non-economic damages to $1.5 million is consistent with Washington law and supported by the evidence.

**B.      Motion for Entry of Partial Judgment**

Kingston asks the Court to enter "final judgment" on the undisputed amounts of the original judgment that will not be affected by the remittitur. The Court finds no support for this request and DENIES it.

The primary problem with Kingston's request is that Rule 54(b)—the rule on which he relies—applies only where there are multiple claims or multiple defendants:

> When an action presents more than one claim for relief . . . or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.

Fed. R. Civ. P. 54(b). The rule has no application here because the damages here are not distinguishable by the different claims Kingston pursued. The remaining damages—the non-economic award—cannot be said to flow from just one claim. So there is no way to sort out the damages on a claim-by-claim basis to make the Rule apply. And the primary Supreme Court case on which Kingston relies involved multiple claims where damages on one claim were distinct from the remaining claims that were yet to be resolved. See Curtiss-Wright Corp. v. Gen. Elec. Co., 446 U.S. 1 (1980). The Court is not convinced that Rule 54(b) applies.

Kingston relies heavily on a decision from the Court of Federal Claims, where the court approved of entry of one portion of the damages that were affirmed on appeal, but where there were other damages to be resolved post-appeal on the same claim. See Stockton E. Water Dist. v. United States, 120 Fed. Cl. 80 (2015). While the Court understands the logic of this decision, it can find no Ninth Circuit authority reaching this same conclusion. And it is difficult to square with existing Ninth Circuit authority that a court should not enter judgment on part of damages for a single claim or set of claims. See United States v. Burnett, 262 F.2d 55, 58-59 (9th Cir. 1958). Although Burnett faced a different procedural posture, it confirms the limited applicable scope of Rule 54(b).

The Court therefore DENIES the Motion.

### C. Attorneys' Fees on Appeal

The Ninth Circuit transferred Kingston's request for attorneys' fees on appeal for determination by this Court. (Dkt. No. 201.) Kingston asks for an award of fees of $401,754.50, as well as a multiplier of 1.1. Although IBM agrees that an award should issue and that the rates requested are reasonable, it contests several aspects of the request. There are five discrete issues the Court considers: (1) whether the Court should exclude time spent on post-appeal mediation, media inquiries, and financing; (2) whether time billed on administrative tasks and for travel should be reduced; (3) whether time billed for post-appeal work should be included; (4) whether the overall fee award should be reduced based on Kingston's success on appeal; and (5) whether the Court should apply a multiplier.

Before analyzing these five points, the Court addresses IBM's argument that Kingston failed to disclose the full extent of his fee request during the meet and confer process prior to filing the motion. The Court is not convinced that this was done in bad faith or that it caused any prejudice. The Court asked the parties to meet and confer before filing the motion to see if they could agree on any aspect of Kingston's fee request. It is clear from the briefing that IBM would not have agreed to the amounts Kingston demands even if he had provided fully up-to-date data on the fee request. As such, the fault here is without consequence, as the Parties still need the Court's assistance to sort out the correct award amount.

#### 1. Work on Mediation, Obtaining Financing, and Talking to the Media

IBM asks the Court to reduce Kingston's award by removing time spent: (1) working on a post-appeal mediation; (2) obtaining financing; and (3) responding to the media. Kingston concedes that the time spent talking to the media should be removed, but requests fees for the remainder. The Court disallows all of the requested amounts.

1     First, the Court is unconvinced that Kingston incurred a reasonable and necessary expense by choosing to engage in mediation that was not ordered by a court. Parties are always free to engage in mediation. But given the quality of counsel, the Court expects that they would not need the assistance of a private mediator. And to the extent they choose to engage one, the cost of that decision must be borne separately by the parties.

    Second, the Court finds no basis to award fees on time spent by Kingston to obtaining financing. A law firm's need for financing support is a business decision exclusively within the purview of that law firm. The time spent finding financing is ultimately time to be billed to the management of the firm, and it is not properly taxed to the opposing party.

    In sum, the Court exclude any recovery for time spent on these three tasks, which totals: $13,762.5 in reductions. This excludes the time billed from 8/16/22 through 8/25/22 and the time billed from 7/20/21 through 8/4/22, as identified on pages 5-6 of Dkt. No. 223.

    **2.    Travel and Administrative Time**

    IBM asks the Court to exclude time billed on administrative tasks and to reduce time billed for travel by 50%. Kingston opposes the reduction of administrative time and argues that his travel time should only be reduced by 25%. The Court agrees with Kingston.

    First, the time billed by a paralegal does not readily appear to be purely administrative. The Court is therefore unconvinced that any reduction is proper. However, as explained in the next section, the Court reduces the fees request by $493.30, which reflects administrative time incurred after the appeal concluded. (See Dkt. No. 223 at 12-13.)

    Second, the Court agrees that a 25% reduction of the time billed for travel is proper. The Court previously upheld fees incurred for travel, where the billing records showed that counsel was also working on the case during the travel. Here, the records are block billed and render it

difficult to make this same determination. The Court finds that a reduction of 25% accounts for time that was spent on pure travel where no case-related work was being performed. This leads to a reduction of $8,840.63 from the request.

### 3. Attorneys' Fees Limited to Appeal

The Court agrees with IBM that the attorneys' fee award here should focus exclusively on the time spent on the appeal. The Ninth Circuit's Order transferred that question to this Court, and it is the only fee request that is properly considered at this juncture. While Kingston may separately apply for a fee award based on his post-appeal-related work, the Court does not find it proper to assess such a request given the posture of the remaining issues and the uncertainty as to whether Kingston will accept remittitur or demand a new trial.

IBM's opposition identifies two different sets of time billed on what it believes is time incurred unrelated to the appeal, which total $45,550. (Dkt. No. 223 at 6 and 10.) The Court agrees in part with IBM, and finds that all of the time identified on pages 8 through 9 of Dkt. No. 223 should be reduced, as well as the remaining billing amounts on pages 4 and 5 of Dkt. No. 223 that the Court has not excluded. This totals a reduction of $32,787.50 from the requested fee award which is not properly awarded at this juncture. The Court DENIES the requested award of these amounts without prejudice.

### 4. Reduction for Success

IBM has come up with a variety of reasons why it believes Kingston's award of fees on appeal should be reduced to reflect the fact he did not obtain confirmation of his non-economic damages award. IBM suggests Kingston's recovery of fees should be halved because the Ninth Circuit suggested his noneconomic damages be reduced by "at least 75%" and that he essentially lost half of the issues on appeal. The Court disagrees. There were three issues on appeal: (1)

1   whether the evidence supported the verdict; (2) whether the jury instructions were correct; and

2   (3) whether the noneconomic damages should be reduced. Kingston successfully defended the

3   verdict and the jury instructions. This was a substantial victory. And as to noneconomic

4   damages, his loss was far from complete. The Court is not convinced that a reduction of the fees

5   based on the results on appeal merit any reduction. The Court DENIES this request from IBM.

**5.     Multiplier**

Kingston asks the Court to apply the same 1.1 multiplier that it applied to his prior request for attorneys' fees after trial. In that Order, the Court explained the basis of that specific multiplier as follows:

> A lodestar multiplier is governed here by Washington law. See Rodriguez v. Cty. of Los Angeles, 891 F.3d 776, 809 (9th Cir. 2018). "After the lodestar has been calculated, the court may consider adjusting the award to reflect additional factors." Chuong Van Pham v. City of Seattle, Seattle City Light, 159 Wn.2d 527, 541 (2007). Kingston bears the burden of justifying the upward adjustment. See id. Adjustments are made "under two broad categories: the contingent nature of success, and the quality of work performed." Bowers, 100 Wn.2d at 598. "The contingency adjustment is based on the notion that attorneys generally will not take high risk contingency cases, for which they risk no recovery at all for their services, unless they can receive a premium for taking that risk." Van Pham, 159 Wn.2d at 541. "[T]o the extent, if any, that the hourly rate underlying the lodestar fee comprehends an allowance for the contingent nature of the availability of fees, no further adjustment duplicating that allowance should be made." Bowers, 100 Wn.2d at 599. But "[w]hile we presume that the lodestar represents a reasonable fee, occasionally a risk multiplier will be warranted because the lodestar figure does not adequately account for the high risk nature of a case." Van Pham, 159 Wn.2d at 542. The Court must thus assess the likelihood of success at the outset of the litigation. Bowers, 100 Wn.2d at 598. And an adjustment for the quality of work performed "is an extremely limited basis for adjustment, because in virtually every case the quality of work will be reflected in the reasonable hourly rate." Id. at 599

(Order on Fees at 9-10 (Dkt. No. 192).)

Here, the Court finds Kingston has failed to justify application of the multiplier. His briefing offers little insight into why a multiplier should apply, and seems to believe that a multiplier should apply to all work on this case because of the Court's earlier decision. But the fees request here focus primarily on the work of appellate counsel, who has never appeared

before the Court. This Court was not involved in the appeal and has no first-hand experience necessary to measure the quality of the work performed. The quality and skill of counsel appears fully reflected in the hourly rates charged and the Court finds no basis on which to apply a multiplier. The Court DENIES the request.

*     *     *

Having considered the billing records and arguments of the Parties, the Court AWARDS $345,870.57 in attorneys' fees incurred on the appeal ($401,754.50 - $13,762.5 - $493.30 - $8,840.63 - $32,787.5 = $345,870.57).

## CONCLUSION

Having considered the briefing of the Parties, the Court REMITS the non-economic damage award to $1.5 million. Kingston must either accept the remittitur of $1.5 million or proceed to trial. Kingston must notify the Court within 14 days of entry of this Order whether he will accept the remittitur or proceed to trial on non-economic damages.

The Court DENIES Kingston's Motion for Entry of Judgment. And the Court GRANTS in part Kingston's Motion for Attorneys' Fees and AWARDS $345,870.57 in attorneys' fees for the appeal.

The clerk is ordered to provide copies of this order to all counsel.

Dated December 23, 2022.

Marsha J. Pechman
United States Senior District Judge